# Exhibit A



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **LOUIS B. ANTONACCI,**<br>an individual, | |
| **Plaintiff,** | **Case No.** |
| v. | |
| **CITY OF CHICAGO,**<br>a municipal corporation, | 1:15-cv-03750<br>Judge Milton I. Shadur<br>Magistrate Judge Sheila M. Finnegan |

**CITY OF CHICAGO,**
a municipal corporation,

> Serve: Mr. Stephen R. Patton
> City of Chicago Department of Law
> 121 N. LaSalle Street, Suite 600
> Chicago, IL 60602

and

**SEYFARTH SHAW LLP,**
a limited liability partnership,

> Serve: J. Stephen Poor
> 131 S. Dearborn Street, Suite 2400
> Chicago, IL 60603

and

**ANITA J. PONDER,**
an individual,

> Serve: Anita J. Ponder
> 131 S. Dearborn Street, Suite 2400
> Chicago, IL 60603

and

**THE LAW OFFICES OF
RUTH I. MAJOR, P.C.,**
a professional corporation,

> Serve: Ruth I. Major
> 30 West Monroe, Suite 1650
> Chicago, Illinois 60603



**FILED**

APR **2 9** 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

and

**RUTH I. MAJOR,**
**an individual,**

> Serve: Ruth I. Major
> 30 West Monroe, Suite 1650
> Chicago, Illinois 60603

and

**MATTHEW J. GEHRINGER,**
**an individual,**

> Serve: Matthew J. Gehringer
> 131 S. Dearborn Street, Suite 1700
> Chicago, IL 60603

and

**PERKINS COIE LLC,**
a limited liability company,

> Serve: CT Corporation System
> 208 South LaSalle Street, Suite 814
> Chicago, Illinois 60604

and

**KRUSE & ASSOCIATES, LTD.,**
**a corporation,**

> Serve:  Margaret Kruse
> 180 N LaSalle Street, Suite 3700
> Chicago, Illinois 60601

and

**MARGARET KRUSE,**
**an individual,**

> Serve: Margaret Kruse
> 180 N. LaSalle Street, Suite 3700
> Chicago, Illinois 60601

and

2

**TOOMEY REPORTING, INC.**
**a corporation,**

      Serve:  Ms. Sandy Toomey
      205 W. Randolph Street, Suite 1230
      Chicago, Illinois 60606

and

**SOSIN & ARNOLD, LTD.,**
**a corporation,**

      Serve:  David Sosin
      9501 W. 144th Place, Suite 205
      Orland Park, Illinois 60462

and

**GEORGE A. ARNOLD,**
**an individual,**

      Serve: George A. Arnold
      9501 W. 144th Place, Suite 205
      Orland Park, Illinois 60462

and

**NEAL & LEROY LLC,**
**a limited liability company,**

      Serve: Langdon Neal
      203 N. LaSalle Street, Suite 2300
      Chicago, IL 60601

             **Defendants.**

## COMPLAINT

Plaintiff Louis B. Antonacci ("Mr. Antonacci") hereby files this Complaint

against the above-named Defendants, and states as follows:

3

## PARTIES

1.      Mr. Antonacci is an individual and a resident of the District of Columbia.

2.      The City of Chicago ("City", "Chicago", or "City of Chicago") is a municipal corporation organized under the laws of the State of Illinois.

3.      Seyfarth Shaw LLP ("Seyfarth") is a limited liability company organized under the law of the State of Illinois, with its principal place of business located in the State of Illinois.

4.      Anita J. Ponder ("Ponder") is an individual and a resident of Cook County, Illinois. All of Ponder's acts alleged herein were on behalf of herself and on behalf of Seyfarth.

5.      The Law Offices of Ruth I. Major, P.C. ("Major Law") is a professional corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

6.      Ruth I. Major ("Major") is an individual, an attorney licensed in the State of Illinois, and a resident of Cook County, Illinois. All of Major's acts alleged herein were on behalf of herself and on behalf of Major Law.

7.      Perkins Coie LLC ("Perkins Coie") is a limited liability company organized under the laws of the State of Delaware, with a place of business in Cook County, Illinois.

8.      Matthew J. Gehringer ("Gehringer") is an individual, an attorney licensed in the State of Illinois, a partner at Perkins Coie, and a resident of Cook County, Illinois. All of Gehringer's acts alleged herein were on behalf of himself, Perkins Coie, Seyfarth, and Ponder.

4

9. Kruse & Associates, LTD. ("Kruse International") is a corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

10. Margaret Kruse ("Kruse") is an individual, a principal officer of Kruse International, and a resident of Cook County, Illinois. All of Kruse's acts alleged herein were on behalf of herself and on behalf of Kruse International.

11. Toomey Reporting, Inc. ("Toomey") is a corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

12. Sosin & Arnold, Ltd. ("Sosin & Arnold") is a corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

13. George A. Arnold ("Arnold") is an individual, an attorney licensed in the State of Illinois, a principal officer of Sosin & Arnold, and a resident of Cook County, Illinois. All of Arnold's acts alleged herein were on behalf of himself and on behalf of Sosin & Arnold.

14. Neal & Leroy LLC ("Neal & Leroy") is a limited liability company organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

## JURISDICTION

15. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because some of the claims asserted herein arise under the laws of the United States.

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Mr. Antonacci and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over all the Defendants pursuant to 735 ILCS 5/2-209 because the Defendants are 1) corporations organized under the laws of this State; 2) persons who resided in this State when the causes of action arose, the action was commenced, or when process was served; 3) persons who transacted business within this State, from which these causes of action arise; and/or 4) persons who committed tortious acts, or caused tortious injury, within this State, from which these causes of action arise.

18.     This Court also has personal jurisdiction over the Defendants pursuant to 18 U.S.C. 1965(d) because all the Defendants reside in this judicial district, have an agent here, and/or transact their affairs in this State.

19.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. 1965 because a substantial part of the events giving rise to the claims occurred here, and Defendants reside and transact their business in this State, either directly or through their agents.

## FACTS COMMON TO ALL COUNTS

20.     Mr. Antonacci is an attorney who has been licensed to practice law since 2004. Mr. Antonacci is licensed to practice in the State of Wisconsin, the Commonwealth of Virginia, and the District of Columbia. Mr. Antonacci has never been disciplined for his conduct as an attorney nor has a bar complaint ever been filed against him.

6

21.     While in law school, Mr. Antonacci served as an Honors Intern for both the Criminal Division of the U.S. Department of Justice and the General Counsel of the U.S. Air Force. Immediately upon graduating with honors from the University of Wisconsin Law School in 2004, Mr. Antonacci began work as a Civilian Honors Attorney for the U.S. Army Corps of Engineers in Huntsville, Alabama. In 2006, Mr. Antonacci, relocated to Washington, D.C. to work in private practice for international law firms, where he represented clients in construction, federal government contracts, and fraud disputes in federal and state courts.

22.     In August of 2011, Mr. Antonacci relocated to his hometown of Chicago, Illinois to accept a job offer from Seyfarth to work as an attorney in its commercial litigation practice group.

23.     Also in August of 2011, the City of Chicago retained Ponder and Seyfarth to advise the City on certain aspects of its Minority and Women Owned Business Enterprise Program ("DPS Matter"). The City retained Seyfarth and Ponder for a fixed fee of $235,000.

24.     The City of Chicago retained Ponder at the direction of City of Chicago Mayor Rahm Emanuel, longtime friend and political ally of Ponder.

25.     Prior to being retained on the DPS Matter, Ponder had lobbied the City for over a decade.

26.     Prior to working for Seyfarth, Ponder had been fired from multiple law firms because she is impossible to work with and regularly harasses those assigned to work for her.

27. At the time the City retained Ponder, Ponder had hundreds of thousands of dollars of federal tax liens outstanding with the Cook County Recorder of Deeds.

28. Upon information and belief, the City off Chicago retained Ponder in order to divert Chicago taxpayer money to Ponder so that she could satisfy her federal debts.

29. Earlier in 2011, Seyfarth and Ponder had falsely certified to the City of Chicago that, in the five (5) years prior to the City's retention of Seyfarth on February 7, 2011, no one "engaged in the performance of [Seyfarth's work for the City]… had been found liable in a civil proceeding, or in any criminal or civil action… instituted by the City or by the federal government…".

30. Mr. Antonacci was initially tasked to work with Ponder on the DPS Matter.

31. Mr. Antonacci applied for admission to the Illinois Bar in April 2012.

32. Despite successfully working with numerous attorneys at Seyfarth, and being retained by a prestigious non-profit organization, Mr. Antonacci was summarily terminated on May 22, 2012, being told that his work with Ponder months earlier was the issue.

33. Seyfarth indicated to Mr. Antonacci that the reason for his termination was a layoff.

34. Seyfarth offered Mr. Antonacci eight weeks of severance pay in exchange for a release of claims against Seyfarth. Mr. Antonacci never signed any release of claims against Seyfarth.

35.     Because Ponder frequently harassed and lied to Mr. Antonacci while he was working with her at Seyfarth, consistent with her reputation for incompetence and professional misconduct, Mr. Antonacci requested all evaluations of his performance while at Seyfarth.

36.     Seyfarth provided Mr. Antonacci his performance evaluations the following day, May 23, 2012, which provided overwhelmingly positive reviews of his performance at Seyfarth.

37.     In June 2012, Mr. Antonacci retained Major and Major Law as his attorney to advise him on legal matters pertaining to the separation of his employment with Seyfarth.

38.     Mr. Antonacci retained Major and Major Law at an hourly rate. Mr. Antonacci offered to make Major's fees entirely contingent on the result obtained, but Major refused.

39.     Ms. Major requested Mr. Antonacci's personnel file from Seyfarth. In June of 2012, Seyfarth produced Mr. Antonacci's personnel file to Ms. Major.

40.     Mr. Antonacci's personnel file revealed an email from Seyfarth Professional Development Consultant, Ms. Kelly Gofron, memorializing numerous lies perpetrated by Ms. Ponder concerning Mr. Antonacci and his work ("Ponder Slander Email").

41.     Seyfarth did not include the Ponder Slander Email in its response to Mr. Antonacci's request for all evaluations of his performance while at Seyfarth.

42.     Utilizing interstate communications, Seyfarth knowingly withheld the Ponder Slander Email and falsely indicated to Mr. Antonacci, via electronic mail, that it did not exist.

43.     Major advised Mr. Antonacci that he had colorable causes of action for promissory estoppel and fraudulent inducement, and thus she should write a demand letter to Seyfarth setting forth those causes of action.

44.     Mr. Antonacci suggested that Major include a cause of action for intentional interference with prospective economic advantage.

45.     Mr. Antonacci asked Major whether she was comfortable suing a large firm in Chicago. Major stated to Mr. Antonacci that she sued law firms in Chicago frequently and had no problem doing so. Upon information and belief, this representation was false because Major had not sued large law firms previously.

46.     Mr. Antonacci indicated to Major that he would likely wish to draft much of the pleadings and briefs, and perform much of the discovery work, in order to save money on legal fees.

47.     Major indicated that she would not object to Mr. Antonacci performing as much or as little of the legal work as he deemed appropriate.

48.     Major never suggested that Mr. Antonacci include a cause of action for defamation or defamation *per se*.

49.     Major's website indicates that Ms. Major has professional expertise in the law of defamation pertaining to professionals and executives.

10

50. Major never intended to file a complaint on behalf of Mr. Antonacci. Major intended to bill Mr. Antonacci an unreasonable amount of money for a demand letter so that she could take as much of his severance package as possible.

51. Major's associate drafted the demand letter to Seyfarth over approximately two months, billing Mr. Antonacci approximately $5,000 for that letter.

52. After Seyfarth rejected the initial demand, Mr. Antonacci indicated to Ms. Major that he would draft a verified complaint.

53. Mr. Antonacci drafted the Verified Complaint, including a cause of action for defamation *per se*, and sent it to me Major and her associate on September 28, 2012.

54. Major's associate left Major Law almost immediately after Mr. Antonacci transmitted the draft complaint.

55. Major did not review the Verified Complaint for over a month. She regularly ignored Mr. Antonacci's emails seeking status updates during this time.

56. After Mr. Antonacci appeared at Major's offices seeking to determine the status of the Verified Complaint, Major finally began reviewing the Verified Complaint.

57. Ms. Major indicated that defamation *per se* was his strongest cause of action and she did not know how the defendants could not be found liable for defamation based on the facts alleged in the Verified Complaint.

58. Ms. Major transmitted the Verified Complaint to Corporation Counsel for the City of Chicago, Mr. Stephen Patton, to ensure that the Verified Complaint did not disclose any confidential or attorney-client privileged information pertaining to the DPS Matter.

11

59.     Major and Mr. Antonacci edited the Verified Complaint multiple times to address the City's concerns regarding potential disclosure of confidential or attorney-client privileged information.

60.     The Verified Complaint contained over 300 concise allegations and contained several probative exhibits substantiating many of those allegations.

61.     On November 5, 2012, Mr. Antonacci's Illinois Bar application was assigned to Ms. Ellen S. Mulaney ("Mulaney"), Illinois Bar Character and Fitness Committee, for review.

62.     On November 19, 2012, Mulaney scheduled an Illinois Supreme Court Rule 708 interview with Mr. Antonacci for November 27, 2012.

63.     Major filed the Verified Complaint in Cook County Circuit Court on November 21, 2012, captioned Antonacci v. Seyfarth Shaw LLP and Anita J. Ponder, Civil Case No. 2012 L 13240 ("Circuit Court Case").

64.     On November 25, 2012, Mulaney rescheduled her interview with Mr. Antonacci indefinitely.

65.     On November 29, 2012 Mr. Joel Kaplan ("Kaplan"), Seyfarth General Counsel, spoke with Ms. Major and made a settlement offer of $100,000 on behalf of the Defendants. Kaplan further indicated that it was a "final offer" and threatened that no further offer would be forthcoming if Mr. Antonacci rejected it.

66.     On November 29, 2012, Mr. Antonacci requested that Major to make a counteroffer to the defendants in the Circuit Court Case. Major never responded to Mr. Antonacci's request.

12

67.     On December 3, 2012, Mulaney indicated to Mr. Antonacci, via electronic mail, that "[b]ecause of the complexity of your file, the Chairman of our committee has decided that the initial interview should be bypassed and we will go directly to a three person panel to conduct your interview."

68.     Because Major never responded to Mr. Antonacci's November 29, 2012, request, Mr. Antonacci followed up with Major on December 6, 2012. Major indicated, via electronic mail message, that Kaplan was "not very happy" and that settlement communications were over for the "near future."

69.     Upon information and belief, during their telephone conversation, utilizing interstate communications, Major agreed with Kaplan to work with Seyfarth, Ponder and their counsel, Mr. Matthew J. Gehringer of Perkins Coie, to sabotage Mr. Antonacci's case.

70.     From December 2012 through the present, Major has had many further telephone conversations and email communications with Gehringer, Seyfarth, Ponder, Kaplan, and others working on behalf of Gehringer, to sabotage Mr. Antonacci's case in the Circuit Court.

71.     Major conspired with Gehringer, Seyfarth, Kaplan, and Ponder to

        a.      keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

        b.      file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit

the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

    c.    include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

    d.    unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

    e.    deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

    f.    if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

    g.    Gehringer agreed to coordinate with Judge Eileen M. Brewer Brewer ("Judge Brewer"), Judge Brewer's law clerk, Mr. Matthew Gran ("Gran"), and any other Cook County Circuit Court judges, as necessary, to pass instructions to Judge

14

Brewer concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

       h.     Major agreed to write a letter to City of Chicago Deputy Corporation Counsel, Mardell Nereim ("Nereim"), and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

       i.     Gehringer agreed to conspire with others as needed moving forward.

72.     Mr. Antonacci's Inquiry Panel originally consisted of Mulaney, Mr. John Storino ("Storino"), and Mr. Matthew Walsh ("Walsh").

73.     Gehringer conspired to have Storino removed from the Inquiry Panel.

74.     Via email dated December 18, 2013, Mulaney falsely indicated to Antonacci that Mr. Storino "asked to be excused from the Panel because his time constraints made it impracticable."

75.     Storino asked to be removed from the Inquiry Panel, at the direction of Gehringer or those working on his behalf, so that the First District Chairman of the Character and Fitness Committee, Mr. Philip Bronstein ("Bronstein"), could replace Storino with Ms. Jeanette Sublett ("Sublett"), Member of Neal & Leroy. All of Sublett's acts alleged herein were on behalf of Neal & Leroy and her personal interests.

76.     Neal & Lerory received approximately $801,070 in legal fees from the City of Chicago in 2011.

77.     Neal & Leroy received approximately $796,330 in legal fees from the City of Chicago in 2012.

78.     Mulaney scheduled Mr. Antonacci's Inquiry Panel meeting date for Friday, January 25, 2013 at the offices of Neal & Lerory.

79.     Judge Brewer was assigned to the Circuit Court Case. Brewer is a longtime friend and political ally of Defendant Ponder. Judge Brewer was also an attorney for the City of Chicago earlier in her career.

80.     Major emailed Mr. Antonacci to ask his opinion of Judge Brewer. Mr. Antonacci indicated that he knew nothing of Judge Brewer so he would watch his friend's oral argument before her.

81.     Major disclosed to Gehringer when Mr. Antonacci would watch Brewer preside over his friend's oral argument. Major disclosed this information so that Gehringer would transmit the information to Judge Brewer, who would deliberately appear calm and reasonable during the hearing, and thus Mr. Antonacci would not ask Major to Petition to Substitute Brewer as of Right. Major disclosed this information utilizing interstate communications.

82.     Gehringer disclosed to Brewer when Mr. Antonacci would watch Brewer preside over his friend's oral argument. Gehringer disclosed this information so that Judge Brewer would deliberately appear calm and reasonable during the hearing, and thus Mr. Antonacci would not ask Major to Petition to Substitute Brewer as of Right. Gehringer disclosed this information utilizing interstate communications.

83.     Defendants thereafter moved to seal the Verified Complaint, on the basis that it disclosed confidential or attorney-client privileged information. On January 7,

16

2013, Judge Brewer sealed the Verified Complaint pending resolution of the Motion to Seal.

84. Immediately after the hearing of January 7, 2013, Major sent Mr. Antonacci, via electronic mail, a draft letter to Patton, whereby Major sought the City's express assurance that the City did not object to the allegations in the Verified Complaint.

85. Mr. Antonacci advised Major that it was imprudent to send such a letter, but Major insisted and consequently sent the letter via U.S. and electronic mail.

86. Nereim responded on behalf of the City of Chicago on January 18, 2013, where she stated that the City had not expressly waived the attorney-client privilege and that the Verified Complaint "went further then the City would have liked."

87. The Inquiry Panel later declined Mr. Antonacci's certification to the Illinois Bar. The Inquiry Panel relied heavily upon Nereim's letter in its report declining Mr. Antonacci's certification to the Illinois Bar.

88. Major sent the January 8, 2013 letter to Patton at the direction of Gehringer. Gehringer directed Nereim and/or Patton to allow Nereim to respond to Major's January 8, 2013 letter. Gehringer instructed Nereim and/or Patton as to the language to include in Nereim's January 18, 2013 response.

89. Gehringer notified the Inquiry Panel that Nereim's letter would be forthcoming and further instructed them how to use the letter to intimidate Mr. Antonacci.

90. Upon information and belief, Gehringer transmitted the City's January 18, 2013 letter to the Inquiry Panel via electronic mail.

91.    Gehringer orchestrated the City's response in order to intimidate Mr. Antonacci so that he would withdraw and/or settle the Circuit Court Case on defendants' terms.

92.    Gehringer and Perkins Coie subsequently filed an appearance on behalf of the Defendants.

93.    Gehringer conspired with the Inquiry Panel and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

94.    Judge Brewer placed Mr. Antonacci on a list of attorneys disfavored by Cook County Circuit Court judges (the "Blacklist"). The Blacklist is circulated to certain attorneys, law firms, and City and County organizations via U.S. and electronic mail, utilizing interstate communications. Those who receive the Blacklist are instructed by the Enterprise to injure the attorneys on the Blacklist in any way possible. Cook County Circuit Court judges consistently rule against and harass attorneys who appear on the Blacklist.

95.    After the January 7, 2013 hearing, Mr. Antonacci indicated that he would draft his response in opposition to Seyfarth and Ponder's 2-619.1 motion to dismiss the Verified Complaint. In addition, Mr. Antonacci had drafted the Verified Complaint.

96.    Major responded erratically, scheduling numerous phone calls and assigning research to her new associate related to her brief. Major tried to insist that she would write the brief and her associate would at least perform extensive research for Mr. Antonacci. Major's associate followed up with a research memorandum that Mr. Antonacci specifically asked that she not prepare.

18

97.     Mr. Antonacci had to insist repeatedly that he would write the response before Major and his associate would leave him alone, despite the fact that, when Mr. Antonacci retained Major, she had indicated that Mr. Antonacci could preform as much or as little of the legal work as he liked.

98.     Major's newfound enthusiasm for Mr. Antonacci's case was false. Major took six months to get Mr. Antonacci's Verified Complaint on file, despite the fact that Mr. Antonacci drafted the Verified Complaint.

99.     Major sought to perform work on the Circuit Court Case so that she could sabotage the case and fraudulently bill Mr. Antonacci, in furtherance of the agreed-upon scheme.

100.    Mr. Antonacci met with the Inquiry Panel at the offices of Neal & Leroy on January 25, 2013. The Inquiry Panel was openly hostile towards Mr. Antonacci throughout the proceedings, unjustifiably questioning his prior practice of law as an Honors Attorney for the Government of the United States and law firms in Washington, D.C. and Northern Virginia. The Inquiry Panel unjustifiably questioned his intentions in filing the Circuit Court Case, and inexplicably determined that his application could not be resolved until defendants' motion to dismiss was ruled upon. The Inquiry Panel inexplicably reasoned that the Circuit Court had jurisdiction to determine whether Mr. Antonacci had violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

101.    The Inquiry Panel sought to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

19

102. Mr. Antonacci refused to withdraw the Circuit Court Case, and merely indicated that he would forward the hearing transcript of the April 2, 2013 hearing on the defendants' motion to dismiss as soon as he received it.

103. A few hours after Mr. Antonacci left the offices of Neal & Leroy, Mulaney emailed Mr. Antonacci and falsely indicated that she had forgotten to mention that morning that her son, Mr. Charles Mulaney, was an attorney at Perkins Coie. Mulaney further indicated that Gehringer had recently filed an appearance in the Circuit Court Case, and that while her son was not involved in the case, she would ask the Chairman about reconstituting the Inquiry Panel if Mr. Antonacci objected to her involvement.

104. Due to inclement weather, Walsh was over 90 minutes late to the Inquiry Panel meeting of January 25, 2013. Mr. Antonacci, Mulaney, and Sublett were all present at Neal & Leroy waiting for Walsh for 90 minutes before the meeting commenced.

105. Mulaney had not forgotten that morning to ask Mr. Antonacci whether he objected to Mulaney's participation as a result of her son working for Perkins Coie. Mulaney sought to harass and intimidate Mr. Antonacci into withdrawing the Circuit Court Case. When Mr. Antonacci refused to do so, she sought to distance herself from the conspiracy because she knew that the ongoing pattern of defrauding, harassing, and intimidating Mr. Antonacci violated state and federal criminal law.

106. On April 2, 2013, Judge Brewer dismissed the Verified Complaint and granted Mr. Antonacci leave to file an amended complaint. Judge Brewer baselessly criticized the Verified Complaint as "incoherent", yet failed to identify even one allegation that was unclear. Judge Brewer further ordered that Mr. Antonacci not include

relevant facts in his Amended Complaint. Judge Brewer acknowledged that she could not find that Mr. Antonacci violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

107.    Mr. Antonacci immediately asked Major to request dismissal with prejudice so that he could stand on his Verified Complaint. Major insisted that she file an Amended Complaint.

108.    On April 11, 2013, Mr. Antonacci transmitted the transcript from the April 2, 2013 hearing to the Inquiry Panel, per its request. Because Judge Brewer acknowledged on the record that she could not find that Mr. Antonacci violated the Illinois Rules of Professional Conduct, Mr. Antonacci expected a favorable resolution of his application.

109.    Mulaney responded on April 11, 2013, via electronic mail, by asking Mr. Antonacci to keep the Inquiry Panel apprised of developments in the Circuit Court Case.

110.    On April 23, 2013, Mr. Antonacci requested that "each member of [the] Inquiry Panel, as well as [Illinois Board of Bar Examiners member] Ms. [Vanessa] Williams, disclose to [Mr. Antonacci] any personal relationships or professional affiliations that they have with Ms. Anita Ponder. [Mr. Antonacci] further request[s] that each member of the Inquiry Panel, as well as Ms. Williams, disclose any communications, oral or written, with Ms. Ponder or Seyfarth Shaw, or anyone on behalf of Anita Ponder or Seyfarth Shaw, concerning [Mr. Antonacci]."

111.    On April 24, 2013, the Inquiry Panel issued its report declining to certify Mr. Antonacci's Illinois Bar application.

112.    The Inquiry Panel never responded to Mr. Antonacci's request that it disclose inappropriate affiliations or communications with Seyfarth or Ponder, or anyone on their behalf. The Inquiry Panel failed to disclose this information because it would have revealed that they were committing felonies under Illinois and U.S. law.

113.    Major filed the Amended Verified Complaint on April 28, 2013. The Amended Verified Complaint was a far weaker version of the Verified Complaint.

114.    Major also insisted that she file a series of motions that she knew would be denied.

115.    Major filed these motions in a calculated effort to delay the circuit court proceedings.

116.    Major filed these motions in a fraudulent effort to increase her legal bills.

117.    For the months of April, May, June, July, and August 2013, Major Law billed Mr. Antonacci over $50,000 in legal fees in the Circuit Court Case. Major Law billed Mr. Antonacci over $50,000 in legal fees for filing motions during the pleading stage of a four-count complaint against two defendants.

118.    Major sought to fraudulently increase her legal bills to put financial pressure on Mr. Antonacci so that he would be more likely to settle his case for the low amount offered by Seyfarth. Major also sought to fraudulently increase her legal bills so that she would retain more of the settlement for herself.

119.    Mr. Antonacci requested a Hearing Panel to review his application to the Illinois Bar.

120.    On May 6, 2013, Mr. Antonacci indicated to Ms. Regina Kwan Peterson, Director of Administration for the Illinois Board of Admission to the Bar, that the

22

conduct of the Inquiry Panel seemed dubious for the reasons discussed above. Peterson initially agreed, stating "[a]fter reading your email, I understand your concerns." Peterson further advised Mr. Antonacci "the hearing panel is not bound in any way by the Inquiry Panel Report and you may marshal facts or evidence to impeach the credibility of the report."

121.    Mr. Antonacci's Hearing Panel was scheduled for August 14, 2013.

122.    Bronstein acted as Chairman of the Hearing Panel.

123.    Pursuant to Rule 9.3(c) of the Rules of the Illinois Committee on Character and Fitness, Mr. Antonacci requested that the Committee issue subpoenas ("Rule 9.3 Subpoenas"), for testimony and documents, to the following: Patton, Nereim, Sublett, Ponder, Mulaney, Seyfarth, Neal & Leroy, Drinker Biddle LLP, and Quarles & Brady LLP.

124.    The Rule 9.3 Subpoenas sought documents and testimony demonstrating that Gehringer, Nereim, Chicago, Seyfarth, Ponder, Mulaney, Sublett, Walsh, Neal & Leroy, had conspired to harass and intimidate Mr. Antonacci, cause him financial duress by indefinitely postponing his admission to the Illinois Bar, and coerce him into withdrawing the Circuit Court Case.

125.    Except for Quarles & Brady, all recipients of the Rule 9.3 Subpoenas moved to quash those subpoenas.

126.    Quarles & Brady complied with the subpoenas by producing Ponder's personnel file from her time as a contract partner there. Ponder's personnel file indicated that she had been fired from both Altheimer & Gray and Quarles & Brady. Ponder's personnel file revealed that she had billed less than 700 hours in the year leading up to

23

her termination. Ponder's personnel file further indicated that no associate at Quarles & Brady would work for Ponder for even 50 hours in a billable year. Ponder's personnel file further revealed that Ponder was expressly deemed "difficult to work with."

127. After the Illinois Board of Admissions to the Bar served Mr. Antonacci's Rule 9.3 Subpoenas, Chairman Bronstein postponed the Hearing Panel indefinitely.

128. Bronstein nonetheless convened the Hearing Panel on August 14, 2013, and styled it as a "prehearing conference."

129. The Hearing Panel did not have jurisdiction to quash the Rule 9.3 Subpoenas.

130. Bronstein convened the prehearing conference so that the Hearing Panel could harass and intimidate Mr. Antonacci in order to coerce him into withdrawing the Rule 9.3 Subpoenas.

131. Counsel for the Character & Fitness Committee, Mr. Stephen Fedo ("Fedo"), was present at the prehearing conference.

132. Gerhinger, on behalf of Ponder and Seyfarth, and Lenny D. Asaro ("Asaro"), on behalf of Neal & Leroy, were also present.

133. Fedo unlawfully disclosed Mr. Antonacci's private Character and Fitness files to Asaro and Gehringer, at the request of Gehringer, Asaro, and Sublett, prior to the prehearing conference.

134. The "prehearing conference" of August 14, 2013, lasted approximately three hours, during which time the members of the Hearing Panel attempted to harass and intimidate Mr. Antonacci such that he would withdraw the Rule 9.3 Subpoenas.

135. Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas.

136.    Bronstein and the Hearing Panel unlawfully quashed Mr. Antonacci's Rule 9.3 Subpoenas.

137.    Also in August 2013, Major Law's two associates – both of whom who had been working on Antonacci's case – quit working for Major and Major Law.

138.    The unlawful conduct of Defendants and their co-conspirators had prevented Mr. Antonacci from obtaining professional opportunities in Illinois and had further damaged Mr. Antonacci's professional reputation. As a direct result of these injuries, in August 2013, Mr. Antonacci relocated to Washington, D.C., because he is still actively licensed in both the District of Columbia and the Commonwealth of Virginia, and thus he could earn a living there.

139.    On August 1, 2013, Judge William Maddux, former Chief of the Law Division at Cook County Circuit Court, denied Seyfarth's Motion to Seal the Verified Complaint.

140.    While Mr. Antonacci was in Washington, D.C., Major indicated to Mr. Antonacci, via electronic mail utilizing interstate communications, that she would not execute Judge Maddux's order and have the seal removed from the Verified Complaint.

141.    Via letter dated August 28, 2013, Mr. Antonacci insisted that Major remove the seal from the Verified Major Complaint, and further set forth numerous undisputed facts demonstrating that Major's position was unfounded and suggested that she was not genuinely advocating on Mr. Antonacci's behalf.

142.    Major responded, via email, that she could no longer represent Mr. Antonacci, and thus she would withdraw her representation after she filed Mr.

Antonacci's Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint and that Motion was ruled upon.

143.    Realizing that Major was trying to sabotage his case, Mr. Antonacci terminated Major's representation immediately so that she could not damage his case further with a faulty Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint. Mr. Antonacci proceeded *pro se* in the Circuit Court.

144.    On September 6, 2013, Major sent Mr. Antonacci a letter, to his address in Washington, D.C., via U.S. first class and certified mail, as well as electronic mail, where she falsely claimed that Mr. Antonacci had accused her former associates of fraudulently billing Mr. Antonacci, which he had never done. Major also falsely claimed that Mr. Antonacci had not identified any actual charges that were incorrect, when Mr. Antonacci had specifically identified that Major Law's charges for "legal services" were unreasonable on their face in light of the work performed.

145.    On September 20, 2013, Mr. Antonacci requested that Major produce of all of Major's and Major Law's communications with Gehringer and Seyfarth pertaining to his case. Major refused to provide those communications, stating, via electronic mail, "under Illinois law you are not entitled to these materials if you owe your attorney money, which you do."

146.    Major refused to disclose her email communications with Gehringer and Seyfarth because those communications demonstrate that she was assisting the Defendants by sabotaging Mr. Antonacci's case and fraudulently billing him.

147.    From December 2013 through the present, Major sent Major Law's bills to Mr. Antonacci via U.S. Mail and electronic mail, utilizing interstate communications.

26

148.	Major sent Mr. Antonacci her legal bills in order to coerce him into accepting Seyfarth's $100,000 settlement offer to pay her legal bills.

149.	On December 5, 2013, Mr. Antonacci presented his Motion for Leave to File Surreply *Instanter* to Judge Brewer. Judge Brewer screamed at Mr. Antonacci erratically throughout the presentment of that motion.

150.	Ms. Peggy Anderson ("Anderson"), on behalf of Toomey, acted as court reporter throughout the proceeding. Anderson took notes on a laptop computer and further made a digital audio recording of the proceeding.

151.	Anderson, Gehringer, and Ms. Sandy Toomey ("Sandy Toomey"), president and principal of Toomey Reporting, agreed and conspired to unlawfully delete portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

152.	In furtherance of the conspiracy, Anderson agreed to provide a false certification that the December 5, 2013 hearing transcript was true and accurate.

153.	In furtherance of the conspiracy, upon information and belief, Anderson, Gehringer, and Sandy Toomey agreed to utilize the U.S. Mail and interstate wires to transmit falsified documents across state lines, and to make material factual misrepresentations regarding the veracity of the transcript and their conspiracy to falsify the same.

154.	At the direction of Gehringer, Anderson deleted portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

155.    Anderson further deleted those portions of the audio recording at the direction of Gehringer.

156.    On December 6, 2013, Judge Brewer denied Seyfarth and Ponder's motion to dismiss the Amended Verified Complaint, ruling that the defamation *per se* claim may proceed based solely on Mr. Antonacci's allegation that Ponder had falsely accused him of engaging in the unauthorized practice of law. Judge Brewer further invited Seyfarth and Ponder to file a motion to strike every other allegation from the Amended Verified Complaint. Judge Brewer instructed Mr. Antonacci not to object to defendants' motion to strike allegations from the Amended Verified Complaint.

157.    Judge Brewer and Gehringer had conspired to weaken Mr. Antonacci's Amended Verified Complaint by allowing defendants to strike allegations from the Amended Verified Complaint, contrary to well settled Illinois law. Judge Brewer instructed Mr. Antonacci to not object to defendants' motion to strike allegations from the Amended Verified Complaint so that Mr. Antonacci would waive his right to appeal the striking of those allegations.

158.    On or around December 16, 2013 Mr. Antonacci caused subpoenas *duces tecum*, for documents and deposition testimony, to be served upon the City of Chicago, Patton, and Ms. Jamie Rhee ("Rhee"), Chief of Procurement Services for the City of Chicago (the "Chicago Subpoenas"). The Chicago Subpoenas sought documents and testimony demonstrating the Ponder had defamed Mr. Antonacci to City personnel relating to the DPS Matter.

159.    Realizing that Mr. Antonacci would not allow the defendants to weaken his Amended Complaint further, and that he would seek discovery from the City proving

28

Ponder fraudulent misconduct, on December 20, 2013, Seyfarth and Ponder moved to reconsider Judge Brewer's December 6, 2013 ruling, and to stay execution of the Chicago Subpoenas. Gehringer noticed the motion to reconsider for January 6, 2014.

160.    Gehringer conspired with Patton, Nereim, and City attorney Mr. Michael Dolesh ("Dolesh"), to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

161.    On December 31, 2013 the City of Chicago moved to stay the Chicago Subpoenas. The City also noticed the motion for January 6, 2014.

162.    Judge Brewer was not present at Cook County Circuit Court on January 6, 2014. Concerned that the substitute judge would not stay the Chicago Subpoenas, Gehringer and Dolesh approached Mr. Antonacci and offered an agreed order whereby Mr. Antonacci would narrow the scope of the Chicago Subpoenas, and the City would produce documents voluntarily within approximately two weeks, at which time Mr. Antonacci would determine whether the depositions of Patton and Rhee needed to go forward. Seeking to deal with the City amicably, Mr. Antonacci entered into the agreed order.

163.    Upon information and belief, from December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct.

164.    During January and February 2013, Dolesh sent Mr. Antonacci numerous emails falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees.

165.    The City never produced documents to Mr. Antonacci or allowed deposition testimony. After Mr. Antonacci had filed amended Chicago Subpoenas, on February 3, 2014, Brewer quashed the Chicago Subpoenas for testimony of Rhee and Patton, and falsely ordered the City to produce documents responsive to the amended Chicago Subpoenas directly to her chambers.

166.    On February 6, 2013, Dolesh sent a letter to Judge Brewer's Chambers, via U.S. Mail, falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees. Dolesh's February 6, 2013 letter also falsely stated that the City was transmitting therewith documents for the court's *in camera* review.

167.    Dolesh transmitted the February 6, 2013 letter to Mr. Antonacci in Washington, D.C. via electronic mail utilizing interstate communications.

168.    The City never transmitted responsive documents to the court for review. Dolesh sent the February 6, 2013 letter solely in furtherance of the conspiracy to conceal evidence of Ponder's fraudulent misconduct.

169.    On or about December 19, 2013, Toomey transmitted the falsified transcript of the December 5, 2013 hearing to Mr. Antonacci, at his residence in the District of Columbia, via U.S. and electronic mail, utilizing interstate communications.

170.    That same day, Mr. Antonacci pointed out the discrepancies in the transcript to Sandy Toomey.

171.    On December 19, 2013, Sandy Toomey falsely stated to Mr. Antonacci, via electronic mail utilizing interstate communications, that no changes had been made to the transcript.

172.    On December 20, 2013, Anderson, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C. During this phone conversation, Anderson falsely stated that she did not alter the transcript at the behest of Gehringer and Toomey. Anderson falsely stated that the transcript matched her recollection of the December 5, 2013 proceeding.

173.    When Mr. Antonacci asked Anderson if he could listen to the audio recording, Anderson stated that she would have to check with Toomey regarding their company policy.

174.    On December 20, 2013, Sandy Toomey, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C, and left him a voice message. In her voice message, Sandy Toomey falsely claimed, multiple times, that Anderson's audio recording of the December 5, 2013 hearing transcript had been deleted and could not be retrieved.

175.    The audio recording had not been deleted and was still in the possession of Toomey and Anderson.

176.    In December 2013, Mr. Antonacci served subpoenas ("Toomey Subpoenas") on Toomey and its court reporter seeking documents and testimony demonstrating that Toomey, at the direction of Gehringer, had falsified the December 5, 2013 hearing transcript.

177.    Arnold represented Toomey in the Circuit Court Case.

178.    Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

179.    From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy.

180.    Brewer quashed the Toomey Subpoenas on February 3, 2014. During the February 3, 2014 hearing, Brewer invited Arnold and Toomey to impose sanctions on Mr. Antonacci for moving to compel the Toomey Subpoenas. Brewer invited Toomey to impose sanctions on Mr. Antonacci in order to intimidate Mr. Antonacci and coerce him into withdrawing the Circuit Court Case.

181.    Mr. Antonacci moved for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas.

182.    On February 28, 2014, Arnold moved for sanctions against Mr. Antonacci ("Toomey's Motion for Sanctions"). Toomey's Motion for Sanctions misrepresented numerous material facts. Arnold transmitted Toomey's Motion for Sanctions to Mr. Antonacci in Washington, D.C. via U.S. Mail. In furtherance of the conspiracy, and at the direction of Gehringer, Ms. Janet Greenfield transmitted Toomey's Motion for Sanctions to Mr. Antonacci, via electronic mail.

32

183. On March 31, 2014, Judge Brewer ruled during a hearing that she would dismiss the Amended Verified Complaint with prejudice.

184. On April 23, 2014 a hearing was held on Mr. Antonacci's motion for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas, as well as Toomey's Motion for Sanctions.

185. Kruse and Kruse International acted as court reporter for the April 23, 2014 hearing.

186. Judge Brewer blatantly harassed Mr. Antonacci throughout the April 23, 2014 proceeding, such that her actual prejudice was unmistakable. Judge Brewer also made numerous false statements during the hearing in an attempt to conceal Toomey's falsification of the December 5, 2013 hearing transcript. The falsity of Judge Brewer's statements is clear in the Record on Appeal. Judge Brewer's bias is an issue on appeal because Mr. Antonacci had petitioned to substitute Judge Brewer for Cause as a result of her actual prejudice.

187. On July 23, 2014, Judge Brewer issued her Final Order ("Final Order") in the Circuit Court Case.

188. The Final Order misrepresented numerous material facts.

189. Gran, on behalf of Judge Brewer, transmitted the Final Order to Mr. Antonacci, at his address in Washington, D.C., via U.S. Mail.

190. Mr. Antonacci perfected an Appeal of the Circuit Court Case (the "Appeal").

33

191. On July 29, 2014, Mr. Antonacci requested that Ms. Kruse provide a Rule 323(b) letter so that Mr. Antonacci could use the transcript of the April 23, 2014 hearing in the Appeal.

192. On August 21, 2014, Kruse and Kruse International sent a letter, via U.S. and electronic mail, to Mr. Antonacci, Gehringer, and Arnold, which falsely stated that Kruse and Kruse International had filed the April 23, 2014 hearing transcript with the Circuit Court of Cook County on August 21, 2014.

193. On September 2, 2014, the Cook County Civil Appeals Clerk preparing the record on appeal indicated to Mr. Antonacci that no one had filed a copy of the April 23, 2014 hearing transcript except for Mr. Antonacci.

194. Neither Kruse nor Kruse International filed the April 23, 2014 hearing transcript with the Circuit Court.

195. Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

196. After talking with the Civil Appeals Clerk, Mr. Antonacci asked Kruse, via electronic mail, whether she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, as she had indicated in her letter of August 21, 2014.

34

197. Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court.

## COUNT I: COMMON LAW FRAUD
### (Major, Major Law)

198. All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

199. Major falsely represented to Mr. Antonacci that she frequently sued large law firms, and thus she had no problem suing Seyfarth.

200. Upon information and belief, Major has never sued a law firm.

201. Major had no intention of suing Seyfarth or Ponder.

202. Major falsely represented that she would pursue Seyfarth aggressively and advocate on his behalf.

203. Major made these representations in order to induce Mr. Antonacci into retaining her so that she could overcharge him for a demand letter that she knew would have no impact.

204. Mr. Antonacci relied on Major's false representations in choosing to retain her.

205. When Mr. Antonacci insisted that Major file the Verified Complaint, Major delayed review of the Verified Complaint for a month because she did not wish to file it.

206. After Mr. Antonacci refused to accept Seyfarth's initial settlement offer, Major agreed with Seyfarth, Kaplan, Gehringer, Ponder, and Perkins Coie to sabotage Mr. Antonacci's case.

35

207. Major agreed with Seyfarth, Kaplan, Gehringer, Ponder, and Perkins Coie to sabotage Mr. Antonacci's case because she believes that she can get more money from referrals from large law firms than she could from Mr. Antonacci's case.

208. Major agreed with Seyfarth, Kaplan, Gehringer, Ponder, and Perkins Coie to sabotage Mr. Antonacci's case because they devised a plan whereby they would seal the Verified Complaint, file an Amended Verified Complaint that was far weaker than Verified Complaint, and allow Major to needlessly charge Mr. Antonacci exorbitant legal fees and keep more of the settlement for herself.

209. Despite agreeing to sabotage Mr. Antonacci's case, Major falsely represented to Mr. Antonacci that she would continue advocating on his behalf.

210. Major also fraudulently failed to represent the fact that she had agreed to sabotage Mr. Antonacci's case.

211. Major falsely represented to Mr. Antonacci that he should not appeal dismissal of the Verified Complaint, but should instead file the Amended Verified Complaint.

212. Mr. Antonacci relied on these false representations and material omissions when he retained Major and Major Law to represent him in the Circuit Court Case.

213. Mr. Antonacci was injured by these false representations in the following ways, *inter alia*:

    a. Seyfarth and Ponder were aware that their defenses to the Verified Complaint were meritless, and thus their entire defense strategy was predicated on Major agreeing to sabotage Mr. Antonaci's case. As such, if Mr. Antonacci had been aware that Major preferred to defraud her client rather than genuinely fight a major law firm, then

Mr. Antonacci would not have retained Major and Major Law and Seyfarth and Ponder would have been forced to address the Circuit Court Case on the merits;

      b.     Mr. Antonacci paid Major and Major Law over $12,000 in legal fees for legal services designed to sabotage the Circuit Court Case;

      c.     Major and Major Law billed Mr. Antonacci for over $50,000 in legal fees for legal services designed to sabotage the Circuit Court Case and increase his legal bills to force him to settle his case for $100,000;

      d.     The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's interest in the Circuit Court Case was put at risk by Major's fraudulent misconduct;

      e.     The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's position in the Circuit Court Case was weakened by Major's fraudulent misconduct; and

      f.     Mr. Antonacci's case was unnecessarily delayed for over year by Major's fraudulent misconduct because Mr. Antonacci could have perfected his Appeal in April of 2013, rather than July of 2014, and thus he lost interest for the amounts due and owing to him pursuant to the Circuit Court Case.

214.    Mr. Antonacci was injured by his reliance on Major and Major Law's false representations in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact

amount to be proven at trial.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (Major, Major Law)

215. All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

216. Major and Major Law had a fiduciary relationship with Mr. Antonacci arising out of their attorney-client relationship.

217. Major and Major Law breached that duty by conspiring with Gehringer, Seyfarth, and Ponder to sabotage Mr. Antonacci's case.

218. Specifically, Major breached her fiduciary duty to Mr. Antonacci by:

a. refusing to appeal Judge Brewer's April 2, 2013 ruling dismissing two counts of the Verified Complaint with prejudice, and two counts without prejudice;

b. instead filing numerous motions in the Circuit Court, knowing those motions would be denied, solely in an effort to increase her legal bills;

c. ordering her associates to perform duplicative and unnecessary work solely in an effort to increase her legal bills;

d. filing an Amended Verified Complaint that was far weaker than the Verified Complaint;

e. baselessly refusing to remove the temporary seal from the Verified Complaint after Judge Maddux ruled that it could not be sealed; and

f. threatening to withdraw her representation.

219. All of these actions benefitted Major and Major Law to the detriment to Mr. Antonacci.

38

220. Mr. Antonacci was injured by Major's and Major Law's breaches of fiduciary duty to Mr. Antonacci in the following ways:

a. Seyfarth and Ponder were aware that their defenses to the Verified Complaint were meritless, and thus their entire defense strategy was predicated on Major agreeing to sabotage Mr. Antonaci's case. As such, if Mr. Antonacci had been aware that Major preferred to defraud her client rather than genuinely fight a major law firm, then Mr. Antonacci would not have retained Major and Major Law and Seyfarth and Ponder would have been forced to address the Circuit Court Case on the merits;

b. Mr. Antonacci paid Major and Major Law over $12,000 in legal fees for legal services designed to sabotage the Circuit Court Case;

c. Major and Major Law billed Mr. Antonacci for over $50,000 in legal fees for legal services designed to sabotage the Circuit Court Case and increase his legal bills to force him to settle his case for $100,000;

d. The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's interest in the Circuit Court Case was put at risk by Major's fraudulent misconduct;

e. The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's position in the Circuit Court Case was weakened by Major's fraudulent misconduct; and

f. Mr. Antonacci's case was unnecessarily delayed for over year by Major's fraudulent misconduct because Mr. Antonacci could have perfected his Appeal in April of 2013, rather than July of 2014, and thus he lost interest for the amounts due and owing to him pursuant to the Circuit Court Case.

221.    Mr. Antonacci was injured by Major's and Major Law's breaches of fiduciary duty to Mr. Antonacci in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

### COUNT III: COMMON LAW CIVIL CONSPIRACY
### (All Defendants)

222.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

223.    Defendants combined, agreed, mutually undertook, and concerted together to effect preconceived plan and unity of design and purpose.

224.    The purpose of this plan was unlawfully to

a.    prevent Mr. Antonacci from prosecuting the Circuit Court Case, which is a breach of Major and Major Law's fiduciary duty to Mr. Antonacci;

b.    coerce and intimidate Mr. Antonacci into withdrawing the Circuit Court Case or accepting Seyfarth's initial settlement offer, by delaying his Illinois Bar Application and putting him on the Blacklist of attorneys disfavored by Cook County Circuit Court judges such that Mr. Antonacci could not earn a living practicing law in Chicago, in violation of 720 ILCS 5/12-6 and 18 USC § 1951; and

40

c.    coerce and intimidate Mr. Antonacci into withdrawing subpoenas lawfully served in Cook County, such that the Defendants would not have to quash those subpoenas without authority, in violation of 720 ILCS 5/12-6 and 18 USC § 1951.

225.    Gehringer was and is the architect of this conspiracy. Shortly after Mr. Antonacci rejected Seyfarth's initial settlement offer, Gerhinger, Seyfarth, Ponder, and Kaplan conspired with Major to

a.    keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b.    file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

c.    include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

d.    unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would

41

damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

e.    deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

f.    if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.    Gehringer agreed to coordinate with Gran, Brewer, and any other Cook County Circuit Court judges, as necessary, to pass instructions concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

h.    Major agreed to write a letter to Neriem, and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

i.    Gehringer agreed to conspire with others as needed moving forward.

226.    Gehringer conspired with Bronstein and Mulaney to have Storino removed from the Inquiry Panel and substituted with Sublett.

227.    Gehringer conspired with Mulaney, Sublett, and Walsh and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or

42

settle the Circuit Court Case, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

228. When, on April 23, 2013, Mr. Antonacci requested that the Inquiry Panel disclose any communications with Seyfarth or Ponder relating to Mr. Antonacci, Ponder, Seyfarth, and Gehringer conspired with Mulaney, Walsh, and Sublett and instructed them, utilizing interstate communications and U.S. Mail, to deny Mr. Antonacci's certification to the Illinois Bar on April 24, 2013, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

229. Gehringer conspired with Bronstein, Fedo, and Asaro to unlawfully quash Mr. Antonacci's Rule 9.3 Subpoenas.

230. Gehringer conspired with Patton, Nereim, and Dolesh to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

231. From December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

232. Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court.

These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 18 USC §§ 1341, 1343, 1952.

233. From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy, in violation of 18 USC §§ 1341, 1343, 1952.

234. Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. On September 2, 2014, Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, in violation of 18 USC §§ 1341, 1343, 1952.

235. Defendants, Kaplan, Mulaney, Sublett, Walsh, Nereim, Brewer, and Dolesh all made this agreement intentionally, purposefully, and without lawful justification.

236. Defendants, Kaplan, Mulaney, Sublett, Walsh, Nereim, Brewer, and Dolesh each undertook acts in furtherance of this conspiracy.

237. Major conspired on behalf of herself and on behalf of Major Law.

238. Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago.

239. Sublett and Asaro conspired on behalf of Neal & Leroy.

44

240. Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, and Ponder.

241. Kaplan conspired on behalf of himself, Seyfarth, and Ponder.

242. Ponder conspired on behalf of herself and on behalf of Seyfarth.

243. Arnold conspired on behalf of himself, Sosin & Arnold, and Toomey.

244. Kruse conspired on behalf of herself and on behalf of Kruse International.

245. Sandy Toomey and Anderson conspired on behalf of Toomey.

246. Mr. Antonacci was injured by Defendants' conspiratorial acts in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

## COUNT IV: Violation of Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1962 et seq.)
### (All Defendants)

247. All of the preceding paragraphs as if fully set forth herein.

248. The association-in-fact of all Defendants named in this Complaint, together with Mulaney, Sublett, Walsh, Nereim, Bronstein, and Dolesh, as described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

249. Specifically, the enterprise is an association-in-fact among individuals, business entities, and a municipal corporation, designed to divert Chicago taxpayer

money to members of the enterprise; protect the members of the enterprise from civil liability in Illinois by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; punishing attorneys who sue members of the enterprise by preventing them from becoming admitted in Illinois; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

250. The enterprise has been engaged in activities which affect interstate and foreign commerce.

251. Each Defendant is distinct from the enterprise itself but each Defendant has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

252. Defendants engaged in "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

253. Violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1341 (Mail Fraud) are specifically enumerated as "racketeering activity" in Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

254. **Defendants violated 18 U.S.C. § 1343 (Wire Fraud) as follows:**

a. Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

b. In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder

46

would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c. In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d. In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

e. In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

f. As more particularly described above, Defendants transmitted, and caused others to transmit, wire communications in interstate commerce for the purpose of executing this scheme.

255. **Defendants violated 18 U.S.C. § 1341 (Mail Fraud) as follows:**

a. Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

b. In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c.     In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d.     In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

e.     In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

f.     As more particularly described above, Defendants used, and caused others to use, the U.S. mail for the purpose of executing this scheme.

256.     Defendants' multiple violations of 18 USC § 1341 and 18 USC § 1343 constitute a "pattern" of racketeering activity.

257.     In light of the pattern of racketeering activity more particularly described above, Defendants' enterprise presents a clear threat of continued racketeering activity.

258.     Defendants maintained their interest in this enterprise by means of this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).

259.     Defendants have been directly participating in and conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

48

260.     The enterprise is separate and distinct from the pattern of racketeering activity.

261.     As a proximate result of these RICO violations, Mr. Antonacci has been injured in an amount that exceeds $75,000, exclusive of interest and costs.

262.     Mr. Antonacci is entitled to recover treble damages, and the costs of bringing this action and the Circuit Court Case.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the treble amount of liability owed to Mr. Antonacci by each Defendant, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs.

### COUNT V: Violation of Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962 (d) - RICO Conspiracy) (All Defendants)

263.     All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

264.     The association-in-fact of all Defendants named in this Complaint, together with Mulaney, Sublett, Walsh, Nereim, Bronstein, Brewer, and Dolesh, as described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

265.     Specifically, the enterprise is an association-in-fact among individuals, business entities, and a municipal corporation, designed to divert Chicago taxpayer money to members of the enterprise; protect the members of the enterprise from civil liability in Illinois by unlawfully influencing the outcome of civil cases, thereby keeping

49

more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; punishing attorneys who sue members of the enterprise by preventing them from becoming admitted in Illinois; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

266. The enterprise has been engaged in activities which affect interstate and foreign commerce.

267. Each Defendant is distinct from the enterprise itself but each Defendant, together with Kaplan, Mulaney, Sublett, Walsh, Nereim, Brewer, and Dolesh, has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

268. Violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1951 (Hobbs Act Extortion), 18 U.S.C. § 1951 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Activity), and 720 ILCS 5/12-6 (Illinois Intimidation, "extortion" under Illinois law and punishable by imprisonment for more than one year), are specifically enumerated as "racketeering activity" in Section 1961(1) of RICO.

269. **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Hobbs Act Extortion) as follows:**

a. Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

50

b. Specifically, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to prevent Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c. In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel utilized wrongful means to achieve wrongful objectives.

d. In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to resolve the Circuit Court Case.

e. In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to use wrongful means to achieve a wrongful objective, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful justification.

f. In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to withdraw the Rule 9.3 Subpoenas.

g. When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful justification.

h. Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

51

i. Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

270. **The agreed-upon scheme involves knowing and intentional violations of 720 ILCS 5/12-6 (Illinois Intimidation/Extortion) as follows:**

a. Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr. Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

b. Specifically, Mulaney, Walsh, and Sublett, threatened to prevent, without lawful authority, Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c. In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to threaten delaying Mr. Antonacci's bar application until the Circuit Court Case was resolved, without lawful authority, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful authority.

d. In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel threatened to deny his application to the Illinois Bar, without lawful authority, if he did not withdraw the Rule 9.3 Subpoenas.

e. When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful authority.

52

f.      Mt. Antonacci subsequently withdrew his Illinois Bar Application before the Hearing Panel could deny it.

g.      Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

h.      Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

271.    **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Activity) as follows:**

a.      Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud, extort, and intimidate Mr. Antonacci.

b.      In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

c.      In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

d.      In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr. Antonacci, threats to

53

take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

e.      In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, used, or caused to be used, the mail and other facilities, including interstate wires, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the scheme to defraud, extort, and intimidate Mr. Antonacci.

272.    The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1341 (mail fraud), as more particularly described above.

273.    The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1343 (wire fraud), as more particularly described above.

274.    Defendants thus conspired to engage in a "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

275.    Defendants thus conspired to engage in a pattern of racketeering activity.

276.    Defendants thus conspired to violate 18 U.S.C. §§ 1962(b) and (c) in violation of 18 U.S.C. § 1962 (d).

277.    Major conspired on behalf of herself and on behalf of Major Law.

278.    Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago.

279.    Sublett and Asaro conspired on behalf of Neal & Leroy.

280.    Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, and Ponder.

281.    Kaplan conspired on behalf of himself, Seyfarth, and Ponder.

282.    Ponder conspired on behalf of herself and on behalf of Seyfarth.

54

283. Arnold conspired on behalf of himself, Sosin & Arnold, and Toomey.

284. Kruse conspired on behalf of herself and on behalf of Kruse International.

285. Sandy Toomey and Anderson conspired on behalf of Toomey.

286. As a proximate result of these RICO violations, Mr. Antonacci has been injured in an amount in excess of $75,000, exclusive of interest and costs.

287. Mr. Antonacci is entitled to recover treble damages, and the costs of bringing this action and the Circuit Court Case.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the treble amount of liability owed to Mr. Antonacci by each Defendant, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs.

## COUNT VI: LEGAL MALPRACTICE
### (Major, Major Law)

288. All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

289. Mr. Antonacci had an attorney-client relationship with Major and Major Law. Major and Major Law represented Mr. Antonacci in the Circuit Court Case.

290. The attorney-client relationship gave rise to a duty of care on the part of Major and Major Law.

291. Major and Major Law breached that duty by, *inter alia*, the following negligent acts and omissions:

a. refusing to appeal Judge Brewer's April 2, 2013 ruling dismissing two counts of the Verified Complaint with prejudice, and two counts without prejudice;

55

b.        instead filing numerous motions in the Circuit Court, knowing those motions would be denied, solely in an effort to increase her legal bills;

c.        ordering her associates to perform duplicative and unnecessary work solely in an effort to increase her legal bills;

d.        filing an Amended Verified Complaint that was far weaker than the Verified Complaint;

e.        baselessly refusing to remove the temporary seal from the Verified Complaint after Judge Maddux ruled that it could not be sealed; and

f.        threatening to withdraw her representation.

292.    But for these negligent acts and omissions, Mr. Antonacci would have prevailed in the Circuit Court Case.

293.    But for these negligent acts and omissions, Mr. Antonacci would have prevailed in the Circuit Court Case one year earlier.

294.    Mr. Antonacci was injured by Major's and Major Law's negligent acts and omissions in the following ways:

a.        Seyfarth and Ponder were aware that their defenses to the Verified Complaint were meritless, and thus their entire defense strategy was predicated on Major agreeing to sabotage Mr. Antonaci's case. As such, if Mr. Antonacci had been aware that Major preferred to defraud her client rather than genuinely fight a major law firm, then Mr. Antonacci would not have retained Major and Major Law and Seyfarth and Ponder would have been forced to address the Circuit Court Case on the merits;

b.        Mr. Antonacci paid Major and Major Law over $12,000 in legal fees for legal services designed to sabotage the Circuit Court Case;

56

c.     Major and Major Law billed Mr. Antonacci for over $50,000 in legal fees for legal services designed to sabotage the Circuit Court Case and increase his legal bills;

d.     The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's interest in the Circuit Court Case was put at risk by Major's fraudulent misconduct;

e.     The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's position in the Circuit Court Case was weakened by Major's fraudulent misconduct; and

f.     Mr. Antonacci's case was unnecessarily delayed for over year by Major's fraudulent misconduct because Mr. Antonacci could have perfected his Appeal in April of 2013, rather than July of 2014, and thus he lost interest for the amounts due and owing to him pursuant to the Circuit Court Case.

295.   Mr. Antonacci was injured by Major's and Major Law's negligent acts and omissions in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

**A JURY TRIAL IS DEMANDED.**

**Dated: April 29, 2015**

Respectfully submitted,

Louis B. Antonacci
360 H Street NE, Unit 334
Washington, DC 20002
lbacookcounty@gmail.com
T 703-300-4635

58