**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

**LOUIS B. ANTONACCI,**
**an individual,**

        **Plaintiff,**

  **v.**

**RAHM ISRAEL EMANUEL,**
**an individual,**

      Serve: Ambassador Rahm Emanuel
      U.S. Embassy – Tokyo
      1-10-5 Akasaka
      Minato-ku, Tokyo 107-8420

      c/o Ministry of Foreign Affairs
      2-2-1 Kasumigaseki Chiyoda-ku
      TOKYO
      100-8919 Japan
      ATTN: Consular Policy Division

**MATTHEW J. GEHRINGER,**
**an individual,**

      Serve: Matthew J. Gehringer
      1733 Asbury Avenue
      Evanston, IL 60201

**PERKINS COIE LLP,**
**a general partnership,**

      Serve: Registered Agent Solutions, Inc.
      7288 Hanover Green Dr.
      Mechanicsville, VA 23111

**PAUL J. KIERNAN,**
**an individual,**

      Serve: Corporate Creations Network, Inc.
      1629 K St. NW #300
      Washington, DC 20006

**Case No.**

**STEPHEN B. SHAPIRO,**
**an individual,**

> Serve: Corporate Creations Network, Inc.
> 1629 K St. NW #300
> Washington, DC 20006

**HOLLAND & KNIGHT LLP,**
**a limited liability partnership,**

> Serve: Corporate Creations Network, Inc.
> 425 W Washington Street, Suite 4
> Suffolk, VA 23434-5320

**SETH T. FIRMENDER,**
**an individual,**

> Serve: Seth T. Firmender
> Lane Construction Corp.
> 90 Fieldstone Court
> Cheshire, CT 06410

**FTI CONSULTING, INC.,**
**a for-profit corporation,**

> Serve: CT Corporation System
> 4701 Cox Road
> Suite 285
> Glen Allen, VA 23060-6080

**ROKK SOLUTIONS LLC,**
**a limited liability company**

> Serve: Rodell Mollineau
> 4662 Charleston Terrace NW
> Washington, DC 20007

**STORIJ, INC. d/b/a The So Company**
**d/b/a Driggs Research International d/b/a**
**STOR Technologies, a for-profit corporation**

> Serve: Incorp Services, Inc.
> 7288 Hanover Green Dr., Ste. A
> Mechanicsville, VA 23111-1709

**BEAN LLC d/b/a Fusion GPS,**
**a limited liability company**

      Serve: Glenn Simpson
      4115 Military Road NW
      Washington, DC 20015

**DERRAN EADDY,**
**an individual**

      Serve: Derran Eaddy
      1260 21st Street NW, Unit 510
      Washington, DC 20036
and

**SEYFARTH SHAW LLP,**
**a limited liability partnership,**

      Serve: Cogency Global, Inc.
      1025 Connecticut Ave. NW
      Suite 712
      Washington, DC 20036

           **Defendants.**

---

*The lie is my expense, the scope of my desire.*
*The Party blessed me with its future; and I protect it with fire.*
*So raise your fists and march around; just don't take what you need.*
*I'll jail and bury those commited and smother the rest in greed.*
*Crawl with me into tomorrow or I'll drag you to your grave.*
*I'm deep inside your children. They'll betray you in my name.*

Sleep Now in the Fire
**RAGE AGAINST THE MACHINE**

*The Truth is like poetry. And most people hate poetry.*

**THE BIG SHORT (2015)**

**COMPLAINT**

Plaintiff Louis B. Antonacci ("Antonacci" or "Mr. Antonacci") hereby files this

Complaint against the above-named Defendants, and states as follows:

**NATURE OF THE CASE**

Ever since Antonacci, as an associate of Holland & Knight LLP, filed a RICO complaint in this Court in 2009, an insidious criminal enterpise has sought to destroy him. Various false narratives are used to justify their actions, depending on the audience at any particular time; and various actors are used to spread those false narratives. Some of those actors are for-profit enterprises operating in the stategic communications and media space. Those firms develop the false narrartives that the enterprise spreads through actors who have a personal or professional relationship with Antonacci. They are bribed with jobs, work promotions, lucrative business opportunities, or other incentives. Many of those bribes are through public officials. This enterprise's activities are ongoing and nationwide, and they have committed innumerable predicate acts against Antonacci in this Commonwealth, the District of Columbia, and Illinois.

Some of these false narratives were propagated by state and federal courts in Chicago, who defamed Antonacci in court opinions – undermining and perverting the common law – at the behest of this enterprise. Antonacci has included his petition for writ of certiorari from the U.S. Court of Appeals for the Seventh Circuit as **Exhibit A** to this complaint, together with the accompanying Appendix. In those pages alone, this Court may see – indisputably – how this enterprise uses courts of law to attack anyone who threatens to expose the corrupt nature of this enterprise.

The opinions of the Chicago courts indisputably prove the rank corruption Antonacci alleges: not only do the state courts carefully fabricate and misrepresent facts in the record (which was limited to Antonacci's complaint and pre-answer motions because, after 18 months in state court, the defendants were never even required to file an answer), but the federal courts, in their unpublished opinions holding only that Antonacci could not invoke subject matter jurisdiction, went out of their way to disparage Antonacci to discredit him. And this dicta is, in part, what the enterprise relies on to create its false narratives and justify their dissemination to the actors charged with spreading those lies. The Illinois Supreme Court's Committee on Character and Fitness even attempted to extort Antonacci into dropping his state court case, and his refusal to capitulate to their extortion made him unworthy of admission to the Illinois Bar. And Derran Eaddy later attempted to murder Antonacci on behalf this enterprise because, in Eaddy's words, Antonacci is just a "privileged white piece of shit."

In 2019, this enterprise launched its activities against Antonacci in this Commonwealth, by attempting to associate Antonacci with dubious claims that it carefully orchestrated by and between a general contractor, who was Antonacci's client, its architect, and the project owner of the 395 Express Lanes development. Seth Firmender, the General

4

Counsel of Antonacci's client, The Lane Construction Corp., agreed to work with this enterprise in its attempt to set up Antonacci for pursuing Lane's fabricated claim against its architect, whose attorney was aware of the scheme and worked to help achieve it.

This enterprise's deleterious effect on the legal profession and American culture is manifest in our country's decline. In their view, political power and money give you a monopoloy on the truth, even if courts of law have to discredit themselves to fabricate their false reality. This is not a cultural issue dependent upon political power or local jurisdiction. This is federal racketeering being perpetrated by officers of the court – the very people charged with protecting against these crimes. They have created a race to the bottom in the profession responsible for maintaining the credibility of our political institutions. And our political dysfunction breeds the results. There can be no faith in America's legal system while this enterprise acts with impunity.

As a final point of introduction, because Antonacci's federal case was dismissed for want of subject matter jurisdiction, neither res judicata nor collateral estoppel apply to this case. In their haste to defame Antonacci and protect the people who administer this enterprise – and the opportunists who join them – those courts decided nothing of legal significance to the instant case. They succeeded only in proving that this enterprise has infiltrated federal courts as well. And, as further described below, the enterprise's activity has been ongoing ever since. This Court should therefore review all allegations below *de novo*. And any applicable statutes of limitations should be tolled because 1) the nature of this enteprise is imperceptible by design, and 2) Antonacci was prejudiced by demonstrable fraud perpetrated by jurists.

Antonacci does not claim to be perfect, but, unlike this enterprise, he takes the practice of law seriously. And Antonacci's SCOTUS petition, the allegations pertaining thereto, and the enterprise's subsequent predicate acts demonstrate that this enterprise presents much more than a "threat" of continued racketeering activity. Through its repeated patterns of behavior, this enterprise betrays its belief that it is simply above the law. Antonacci disagrees.

**<u>PARTIES</u>**

1.      Mr. Antonacci is an individual and a citizen of the Commonwealth of Virginia. Mr. Antonacci is licensed to practice law in the Commonwealth of Virginia, the District of Columbia, the State of Maryland, and the State of Wisconsin. Mr. Antonacci has been admitted to this Court since 2009.

2.       **Rahm Israel Emanuel ("Emanuel")** is an individual, former Mayor of the City of Chicago, and current U.S. Ambassador to Japan. All acts by Emanuel alleged herein were prior to his appointment as Ambassador to Japan on December 18, 2021.

3.       **Matthew J. Gehringer ("Gehringer")** is an individual, an attorney licensed in the State of Illinois, the former General Counsel of Perkins Coie, and a citizen of Cook County, Illinois. All of Gehringer's acts alleged herein were on behalf of himself, Perkins Coie, Seyfarth, and Anita J. Ponder ("Ponder), a former partner at Seyfarth who Gehringer represented as counsel of record in Antonacci's state and federal cases against Ponder, Seyfarth, Perkins Coie and Gehringer in Chicago. It should be noted, after Antonacci opened this action in PACER, but before filing this complaint, Gehringer seems to have left Perkins Coie. (**See Antonacci Ltr. to Bates Larson ("Larson"), General Counsel of Perkins Coie, <u>Ex. K</u>.**) Larson was co-counsel with Gehringer in Antonacci's State Court Case in Chicago. Antonacci will reiterate that Gehringer was the architect of the enterprise's criminal conspiracy against Antonacci in Chicago. The fact that Gehringer suddenly disappeared from Perkins Coie, once he got word of this action being initiated, betrays his and Perkins Coie's complicity in the ongoing acts of this enterprise, particularly here in this Commonwealth.

4.       **Perkins Coie LLP ("Perkins Coie")** is a general partnership organized under the laws of Washington State, with a registered office in the Commonwealth of Virginia.

5.       **Paul J. Kiernan ("Kiernan")** is an individual, an attorney licensed in the District of Columbia, and a partner at Holland & Knight LLP. All acts by Kiernan alleged herein were on behalf of himself and Holland & Knight.

6.      **Stephen B. Shapiro ("Shapiro")** is an individual, an attorney licensed in the Commonwealth of Virginia, and a partner at Holland & Knight LLP. All acts by Shapiro alleged herein were on behalf of himself and Holland & Knight.

7.      **Holland & Knight LLP ("Holland & Knight")** is a Florida limited liability partnership with a registered office in Virginia.

8.      **Seth T. Firmender ("Firmender")** is an individual, an attorney licensed in Colorado and Connecticut, and the General Counsel of The Lane Construction Corp. ("Lane"). All acts by Firmender alleged herein were ultra vires to his duties as General Counsel of Lane because they were contrary to the interests of Lane and its shareholders and sought primarily to benefit Firmender and the criminal enterprise alleged herein, to the detriment of Lane.

9.      **FTI Consulting, Inc. ("FTI")** is a corporation organized under the laws of the State of Maryland, with registered office in Virginia.

10.     **Rokk Solutions, LLC ("Rokk")** is a limited liability company organized under the laws of the District of Columbia.

11.     **Storij, Inc. d/b/a The So Company and d/b/a Driggs Research International and d/b/a STOR Technologies ("Storij")** is a for-profit corporation organized under the laws of the State of Delaware, with a registered office in Virginia. Storij is a front company for the enterprise to collect human intelligence data and illegally, or through fraudulently obtained search warrants, exploit the computer systems and mobile devices of its targets.

12.     **BEAN LLC, d/b/a Fusion GPS ("Fusion GPS")** is a Delaware limited liability company with a place of business in the District.

13. **Derran Eaddy ("Eaddy")** is an individual, a DC citizen, and a strategic communications professional with an office located in Washington, DC: www.derraneaddy.com.

14. **Seyfarth Shaw LLP ("Seyfarth")** is a limited liability partnership organized under the law of the State of Illinois, with its principal place of business located in the State of Illinois.

## JURISDICTION

15. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because some of the claims asserted herein arise under the laws of the United States.

16. This Court has personal jurisdiction over all the Defendants pursuant to Va. Code 1950 § 8.01-328.1 because the Defendants transact business in this Commonwealth and/or caused tortious injury by act or omission in this Commonwealth.

17. This Court also has personal jurisdiction over the Defendants pursuant to 18 U.S.C. 1965(d) because all the Defendants reside in this judicial district, have an agent here, and/or transact their affairs in this Commonwealth, either directly or through their agents and/or co-conspirators.

18. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. 1965 because a substantial part of the events giving rise to the claims occurred here, and Defendants reside and transact their business in this Commonwealth, either directly or through their agents.

## FACTS COMMON TO ALL COUNTS

8

19. Mr. Antonacci is an attorney who has been licensed to practice law since 2004. Mr. Antonacci is licensed to practice in the State of Wisconsin, the Commonwealth of Virginia, the District of Columbia, and the State of Maryland. Mr. Antonacci has never been disciplined or sanctioned for his conduct as an attorney, nor has a bar complaint ever been filed against him, nor has anyone ever alleged legal malpractice against him.

20. While in law school, Mr. Antonacci served as an Honors Intern for both the Criminal Division of the U.S. Department of Justice and the General Counsel of the U.S. Air Force at the Pentagon.

21. Immediately upon graduating with honors from the University of Wisconsin Law School in 2004, Mr. Antonacci began work as a Civilian Honors Attorney for the U.S. Army Corps of Engineers in Huntsville, Alabama. In that capacity, Antonacci was the lead attorney for the Corps's chemical demilitarization program, where he worked extensively with the Russian Ministry of Defense and performed a temporary assignment in Baghdad, Iraq, in support of our reconstruction mission there. Antonacci was granted and maintained security clearances with both DOJ and DOD.

22. In 2006, Mr. Antonacci relocated to Northern Virginia to work in private practice for Watt Tieder Hoffar & Fitzgerald LLP, where he represented clients in federal government contract and commercial disputes in federal and state courts.

23. **Mr. Antonacci has never been a political appointee.** And while he was a civil servant under G.W. Bush's administration, **he has never worked for any administration of the Democratic party.** He has never been employed by any political campaign or committee in any capacity.

24.     Antonacci was recruited from his associate position at Watt Tieder Hoffar & Fitzgerald LLP to work as an associate at Holland & Knight LLP in its Washington, DC office.

25.     While he was an associate at Holland & Knight LLP, Mr. Antonacci filed a federal lawsuit in this Court asserting RICO and state law fraud claims against an alleged enterprise that sought to defraud a firm client out of $4,000,000 **(1:09-cv-00927 LMB-TRJ)** ("Katz Fraud Case").

26.     Mr. Antonacci built the Katz Fraud Case while pursuing a $4,000,000 consent judgment against the judgment debtor in Fairfax County Circuit Court. Counsel for the judgment debtor, Gerald I. Katz ("Katz"), defied court orders and subpoenas to conceal the extensive fraud perpetrated by the judgment debtor in conveying away its assets.

27.     Katz was sanctioned by Fairfax County Circuit Court for his conduct in those proceedings.

28.     Through the discovery Mr. Antonacci was ultimately able to obtain, he discovered a carefully executed scheme designed and orchestrated by Katz, who had expressly planned to abuse discovery practice in Fairfax County Circuit Court to conceal evidence of his fraudulent scheme. Mr. Antonacci used that evidence to put together the Katz Fraud Case.

29.     Katz was named as a defendant in the original version of the Katz Fraud Case because Antonacci's client could gain a strategic advantage by doing so, and because there was incontrovertible evidence that the fraudulent scheme had been designed and orchestrated by Katz.

10

30.    Antonacci's supervising partner, Steven J. Weber, and the Construction and Design Group's practice group leader at that time, the late Andrew J. Stephenson, both fully supported that strategy.

31.    When Mr. Antonacci notified Holland & Knight's DC office management that the firm's client was planning to sue Katz, Kiernan, who was the executive partner of Holland & Knight's DC office at that time, called a meeting with Mr. Antonacci, Weber, and Stephenson.

32.    During that meeting, Kiernan indicated that naming Katz as a defendant was not legally viable because the agent immunity doctrine precludes conspiracy claims between attorney and client.

33.    Mr. Antonacci indicated that he was well aware of the agent immunity doctrine, but because the conspiracy extended to third parties outside of the attorney-client relationship, the agent immunity doctrine did not apply to the Katz Fraud Case.

34.    Mr. Antonacci nonetheless indicated that he was just an associate, so if the firm did not wish to name Katz as a defendant, then he would not do so because that was not his decision to make.

35.    Kiernan became visibly angry and abruptly ended the meeting.

36.    After further pressure from Kiernan, Mr. Antonacci removed Katz from the Katz Fraud Case.

37.    Kiernan resisted this limitation of the agent immunity doctrine because this enterprise uses lawyers like Kiernan and Katz to commit and conceal their fraudulent schemes.

38.    Mr. Antonacci filed the Katz Fraud Case in this court on August 18, 2009.

11

39.     After this court denied the defendants' initial motion to dismiss, the case settled quickly.

40.     Mr. Antonacci's supervising partner, Mr. Steven J. Weber, was terminated from the firm shortly after the Katz Fraud Case settled.

41.     Weber was fired for breach of his partnership agreement, though he was largely absent from the firm throughout most of Antonacci's tenure there.

42.     One of Weber's clients stayed with the firm as Mr. Antonacci's client, despite that Mr. Antonacci was a mid-level associate at the time. That client was an Iraqi firm for whom Antonacci had won seven figures in claims before the U.S. Armed Services Board of Contract Appeals.

43.     Mr. Antonacci was subsequently assigned to represent a firm client in a second request pursuant to the Hart-Scott-Rodino Antitrust Improvements Act. Mr. Antonacci successfully managed the production and review of millions of client documents to DOJ in that matter, managing over a hundred contract attorneys and numerous vendors.

44.     Around the same time, Antonacci won a motion confirming a AAA arbitration award in the U.S. District Court for the Southern District of New York, despite opposing counsel being disbarred during the arbitration. The District Judge essentially copied Antonacci's brief in issuing its opinion.

45.     Mr. Antonacci billed 267 hours in March 2010.

46.     In April 2010, the day after Mr. Antonacci's work on the second request was completed and DOJ's Antitrust Division approved the merger at issue, Mr. Antonacci was asked to resign with three-days' notice.

12

47.     Prior to Mr. Antonacci's forced resignation, and shortly after the Katz Fraud Case settled, the firm had admonished Mr. Antonacci for being in an inappropriate relationship with Ms. Livya Heithaus ("Livya"), another associate at the firm.

48.     When Mr. Antonacci asked what was inappropriate about their relationship, firm partners indicated that they spent too much time together and stood too close together, so it was apparent they were in a relationship and they should stop spending so much time together.

49.     Livya was married to Mr. James Blowitski at that time, a DC resident who attended the University of Maryland at College Park with Livya. Mr. Blowitski worked at Lockheed Martin at that time.

50.     The morning before the firm's meeting with Mr. Antonacci regarding his relationship with Livya, Livya emailed Mr. Antonacci to tell him that the firm had spoken to her about their relationship.

51.     This meeting with Antonacci was a charade. It was meant only to harass and confuse Mr. Antonacci. Because Antonacci and Livya were at the same level at the firm, Antonacci did not supervise Livya in any way, so it was not clear why the firm would be concerned about their relationship.

52.     In fact, numerous of Weber's administrative assistants had complained to the firm that Weber sexually harassed them, but rather than taking action against Weber, the firm simply paid those administrative assistants for a release of claims against the firm, and reassigned them.

53.     Given the rampant mismanagement pervading Holland & Knight's DC office, Mr. Antonacci had already begun looking for another job. At that time, because

13

Mr. Antonacci was an extremely successful attorney in government contracts and commercial litigation, recruiters called Mr. Antonacci on a daily basis seeking to place him in a number of positions.

54. Before the firm forced Mr. Antonacci to resign, a partner at Sheppard Mulling LLP called Shapiro to tell him that they were going to offer Mr. Antonacci a position as a senior associate there.

55. Shapiro knowingly defamed Antonacci to prevent him from being offered the position at Sheppard Mullin.

56. Shapiro prevented Mr. Antonacci from getting another job because the criminal enterprise further described below, of which he and Kiernan are a part, are afraid of the legal theories espoused by Mr. Antonacci in the Katz Fraud Case, so they wished to end his career as quickly as possible.

57. Kiernan and Shapiro also sought retaliation against Antonacci for exposing the corrupt law practice of Katz, who is part of their criminal enterprise. While Antonacci simply thought he was doing his job well, Kiernan and Shapiro saw his success as a threat to their way of "practicing law."

58. Kiernan, Shapiro, Emanuel, FTI, Fusion GPS, Rokk, and others have been spreading the false narrative that Livya was married to a partner at Holland & Knight, rather than Blowitski, as an attempt to justify why Antonacci was forced to resign from Holland & Knight, and to falsely justify their actions in preventing him from obtaining gainful employment.

14

59.    Another false narrative spread by this enterprise, and specifically by Rokk, is that Antonacci was laid off during the mass layoffs of 2009. The enterprise spreads this narrative as a way to falsely justify why a successful attorney was suddenly unemployed.

60.    In fact, Antonacci was so busy during 2009 that it would have been impossible to layoff Antonacci in 2009.

61.    Moreover, Shapiro and another senior attorney in that group called a meeting with Antonacci to tell him explicitly, without him even asking, that he should not look for another job in 2009 because his position with the firm was secure, despite the layoffs.

62.    Kiernan, Shapiro, and Emanuel, by themselves and through FTI, Rokk, Fusion GPS, and others, have continued defaming Mr. Antonacci in order to prevent him from gaining legal employment, so that he could not promote legal theories that could implicate dubious attorneys like Kiernan, Shapiro, and Katz.

63.    Katz has since been disbarred from the Virginia Bar, the DC Bar, the Maryland Bar, and the bar of the Court of Federal Claims.

64.    On April 27, 2010, Mr. Antonacci was asked to resign from the firm with three days' notice. The release he signed was procured through fraud. Had Mr. Antonacci known that this enterprise would seek to destroy his career and prevent him from gaining subsequent employment, he never would have signed the release.

65.    Kiernan's wife, Ms. Leslie Kiernan ("Leslie Kiernan"), worked as senior counsel in the Obama Administration.

66.    Leslie Kiernan is currently General Counsel of the U.S. Department of Commerce. She was appointed to that position by President Biden.

15

67.     Leslie Kiernan interviewed Judge Diane Wood of the Seventh Circuit for the SCOTUS position later filled by Sonia Sotomayor.

68.     At all times relevant to these proceedings, Judge Wood was the Chief Judge for the U.S. Court of Appeals for the Seventh Circuit.

69.     Judge Wood chaired the panel and wrote the opinion in Mr. Antonacci's appeal before the Seventh Circuit described below. That opinion is reproduced in the Appendix to Mr. Antonacci's SCOTUS petition, attached hereto as **Exhibit A**.

70.     When Leslie Kiernan interviewed Judge Wood, Leslie Kiernan was an attorney in private practice.

71.     Leslie Kiernan indicated to Judge Wood that Mr. Antonacci was an enemy of their criminal enterprise, and thus she should deny him any relief sought in her court and seek to defame him in her opinion.

72.     As stated above, Antonacci was forced to resign from Holland & Knight, and was prevented from being offered another job, on April 30, 2010. Despite being heavily recruited for a wide variety of legal positions before his forced resignation, Mr. Antonacci was unable to find another job 16 for months.

73.     Kiernan, Shapiro and Emanuel engaged their enterprise to prevent Mr. Antonacci from obtaining employment. They continue to do so.

74.     Kiernan, Shapiro and Emanuel engaged their enterprise to prevent Mr. Antonacci from obtaining another job because they were afraid that legal theories promoted by Antonacci could implicate attorneys like Kiernan, Shapiro, and Katz, who this enterprise, and particularly political tools like Emanuel, use to conceal the criminal and fraudulent acts of this enterprise.

16

75.     On May 3, 2010, Mr. Philip Tucker Evans ("Evans"), a partner at Holland & Knight who was Antonacci's assigned "mentor," reached out to apologize to Antonacci for the way things worked out at that firm.

76.     Evans disingenuously offered to help Mr. Antonacci by acting as a reference for him.

77.     Kiernan and Shapiro asked Evans to stay in contact with Antonacci so that the enterprise could continue defaming Antonacci and prevent him from gaining future employment.

78.     Evans, on behalf of Holland & Knight and this enterprise, has been actively defaming Antonacci on behalf of this enterprise ever since.

79.     Emanuel worked as White House Chief of Staff to President Barack Obama from January 2009 to October 2010.

80.     Emanuel is a leader of this enterprise. While he was in the greater Washington area working as Obama's Chief of Staff, Emanuel, Paul Kiernan, Shapiro, and Katz, agreed to use their enterprise to destroy Antonacci's legal career because his contempt for corruption posed a threat to them.

81.     In October of 2010, Emanuel left his job as Chief of Staff to President Obama to run for Mayor of Chicago.

82.     In early 2011, Livya moved out of the condominium where she had lived with Blowitski and moved into her own apartment in DC's NOMA neighborhood.

83.     Blowitski was aware of Livya's affair with Antonacci since 2010.

84.     In August of 2011, after 16 months of unemployment, Mr. Antonacci relocated to his hometown of Chicago, Illinois to accept a job offer from Seyfarth to work as an attorney in its commercial litigation practice group.

85.     This was a trap set by this enterprise, particularly through Kiernan, Seyfarth and Emanuel.

86.     Livya divorced Blowitski in 2011, and moved to Chicago in January 2012.

87.     Livya transferred to the Chicago office of Holland & Knight.

88.     In August of 2011, around the same time Antonacci was offered the job at Seyfarth, the City of Chicago retained Ponder and Seyfarth to advise the City on certain aspects of its Minority and Women Owned Business Enterprise Program ("DPS Matter").

89.     Mr. Antonacci was initially tasked to work with Ponder on the DPS Matter.

90.     The City of Chicago retained Ponder and Seyfarth at the direction of City of Chicago Mayor Rahm Emanuel. Both Emanuel and Ponder are part of this enterprise.

91.     Prior to being retained on the DPS Matter, Ponder had lobbied the City for over a decade.

92.     Prior to working for Seyfarth, Ponder had been fired from multiple law firms because she is impossible to work with and regularly harasses those assigned to work with her.

93.     Ponder's value to this enterprise is to compromise the careers of attorneys who advocate for the rule of law and could thus pose a threat to this enterprise.

94.     Through his father, Mr. Tino Antonacci, the Plaintiff met with Jay Doherty ("Doherty"), former president of the City Club of Chicago, prior to accepting the

18

job offer from Seyfarth. Doherty insisted that Ponder is a "team player" and a good person for whom to work.

95.     Doherty was recently convicted of bribery in the U.S. District Court of the Northern District of Illinois, in connection with former Illinois House Speaker Michael Madigan, also under federal indictment, and this enterprise.

96.     At the time the City retained Ponder, Ponder had hundreds of thousands of dollars of federal tax liens outstanding.

97.     And to be clear, Ponder's "work" up to that point had largely been as a City lobbyist. Ponder was paid millions by City contractors to steer city contracts to them. The only skill required for this work was her relationship with Mike and Lisa Madigan. Yet this "government contracts lawyer" could not be bothered to pay her federal taxes with the millions she was paid normalizing procurement fraud.

98.     Emanuel, on behalf of the City of Chicago, retained Ponder in order to divert Chicago taxpayer money to Ponder so that she could satisfy her federal debts and compromise Antonacci's legal career, which Emanuel, through information received from the Kiernans and Shapiro, deems a threat to this enterprise.

99.     Mr. Antonacci applied for admission to the Illinois Bar in April 2012.

100.    Mr. Antonacci was not required to take the Illinois Bar exam as a result of his prior qualifying practice.

101.    Despite successfully working with numerous attorneys at Seyfarth, and being retained by a prestigious non-profit organization, Mr. Antonacci was summarily terminated on May 22, 2012, being told that his work with Ponder months earlier was the issue.

19

102.    Seyfarth nonetheless characterized Antonacci's termination as a "layoff" and tried to hide evidence of Ponder's defamatory statements concerning Antonacci, as further discussed below.

103.    Antonacci was terminated at the behest of Emanuel, Kiernan and Shapiro, who deem Antonacci a threat to their criminal enterprise.

104.    Emanuel assured Seyfarth and Ponder more legal work from the City of Chicago in exchange for Seyfarth's termination of Antonacci, which they received.

105.    Antonacci was terminated summarily from Seyfarth the day after Livya left Holland & Knight to work for Shiff Hardin LLP (now ArentFox Schiff LLP).

106.    Antonacci was terminated the day after Livya left Holland & Knight to support the enterprise's false narrative that Antonacci had somehow "stolen" the wife of a Holland & Knight partner, and thus he had poor judgment and the retaliation inflicted on Antonacci was justified.

107.    The real reason Antonacci was terminated was to prevent him from promoting legal theories that would implicate this enterprise.

108.    Moreover, while Antonacci had prevailed for Holland & Knight and its client in the Katz Fraud Case, and many other cases for the firm and its clients, Kiernan, Emanuel, Katz and Shapiro saw Antonacci's victory as exposing the corrupt nature of their enterprise.

109.    Later in 2012, Blowitski, Livya's ex-husband, suddenly lost consciousness and went into a coma. When he awoke, he had lost many recent memories and could not form new memories. He was later diagnosed with permanent retrograde amnesia caused by an unknown virus.

**ANTONACCI'S STATE COURT CASE AND ILLINOIS BAR ADMISSION**

110.    Turning back to Antonacci's termination from Seyfarth, Seyfarth indicated to Mr. Antonacci that the reason for his termination was a layoff.

111.    Seyfarth offered Mr. Antonacci eight weeks of severance pay in exchange for a release of claims against Seyfarth. Mr. Antonacci never signed any release of claims against Seyfarth.

112.    Because Ponder frequently harassed and lied to Mr. Antonacci while he was working with her at Seyfarth, Mr. Antonacci requested all evaluations of his performance while at Seyfarth.

113.    Seyfarth provided Mr. Antonacci his performance evaluations the following day, May 23, 2012, which provided overwhelmingly positive reviews of his performance at Seyfarth, though there were no formal performance evaluations from Ponder.

114.    Antonacci hired a local attorney, Major and Major Law, who requested Antonacci's personnel file from Seyfarth.

115.    Mr. Antonacci's personnel file revealed an email from Seyfarth Professional Development Consultant, Ms. Kelly Gofron, memorializing numerous lies perpetrated by Ms. Ponder concerning Mr. Antonacci and his work ("Ponder Slander Email"), including that Antonacci had engaged in the unauthorized practice of law while working under her supervision, which is a legal impossibility under Illinois law.

116.    Seyfarth did not include the Ponder Slander Email in its response to Mr. Antonacci's request for all evaluations of his performance while at Seyfarth.

21

117.    Seyfarth withheld the Ponder Slander Email so that Antonacci would not realize the tools being used by this enterprise to damage his legal career, preventing him from espousing legal theories that would implicate the Defendants.

118.    Utilizing interstate communications, Seyfarth knowingly withheld the Ponder Slander Email and falsely indicated to Mr. Antonacci, via electronic mail, that it did not exist.

119.    Antonacci's employment with Seyfarth and Ponder was a trap set by this enterprise through Kiernan and Emanuel – it was the only job offer he received after 16 months of unemployment.

120.    Mr. Antonacci drafted the Verified Complaint, including a cause of action for defamation *per se*, and sent it to Major and her associate on September 28, 2012.

121.    Ms. Major transmitted the Verified Complaint to Corporation Counsel for the City of Chicago, Mr. Stephen Patton, to ensure that the Verified Complaint did not disclose any confidential or attorney-client privileged information pertaining to the DPS Matter.

122.    Major and Mr. Antonacci edited the Verified Complaint multiple times to address the City's concerns regarding potential disclosure of confidential or attorney-client privileged information.

123.    The Verified Complaint contained over 300 concise allegations and contained several probative exhibits substantiating many of those allegations.

124.    On November 5, 2012, Mr. Antonacci's Illinois Bar application was assigned to Ms. Ellen S. Mulaney ("Mulaney"), Illinois Bar Character and Fitness Committee, for review.

22

125. On November 19, 2012, Mulaney scheduled an Illinois Supreme Court Rule 708 interview with Mr. Antonacci for November 27, 2012.

126. Major filed the Verified Complaint in Cook County Circuit Court on November 21, 2012, captioned *Antonacci v. Seyfarth Shaw LLP and Anita J. Ponder*, Civil Case No. 2012 L 13240 ("Circuit Court Case").

127. On November 25, 2012, Mulaney rescheduled her interview with Mr. Antonacci indefinitely.

128. On November 29, 2012 Mr. Joel Kaplan ("Kaplan"), Seyfarth General Counsel, spoke with Ms. Major and made a settlement offer of $100,000 on behalf of the Defendants.

129. On November 29, 2012, Mr. Antonacci requested that Major to make a counteroffer to the defendants in the Circuit Court Case. Major never responded to Mr. Antonacci's request.

130. On December 3, 2012, Mulaney indicated to Mr. Antonacci, via electronic mail, that "[b]ecause of the complexity of your file, the Chairman of our committee has decided that the initial interview should be bypassed and we will go directly to a three person panel to conduct your interview."

131. Because Major never responded to Mr. Antonacci's November 29, 2012, request, Mr. Antonacci followed up with Major on December 6, 2012. Major indicated, via electronic mail message, that Kaplan was "not very happy" and that settlement communications were over for the "near future."

132. During their telephone conversation, utilizing interstate communications, Major agreed with Kaplan to work with Seyfarth, Ponder, Gehringer, and Emanuel, either

23

through himself or through the City of Chicago's Office of the Corporate Counsel, to sabotage Mr. Antonacci's case and damage his professional reputation.

133. From December 2012 through October 2016, Major has had many further telephone conversations and email communications with Gehringer, Seyfarth, Ponder, Kaplan, and others working on behalf of Gehringer, to sabotage Mr. Antonacci's case in the Circuit Court.

134. Major conspired with Emanuel, Gehringer, Seyfarth, Kaplan, and Ponder to

a. keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b. file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

c. include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

d. unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar

24

Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

e.     deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

f.     if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.     Gehringer agreed to coordinate with Judge Eileen M. Brewer Brewer ("Judge Brewer"), Judge Brewer's law clerk, Mr. Matthew Gran ("Gran"), and any other Cook County Circuit Court judges, as necessary, to pass instructions to Judge Brewer concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

h.     Major agreed to write a letter to City of Chicago Deputy Corporation Counsel, Mardell Nereim ("Nereim"), and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

i.     Gehringer agreed to conspire with others as needed moving forward.

25

135.    Mr. Antonacci's Inquiry Panel originally consisted of Mulaney, Mr. John Storino ("Storino"), and Mr. Matthew Walsh ("Walsh").

136.    Gehringer conspired to have Storino removed from the Inquiry Panel.

137.    Via email dated December 18, 2013, Mulaney falsely indicated to Antonacci that Mr. Storino "asked to be excused from the Panel because his time constraints made it impracticable."

138.    Storino asked to be removed from the Inquiry Panel, at the direction of Gehringer or those working on his behalf, so that the First District Chairman of the Character and Fitness Committee, Mr. Philip Bronstein ("Bronstein"), could replace Storino with Ms. Jeanette Sublett ("Sublett"), Member of Neal & Leroy. All of Sublett's acts alleged herein were on behalf of this enterprise.

139.    Neal & Lerory received approximately $801,070 in legal fees from the City of Chicago in 2011.

140.    Neal & Leroy received approximately $796,330 in legal fees from the City of Chicago in 2012.

141.    Mulaney scheduled Mr. Antonacci's Inquiry Panel meeting date for Friday, January 25, 2013 at the offices of Neal & Lerory.

142.    Judge Brewer was assigned to the Circuit Court Case. Brewer is a member of this enterprise.

143.    At the time the Circuit Court Case was pending, Brewer was in a legal dispute with her domestic partner, where she was attempting to force the sale of a townhome that they co-owned.

144.    In exchange for her criminal acts of fraud as judge in the Circuit Court Case – which is demonstrated by the record itself – the enterprise forced a settlement of the dispute that was favorable to Brewer. The Illinois Supreme Court later overruled the appellate court ruling that was the basis of Brewer's settlement. *See Blumenthal v. Brewer*, 24 N.E.3d 168, 2014 Ill. App. 132250 (Ill. App. Ct. 2014) and *Blumenthal v. Brewer*, 2016 IL 118781.

145.    Defendants thereafter moved to seal the Verified Complaint, on the basis that it disclosed confidential or attorney-client privileged information. On January 7, 2013, Judge Brewer sealed the Verified Complaint pending resolution of the Motion to Seal.

146.    Immediately after the hearing of January 7, 2013, Major sent Mr. Antonacci, via electronic mail, a draft letter to Patton, whereby Major sought the City's express assurance that the City did not object to the allegations in the Verified Complaint.

147.    Mr. Antonacci advised Major that it was imprudent to send such a letter, but Major insisted and consequently sent the letter via U.S. and electronic mail.

148.    Nereim responded on behalf of the City of Chicago on January 18, 2013, where she stated that the City had not expressly waived the attorney-client privilege and that the Verified Complaint "went further than the City would have liked."

149.    The Inquiry Panel later declined Mr. Antonacci's certification to the Illinois Bar. The Inquiry Panel relied heavily upon Nereim's letter in its report declining Mr. Antonacci's certification to the Illinois Bar.

150.    Major sent the January 8, 2013 letter to Patton at the direction of Gehringer. Gehringer directed Nereim and/or Patton to allow Nereim to respond to

27

Major's January 8, 2013 letter. Gehringer instructed Nereim and/or Patton as to the language to include in Nereim's January 18, 2013 response.

151.    Gehringer notified the Inquiry Panel that Nereim's letter would be forthcoming and further instructed them how to use the letter to intimidate Mr. Antonacci.

152.    Gehringer transmitted the City's January 18, 2013 letter to the Inquiry Panel via electronic mail.

153.    Gehringer orchestrated the City's response in order to intimidate Mr. Antonacci so that he would withdraw and/or settle the Circuit Court Case on defendants' terms.

154.    Gehringer and Perkins Coie subsequently filed an appearance on behalf of the Defendants.

155.    Gehringer conspired with the Inquiry Panel and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

156.    The enterprise placed Mr. Antonacci on a list of attorneys disfavored by Cook County Circuit Court judges (the "Blacklist"). The Blacklist is circulated to certain attorneys, law firms, and City and County organizations via U.S. and electronic mail, utilizing interstate communications. Those who receive the Blacklist are instructed by the Enterprise to injure the attorneys on the Blacklist in any way possible. Cook County Circuit Court judges consistently rule against and harass attorneys who appear on the Blacklist.

157.    Mr. Antonacci met with the Inquiry Panel at the offices of Neal & Leroy on January 25, 2013. The Inquiry Panel was openly hostile towards Mr. Antonacci throughout the proceedings, unjustifiably questioning his prior practice of law as an Honors Attorney for the Government of the United States and law firms in Washington, D.C. and Northern Virginia. The Inquiry Panel unjustifiably questioned his intentions in filing the Circuit Court Case, and inexplicably determined that his application could not be resolved until defendants' motion to dismiss was ruled upon. The Inquiry Panel inexplicably reasoned that the Circuit Court had jurisdiction to determine whether Mr. Antonacci had violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

158.    The Inquiry Panel sought to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

159.    Mr. Antonacci refused to withdraw the Circuit Court Case, and merely indicated that he would forward the hearing transcript of the April 2, 2013 hearing on the defendants' motion to dismiss as soon as he received it.

160.    A few hours after Mr. Antonacci left the offices of Neal & Leroy, Mulaney emailed Mr. Antonacci and falsely indicated that she had forgotten to mention that morning that her son, Mr. Charles Mulaney, was an attorney at Perkins Coie. Mulaney further indicated that Gehringer had recently filed an appearance in the Circuit Court Case, and that while her son was not involved in the case, she would ask the Chairman about reconstituting the Inquiry Panel if Mr. Antonacci objected to her involvement.

29

161.    Due to inclement weather, Walsh was over 90 minutes late to the Inquiry Panel meeting of January 25, 2013. Mr. Antonacci, Mulaney, and Sublett were all present at Neal & Leroy waiting for Walsh for 90 minutes before the meeting commenced.

162.    Mulaney had not forgotten that morning to ask Mr. Antonacci whether he objected to Mulaney's participation as a result of her son working for Perkins Coie. Mulaney sought to harass and intimidate Mr. Antonacci into withdrawing the Circuit Court Case. When Mr. Antonacci refused to do so, she sought to distance herself from the conspiracy because she knew that the ongoing pattern of defrauding, harassing, and intimidating Mr. Antonacci violated state and federal criminal law.

163.    On April 2, 2013, Judge Brewer dismissed the Verified Complaint and granted Mr. Antonacci leave to file an amended complaint. Judge Brewer baselessly criticized the Verified Complaint as "incoherent", yet failed to identify even one allegation that was unclear. Judge Brewer further ordered that Mr. Antonacci not include relevant facts in his Amended Complaint. Judge Brewer acknowledged that she could not find that Mr. Antonacci violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

164.    Mr. Antonacci immediately asked Major to request dismissal with prejudice so that he could stand on his Verified Complaint. Major insisted that she file an Amended Complaint.

165.    On April 11, 2013, Mr. Antonacci transmitted the transcript from the April 2, 2013 hearing to the Inquiry Panel, per its request. Because Judge Brewer acknowledged on the record that she could not find that Mr. Antonacci violated the

Illinois Rules of Professional Conduct, Mr. Antonacci expected a favorable resolution of his application.

166.    Mulaney responded on April 11, 2013, via electronic mail, by asking Mr. Antonacci to keep the Inquiry Panel apprised of developments in the Circuit Court Case.

167.    On April 23, 2013, Mr. Antonacci requested that "each member of [the] Inquiry Panel, as well as [Illinois Board of Bar Examiners member] Ms. [Vanessa] Williams, disclose to [Mr. Antonacci] any personal relationships or professional affiliations that they have with Ms. Anita Ponder. [Mr. Antonacci] further request[s] that each member of the Inquiry Panel, as well as Ms. Williams, disclose any communications, oral or written, with Ms. Ponder or Seyfarth Shaw, or anyone on behalf of Anita Ponder or Seyfarth Shaw, concerning [Mr. Antonacci]."

168.    On April 24, 2013, the Inquiry Panel issued its report declining to certify Mr. Antonacci's Illinois Bar application.

169.    The Inquiry Panel never responded to Mr. Antonacci's request that it disclose inappropriate affiliations or communications with Seyfarth or Ponder, or anyone on their behalf. The Inquiry Panel failed to disclose this information because it would have revealed that they were committing felonies under Illinois and U.S. law.

170.    As discussed in Antonacci's SCOTUS Petition (Case No. 15-1524), attached hereto, the Inquiry Panel's Report is rife with fraud. It is reproduced in the Appendix to the SCOTUS Petition. **(Pet. App. 143a-48 at <u>Ex. A.</u>)**

171.    Major filed the Amended Verified Complaint on April 28, 2013. The Amended Verified Complaint was a far weaker version of the Verified Complaint.

31

172.    Mr. Antonacci requested a Hearing Panel to review his application to the Illinois Bar.

173.    On May 6, 2013, Mr. Antonacci indicated to Ms. Regina Kwan Peterson, Director of Administration for the Illinois Board of Admission to the Bar, that the conduct of the Inquiry Panel seemed dubious for the reasons discussed above. Peterson initially agreed, stating "[a]fter reading your email, I understand your concerns." Peterson further advised Mr. Antonacci "the hearing panel is not bound in any way by the Inquiry Panel Report and you may marshal facts or evidence to impeach the credibility of the report."

174.    Mr. Antonacci's Hearing Panel was scheduled for August 14, 2013.

175.    Bronstein acted as Chairman of the Hearing Panel.

176.    Pursuant to Rule 9.3(c) of the Rules of the Illinois Committee on Character and Fitness, Mr. Antonacci requested that the Committee issue subpoenas ("Rule 9.3 Subpoenas"), for testimony and documents, to the following: Patton, Nereim, Sublett, Ponder, Mulaney, Seyfarth, Neal & Leroy, Drinker Biddle LLP, and Quarles & Brady LLP.

177.    The Rule 9.3 Subpoenas sought documents and testimony demonstrating that Gehringer, Nereim, Chicago, Seyfarth, Ponder, Mulaney, Sublett, Walsh, Neal & Leroy, had conspired to harass and intimidate Mr. Antonacci, cause him financial duress by indefinitely postponing his admission to the Illinois Bar, and coerce him into withdrawing the Circuit Court Case.

178.    Except for Quarles & Brady, all recipients of the Rule 9.3 Subpoenas moved to quash those subpoenas.

179.    Quarles & Brady complied with the subpoenas by producing Ponder's personnel file from her time as a contract partner there. Ponder's personnel file indicated that she had been fired from both Altheimer & Gray and Quarles & Brady. Ponder's personnel file further revealed that Ponder was expressly deemed "difficult to work with."

180.    After the Illinois Board of Admissions to the Bar served Mr. Antonacci's Rule 9.3 Subpoenas, Chairman Bronstein postponed the Hearing Panel indefinitely.

181.    Bronstein nonetheless convened the Hearing Panel on August 14, 2013, and styled it as a "prehearing conference."

182.    The Hearing Panel did not have any legal authority to quash the Rule 9.3 Subpoenas.

183.    Bronstein convened the prehearing conference so that the Hearing Panel could harass and intimidate Mr. Antonacci in order to coerce him into withdrawing the Rule 9.3 Subpoenas.

184.    Counsel for the Character & Fitness Committee, Mr. Stephen Fedo ("Fedo"), was present at the prehearing conference.

185.    Gerhinger, on behalf of Ponder and Seyfarth, and Lenny D. Asaro ("Asaro"), on behalf of Neal & Leroy, were also present.

186.    Fedo unlawfully disclosed Mr. Antonacci's private Character and Fitness files to Asaro and Gehringer, at the request of Gehringer, Asaro, and Sublett, prior to the prehearing conference.

187.     The "prehearing conference" of August 14, 2013, lasted approximately three hours, during which time the members of the Hearing Panel attempted to harass and intimidate Mr. Antonacci such that he would withdraw the Rule 9.3 Subpoenas.

188.     Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas.

189.     Bronstein and the Hearing Panel unlawfully quashed Mr. Antonacci's Rule 9.3 Subpoenas.

190.     The unlawful conduct of Defendants and their co-conspirators had prevented Mr. Antonacci from obtaining professional opportunities in Illinois and had further damaged Mr. Antonacci's professional reputation. As a direct result of these injuries, in August 2013, Mr. Antonacci relocated to Washington, D.C., because he is still actively licensed in both the District of Columbia and the Commonwealth of Virginia, and thus he could earn a living there. In 2017, Antonacci became licensed in Maryland as well. To this day, Mr. Antonacci has never been subject to disciplinary action nor has a client ever alleged malpractice against him.

191.     On August 1, 2013, Judge William Maddux, former Chief of the Law Division at Cook County Circuit Court, denied Seyfarth's Motion to Seal the Verified Complaint.

192.     While Mr. Antonacci was in Washington, D.C., Major indicated to Mr. Antonacci, via electronic mail utilizing interstate communications, that she would not execute Judge Maddux's order and have the seal removed from the Verified Complaint.

193.     Via letter dated August 28, 2013, Mr. Antonacci insisted that Major remove the seal from the Verified Major Complaint, and further set forth numerous

undisputed facts demonstrating that Major's position was unfounded and suggested that she was not genuinely advocating on Mr. Antonacci's behalf.

194.    Major responded, via email, that she could no longer represent Mr. Antonacci, and thus she would withdraw her representation after she filed Mr. Antonacci's Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint and that Motion was ruled upon.

195.    Realizing that Major was trying to sabotage his case, Mr. Antonacci terminated Major's representation immediately so that she could not damage his case further with a faulty Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint. Mr. Antonacci proceeded *pro se* in the Circuit Court.

196.    On September 6, 2013, Major sent Mr. Antonacci a letter, to his address in Washington, D.C., via U.S. first class and certified mail, as well as electronic mail, where she falsely claimed that Mr. Antonacci had accused her former associates of fraudulently billing Mr. Antonacci, which he had never done.

197.    On September 20, 2013, Mr. Antonacci requested that Major produce of all of Major's and Major Law's communications with Gehringer and Seyfarth pertaining to his case. Major refused to provide those communications.

198.    Major refused to disclose her email communications with Gehringer and Seyfarth because those communications demonstrate that she was assisting the Defendants by sabotaging Mr. Antonacci's case and fraudulently billing him.

199.    From December 2013 through May of 2015, Major sent Major Law's bills to Mr. Antonacci via U.S. Mail and electronic mail, utilizing interstate communications.

35

200.     Major sent Mr. Antonacci her legal bills in order to coerce him into accepting Seyfarth's $100,000 settlement offer to pay her legal bills.

201.     On December 5, 2013, Mr. Antonacci presented his Motion for Leave to File Surreply *Instanter* to Judge Brewer. Judge Brewer screamed at Mr. Antonacci erratically throughout the presentment of that motion.

202.     Ms. Peggy Anderson ("Anderson"), on behalf of Toomey, acted as court reporter throughout the proceeding. Anderson took notes on a laptop computer and further made a digital audio recording of the proceeding.

203.     Anderson, Gehringer, and Ms. Sandy Toomey ("Sandy Toomey"), president and principal of Toomey Reporting, agreed and conspired to unlawfully delete portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

204.     In furtherance of the conspiracy, Anderson agreed to provide a false certification that the December 5, 2013 hearing transcript was true and accurate.

205.     In furtherance of the conspiracy, upon information and belief, Anderson, Gehringer, and Sandy Toomey agreed to utilize the U.S. Mail and interstate wires to transmit falsified documents across state lines, and to make material factual misrepresentations regarding the veracity of the transcript and their conspiracy to falsify the same.

206.     At the direction of Gehringer, Anderson deleted portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

36

207.    Anderson further deleted those portions of the audio recording at the direction of Gehringer and this criminal enterprise.

208.    On December 6, 2013, Judge Brewer denied Seyfarth and Ponder's motion to dismiss the Amended Verified Complaint, ruling that the defamation *per se* claim may proceed based solely on Mr. Antonacci's allegation that Ponder had falsely accused him of engaging in the unauthorized practice of law. Judge Brewer further invited Seyfarth and Ponder to file a motion to strike every other allegation from the Amended Verified Complaint. Judge Brewer instructed Mr. Antonacci not to object to defendants' motion to strike allegations from the Amended Verified Complaint.

209.    Judge Brewer and Gehringer had conspired to weaken Mr. Antonacci's Amended Verified Complaint by allowing defendants to strike allegations from the Amended Verified Complaint, contrary to well settled Illinois law. Amusingly, Judge Brewer even instructed Mr. Antonacci to not object to defendants' motion to strike allegations from the Amended Verified Complaint so that Mr. Antonacci would waive his right to appeal the striking of those allegations.

210.    On or around December 16, 2013 Mr. Antonacci caused subpoenas *duces tecum*, for documents and deposition testimony, to be served upon the City of Chicago, Patton, and Ms. Jamie Rhee ("Rhee"), Chief of Procurement Services for the City of Chicago (the "Chicago Subpoenas"). The Chicago Subpoenas sought documents and testimony demonstrating the Ponder had defamed Mr. Antonacci to City personnel relating to the DPS Matter.

211.    Realizing that Mr. Antonacci would not allow the defendants to weaken his Amended Complaint further, and that he would seek discovery from the City proving

37

Ponder fraudulent misconduct, on December 20, 2013, Seyfarth and Ponder moved to reconsider Judge Brewer's December 6, 2013 ruling, and to stay execution of the Chicago Subpoenas. Gehringer noticed the motion to reconsider for January 6, 2014.

212.    Gehringer conspired with Patton, Nereim, and City attorney Mr. Michael Dolesh ("Dolesh"), to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

213.    On December 31, 2013 the City of Chicago moved to stay the Chicago Subpoenas. The City also noticed the motion for January 6, 2014.

214.    Judge Brewer was not present at Cook County Circuit Court on January 6, 2014. Concerned that the substitute judge would not stay the Chicago Subpoenas, Gehringer and Dolesh approached Mr. Antonacci and offered an agreed order whereby Mr. Antonacci would narrow the scope of the Chicago Subpoenas, and the City would produce documents voluntarily within approximately two weeks, at which time Mr. Antonacci would determine whether the depositions of Patton and Rhee needed to go forward. Seeking to deal with the City amicably, Mr. Antonacci entered into the agreed order.

215.    Upon information and belief, from December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct.

216.     During January and February 2013, Dolesh sent Mr. Antonacci numerous emails falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees.

217.     The City never produced documents to Mr. Antonacci or allowed deposition testimony. After Mr. Antonacci had filed amended Chicago Subpoenas, on February 3, 2014, Brewer quashed the Chicago Subpoenas for testimony of Rhee and Patton, and falsely ordered the City to produce documents responsive to the amended Chicago Subpoenas directly to her chambers.

218.     On February 6, 2013, Dolesh sent a letter to Judge Brewer's Chambers, via U.S. Mail, falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees. Dolesh's February 6, 2013 letter also falsely stated that the City was transmitting therewith documents for the court's *in camera* review.

219.     Dolesh transmitted the February 6, 2013 letter to Mr. Antonacci in Washington, D.C. via electronic mail utilizing interstate communications.

220.     The City never transmitted responsive documents to the court for review. Dolesh sent the February 6, 2013 letter solely in furtherance of the conspiracy to conceal evidence of Ponder's malicious fraud.

221.     On or about December 19, 2013, Toomey transmitted the falsified transcript of the December 5, 2013 hearing to Mr. Antonacci, at his residence in the District of Columbia, via U.S. and electronic mail, utilizing interstate communications.

222.     That same day, Mr. Antonacci pointed out the discrepancies in the transcript to Sandy Toomey.

39

223.    On December 19, 2013, Sandy Toomey falsely stated to Mr. Antonacci, via electronic mail utilizing interstate communications, that no changes had been made to the transcript.

224.    On December 20, 2013, Anderson, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C. During this phone conversation, Anderson falsely stated that she did not alter the transcript at the behest of Gehringer and Toomey. Anderson falsely stated that the transcript matched her recollection of the December 5, 2013 proceeding.

225.    When Mr. Antonacci asked Anderson if he could listen to the audio recording, Anderson stated that she would have to check with Toomey regarding their company policy.

226.    On December 20, 2013, Sandy Toomey, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C, and left him a voice message.  In her voice message, Sandy Toomey falsely claimed, multiple times, that Anderson's audio recording of the December 5, 2013 hearing transcript had been deleted and could not be retrieved.

227.    The audio recording had not been deleted and was still in the possession of Toomey and Anderson.

228.    In December 2013, Mr. Antonacci served subpoenas ("Toomey Subpoenas") on Toomey and its court reporter seeking documents and testimony demonstrating that Toomey, at the direction of Gehringer, had falsified the December 5, 2013 hearing transcript.

229.    Arnold represented Toomey in the Circuit Court Case.

40

230.    Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

231.    From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy.

232.    Brewer quashed the Toomey Subpoenas on February 3, 2014. During the February 3, 2014 hearing, Brewer invited Arnold and Toomey to impose sanctions on Mr. Antonacci for moving to compel the Toomey Subpoenas. Brewer invited Toomey to impose sanctions on Mr. Antonacci in order to intimidate Mr. Antonacci and coerce him into withdrawing the Circuit Court Case.

233.    Mr. Antonacci moved for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas.

234.    On February 28, 2014, Arnold moved for sanctions against Mr. Antonacci ("Toomey's Motion for Sanctions"). Toomey's Motion for Sanctions misrepresented numerous material facts. Arnold transmitted Toomey's Motion for Sanctions to Mr. Antonacci in Washington, D.C. via U.S. Mail. In furtherance of the conspiracy, and at the direction of Gehringer, Ms. Janet Greenfield transmitted Toomey's Motion for Sanctions to Mr. Antonacci, via electronic mail.

235.     On March 31, 2014, Judge Brewer ruled during a hearing that she would dismiss the Amended Verified Complaint with prejudice.

236.     On April 23, 2014 a hearing was held on Mr. Antonacci's motion for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas, as well as Toomey's Motion for Sanctions.

237.     Kruse and Kruse International acted as court reporter for the April 23, 2014 hearing.

238.     Judge Brewer blatantly harassed Mr. Antonacci throughout the April 23, 2014 proceeding, such that her actual prejudice was unmistakable. Judge Brewer also made numerous false statements during the hearing in an attempt to conceal Toomey's falsification of the December 5, 2013 hearing transcript.

239.     On July 23, 2014, Judge Brewer issued her Final Order ("Final Order") in the Circuit Court Case.

240.     The Final Order misrepresented numerous material facts.

241.     Gran, on behalf of Judge Brewer, transmitted the Final Order to Mr. Antonacci, at his address in Washington, D.C., via U.S. Mail.

242.     Antonacci later perfected an appeal of the Circuit Court Case ("Circuit Court Appeal").

243.     While the Circuit Court Appeal was pending, on April 29, 2015, Antonacci filed his complaint in the U.S. District Court for the Northern District of Illinois, alleging RICO and other fraud claims against members of this criminal enterprise. (NDIL Case No. 1:15-cv-3750.)

42

## SHAUN SO AND RICHARD WHEELER

244.    When Antonacci arrived back in DC after filing the federal complaint in Chicago, a local political lawyer who Antonacci has known for many years, and who worked with Leslie Kiernan in the Obama Administration, introduced Antonacci to Shaun So and Richard Wheeler, principals for Storij.

245.    Antonacci was introduced to So and Wheeler under the false pretense that Storij needed legal assistance with its government contracts work.

246.    So and Wheeler had served in the Army together doing intelligence work.

247.    Specifically, Wheeler worked in signals intelligence and has expertise hacking, infiltrating, and exploiting computer systems and mobile devices.

248.    So's expertise is human intelligence and interrogation.

249.    So and Wheeler are part of this enterprise.

250.    Shortly thereafter, Storij retained Antonacci's law firm, Antonacci PLLC f/k/a Antonacci Law PLLC, for legal services pertaining to its government contracts work.

251.    Antonacci Law provided legal services to The So Company from 2015 through 2021.

252.    The So Company never sent Antonacci Law a U.S. tax form 1099, but So, Wheeler, and other So Company "employees" regularly utilized U.S. mails and interstate wires to perpetuate the fraudulent scheme orchestrated by this enterprise.

253.    The enterprise uses So and Wheeler to keep tabs on Antonacci and stay apprised of his plans regarding his federal lawsuit against the enterprise, his law business

43

and his clients, and his personal contacts and his perspective on his relationship with Livya. So specifically cultivated a personal relationship with Antonacci in order to do so.

254. In 2017, Antonacci helped to save So's life when So broke his leg while they were winter mountaineering in the Adirondacks. They did a triathlon together in 2019.

255. The enterprise uses Wheeler to illegally infiltrate and exploit Antonacci's protected computer systems and mobile phone, as further described below.

## ANTONACCI'S FEDERAL CASE IN ILLINOIS

256. Six days after Antonacci filed his federal complaint against this enterprise, on May 5, 2015, district judge Milton I. Shadur, dismissed Antonacci's complaint, *sua sponte*, for lack of subject matter jurisdiction, and entered judgment.

257. Antonacci filed his notice of appeal on June 2, 2015 ("Seventh Circuit Case"). (Appellate Case No. 15-2194.)  None of the Respondents filed a cross-appeal.

258. On July 27, 2015, the Seventh Circuit issued an order striking Antonacci's brief for failing to identify "by name" each member of Neal & Leroy LLC and Perkins Coie LLC, as well as each partner of Seyfarth Shaw LLP, and the state of citizenship of each member or partner thereof.

259. The Seventh Circuit ordered Antonacci to file a new brief, by July 31, 2015, that conformed with this requirement.

260. On August 5, 2015, the respondents in the Seventh Circuit Case jointly moved for a 35-day extension of time to file their Briefs of Appellee, which was granted the very next day.

261.    Eleven days later, the Illinois Appellate Court issued its opinion in the Circuit Court Appeal ("Illinois Appellate Opinion"), without oral argument.

262.    The Illinois Appellate Opinion is rife with indisputably false statements seeking to protect this enterprise and damage Antonacci's legal career. The Illinois Appellate Court Opinion contradicts itself – and orders of the Circuit Court – with its treatment of facts throughout its opinion. (*See* **Antonacci SCOTUS Pet. at 22, <u>Ex. A.</u>)**

263.    Antonacci's petition for leave to appeal to the Illinois Supreme Court details the calculated, false statements of fact made by the Illinois Appellate Court in support of this enterprise. **(Pet. App. 279a-81a, <u>Ex. A.</u>)**

264.    The Seventh Circuit delayed Antonacci's Appeal so that the Illinois Appellate Court could issue its fraudulent opinion to bolster the position of the respondents in the Seventh Circuit Case.

265.    On November 24, 2015, the Seventh Circuit issued its order scheduling oral argument in Antonacci's federal case for January 26, 2016.

266.    On November 25, 2015, the Illinois Supreme Court issued its order denying Antonacci's Leave to Appeal the Illinois Appellate Court Opinion.

267.    In March of 2016, the Seventh Circuit affirmed the district court's ruling that it did not have subject matter jurisdiction over Antonacci's RICO complaint.

268.    Also in March of 2016, Gehringer was elevated to General Counsel of Perkins Coie.

269.    Around the same time, Gehringer, on behalf of Perkins Coie, engaged Fusion GPS on behalf of the "DNC and Hilary for America" to provide a disinformation campaign, with the assistance of various intelligence agencies under the control of

45

President Barack Obama, Emanuel's former boss, to falsely associate President Trump with Russian election interference. **(Oct. 27, 2017 Ltr. from M. Gehringer to W. Taylor, <u>Ex. B</u>.)**

270.    Perkins Coie and Gehringer also engaged Fusion GPS to provide a disinformation campaign concerning Antonacci to undermine his reputation and prevent him from gaining professional opportunities.

271.    Perkins Coie and/or other Defendants and/or other unknown co-conspirators, have engaged, and continue to engage, FTI, Fusion GPS and Rokk to provide a disinformation campaign(s) concerning Antonacci.

272.    Antonacci petitioned SCOTUS for writ of certiorari. **(No. 15-1524, <u>Ex. A</u>**). That writ was denied in October 2016.

### DERRAN EADDY

273.    On September 23, 2016, shortly before Antonacci's SCOTUS writ was denied, he was having dinner outside at The Royal restaurant, in the Shaw neighborhood of Washington, DC, with some "friends" and Livya, who was six-months pregnant at the time. Their table was on the sidewalk abutting the restaurant.

274.    Antonacci had an flight to Germany the following morning.

275.    While they waited for their food, Eaddy ran up to their table and started repeatedly screaming "YOU'RE ALL PRIVILEGED WHITE PIECES OF SHIT!" Eaddy began pointing at individuals at the table screaming: "YOU'RE A PRIVILEGED WHITE PIECE OF SHIT! YOU'RE A PRIVILEGED WHITE PIECE OF SHIT!..." until he put his finger right in Livya's face – who, again, was six-months pregnant at the time – and screamed "YOU'RE A PRIVILEGED WHITE PIECE OF SHIT!"

276. At that point, concerned for Livya's safety, Antonacci jumped up and pursued Eaddy, who immediately pulled out his phone and started recording Antonacci.

277. Eaddy was race-baiting Antonacci, hoping to capture Antonacci on video shouting racial slurs at Eaddy, who is African-American. Antonacci is not racist, despite this enterprise's desire to defame him, and thus he did not take Eaddy's bait.

278. After a couple minutes running up and down Florida Avenue NW, Eaddy put his phone away and said to Antonacci "I'M GONNA KILL YOU!" At that point, Eaddy punched Antonacci in the nose. Antonacci immediately wrestled Eaddy to the ground. Eaddy then began trying to gouge out Antonacci's eyes. Antonacci got Eaddy into position and began punching Eaddy in the head, when suddenly several DC Metro police officers appeared and pulled Antonacci off of Eaddy and threatened to arrest him.

279. Because the windows were open at The Royal restaurant, several witnesses corroborated Antonacci's account that Eaddy was the aggressor who assaulted their table unprovoked. Eaddy was arrested and charged and convicted of simple assault and battery and received a suspended sentence based on his alleged psychological problems.

280. Despite Antonacci's urging to the AUSA in charge of the case (who changed numerous times), Eaddy was not charged with a hate crime.

281. Eaddy is a middle-aged strategic communications professional with a master's degree. According to his website, he represents VA contractors' interests on Capitol Hill: www.derraneaddy.com

282. Eaddy is married to white woman.

283. By Eaddy's own admission, Eaddy intended to kill Antonacci.

284.    The Defendants paid or otherwise incentivized Eaddy to attempt to murder Antonacci, assault and race-bait him.

285.    Eaddy received additional work representing VA contractors in exchange for his criminal acts.

**DEFAMATION STRATEGY AFTER SCOTUS PETITION WAS DENIED**

286.    After Antonacci's petition for writ of certiorari was denied, he believed that the enterprise alleged in his federal case was done with their campaign to destroy him. He was wrong, and has since realized the extent and nature of this criminal enterprise.

287.    Antonacci and Livya had a child, A. G. A., on December 15, 2016. (*See* **Nov. 11, 2022 paternity test results, Ex. C.**) Antonacci had another paternity test done before he married Livya, which retuned the same result. That test was done with Livya.

288.    Antonacci and Livya had another child, S. P. A., on October 14, 2019. (*See* **Nov. 11, 2022 paternity test results, Ex. C.**)

289.    On November 23, 2016, Antonacci won an appeal from the Circuit Court of Arlington County to the Supreme Court of Virginia, reinstating his client's jury verdict. *See Medlin & Son Construction Co., Inc. v The Matthews Group, Inc.*, Va. Record. No. 160050 (Nov. 23, 2016).[1]

290.    Antonacci and Livya bought a condo in the Petworth neighborhood of Washington, DC, which they still own jointly, in December of 2016.

291.    In September of 2017, Antonacci and Livya were married. On June 12, 2023, they were divorced.

---

[1] Available at https://www.vacourts.gov/courts/scv/orders_unpublished/160050.pdf

292.    In September of 2018, Antonacci traveled to Chicago to meet Stephen J. Lombardo III ("Lombardo"), an old family friend.

293.    Lombardo attended Georgetown for his undergraduate degree and for law school.

294.    Lombardo worked for Katten Muchin Zavis Rosenman LLP in Chicago for several years, doing transactional work, before going to work for his father's Gibsons restaurant group as Chief Operating Officer.

295.    Antonacci's father had worked for Lombardo's father at Chicago-area restaurants when they were younger, so Antonacci and Lombardo have known each other their whole lives.

296.    Antonacci worked as a waiter for a Gibsons affiliate in Rosemont, Illinois prior to attending law school.

297.    Antonacci traveled to Chicago to determine whether Gibsons was exploring business opportunities in the DC area and if Antonacci could provide legal assistance.

298.    Rather than work with Antonacci, Lombardo agreed to assist the criminal enterprise, through Emanuel, in its attempt to destroy Antonacci and his legal career.

299.    Lombardo agreed to assist the enterprise in exchange for a partnership with the Think Food Group, Inc.

300.    Paul Kiernan and Holland & Knight represented Think Food Group, Inc. when it was sued for breach of its lease with the Trump Hotel.

301.    Gibsons is currently working to open at least two restaurants associated with the Think Food Group.

49

302.   In exchange, Lombardo connected the enterprise with his Georgetown classmate, Firmender. Firmender and Lombardo played baseball together at Georgetown. Firmender is the General Counsel of Lane.

303.   Upon graduating from the University of Colorado Law School, Firmender hung a shingle practicing family law in Denver for several years.

304.   Firmender went from solo-practice family lawyer to General Counsel of a publicly-traded construction company overnight.

305.   Because this enterprise protects Firmender and other members of from any accountability, he agreed to orchestrate dubious claims against Lane's architect, while setting up Antonacci for a false claims act investigation associated with Antonacci's representation of Lane ("AECOM Fraud").

306.   To be clear, Antonacci does not know whether Firmender actually received any funds from the AECOM Fraud. Firmender may have simply perpetrated the AECOM Fraud out of loyalty to the enterprise that gave him the position he is not qualified for, and with it the prestige he never earned.

307.   This is why this enterprise promotes people who are politically compromised or otherwise unqualified for positions they hold – because it buys loyalty. The Chicago court system is a prime example of this, as evidenced in Antonacci's SCOTUS petition.

308.   As will be further discussed below, Firmender deliberately sought to sabotage Lane's case and implicate Antonacci in the pursuit of Lane's dubious claims, utilizing interstate wires, follows:

50

a. Lane's position regarding a key legal issue changed suddenly right before the relevant hearing, and one of Lane's employees allegedly destroyed an unknown number of documents, which Lane could not explain.

b. Lane's IT department further sought to falsely associate Antonacci with that employee's data collection efforts, and further refused to articulate its data preservation policies.

c. Some key employees implicated in the mysterious acts left the firm shortly before AECOM's complaint was filed, which was orchestrated by Firmender.

d. Firmender inexplicably delayed hiring both the consultant tasked to audit Lane's backcharge, Deloitte, and the firm tasked to collect and process Lane's discovery, Epiq.

e. And once Epiq was hired and Antonacci had trained all the contract attorneys, Firmender inexplicably ordered Epiq to stop work multiple times, particularly after Antonacci brought new evidence to Lane's attention.

309.    In short, even if Firmender did not steal any government money and/or attempt to defraud AECOM, he went out of his way to make it look like he did. And in a way that was obviously meant to implicate Antonacci.

310.    Around the same time, Anthony J. Antonacci ("Tony Antonacci"), Antonacci's younger brother, agreed to assist the enterprise in exchange for funding and promotion of his up his soon-to-be restaurant, Pennyville Station, in Park Ridge, Illinois, where the Antonaccis grew up.

311.    All the previous ventures of Tony Antonacci and his father, Tino Antonacci, had failed completely and their investors lost over $10,000,000 in the aggregate, and Tino Antonacci lost what little savings he had.

312.    Louis Antonacci had even set them up with a venture capitalist, who lost over $1,000,000 investing in Tony and Tino Antonacci's ice cream cone venture.

313.    Tony Antonacci was expelled from Loyola Academy High School after his first year there, and later dropped out of Maine Township High School South after failing all of his classes. Tony Antonacci went to work for his father, Tino Antonacci, in his Chicago restaurant, Basta Pasta, after dropping out of high school. After Tino Antonacci sold Basta Pasta in or about 2003, Tony stayed on to work for the buyer, but the restaurant failed shortly thereafter.

314.    Tony Antonacci, who has been destitute most of his adult life and living off the charity of his wife's family, agreed to actively defame Louis Antonacci to patrons at his restaurant and everyone else in Park Ridge and Chicago who knows Louis Antonacci.

315.    Louis Antonacci was the first person in his family to graduate from college.

316.    Louis Antonacci is the only lawyer in his family's history.

317.    Tony Antonacci was compelled to seek treatment for numerous behavioral and psychological disorders before he dropped out of high school.

318.    In his late 50s, after ignoring Louis Antonacci's advice to Tino Antonacci that he invest his proceeds from the sale of Basta Pasta and get a job for a decade so he

could retire, Tino Antonacci spent the proceeds trying to launch a company that manufactured and sold ice cream cones.

319. After losing his house and depleting his savings, Tino Antonacci moved back in with his parents in his early 60s. He now works for Tony Antonacci.

320. Tino and Tony Antonacci's financial situations made them easy for this enterprise to exploit.

321. Louis Antonacci went to college and law school and sought a career through education and developing skills, so Tino and Tony Antonacci resent him for gaining opportunities that they do not have. By demonizing Louis Antonacci as some sort of out-of-touch "elite," because he sought to educate himself, it is easy for Tino and Tony Antonacci to feel good about helping this enterprise attack Antonacci's career, because he is not like them and they cannot understand the work he does.

322. This is typical of the class warfare that accompanies declining empires like contemporary America:

> **[THE BIG CYCLE OF INTERNAL ORDER AND DISORDER]**
>
> Watch populism and polarization as markers. The more that populism and polarization exist, the further along a nation is in Stage 5, and the closer it is to civil war and revolution. In Stage 5 [very bad financial conditions and intense conflict], moderates become the minority. In Stage 6 [civil war/revolution], they cease to exist.
>
> **+ Class Warfare**
> In Stage 5, class warfare intensifies. That is because, as a rule, during times of increased hardship and conflict there is an increased inclination to look at people in stereotypical ways as members of one or more classes and to look at these classes as either being enemies or allies. In Stage 5, this begins to become much more apparent. In Stage 6, it becomes dangerous.
>
> Dalio, Ray, PRINCIPLES FOR DEALING WITH THE CHANGING WORLD ORDER: WHY NATIONS SUCCEED AND FAIL, 173, New York, NY,

Avid Reader Press (2021).

323.    Besides defaming Antonacci to people in Chicago, this enterprise also uses Tino and Tony Antonacci in an attempt to shield itself from defamation claims. They do this by spreading lies about Antonacci with the caveat that "Antonacci's brother (or father) said [lie] about [Antonacci]." The fact that Louis Antonacci's family members said the lie is a true statement of fact, thus giving the enterprise a basis for shielding themselves from a defamation claim, and further bolsters the credibility of the lie in question, because one's family members tend to care about them and know them better than other people.

324.    Some of Tino and Tony Antonacci's defamatory claims are as follows:

   a.     Tino and Tony Antonacci falsely claim that Louis Antonacci failed the Illinois Bar exam (Louis Antonacci has never failed any bar exam).

   b.     Tino and Tony Antonacci falsely claim that Livya was previously married to a partner at Holland & Knight.

   c.     Tino and Tony Antonacci falsely claim that Livya left Louis Antonacci.

   d.     Tino and Tony Antonacci falsely claim that Louis Antonacci is or was abusive towards Livya.

   e.     Tino and Tony Antonacci falsely claim that Louis Antonacci is misogynistic, bigoted, and homophobic (Anita Ponder is an African-American woman, so this enterprise defames Antonacci by spreading the lie that Antonacci sued her for that reason.)

54

f.      Tino and Tony Antonacci falsely claim that Louis Antonacci did not first leave Livya in December of 2020.

g.      Tony Antonacci falsely denies that Louis Antonacci told him that he was leaving Livya in October of 2020.

h.      Tino and Tony Antonacci falsely claim that Louis Antonacci has a history of mental health problems.

325.    In fact, Louis Antonacci has never had any mental health problems.[2] He was a successful student and a very successful lawyer before he exposed the fraudulent law practice of one crooked lawyer, Katz. And that turns out to be standard business operations for this enterprise, which is shockingly administered by officers of the court.

326.    In contrast, Tony Antonacci was repeatedly compelled to seek mental and behavioral healthcare until he dropped out of high school – after failing all of his classes – to work for his father.

327.    In Antonacci's experience, this enterprise frequently accuses its enemies (which it bizarrely creates out of fear and spite, betraying its inherently self-defeating nature) of its own inadequacies and misconduct, thereby projecting it onto others and distracting from its own failings and malicious behavior.

328.    The purpose of this defamation campaign is to ensure that Louis Antonacci receives no legal work or employment/business opportunities from his network, and it makes the malicious acts of the enterprise seem justified, allowing them to maintain and gain political support.

---

[2] Louis Antonacci believes he may have a form of autism, although no medical professional has ever diagnosed that.

## LANE CONSTRUCTION AND THE AECOM FRAUD

329.    In early September of 2019, Lombardo indicated to Antonacci, via interstate phone calls and text, that he had become aware of a position with U.S. Department of Justice's Oversight Section in the Office of Intelligence in its National Security Division.

330.    Antonacci's experience fighting his racketeering case in Chicago was, in his view, highly relevant to the oversight position in DOJ's Office of Intelligence, and thus he highlighted that experience in his cover letter to Aprel Thompson applying for the position. Antonacci further attached his SCOTUS petition to his application. (*See* **L. Antonacci Sept. 12, 2019 Ltr. to A. Thompson, <u>Ex. D</u>.**) Antonacci's application was denied.

331.    Relatedly, Antonacci has applied to hundreds of jobs, all over the country and world, over the past 14 years, all of which have been denied (except Seyfarth). This enterprise has prevented Antonacci from obtaining secure employment, through widespread defamation and paying off everyone in his personal and professional networks, in order to keep him trapped.

332.    The enterprise saw Antonacci's application to DOJ as a direct threat to their activity, so it set the AECOM Fraud in motion.

333.    Lane was referred to Antonacci through another Lane outside counsel who regularly represents Livya's employer in litigation.

334.    And, as stated above, Wheeler and So monitored Antonacci by illegally hacking into his computer system and/or mobile phone. This information was passed to

Firmender and Mancini, so they understood Antonacci's progress, strategy and outlook throughout the case.

335.    Lane retained Antonacci Law in October of 2019.

336.    The AECOM Fraud centered around Lane's alleged backcharge against AECOM Technical Services, Inc., its design subcontractor on the 395 Express Lanes Project in Northern Virginia (the "Project").

337.    The AECOM Fraud was premeditated and agreed between Firmender and AECOM's counsel, David Mancini of Troutman Pepper Hamilton Sanders LLP. Firmender assured Mancini that his client would be satisfied with the outcome of the suit because Firmender could agree to settle it at any time. Antonacci was the target of the AECOM Fraud.

338.    Judge Mann was elevated to the Supreme Court of Virginia in August of 2022.

339.    The Project was a public-private partnership. Transurban LLC ("Transurban") acted as the Project Owner.

340.    In furtherance of this fraudulent scheme, Lane hosted several meetings with Antonacci at Lane's Project offices in Springfield, VA.

341.    In furtherance of this fraudulent scheme, and utilizing interstate wires, a Lane Project engineer further invited Antonacci to Lane's Chantilly, VA office to give Antonacci two thumb drives containing data that Lane hoped would implicate Antonacci in the AECOM Fraud.

342.    Lane asked Antonacci for a legal analysis of its backcharge against AECOM.

57

343.    Antonacci sought Lane's express clarification on a number of relevant issues regarding Lane's proposed backcharge prior to providing his legal analysis.

344.    Most notably, Lane had settled all of its claims against Transurban in July of 2019 (the "Owner Settlement"). Because Firmender had orchestrated turnover of Lane employees involved in the Owner Settlement, there was some alleged confusion as to whether the Owner Settlement had included AECOM's claims, which Lane purports to have indicated to AECOM it would pass through to the Owner.

345.    Lane indicated to Antonacci that the Owner had taken the position, pursuant to the Owner Settlement, that AECOM's claims were untimely and Lane's $5,000,000 settlement payment was for weather delays that had impacted Lane.

346.    David Mancini requested a copy of the Owner Settlement from Antonacci, which by its terms was confidential. In correspondence with Transurban's counsel, Antonacci requested that the Owner waive the confidentiality provisions of the Owner Settlement so that he could provide it to AECOM. Transurban refused that request.

347.    After Lane provided the express clarifications requested by Antonacci, Antonacci provided his legal analysis.

348.    In June of 2020, Lane and AECOM spent two days in mediation at the offices of Troutman Pepper Hamilton Sanders LLP, who represented AECOM.

349.    The mediation at Troutman was a staged event meant only to attempt to implicate Antonacci in the AECOM Fraud. The mediator did not even begin exchanging numbers until after lunch on the second day of a two-day mediation. The parties had no intent of settling at mediation, but rather to wait until the election to see if Biden won, in

which case the enterprise's control of DOJ would allow them to perpetrate the AECOM Fraud with impunity.

350.    After mediation failed, and a lawsuit by AECOM seemed likely, Antonacci insisted that they hire an outside consultant to analyze the amount sought in the backcharge for allowability, allocability, and reasonableness. Lane and Antonacci Law hired Deloitte LLP to perform this analysis.

351.    Lane was served with AECOM's complaint, which was filed in Fairfax County Circuit Court, on November 17, 2020, once it was clear that President Biden had won the election. (Civil No. 2020 18128.)

352.    President Biden is affiliated with this enterprise.

353.    Lane was served with AECOM's complaint on December 8, 2020.

354.    Antonacci's Law filed some pre-answer motions on Lane's behalf, including a plea in bar, which sought to dismiss many of AECOM's claims as untimely under Virginia law, consistent with Lane's position in mediation.

355.    Prior to the complaint being filed in Fairfax, a number of Lane's employees, who had worked with Antonacci in analyzing the case before and after mediation, left Lane to work for other companies.

356.    After President Biden took office and the political appointees controlling U.S. intelligence agencies changed, Shaun So asked Antonacci to have a Zoom videoconference with So and Wheeler.

357.    During this videoconference, Wheeler violated federal law to infiltrate Antonacci's computer and mobile phone. Wheeler did this so that the enterprise could

monitor Antonacci's activities and behavior, via his computer's cameras and audio, while he worked on the Fairfax Circuit Court Case, and after.

358.    Alternatively, the enterprise provided false, incomplete, and/or misleading information about Antonacci to relevant authorities and/or intelligence agencies in order to obtain a warrant allowing Wheeler and So to monitor Antonacci.

359.    Wheeler, and/or other members of this criminal enterprise have continued illegally infiltrating and monitoring Antonacci and Antonacci PLLC. *See generally*, Robert J. Deibert, *The Autocrat in Your iPhone: How Mercenary Spyware Threatens Democracy*, 102 Foreign Affairs, 1, 72 (2023).[3]

360.    As indicated above, Mancini omitted key contract documents from AECOM's complaint. The enterprise had hoped that Antonacci would not notice these omissions.

---

[3] "Bringing together a largely unregulated industry with an invasive-by-design digital ecosystem in which smartphones and other personal devices contain the most intimate details of people's lives, **the new technology can track almost anyone, anywhere in the world.**"

"Providing the ability to clandestinely infiltrate even the most up-to-date smartphones—**the latest "zero click" version of the spyware can penetrate a device without any action by the user—Pegasus** has become the digital surveillance tool of choice for repressive regimes around the world."

"**For Israel, which approves export licenses for NSO Group's Pegasus**, the sale of spyware to foreign governments has brought new diplomatic clout…"

"A **global market for spyware** also means that forms of surveillance and espionage that were once limited to a few major powers are now available to almost any country, and potentially to **even more private firms**. Left unregulated, the **proliferation of this technology threatens to erode many of the institutions, processes, and values on which the liberal international order depends.**"

"Like soldiers of fortune, advanced spyware companies tend to put revenues ahead of ethics, selling their products without regard to the politics of their clients—giving rise to the term "mercenary spyware"—and like military contractors, **their dealings with government security agencies are often cloaked in secrecy to avoid public scrutiny**. Moreover, just as military contractors have offered **lucrative private-sector careers for veterans of military and intelligence agencies, spyware firms and government security services have been building similarly mutually beneficial partnerships, boosting the industry in the process**."

361. Antonacci would have seen this as a typical litigation tactic, but when Antonacci hired a process server to file the complete contract with Lane's Motion Craving Oyer, his process server not only failed to file the contract documents with the Fairfax County clerk's office, but further failed to indicate as much to Antonacci when Antonacci spoke to the process server later that day. (*See* **Antonacci Ltr. to Fairfax Clerk's Office, Ex. E.**)

362. Shortly after Antonacci received his copy of the allegedly filed documents, he saw that, instead of having a file stamp from the clerk's office, the documents had a stamp indicating that they had been received by judicial chambers (which looks very similar to the clerk's stamp).

363. This enterprise utilized interstate mails and wires to communicate to the process server that he should not file the documents with the clerk's office, but rather with judicial chambers, in order to prejudice Antonacci's case and give Lane a basis to allege legal malpractice against Antonacci.

364. Fortunately, Antonacci quickly noticed and resolved the issue.

365. Pursuant to discovery requests served by AECOM, Lane hired Epiq eDiscovery Solutions ("Epiq") to collect and analyze Lane's data. Antonacci managed Epiq's review, through approximately 60 contract attorneys, of hundreds of thousands of documents.

366. While Epiq sought to collect the laptops of relevant custodians, a Lane in-house lawyer working at the behest of Firmender, Mr. Allen Wiggins, indicated to Antonacci that a former Lane employee had deliberately destroyed data on some of those laptops. Wiggins denied any knowledge as to how or why this had occurred.

367.    When Antonacci sought clarification from Lane regarding its document preservation policies and why the data had been destroyed, Lane's IT Department, at the behest of Firmender, sought to falsely associate Antonacci with Lane's destruction of documents. Antonacci promptly corrected Lane. (*See* **2021 email correspondence,  Ex. F.)**

368.    On June 16, 2021, not long before the hearing on the plea in bar was scheduled, while Antonacci was performing quality control review of the documents deemed responsive by the contract attorneys, he found some correspondence by a previous project manager, who had worked on the Project before Antonacci had been retained, that contradicted Lane's stated position regarding the Owner Settlement.

369.    Antonacci asked Lane to hire the former project manager as a consultant so that Antonacci could interview him via teleconference, which was scheduled for June 23, 2021.

370.    The following day, on June 17, 2021, Firmender ordered all effort on the case halted, including the work of all the contract attorneys that Antonacci had trained, so that no further review of Lane's documents could occur.

371.    Immediately preceding the teleconference with Tracy, Tracy sent Antonacci a memorandum that confirmed Antonacci's concern regarding the Owner Settlement, which was further confirmed during the call.

372.    Because Antonacci was concerned about Lane's position concerning AECOM's claims, as well as Lane's backcharge, and its potential destruction of documents, Antonacci withdrew Lane's plea in bar on July 12, 2021.

373. Antonacci was also concerned that the Fairfax County Judge presiding over the case, Judge Thomas Mann, who, in a departure from Fairfax County Circuit Court's normal procedures, had been assigned to preside over the entire case from the outset, was assisting this enterprise and would use the evidence presented by Antonacci at the hearing against Lane, thus providing Lane a basis for a legal malpractice claim.

374. Notably, Mann denied every motion and request Antonacci presented to the court up to that point. Mann even denied Lane's Motion Craving Oyer after there was indisputable evidence that Mancini had omitted thousands of key contract documents from AECOM's complaint.

375. Mann granted every motion and request made by AECOM (Mann did deny AECOM's motion to strike Lane's plea in bar, but Antonacci's pursuit of Lane's plea was integral to the AECOM Fraud, so Mancini only filed that motion, which has no basis in Virginia civil procedure in any case, in order to give Judge Mann an opportunity to appear impartial).

376. Mann was elevated to the Supreme Court of Virginia in August of 2022.

377. Antonacci asked Lane to seek separate counsel to proceed with the matter.

378. Because Antonacci withdrew its plea in bar on behalf of Lane, Lane was required to Answer the last count of AECOM's complaint, and thus would be required to file its counterclaim, if any. Antonacci therefore raised his concerns regarding the new information concerning the Owner Settlement and document destruction with Firmender. (*See* email correspondence, <u>Ex. G</u>.)

379. Immediately after Antonacci raised his concerns, Firmender asked Antonacci to cease working on the case immediately and sought to minimize Antonacci's

bills for work performed, which Lane, pursuant to Firmender's direction, had delayed payment for months.

380.    At the time Antonacci raised his concerns about Lane's positions to Firmender, Lane owed Antonacci Law over $230,000 in past legal due bills, in breach of its contract with Antonacci Law. That amount does not include how much Lane owed Deloitte at the time.

381.    Lane immediately retained Shapiro, Lifschitz & Schram LLP ("SLS"), a Washington, DC, law firm, despite the fact that not one attorney at SLS was licensed in Virginia at the time.

382.    A VA licensed attorney joined the firm shortly after and entered appearance on behalf of Lane.

383.    Antonacci withdrew as counsel of record, and, according to Lane, the case settled immediately after.

384.    In January of 2022, Antonacci received an audit request from KPMG S.p.A. in Milan, Italy, who audits Lane's parent company, WeBuild S.p.A. ("Webuild").

385.    Antonacci notified Firmender of the request, who repeatedly and adamantly requested that Antonacci not respond because Lane's matters with Antonacci Law had settled. (*See* **Jan. 2022 email correspondence, Ex. H.**)

386.    Antonacci notified Livya of his intent to respond to the audit letter, which needed to be received by Webuild by close of business in Milan on Monday, January 31, 2022, so around 9am EDT.

387.   On the Sunday before the response was due, Antonacci spent most of the afternoon working from home on his response because he would not have much time in the morning before he and Livya took their children to separate schools/daycare.

388.   That evening, Livya repeatedly asked Antonacci when he would stop working so they could relax together. When he finally stopped working, she asked him whether he had finished the letter. Antonacci responded that he had not, but would get up early to finish it before emailing to Milan.

389.   Antonacci had finished the letter and had set his email account to send it automatically the following morning.

390.   Around 1am on January 31, 2022, Livya woke Antonacci saying that she had severe back pain and urinary distress. He got the kids up and rushed them and Livya to the emergency room at Washington Hospital Center.

391.   Antonacci and the children sat in the waiting room for hours while Livya was with the doctors.

392.   She came out around 5am, saying that the doctors had indicated her symptoms may have been caused by a kidney stone, which she may have passed in the bathroom at home because she was feeling fine, but it was impossible to diagnose with certainty, save maybe a CAT scan. Antonacci went home and put the children back to bed while Livya waited at the hospital to be discharged. (*See* **Jan. 31, 2022 email correspondence, <u>Ex. I.</u>)**

393.   The audit response letter was sent via email the morning of January 31, 2022. **(<u>Ex. J.</u>)**

394.    Antonacci separated from Livya in May of 2022 after selling their primary residence. He moved to Alexandria, Virginia and is currently a resident here.[4]

395.    So, Wheeler, and Storij continued perpetrating their fraudulent scheme in relation to Storij's alleged government contracts work, via emails and text messages, through May of 2022.

396.    In June of 2022, after running a marathon in Ventura, California, Antonacci stopped in Chicago unannounced before his return to Alexandria, Virginia. Antonacci went to Gibsons to talk with Lombardo, and later Pennyville Station to talk with Tony Antonacci (Tino Antonacci refused to see him). Their evasive and contradictory responses to Antonacci's questions satisfied Antonacci that they are working with this enterprise to discredit him and destroy his legal career.

397.    Antonacci filed for divorce from Livya on December 1, 2022, in the Superior Court of the District of Columbia.

398.    DC Superior Court Judge Veronica Sanchez, a Biden appointee, granted Livya's motion to strike allegations from Antonacci's Verified Answer to Livya's Counterclaim.

399.    Striking allegations and sealing complaints is a key tactic used by this enterprise. In the Katz Fraud case, Katz moved to strike hundreds of relevant allegations from Holland & Knight's complaint, which this Court denied. In Antonacci's State Court Case against Ponder and Seyfarth, the Defendants had Antonacci's complaint sealed, and after Antonacci fought for an order to have it unsealed, Major refused to perform the administrative task of having the complaint unsealed, which Antonacci had to do himself

---

[4] Antonacci had first moved out of their house in December of 2020, obtained a lease offer for an apartment in DC, and stayed at a hotel for a week while drafting Lane's responsive pleadings to AECOM's complaint.

after firing her. This is just one of many ways this enterprise seeks to conceal evidence of its criminal operations.

400.    On April 5, 2023, Antonacci formally terminated Antonacci PLLC's service agreement with Lane.

401.    In May of 2023, a representative of Lane, on behalf of Firmender, called Antonacci to inquire as to his billing practices and client base. Antonacci ended the call quickly.

402.    Antonacci and Livya were divorced on June 12, 2023.

403.    On December 8, 2023, Antonacci PLLC formally terminated its service agreement with Storij, though he has not done any work for Storij since 2021.

404.    After Antonacci opened this action in PACER, but before filing this complaint, Gehringer seems to have left Perkins Coie. (*See* **Antonacci Ltr. to Bates Larson ("Larson"), General Counsel of Perkins Coie, <u>Ex. K</u>.**) Larson was co-counsel with Gehringer in Antonacci's State Court Case in Chicago. Antonacci will reiterate that Gehringer was the architect of the enterprise's criminal conspiracy against Antonacci in Chicago. The fact that Gehringer suddenly fled Perkins Coie, once he got word of this action being initiated, betrays his and Perkins Coie's complicity in the ongoing acts of this enterprise, particularly here in this Commonwealth.

405.    The Defendants have been collecting and fabricating opposition research on Antonacci at all times relevant to these proceedings. To that end, this enterprise has had numerous people make video and audio recordings of Antonacci, and take pictures, which it uses to make deepfakes of Antonacci, where it fabricates things he has done and

said, and takes statements and actions out of context, that it collects and disseminates to further defame Antonacci.

## COUNT I: Violation of Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1962 (a), (b), and (c))
### (All Defendants)

406.    Antonacci incorporates all of the preceding paragraphs as if they were fully set forth herein.

407.    The association-in-fact of all Defendants named in this Complaint, together with the others described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

408.    Specifically, the enterprise is an association-in-fact among individuals and business entities designed to divert taxpayer money to members of the enterprise; destroy the professional reputation of anyone who seeks to expose the nature and extent of the enterprise through fraud, widespread defamation, and murder; protect the members of the enterprise from civil liability by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; bribing and otherwise incentivizing people associated with those deemed enemies of this enterprise to spread lies about those "enemies;" punishing attorneys who sue members of the enterprise by preventing them from becoming admitted to practice law; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; illegally infiltrating protected computers to spy on the "enemies" of the enterprise, in some cases through fraudulently

68

obtained search warrants; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

409.    The enterprise has been engaged in activities which affect interstate and foreign commerce.

410.    Each Defendant is distinct from the enterprise itself but each Defendant has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

411.    Defendants engaged in "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

412.    Violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1503 (Obstruction of Federal Court Proceedings), 18 U.S.C. 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises) and Murder are specifically enumerated as "racketeering activity" in Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

413.    **Defendants violated 18 U.S.C. § 1343 (Wire Fraud) as follows:**

    a.      Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

    b.      In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c.      In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d.      In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

e.      In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

f.      In furtherance of this scheme, as more particularly described above, the Defendants, through the AECOM Fraud, attempted to set up Antonacci for a False Claims Act violation. To that end, the Firmender orchestrated a legally dubious settlement with the Owner on the 395 Express Lanes Project, caused the destruction of relevant documents with litigation imminent and/or pending, and attempted to create a paper trail leading to Antonacci.

g.      When Antonacci withdrew the plea in bar, Firmender, Wiggins, and others made false statements about Antonacci's litigation skills, whereby they willfully and maliciously omitted the fact that Antonacci had to withdraw the plea to avoid becoming complicit in the AECOM Fraud.

h.      In furtherance of this scheme, as more particularly described above, So and Wheeler utilized interstate wires to knowingly, and with intent to defraud,

70

accessed Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in order to surveil him and monitor his behavior, in violation of 18 U.S.C. § 1830.

       i.     Alternatively, So, Wheeler, Storij, and other Defendants utilized interstate wires to provide false, incomplete, and/or misleading information to U.S. government officials in order to obtain illegally a warrant allowing them to do so.

       j.     In furtherance of this scheme, as more particularly described above, Defendants transmitted, and caused others to transmit, wire communications in interstate commerce for the purpose of executing this scheme.

414.   **Defendants violated 18 U.S.C. § 1341 (Mail Fraud) as follows:**

       a.     Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

       b.     In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

       c.     In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

       d.     In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from

becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

e.  In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

f.  In furtherance of this scheme, as more particularly described above, the Defendants, through the AECOM Fraud, attempted to set up Antonacci for a False Claims Act violation. To that end, the Firmender orchestrated a legally dubious settlement with the Owner on the 395 Express Lanes Project, caused the destruction of relevant documents with litigation imminent and/or pending, and attempted to create a paper trail leading to Antonacci.

g.  As more particularly described above, Defendants used, and caused others to use, the U.S. mail for the purpose of executing this scheme.

415. **Defendants violated 18 U.S.C. § 1503 (Obstruction of Justice) as follows:**

a.  Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the outcome of Antonacci's federal case in Chicago, both at the district court level and in the Seventh Circuit Appeal.

b.  Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence District Judge Milton Shadur to dismiss *sua sponte* Antonacci's complaint for want of subject matter jurisdiction less than a week after he filed it.

c.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the Seventh Circuit's Clerk's office to inexplicably deny Antonacci electronic filing privileges in an attempt to have his appeal dismissed.

d.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the Seventh Circuit to grant the respondent's motion for a 35-day extension of time to file their brief of appellee – one day after filing – in order to allow the Illinois Appellate Court to issue its opinion 11 days later, such that the appellees could rely on that fraudulent opinion.

e.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence Judge Wood to draft and orchestrate its unfounded and deliberately defamatory opinion.

f.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully utilized Fusion GPS and FTI to spread false narratives about Antonacci to ensure that he received no relief from the federal courts, and to ensure that his SCOTUS petition was denied.

416.  **Defendants violated 18 U.S.C. 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises)**

a.    Defendants traveled throughout the country to perpetuate this racketeering enterprise, including, without imitation:

i.    So and Wheeler traveled between New York, California, and Washington, DC numerous times in furtherance of this fraudulent scheme.

73

    ii.   Allen Wiggins, Assistant General Counsel for Lane, frequently traveled between North Carolina, Virginia, Connecticut, and Washington, DC in furtherance of this fraudulent scheme.

    iii.   Leslie Kiernan traveled from Maryland and/or Washington, DC, to Chicago, Illinois, in furtherance of this fraudulent scheme.

    iv.   Diane Wood traveled from Chicago, Illinois, to Washington, DC, in furtherance of this fraudulent scheme.

    v.   Lombardo traveled to Maryland to meet with Jose Andres in furtherance of this fraudulent scheme.

417.   **Defendants attempted to murder Louis Antonacci as follows:**

a.   Utilizing interstate wires, the Defendants either infiltrated Antonacci's mobile device or communicated with his "friends" to discover where Antonacci would be the evening before he was scheduled to fly to Germany.

b.   Derran Eaddy went to Royal Restaurant with the intent to kill Antonacci.

c.   Derran Eaddy antagonized Antonacci by calling him a "privileged white piece of shit" and then pointing in his pregnant girlfriend's face in a threatening manner.

d.   Eaddy was hoping that he would capture Antonacci shouting racial slurs or attacking Eaddy.

e.   Eaddy attempted to murder Antonacci when he punched Antonacci in the nose, but Antonacci wrestled Eaddy to the ground before he could harm Antonacci further.

74

418.    Defendants' multiple violations of 18 USC § 1341, 18 USC § 1343, 18 USC § 1503, and constitute a "pattern" of racketeering activity.

419.    In light of the pattern of racketeering activity more particularly described above, Defendants' enterprise presents a clear threat of continued racketeering activity.

420.    Defendants maintained their interest in this enterprise by means of this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).

421.    Defendants have been directly participating in and conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

422.    The enterprise is separate and distinct from the pattern of racketeering activity.

423.    As a proximate result of these RICO violations, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

424.    Mr. Antonacci is entitled to recover treble damages, and the costs of bringing this action and the Circuit Court Case.

425.    The Defendants acted with gross fraud, wantonness, maliciousness, and willful disregard for Antonacci's rights, and are therefore liable for punitive damages.

426.    The damages Antonacci and his profession are incurring are ongoing.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of $105,000,000, plus punitive damages, attorneys' fees and the costs of this action.

75

## COUNT II: Violation of Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1962 (d) - RICO Conspiracy)
### (All Defendants)

427.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

428.    The association-in-fact of all Defendants named in this Complaint, together with the others described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

429.    Specifically, the enterprise is an association-in-fact among individuals and business entities designed to divert taxpayer money to members of the enterprise; destroy the professional reputation of anyone who seeks to expose the nature and extent of the enterprise through fraud, widespread defamation, and murder; protect the members of the enterprise from civil liability by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; bribing and otherwise incentivizing people associated with those deemed enemies of this enterprise to spread lies about those "enemies;" punishing attorneys who sue members of the enterprise by preventing them from becoming admitted to practice law; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; illegally infiltrating protected computers to spy on the "enemies" of the enterprise, in some cases through fraudulently obtained search warrants; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

430.    The enterprise has been engaged in activities which affect interstate and foreign commerce.

431.    Each Defendant is distinct from the enterprise itself but each Defendant, together with the others more particularly described above, has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

432.    Violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1503 (Obstruction of Federal Court Proceedings), 18 U.S.C. 1952 (Interstate and foreign travel or transportation in aid of racketeering enterprises) and Murder are specifically enumerated as "racketeering activity" in Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

433.    **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Hobbs Act Extortion) as follows:**

a.    Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

b.    Specifically, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to prevent Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c.    In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel utilized wrongful means to achieve wrongful objectives.

d.    In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to resolve the Circuit Court Case.

e.    In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to use wrongful means to achieve a wrongful objective, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful justification.

f.    In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to withdraw the Rule 9.3 Subpoenas.

g.    When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful justification.

h.    Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

i.    Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

434.    **The agreed-upon scheme involves knowing and intentional violations of 720 ILCS 5/12-6 (Illinois Intimidation/Extortion) as follows:**

a.    Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr.

78

Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

b.      Specifically, Mulaney, Walsh, and Sublett, threatened to prevent, without lawful authority, Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c.      In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to threaten delaying Mr. Antonacci's bar application until the Circuit Court Case was resolved, without lawful authority, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful authority.

d.   In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel threatened to deny his application to the Illinois Bar, without lawful authority, if he did not withdraw the Rule 9.3 Subpoenas.

e.   When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful authority.

f.   Mr. Antonacci subsequently withdrew his Illinois Bar Application before the Hearing Panel could deny it.

g.   Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

h.   Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

79

435. **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Activity) as follows:**

a. Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud, extort, and intimidate Mr. Antonacci.

b. In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

c. In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

d. In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr. Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

e. In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, used, or caused to be used, the mail and other facilities, including interstate wires, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the scheme to defraud, extort, and intimidate Mr. Antonacci.

80

f.    In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, traveled between New York, California, North Carolina, Illinois, Virginia, Connecticut, Maryland, and Washington, DC numerous times to collaborate with one another and present Antonacci with material misrepresentations of fact and material omissions.

g.    In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, set up Antonacci Law to do business with a front company, Storij, which is organized in Delaware and has its principal place of business in New York, whereby Storij obtained fraudulent U.S. government subcontracts for the sole purposes of gathering intelligence data on Antonacci.

h.    Firmender specifically orchestrated the AECOM Fraud and interstate travel between Connecticut, Virginia, the District of Columbia, and North Carolina in order to damage Antonacci's career.

i.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, and Gehringer corruptly and successfully endeavored to influence the outcome of Antonacci's federal case in Chicago, both at the district court level and in the Seventh Circuit Appeal.

436.    The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1503 (Obstruction of Justice), as more particularly described above.

437.    The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1341 (mail fraud), as more particularly described above.

438.    The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1343 (wire fraud), as more particularly described above.

81

439. Defendants thus conspired to engage in a "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

440. Defendants thus conspired to engage in a pattern of racketeering activity.

441. Defendants thus conspired to violate 18 U.S.C. §§ 1962(b) and (c) in violation of 18 U.S.C. § 1962 (d).

442. Major conspired on behalf of herself and on behalf of Major Law.

443. Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago and this enterprise.

444. Sublett and Asaro conspired on behalf of Neal & Leroy and this enterprise.

445. Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, Ponder, and this enterprise.

446. Kaplan conspired on behalf of himself, Seyfarth, Ponder and this enterprise.

447. Ponder conspired on behalf of herself, Seyfarth, and this enterprise.

448. Arnold conspired on behalf of himself, Sosin & Arnold, Toomey, and this enterprise.

449. Mulaney conspired on behalf of herself and this enterprise.

450. Kruse conspired on behalf of herself, on behalf of Kruse International, and this enterprise.

451. Sandy Toomey and Anderson conspired on behalf of Toomey and this enterprise.

452.    Lombardo conspired on behalf of himself, the Gibsons Restaurant Group and this enterprise.

453.    Firmender conspired on behalf of himself and this enterprise.

454.    FTI conspired on behalf of itself and this enterprise.

455.    Fusion GPS conspired on behalf of itself and this enterprise.

456.    Rokk conspired on behalf of itself and this enterprise.

457.    Derran Eaddy conspired on behalf of himself and this enterprise.

458.    Emanuel conspired on behalf of himself and this enterprise.

459.    Shapiro and Kiernan conspired on behalf of themselves, Holland & Knight, and this enterprise.

460.    Diane Wood conspired on behalf of herself and this enterprise.

461.    So and Wheeler conspired on behalf of themselves, Storij and this enterprise.

462.    As a proximate result of these RICO violations, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

463.    Mr. Antonacci is entitled to recover treble damages, the costs of bringing this action, and his reasonable attorneys' fees.

464.    The Defendants acted with gross fraud, wantonness, maliciousness, and willful disregard for Antonacci's rights, and are therefore liable for punitive damages.

465.    The damages Antonacci and his profession are incurring are ongoing.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of $105,000,000, plus punitive damages, attorneys' fees and

the costs of this action.

## COUNT III: STATUTORY BUSINESS CONSPIRACY
### (VA. CODE (1950) §§ 18.2-499, 18.2-500)
### (All Defendants)

466.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

467.    Defendants combined, agreed, mutually undertook, and concerted together, and with others, to effect preconceived plan and unity of design and purpose.

468.    The purpose of this plan was unlawfully to destroy Antonacci's legal career so that he could not expose the criminal nature of this enterprise.

469.    Shapiro and Kiernan conspired to defame Antonacci to prevent him from taking a senior associate position before they forced him to resign despite his overwhelming success for Holland & Knight and its clients.

470.    Shapiro, Kiernan, and Emanuel conspired to prevent Antonacci from getting another job until he applied for a position with Seyfarth Shaw and Anita Ponder after Emanuel had been elected Mayor of Chicago.

471.    Once he was in Chicago, Defendants conspired to have Ponder baselessly slander Antonacci to firm management, terminate him despite his generating his own business and receiving overwhelmingly positive performance evaluations from everyone but Ponder, and ensure the Ponder Slander Email was in his personnel file so that it would appear that he was incapable of doing his job.

472.    Once he was terminated from Seyfarth, the purpose of the plan was to

      a.      prevent Mr. Antonacci from prosecuting the Circuit Court Case, which is a breach of Major and Major Law's fiduciary duty to Mr. Antonacci;

84

b.      coerce and intimidate Mr. Antonacci into withdrawing the Circuit Court Case or accepting Seyfarth's initial settlement offer, by delaying his Illinois Bar Application and putting him on the Blacklist of attorneys disfavored by Cook County Circuit Court judges such that Mr. Antonacci could not earn a living practicing law in Chicago, in violation of 720 ILCS 5/12-6 and 18 USC § 1951; and

c.      coerce and intimidate Mr. Antonacci into withdrawing subpoenas lawfully served in Cook County, such that the Defendants would not have to quash those subpoenas without authority, in violation of 720 ILCS 5/12-6 and 18 USC § 1951;

473.    Gehringer was and is the architect of this conspiracy. Shortly after Mr. Antonacci rejected Seyfarth's initial settlement offer, Gerhinger, Seyfarth, Ponder, and Kaplan conspired with Major to

a.      keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b.      file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

c.      include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

85

d.    unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

e.    deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

f.    if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.    Gehringer agreed to coordinate with Gran, Brewer, and any other Cook County Circuit Court judges, as necessary, to pass instructions concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

h.    Major agreed to write a letter to Neriem, and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

i.    Gehringer agreed to conspire with others as needed moving forward.

86

474.    Gehringer conspired with Bronstein and Mulaney to have Storino removed from the Inquiry Panel and substituted with Sublett.

475.    Gehringer conspired with Mulaney, Sublett, and Walsh and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

476.    When, on April 23, 2013, Mr. Antonacci requested that the Inquiry Panel disclose any communications with Seyfarth or Ponder relating to Mr. Antonacci, Ponder, Seyfarth, and Gehringer conspired with Mulaney, Walsh, and Sublett and instructed them, utilizing interstate communications and U.S. Mail, to deny Mr. Antonacci's certification to the Illinois Bar on April 24, 2013, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

477.    Gehringer conspired with Bronstein, Fedo, and Asaro to unlawfully quash Mr. Antonacci's Rule 9.3 Subpoenas.

478.    Gehringer conspired with Patton, Nereim, and Dolesh to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

479.    From December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications,

87

to knowingly conceal the City's evidence of Ponder's fraudulent misconduct, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

480.    Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 18 USC §§ 1341, 1343, 1952.

481.    From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy, in violation of 18 USC §§ 1341, 1343, 1952.

482.    Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. On September 2, 2014, Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, in violation of 18 USC §§ 1341, 1343, 1952.

483.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's federal case in Chicago, both at the district court level and in the Seventh Circuit Appeal, in violation of 18 U.S.C. § 1503.

484.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's SCOTUS Petition, in violation of 18 U.S.C. § 1503.

485.    Defendants conspired with Derran Eaddy to attempt to murder Antonacci and race-bait him.

486.    Defendants, and the others set forth above, conspired with Rokk, FTI, and Fusion GPS to perpetuate a surreptitious defamation campaign against Antonacci, in violation of 18 U.S.C. §§ 1343 and 1341, and Va. Code § 18.2-499.

487.    Firmender conspired with the Defendants and others, as more particularly described above, to orchestrate the AECOM Fraud, in violation of 18 U.S.C. §§ 1343, 1341, and 3729, and Va. Code § 18.2-499.

488.    So, Wheeler, Storij, and other Defendants conspired to knowingly, and with intent to defraud, access Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in violation of 18 U.S.C. § 1830(b).

489.    Alternatively, So, Wheeler, Storij, and other Defendants conspired to provide false, incomplete, and/or misleading information to U.S. government officials in order to obtain illegally a warrant allowing them to do so.

490.    At all times relevant to these proceedings, Antonacci's computer was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

491.    At all times relevant to these proceedings, Antonacci's mobile phone was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

89

492.    Defendants, and the others more particularly described above, all made this agreement intentionally, purposefully, and without lawful justification.

493.    Defendants, and the others more particularly described above, each undertook acts in furtherance of this conspiracy.

494.    Major conspired on behalf of herself and on behalf of Major Law.

495.    Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago and this enterprise.

496.    Sublett and Asaro conspired on behalf of Neal & Leroy and this enterprise.

497.    Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, Ponder, and this enterprise.

498.    Kaplan conspired on behalf of himself, Seyfarth, Ponder and this enterprise.

499.    Ponder conspired on behalf of herself, Seyfarth, and this enterprise.

500.    Arnold conspired on behalf of himself, Sosin & Arnold, Toomey, and this enterprise.

501.    Mulaney conspired on behalf of herself and this enterprise.

502.    Kruse conspired on behalf of herself, on behalf of Kruse International, and this enterprise.

503.    Sandy Toomey and Anderson conspired on behalf of Toomey and this enterprise.

504.    Lombardo conspired on behalf of himself, the Gibsons Restaurant Group and this enterprise.

505. Firmender conspired on behalf of himself and this enterprise.

506. FTI conspired on behalf of itself and this enterprise.

507. Fusion GPS conspired on behalf of itself and this enterprise.

508. Rokk conspired on behalf of itself and this enterprise.

509. Derran Eaddy conspired on behalf of himself and this enterprise.

510. Emanuel conspired on behalf of himself and this enterprise.

511. Shapiro and Kiernan conspired on behalf of themselves and this enterprise.

512. Diane Wood conspired on behalf of herself and this enterprise.

513. So and Wheeler conspired on behalf of themselves, Storij and this enterprise.

514. As set forth above, Defendants willfully and maliciously combined, associated, agreed, mutually undertook and concerted to together to willfully and maliciously injure Antonacci in his reputation, business, and profession.

515. The damage Antonacci and his business are incurring is ongoing.

516. As a proximate result of these violations of Va. Code (1950) § 18.2-499, 18.2-500, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

517. Pursuant to Va. Code § 18.2-500, Mr. Antonacci is entitled to recover treble damages, the costs of bringing this action, and his reasonable attorneys' fees.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-

91

named Defendants, in the amount of $105,000,000, plus attorneys' fees and the costs of this action.

## COUNT IV: COMMON LAW CIVIL CONSPIRACY
### (All Defendants)

518.    All the preceding paragraphs are incorporated as if fully set forth herein.

519.    Defendants combined, agreed, mutually undertook, and concerted together to effect a preconceived plan of unity of design and purpose.

520.    The purpose of this plan was to destroy Antonacci's legal career so that he could not expose the criminal nature of the enterprise set forth above.

521.    The purpose of this plan was unlawfully to destroy Antonacci's legal career so that he could not expose the criminal nature of this enterprise.

522.    Shapiro and Kiernan conspired to defame Antonacci to prevent him from taking a senior associate position before they forced him to resign despite his overwhelming success for Holland & Knight and its clients.

523.    Shapiro, Kiernan, and Emanuel conspired to prevent Antonacci from getting another job until he applied for a position with Seyfarth Shaw and Anita Ponder after Emanuel had been elected.

524.    Once he was in Chicago, Defendants conspired to have Ponder baselessly slander Antonacci to firm management, terminate him despite his generating his own business and receiving overwhelmingly positive performance evaluations from everyone but Ponder, and ensure the Ponder Slander Email was in his personnel file so that it would appear that he was incapable of doing his job.

525.    Once he was terminated from Seyfarth, the purpose of the plan was to

92

d.      prevent Mr. Antonacci from prosecuting the Circuit Court Case, which is a breach of Major and Major Law's fiduciary duty to Mr. Antonacci;

e.      coerce and intimidate Mr. Antonacci into withdrawing the Circuit Court Case or accepting Seyfarth's initial settlement offer, by delaying his Illinois Bar Application and putting him on the Blacklist of attorneys disfavored by Cook County Circuit Court judges such that Mr. Antonacci could not earn a living practicing law in Chicago, in violation of 720 ILCS 5/12-6 and 18 USC § 1951; and

f.      coerce and intimidate Mr. Antonacci into withdrawing subpoenas lawfully served in Cook County, such that the Defendants would not have to quash those subpoenas without authority, in violation of 720 ILCS 5/12-6 and 18 USC § 1951;

526.    Gehringer was and is the architect of this conspiracy. Shortly after Mr. Antonacci rejected Seyfarth's initial settlement offer, Gerhinger, Seyfarth, Ponder, and Kaplan conspired with Major to

j.      keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

k.      file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

l.      include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied

93

Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

m.    unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

n.    deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

o.    if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

p.    Gehringer agreed to coordinate with Gran, Brewer, and any other Cook County Circuit Court judges, as necessary, to pass instructions concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

q.    Major agreed to write a letter to Neriem, and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to

94

harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

      r.    Gehringer agreed to conspire with others as needed moving forward.

527.    Gehringer conspired with Bronstein and Mulaney to have Storino removed from the Inquiry Panel and substituted with Sublett.

528.    Gehringer conspired with Mulaney, Sublett, and Walsh and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

529.    When, on April 23, 2013, Mr. Antonacci requested that the Inquiry Panel disclose any communications with Seyfarth or Ponder relating to Mr. Antonacci, Ponder, Seyfarth, and Gehringer conspired with Mulaney, Walsh, and Sublett and instructed them, utilizing interstate communications and U.S. Mail, to deny Mr. Antonacci's certification to the Illinois Bar on April 24, 2013, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

530.    Gehringer conspired with Bronstein, Fedo, and Asaro to unlawfully quash Mr. Antonacci's Rule 9.3 Subpoenas.

531.    Gehringer conspired with Patton, Nereim, and Dolesh to delay execution of the Chicago Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

532.    From December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

533.    Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 18 USC §§ 1341, 1343, 1952.

534.    From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy, in violation of 18 USC §§ 1341, 1343, 1952.

535.    Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. On September 2, 2014, Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, in violation of 18 USC §§ 1341, 1343, 1952.

536.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's federal case in Chicago,

both at the district court level and in the Seventh Circuit Appeal, in violation of 18 U.S.C. § 1503.

537.    Leslie Kiernan, Paul Kiernan, Emanuel, Seyfarth, Gehringer, FTI and Fusion GPS conspired to influence the outcome of Antonacci's SCOTUS Petition, in violation of 18 U.S.C. § 1503.

538.    Defendants conspired with Derran Eaddy to attempt to murder Antonacci and race-bait him.

539.    Defendants, and the others set forth above, conspired with Rokk, FTI, and Fusion GPS to perpetuate a surreptitious defamation campaign against Antonacci, in violation of 18 U.S.C. §§ 1343 and 1341, and Va. Code § 18.2-499.

540.    Firmender conspired with the Defendants and others, as more particularly described above, to orchestrate the AECOM Fraud, in violation of 18 U.S.C. §§ 1343, 1341, 18 U.S.C. §§ 3729, and Va. Code § 18.2-499.

541.    So, Wheeler, Storij, and other Defendants conspired to knowingly, and with intent to defraud, access Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in violation of 18 U.S.C. § 1830(b).

542.    Alternatively, So, Wheeler, Storij, and other Defendants conspired to provide false, incomplete, and/or misleading information to U.S. government officials in order to obtain illegally a warrant allowing them to do so.

543.    At all times relevant to these proceedings, Antonacci's computer was engaged in interstate and/or foreign commerce, as is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

544.    At all times relevant to these proceedings, Antonacci's mobile phone was engaged in interstate and/or foreign commerce, as is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

545.    Defendants, and the others more particularly described above, all made this agreement intentionally, purposefully, and without lawful justification.

546.    Defendants, and the others more particularly described above, each undertook acts in furtherance of this conspiracy.

547.    Major conspired on behalf of herself and on behalf of Major Law.

548.    Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago and this criminal enterprise.

549.    Sublett and Asaro conspired on behalf of Neal & Leroy and this criminal enterprise.

550.    Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, Ponder, and this criminal enterprise.

551.    Kaplan conspired on behalf of himself, Seyfarth, Ponder and this criminal enterprise.

552.    Ponder conspired on behalf of herself, Seyfarth, and this criminal enterprise.

553.    Arnold conspired on behalf of himself, Sosin & Arnold, Toomey, and this criminal enterprise.

554.    Mulaney conspired on behalf of herself and this criminal enterprise.

555.    Kruse conspired on behalf of herself, on behalf of Kruse International, and this criminal enterprise.

556. Sandy Toomey and Anderson conspired on behalf of Toomey and this criminal enterprise.

557. Lombardo conspired on behalf of himself, the Gibsons Restaurant Group and this criminal enterprise.

558. Firmender conspired on behalf of himself and this criminal enterprise.

559. FTI conspired on behalf of itself and this criminal enterprise.

560. Fusion GPS conspired on behalf of itself and this criminal enterprise.

561. Rokk conspired on behalf of itself and this criminal enterprise.

562. Derran Eaddy conspired on behalf of himself and this criminal enterprise.

563. Emanuel conspired on behalf of himself and this criminal enterprise.

564. Shapiro and Kiernan conspired on behalf of themselves and this criminal enterprise.

565. Diane Wood conspired on behalf of herself and this criminal enterprise.

566. So and Wheeler conspired on behalf of themselves, Storij and this criminal enterprise.

567. Defendants made this agreement intentionally, purposefully, and without lawful justification.

568. Defendants each undertook acts in furtherance of this conspiracy.

569. As a proximate result of this conspiracy, Mr. Antonacci has been injured in the amount of $35,000,000 in lost earnings, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named

Defendants, in the amount of $35,000,000, plus attorneys' fees and the costs of this action.

## COUNT V: COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. § 1030)
### (Storij)

570.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

571.    So and Wheeler, on behalf of Storij, knowingly, and with intent to defraud, accessed Antonacci's computer systems and mobile phone without authorization or exceeding authorized access, in violation of 18 U.S.C. § 1830.

572.    At all times relevant to these proceedings, Antonacci's computer was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

573.    At all times relevant to these proceedings, Antonacci's mobile phone was engaged in interstate and/or foreign commerce, and is therefore a "protected computer" as that term is used in 18 U.S.C. § 1030(e)(2)(B).

574.    Antonacci has suffered economic damage as a result of Storij's intentional violations of 18 U.S.C. § 1030, including lost profits, in an amount to be proven at trial.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against Storij, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial.

**A JURY TRIAL IS DEMANDED.**

100

**Dated: February 14, 2024 ♥**

Respectfully submitted,


<u>        /s/        </u>
Louis B. Antonacci
VSB No. 75840
**ANTONACCI PLLC**
501 Holland Lane, Unit 107
Alexandria, VA 22314
lou@antonaccilaw.com
T 703-300-4635

# EXHIBIT A

No. _____

In The
# Supreme Court of the United States

──────── ♦ ────────

# LOUIS B. ANTONACCI,

*Petitioner,*

v.

# CITY OF CHICAGO, *et al.*,

*Respondents.*

──────── ♦ ────────

ON PETITION FOR WRIT OF CERTIORARI TO
THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

──────── ♦ ────────

PETITION FOR WRIT OF CERTIORARI

──────── ♦ ────────

Louis B. Antonacci
*Petitioner and Counsel of Record*
ANTONACCI LAW PLLC
1875 Connecticut Avenue NW, 10th Floor
Washington, DC  20009
(202) 545-7590
lou@antonaccilaw.com

*Petitioner and Counsel of Record*

THE LEX GROUP<sup>DC</sup> ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

i

## QUESTIONS PRESENTED FOR REVIEW

Whether this Court's ruling in *Bell v. Hood*, 327 U.S. 678 (1946) prohibits the dismissal of Petitioner's well-pleaded RICO claims (18 U.S.C. §§ 1961 *et seq*.) for lack of subject matter jurisdiction.

Whether dozens of alleged acts of extortion, mail fraud, and wire fraud, perpetrated over a two-year period by lawyers, state court judges, and court reporters, sufficiently alleges a "pattern" of racketeering activity under RICO, when the criminal enterprise has undue influence over the state courts and attorney admission process and thus presents a clear threat of continued racketeering activity.

Whether a plaintiff may file an amended complaint, pursuant to FRCP 59(e), after a district court has already dismissed the complaint and entered judgment thereon.

Whether a district court may *sua sponte* dismiss a case for lack of diversity jurisdiction, and enter judgment thereon, without allowing any jurisdictional discovery, because the plaintiff used the word "resident" rather than "citizen" when describing the particular citizenship of the parties.

Whether a district court may *sua sponte* dismiss a case for lack of diversity jurisdiction, and enter judgment thereon, without allowing any jurisdictional discovery, despite the plaintiff's allegation that there is complete diversity of "citizenship" between the plaintiff and the defendants.

ii

Whether the unsupported affidavit of alleged Seyfarth Shaw LLP partner Joseph Damato, submitted with the brief of appellee, may destroy diversity jurisdiction and, if so, whether Seyfarth may properly be dismissed as a dispensable party, pursuant to this court's holding in *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989).

## PARTIES TO THE PROCEEDING AND
## RULE 29.6 STATEMENT

Petitioner is Louis B. Antonacci. Respondents are the City of Chicago, Seyfarth Shaw LLP, Anita J. Ponder, The Law Offices of Ruth I. Major, P.C., Ruth I. Major, Perkins Coie LLC, Matthew J. Gehringer, Kruse & Associates, LTD., Margaret Kruse, Toomey Reporting, Inc., Sosin & Arnold, Ltd., George A. Arnold, and Neal & Leroy LLC.

iv

## TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED FOR REVIEW...............i

PARTIES TO THE PROCEEDING AND RULE 29.6 STATEMENT ........................................iii

TABLE OF CONTENTS...........................................iv

TABLE OF AUTHORITIES ....................................ix

OPINIONS BELOW ................................................ 1

JURISDICTION ...................................................... 2

STATUTORY PROVISIONS INVOLVED................. 2

STATEMENT OF THE CASE ................................. 3

    A.    PROCEEDINGS BELOW ..................... 3

    B.    THE UNDISPUTED FACTS ............... 6

REASONS FOR GRANTING THE PETITION....... 15

    A.    THE DISTRICT COURT HAS JURISDICTION UNDER 28 U.S.C. § 1331 ..................................... 15

    B.    ANTONACCI HAS STATED PLAUSIBLE RICO CLAIMS FOR CONDUCT AND CONSPIRACY........ 27

    C.    IF NECESSARY, THE CASE SHOULD BE REMANDED TO DETERMINE IF DIVERSITY JURISDICTION EXISTS................... 32

D. IF NECESSARY, SEYFARTH
SHOULD BE DISMISSED AS A
DEFENDANT......................................35

CONCLUSION ........................................................36

APPENDIX:

Memorandum Opinion and Order of
The United States Court of Appeals for
The Seventh Circuit
        entered March 18, 2016 ......................1a

Order of
The United States Court of Appeals for
The Seventh Circuit
Re: Striking Appellant's Brief
        entered July 27, 2015........................10a

Order of
The United States Court of Appeals for
The Seventh Circuit
Re: Denying Motion to Amend Pleadings
        entered July 8, 2015..........................13a

Memorandum Opinion and Order of
The United States District Court for
The Northern District of Illinois –
Eastern Division
        entered May 5, 2015..........................15a

Judgment in a Civil Case of
The United States District Court for
The Northern District of Illinois
        filed May 5, 2015...............................20a

vi

Order of
The Supreme Court of Illinois
Re:  Denying Petition for Leave to Appeal
        entered November 25, 2015 .............. 22a

Order of
The Appellate Court of Illinois –
First Division
        entered August 17, 2015 ................... 23a

Order of
The Circuit Court of Cook County, Illinois
Re:  Granting Defendants' Motion to
Reconsider and Denying Plaintiff's
Motion to Reconsider
        entered July 23, 2014 ........................ 51a

Transcript of Hearing Proceedings before
The Honorable Eileen Mary Brewer
The Circuit Court of Cook County, Illinois
        on April 23, 2014 ............................... 81a

Order of
The Circuit Court of Cook County, Illinois
Re:  Denying Plaintiffs' Second Petition for
Substitution of Judge for Cause
        entered March 19, 2014 .................. 137a

Order of
The Circuit Court of Cook County, Illinois
Re:  Denying in Part and Granting in Part
Defendant's Motion to Dismiss
        entered December 6, 2013............... 139a

vii

Order of
The Circuit Court of Cook County, Illinois
Re:  Denying Seyfarth Shaw and Anita
Ponder's Motion to Seal Complaint
        entered August 1, 2013 ................... 141a

Inquiry Panel Report
        dated April 24, 2013 ....................... 143a

28 U.S.C. § 1332 ........................................ 149a

28 U.S.C. § 1341 ........................................ 160a

28 U.S.C. § 1343 ........................................ 162a

28 U.S.C. § 1951 ........................................ 164a

28 U.S.C. § 1952 ........................................ 166a

28 U.S.C. § 1961 ........................................ 170a

28 U.S.C. § 1962 ........................................ 177a

D.C. Code § 29-105.01 ............................... 179a

D.C. Code § 29-601.04 ............................... 181a

Ill. Com. Stat. 5/12-6 ................................. 186a

Ill. Com. Stat. 2016/401 ............................ 189a

Petitioner's Complaint
in The United States District Court for
The Northern District of Illinois –
Eastern Division
        filed April 29, 2015 .......................... 192a

viii

Petitioner's Petition for Leave to Appeal
in The Supreme Court of Illinois
        filed September 21, 2015................. 264a

Letter to
United States Court of Appeals for
The Seventh Circuit
Re:  Brief of Appellant
        dated July 10, 2015 ......................... 291a

Order of
The State of Illinois Supreme Court
Re:  Recording Devices
        entered March 15, 2005 ................. 295a

ix

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal,*
        556 U.S. 662 (2009)........................... 3, 5, 20, 29

*Bell v. Hood,*
        327 U.S. 678 (1946)............................... *passim*

*Bell Atlantic Corp. v. Twombly,*
        550 U.S. 544 (2007)........................... 3, 5, 20, 29

*Bridge v. Phoenix Bond & Indem. Co.,*
        553 U.S. 639 (2008)....................................... 27

*Carden v. Arkoma Associates,*
        494 U.S. 185 (1990)....................................... 33

*ChampionsWorld LLC v.*
*U.S. Soccer Federation, Inc.,*
        726 F. Supp. 2d 961 (N.D.Ill. 2010)............... 30

*Conley v. Gibson,*
        355 U.S. 41 (1957).......................................... 3

*Davis v. Loftus,*
        334 Ill. App. 3d 761 (1st Dist. 2002)........ 33, 35

*Gaynor v. American Association of*
*Nurse Anesthetists,*
        2015 IL App (1st) 150557-U
        (Dec. 30, 2015).............................................. 22

x

*Goosby v. Osser*,
  409 U.S. 512 (2015)......................................16

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
  492 U.S. 229 (1989)...........................27, 30, 31

*In re Harris*,
  93 Ill. 2d 285, 443 N.E.2d 557 (1982)..............9

*Kaye v. D'Amato*,
  357 F. App'x 706 (7th Cir. 2009)....................27

*Kramer v. McDonald's System, Inc.*,
  77 Ill. 2d 323 (Ill. 1979).................................34

*Liquid Air Corp. v. Rogers*,
  834 F.2d 1297 (7th Cir. 1987).......................31

*Morson v. Kreindler & Kreindler, LLP*,
  616 F. Supp. 2d 171 (D. Mass. 2009).......33, 35

*Newman-Green Inc. v. Alfonzo-Larrain*,
  490 U.S. 826 (1989)..................................ii, 35

*Passavant Mem'l Area Hosp. Ass'n v.*
*Lancaster Pollard & Co.*,
  2012 U.S. Dist. LEXIS 46590
  (C.D. Ill. 2012)....................................33, 34, 35

*Riley v. Vilsack*,
  665 F. Supp. 2d 994 (N.D. Ill. 2011)..............29

*Shapiro v. McManus*,
  136 S. Ct. 450 (2015)....................................17

xi

*Shields Enterprises, Inc. v.*
*First Chicago Corp.*,
　　975 F.2d 1290 (7th Cir. 1992)........................ 30

*Shockley v. Jones*,
　　823 F.2d 1068 (7th Cir. 1987)........................ 32

*Signicast, LLC v. Fireman's Fund Ins.* Co.,
　　920 F. Supp. 2d 967 (E.D. Wis. 2013) ........... 33

*Steel Co. v. Citizens for a Better Env't*,
　　523 U.S. 83 (1998)......................................... 17

**STATUTES**

18 U.S.C. § 1341........................................... 2, 27, 28

18 U.S.C. § 1343........................................... 2, 27, 28

18 U.S.C. § 1951........................................... 2, 27, 28

18 U.S.C. § 1952........................................... 2, 27, 28

18 U.S.C. §§ 1961 *et seq.*.................................. *passim*

18 U.S.C. § 1961(1) ........................................... 27, 28

18 U.S.C. § 1961(5) ................................................. 27

18 U.S.C. § 1962....................................................... 2

28 U.S.C. § 1254(1) ................................................... 2

28 U.S.C. § 1331........................................... 2, 3, 15

28 U.S.C. § 1332........................................... 2, 3, 33

28 U.S.C. § 1653....................................................... 2

xii

720 Ill. Com. Stat. 5/12-6 ...................................... 2, 28

805 Ill. Com. Stat. 206/401(f) ............................... 2, 34

D.C. Code § 29-105.01(a) ..................................... 2, 34

D.C. Code § 29-601.04(b) ..................................... 2, 34

**RULES**

Fed. R. Civ. P. 8(a)(2) ................................................. 3

Fed. R. Civ. P. 59(e) ............................................. i, 4, 6

Ill. R. Prof. Resp. 5.5(c) ............................................ 25

Bd. of Admissions to the Bar & the Comm. on
Character & Fitness of the Sup. Ct. of Ill. R. of
Proc. R. 9.3(c) ......................................................... 11

**OTHER AUTHORITIES**

Gregor Aisch, Eric Buth, Matthew Bloch,
Amanda Cox and Kevin Quealy,
*The Best and Worse Places to Grow Up:
How Your Area Compares*, The New York
Times | The Upshot (May 4, 2015) .......................... 20

*Attorney Grievance Commission of Maryland
v. Gerald Isadore Katz*, Miscellaneous
Docket AG No. 6, September Term, 2014 ........... 25-26

Ben Austen, *Chicago after
Laquan McDonald*, THE NEW YORK
TIMES MAGAZINE (April 20, 2016) ............................. 20

xiii

Raj Chetty, Nathaniel Hendren, Patrick
Kline, and Emmanuel Saez, *Where is the Land
of Opportunity? The Geography of
Intergenerational Mobility in the United
States*, QUARTERLY JOURNAL OF ECONOMICS
129(4): 1553-1623 (2014) .........................................20

Nicole Gonzalez Van Cleve*, Chicago's criminal
court system is as flawed as its police*, Crain's
Chicago Business (June 14, 2016)............................19

Nicole Gonzalez Van Cleve, CROOK COUNTY:
RACISM AND INJUSTICE IN AMERICA'S
LARGEST CRIMINAL COURT (Stanford
University Press) (2016)..........................................19

Cynthia Dizikes, Todd Lightly, *Legal Battles
Hidden from Public View*, CHICAGO TRIBUNE
(February 24, 2013) .................................................23

Editorial Board, *We Are Listening: Profile on
Michael Dolesh*, CHICAGO TRIBUNE
(February 28, 2013) .................................................24

*The Fish Rots from the Head in Chicago*,
NATIONAL JOURNAL (circa. Dec. 7, 2015).................18

Fortune Editors, *The World's 19 Most
Disappointing Leaders*, FORTUNE
(March 30, 2016, 9:00 AM) ......................................18

Francis Fukuyama, *America in Decay: The
Sources of Political Dysfunction*, 93 Foreign
Affairs 5 (2014) ................................................26, 32

Taylor Humphrey, David Krane, Alex Chew,
John Simmons, *2015 Lawsuit Climate Survey:
Ranking the States*, U.S. Chamber Institute
for Legal Reform (September 10, 2015) ................... 19

Jason Meisner, *Emanuel Averts Witness Stand
as City Settles Suit by Whistleblower Cops*,
CHICAGO TRIBUNE (May 31, 2016, 7:44 PM) ............ 18

Jason Meisner, Stacy St. Clair, *Senior City
Lawyer Quits after Judge Rules He Hid
Evidence in Fatal Police Shooting*,
CHICAGO TRIBUNE (Jan. 5, 2016, 6:51 AM) .............. 18

Jack Mirkinson, *Rahm Emanuel is a
National Disgrace: Why He Represents
Every Worst Instinct of the Democratic Party*,
SALON (Jan. 7, 2016, 1:24 PM) ................................ 18

NPR Staff, *The View from Illinois:
Voters Frustrated that Government is
Broken*, NPR (April 15, 2016, 9:13 AM) ................... 20

Amanda Robert, *In Illinois, Some Push
Bankruptcy as Solution to Troubled Public
Budgets*, FORBES (April 19, 2016, 9:46 AM) ............. 20

1

**OPINIONS BELOW**

The Seventh Circuit's opinion is unpublished and reproduced at Pet. App. 1a-9a. The Seventh Circuit's order requiring the petitioner to identify "by name" each member of Neal & Leroy LLC and Perkins Coie LLC, as well as each partner of Seyfarth Shaw LLP, and the state of citizenship of each member or partner thereof, is also unpublished and reproduced at Pet. App. 10a-12a. The district court's *sua sponte* memorandum opinion and judgment is unpublished and reproduced at Pet. App. 15a-21a.

The Supreme Court of Illinois's order denying Antonacci's petition for leave to appeal (Pet. App. 22a) is reported at 42 N.E.3d 369. The opinion of the Appellate Court of Illinois, First District, First Division (Pet. App. 23a-51a), is reported at 39 N.E.3d 225. The memorandum opinion of the Circuit Court of Cook County, Illinois, County Department, Law Division ("Cook County Circuit Court"), is unpublished and reproduced at Pet. App. 51a-80a. Other relevant, unpublished opinions of Cook County Circuit Court, as well as the transcript of the April 23, 2014 hearing before The Honorable Eileen M. Brewer, are reproduced at Pet. App. 81a-142a.

The Report of the Inquiry Panel convened by the Supreme Court of Illinois's Committee on Character and Fitness is unpublished and reproduced at Pet. App. 143a-148a.

2

## JURISDICTION

The Seventh Circuit issued its per curiam opinion on March 18, 2016. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1254(1).

## STATUTORY PROVISIONS INVOLVED

This case involves 28 U.S.C. § 1331 "Federal Questions," which states, in its entirety, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

This case also involves 28 U.S.C. § 1653 "Amendment of pleadings to show jurisdiction," which states, in its entirety, "[d]effective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."

The following statutory provisions are also involved in this case:

18 U.S.C. § 1341..................... 160a-61a
18 U.S.C. § 1343..................... 162a-63a
18 U.S.C. § 1951..................... 164a-65a
18 U.S.C. § 1952..................... 166a-69a
18 U.S.C. § 1961..................... 170a-76a
18 U.S.C. § 1962..................... 177a-78a
28 U.S.C. § 1332..................... 149a-59a
720 ILCS 5/12-6 .................... 186a-88a
805 ILCS 206/401(f)............... 189a-91a
DC ST § 29-105.01(a)............. 179a-80a
DC ST § 29-601.04(b)............. 181a-85a

3

## STATEMENT OF THE CASE

### A.    PROCEEDINGS BELOW

On April 29, 2015, Petitioner Louis B. Antonacci, an attorney and a citizen of the District of Columbia, brought against all respondents two (2) counts under the Racketeer Influenced and Corrupt Organizations Act, as well as one (1) count of common law civil conspiracy, in the U.S. District Court for the Northern District of Illinois. He also brought three (3) causes of action against his former lawyer, Ruth Major, and her law firm, Major Law, for common law fraud, breach of fiduciary duty, and legal malpractice.

Antonacci alleged both federal question (28 U.S.C. § 1331) and diversity (28 U.S.C. § 1332) subject-matter jurisdiction. On May 5, 2015, district judge Milton I. Shadur dismissed Antonacci's complaint, *sua sponte*, for lack of subject matter jurisdiction, and entered judgment thereon. Shadur reasoned that Antonacci could not invoke federal-question jurisdiction because his RICO claim 1) did not comply with the Federal Rule of Civil Procedure Rule 8(a)(2) requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief," and 2) it "plainly appear[ed] to fail – flat-out – the 'plausibility' requirement established by the Twombly-Iqbal canon that has taken the place of the long-standing and overly generous Conley v. Gibson approach." Similarly, the district court found two (2) fundamental defects in the complaint that destroyed diversity jurisdiction: 1) Antonacci used the word "resident," rather than "citizen," when describing the parties, and

2) Antonacci alleged the state of organization for the two limited liability partnerships, and the one limited liability company, rather than the states of citizenship for each and every one of their limited liability partners or members.

For those reasons, the district court dismissed Antonacci's complaint and entered judgment thereon. Judge Shadur further concluded his memorandum opinion with the following:

> But because this Court's view has always been that the "must dismiss the suit" language of [*Adams v. Catrambone*, 359 F.3d 858, 861 (7th Cir. 2004)] may be viewed as Draconian in nature, its consistent practice has been to comply with that case's mandate but, if a plaintiff were to cure that deficiency within the 28-day time frame made available by FRCP 59(e), to entertain a motion that would avoid the plaintiff's having to file a new lawsuit – on condition, however, that a payment equivalent to another filing fee must be tendered by the plaintiff to avoid his, her or its having to redraft a bulky complaint.

The district court's invitation to file a FRCP 59(e) motion – to alter or amend a judgment – does not seem to make sense where, as here, the complaint had been dismissed as a result of the judgment. And note the district court's indecipherable "condition" that Antonacci pay another filing fee so that he would not "redraft a bulky complaint."

5

Antonacci filed his notice of appeal on June 2, 2015. None of the respondents filed a cross-appeal.

On July 27, 2015, the Seventh Circuit issued an order striking Antonacci's brief for failing to identify "by name" each member of Neal & Leroy LLC and Perkins Coie LLC, as well as each partner of Seyfarth Shaw LLP, and the state of citizenship of each member or partner thereof. Pet. App. 10a-12a. The Seventh Circuit ordered Antonacci to file a new brief, by July 31, 2015, that conformed to this requirement.[1] On March 18, 2016, the Seventh Circuit affirmed the decision of the district court, albeit on different grounds. As set forth above, the district court erroneously dismissed the complaint for lack of subject matter jurisdiction pursuant to *Twombly* and *Iqbal*. The Seventh Circuit erroneously affirmed that decision because it found Antonacci's RICO claims "legally frivolous," and thus did not

---

[1] The lower courts' proceedings were rife with irregularity. Initially, Antonacci was not allowed electronic filing privileges, which is mandatory in the Seventh Circuit. The Seventh Circuit's clerk instructed Antonacci to file a motion requesting electronic filing privileges. Antonacci did so on July 6, 2015, together with his motion to amend his complaint to cure the alleged jurisdictional deficiencies regarding diversity of citizenship. The motion was denied in its entirety on July 8, 2015. Antonacci's production vendor attempted to file the brief of appellant in paper form on July 9, 2015, but the clerk rejected the filing and later instructed Antonacci to file a motion for extension of time to file his brief. Antonacci had to write a letter to the clerk, with a screen shot, proving that he did not have ECF privileges, before he was allowed to file electronically. Pet. App. 291a-94a. Additionally, on August 5, 2015, respondents jointly moved for a 35-day extension of time to file their Briefs of Appellee, which was granted the very next day. The Illinois Appellate Court issued its opinion eleven days later, without oral argument.

meet the *Bell v. Hood* standard. The Seventh Circuit reasoned that "[w]hile [Antonacci] premises his RICO claims on multiple allegations of fraud, each individual allegation is so unsupported by any plausible detail as to be preposterous." The Seventh Circuit further ruled that diversity jurisdiction is not available to "salvage" this case because Seyfarth submitted the affidavit of Joseph Damato, which alleges he is an equity partner at Seyfarth and a citizen of the District of Columbia, and thus no jurisdictional discovery is required.

Finally, the Seventh Circuit incorrectly asserted the district court "gave [Antonacci] 28 days to file an amended complaint, which it promised to consider." As demonstrated above, the district court entered judgment and closed the case in the district court, so no amended complaint could be filed. The district court even specifically instructed Antonacci not to file an amended complaint. And the district court's invitation to file a FRCP 59(e) motion would do nothing to advance Antonacci's case in any event. But the Seventh Circuit nonetheless went so far as to hold that Antonacci did not deserve another "chance" because of "his own failure to take advantage of the last-chance opportunity extended by the district court."

The opportunity to do what, exactly, remains unclear.

## B.    THE UNDISPUTED FACTS

Antonacci will not belabor the details of his allegations because he reproduced the complaint in the appendix. Pet. App. 192a-263a. But he will

7

summarize his allegations briefly to demonstrate how they were misconstrued by the Seventh Circuit.

In August 2011, Antonacci relocated from Washington, DC, to his hometown of Chicago to work for Seyfarth in its commercial litigation group. Pet. App. 200a. Antonacci was already licensed to practice law in Wisconsin, Virginia, and the District of Columbia. Pet. App. 199a-200a. Antonacci successfully worked for numerous partners at Seyfarth, independently generated business, and received nothing but overwhelmingly positive performance evaluations. Pet. App. 201a-202a. Antonacci was nonetheless summarily terminated from Seyfarth, with seven hours' notice, on May 22, 2012, as the result of a purported layoff. Pet. App. 201a.

Antonacci hired a local attorney, Major and Major Law, who requested Antonacci's personnel file from Seyfarth. Pet. App. 203a. Antonacci's personnel file revealed that Ponder – a longtime Chicago lobbyist[2] who had been hired by Seyfarth as a result of Mayor Emanuel's recent election – had been lying about Antonacci and his work to numerous senior

---

[2] Oddly, the Seventh Circuit expressly doubted the veracity of facts that may be easily gleaned from public records. That Ponder was a City lobbyist until 2010 is a matter of public record. Similarly, Ponder's federal tax liens are a matter of public record as well. That Ponder was contributing to dozens of local political campaigns, rather than pay her federal taxes, is also a matter of public record. In ironic contrast, the Seventh Circuit seems to suggest that Antonacci is somehow capable of determining the state of domicile of every equity partner and/or member of the law firm respondents, without any jurisdictional discovery, as Chief Judge Diane Wood claimed during the oral argument of January 26, 2016. That is impossible.

partners at Seyfarth. Pet. App. 199a-200a, 202a-03a. Major agreed to aggressively pursue Antonacci's case against Seyfarth and Ponder. Pet. App. 203a, 234a. After initial claim settlement negotiations failed, Major worked with the City of Chicago to ensure that no privileged information was disclosed in the complaint. Pet. App. 205a. On November 21, 2012, Major filed Antonacci's verified complaint in Cook County Circuit Court, alleging defamation and other torts against Seyfarth and Ponder, and the enterprise sprang into action. Pet. App. 206a.

Antonacci had applied for admission on motion to the Illinois bar in April 2012. Pet. App. 201a. A member of the Illinois Supreme Court's Character and Fitness Committee, Ellen Mulaney, had scheduled a routine interview with Antonacci prior to Major filing the complaint. Pet. App. 206a. Shortly after Major filed the complaint, Mulaney postponed the interview indefinitely. Around the same time, Seyfarth offered to settle the case for $100,000, but threatened that if Antonacci did not accept the offer, then they would make his professional life difficult. *Id*. Antonacci told Major to counteroffer, which she did not do. *Id*. Instead, she agreed to work with Seyfarth, Gehringer, and Perkins Coie to sabotage his case and run up his legal bills.[3] Pet. App. 207a-09a. Shortly thereafter, Mulaney indicated to Antonacci that they would skip the interview and proceed directly to an Inquiry Panel. Pet. App. 206a.

Seyfarth and Ponder then moved to seal the complaint and dismiss it for failure to state a claim.

---

[3] Major had refused to work on a contingency fee basis.

Pet. App. 211a. The Inquiry Panel met with Antonacci, at the offices of respondent Neal & Leroy, LLC, while those issues were briefed. Pet. App. 214a-16a. The Inquiry Panel was openly hostile towards Antonacci, focusing their harassment on Antonacci's intentions in filing the complaint. *Id.* They tried to coerce him into withdrawing the case, which he refused to do, so they instructed him to inform them of the results of the upcoming hearing on the motion to dismiss the complaint. *Id.* The Panel reasoned that Seyfarth and Ponder had alleged Antonacci may have violated the Rules of Professional Conduct by filing the complaint, and thus they wanted Circuit Judge Eileen Brewer's opinion on that issue. *Id.* The Circuit Court has no jurisdiction to hear allegations regarding violations of the Rules of Professional Conduct.[4] Moreover, Judge Brewer had recused herself from hearing Seyfarth and Ponder's motion to seal the complaint, as a result of her own improper sealing of court records in cases where she was personally involved (*see* note 11, *infra*), but the Inquiry Panel was not interested in that hearing. Pet. App. 222a.

The April 2, 2013 hearing was held and Judge Brewer criticized Antonacci's complaint as incoherent and indecipherable, despite that it was verified and complete with numerous exhibits substantiating his allegations. Pet. App. 216a. Kelly Gofron's email memorializing some of Ponder's defamatory statements was not exhibited to the

---

[4] The Illinois Supreme Court has exclusive and plenary jurisdiction over attorney disciplinary matters, which it has delegated to the Attorney Registration and Disciplinary Commission. *In re Harris*, 93 Ill.2d 285, 291, 443 N.E.2d 557 (1982).

10

verified complaint ("Ponder Slander Email"). Pet. App. 208a. She dismissed his defamation and tortious interference counts without prejudice and stated that the Ponder Slander Email must be exhibited to the amended complaint. Pet. App. 208-09a, 216a. Antonacci asked Major to seek dismissal with prejudice and appeal, so that he could stand on his verified complaint. Pet. App. 216a. Major refused, saying that he needed to let her manage the proceedings. *Id.* The Illinois Appellate Court would later rule that Ponder's lies, memorialized in the Ponder Slander Email, must be accepted as true, because the Ponder Slander Email was attached to the amended complaint. Pet. App. 35a, 39a-42a.

Major filed the amended verified complaint, with the Ponder Slander Email attached, and began filing a series of frivolous motions in order to run up his legal bills – she billed him $50,000 in three months during the pleading stage of a four-count complaint against two defendants. Pet. App. 218a. Meanwhile, Antonacci reported to the Inquiry Panel, per its request, that Brewer had correctly indicated that she had no jurisdiction to determine allegations of violations of the Illinois Rules of Professional Conduct. Pet. App. 217a. Mulaney responded by asking Antonacci to keep the Panel apprised of developments in the case. *Id.* On April 23, 2013, Antonacci asked the Panel to disclose any communications with the respondents concerning his application or the circuit court case. *Id.* The Panel issued its report declining to certify him for admission to the bar the following day. *Id.*

Antonacci sought review of the Inquiry Panel's decision before a Hearing Panel chaired by former

City of Chicago lawyer, and former Cook County Circuit Court Judge, Philip Bronstein. Pet. App. 219a-220a. Pursuant to Rule 9.3(c) of the Rules of the Illinois Committee on Character and Fitness, Antonacci served subpoenas on Seyfarth, Ponder, members of his Inquiry Panel, the City of Chicago, and others seeking evidence that they had conspired to harass and intimidate Antonacci, cause him financial duress by indefinitely postponing his admission to the Illinois Bar, and coerce him into withdrawing the Circuit Court Case. *Id.* Upon notification that Antonacci had served those subpoenas, Bronstein immediately restyled Antonacci's hearing panel as a "pre-hearing conference," and, after unsuccessfully attempting to coerce Antonacci into withdrawing those subpoenas during that "conference," simply quashed them without any lawful authority. Pet. App. 220a-221a. Antonacci withdrew his application to the Illinois bar and moved back to DC. Pet. App. 222a.

Shortly after Antonacci relocated to Washington, DC, Major refused to execute Judge Maddux's order denying Seyfarth's motion to seal the verified complaint.[5] Pet. App. 141a-42a, 222a. She then indicated that she could no longer represent Antonacci and would withdraw her representation after filing a response to Seyfarth and Ponder's motion to dismiss the amended complaint. Pet. App. 222a-223a. Antonacci fired her immediately and proceeded *pro se.* Pet. App. 223a.

Seyfarth and Ponder's motion to dismiss the amended verified complaint was scheduled to be

---

[5] Judge Brewer had sealed the complaint pending the outcome of the motion to seal.

12

heard on December 6, 2013. Pet. App. 225a-26a. Antonacci had moved for leave to file a surreply to that motion *instanter* weeks before the hearing, but he presented it to Judge Brewer on December 5, 2013. Pet. App. 224a. Because Gehringer and Brewer were initially unaware that Antonacci had a court reporter present at the December 5, 2013 hearing, Brewer screamed at Antonacci in a hysterical manner for about the first minute of the proceeding. *Id*. When Antonacci received the transcript two weeks later, he noted that Brewer's hysterical tirade was absent. Antonacci spoke to the court reporter, Peggy Anderson, via telephone, and she claimed that she did not remember Brewer's hostile outbursts, but she had checked the transcript against the audio and it matched. Pet. App. 228a-29a. Antonacci asked if he could listen to the audio recording. Pet. App. 229a. Peggy Anderson said she would ask her boss, Sandy Toomey, president of respondent Toomey Reporting. *Id*.

Toomey left Antonacci a voice message where she falsely claimed that the audio recording of the hearing had been deleted and could not be retrieved. *Id*.; *see also* Pet. App. 105a-06a. Antonacci followed up with an email asking if he could review the court reporter's stenographic notes, which she had taken on a laptop computer. Pet. App. 87a-88a. Toomey responded "[w]e can't give our only copy of the notes to an attorney. With a court order in front of a judge we can read the notes to you." Pet. App. 274a. Antonacci issued subpoenas for documents and testimony, and for the forensic examination of the court reporter's laptop. Pet. App. 87a, 275a. Brewer quashed those subpoenas. Pet. App. 230a-32a, 276a, 278a.

13

Turning back to Seyfarth and Ponder's motion to dismiss the amended verified complaint, on December 6, 2013, Brewer dismissed the tortious interference claim with prejudice, but allowed Antonacci's defamation claim to proceed based solely on Antonacci's allegation that Ponder had falsely accused Antonacci of engaging in the unauthorized practice of law. Pet. App. 139a-40a, 225a-26a. Rather than require the defendants to answer the complaint, Brewer invited them to file a motion to strike every other allegation in the amended complaint. *Id.* She scheduled a "clerk's status" on that motion – when the parties meet with the judge's law clerk to set a hearing date – for mid-February 2014. Pet. App. 140a-41a. In light of Brewer's apparent efforts to unreasonably delay the proceedings, Antonacci asked her if she knew Ponder. Pet. App. 55a, 273a-74a. Brewer responded "I do not know Anita Ponder." *Id.* She later refused to execute an affidavit attesting to that fact. Pet. App. 58a, 277a.

Because Brewer had erroneously ruled that he could not allege Ponder had made additional defamatory statements about him to City of Chicago[6] officials "upon information and belief," Antonacci served subpoenas on the City on December 20, 2013. Pet. App. 75a-76a, 225a. City attorney Mike Dolesh utilized U.S. mails and interstate wires to falsely claim that evidence of Ponder's fraudulent misconduct did not exist, and then further falsely claim that he had sent documents responsive to

---

[6] Antonacci's work with Ponder involved advising the City of Chicago on reforms to its affirmative action programs in city procurement.

14

Antonacci's subpoenas to Brewer's chambers for an *in camera* review, which Dolesh did not do. Pet. App. 226a-28a. Brewer ultimately quashed Antonacci's subpoenas for the deposition testimony of Chicago Corporation Counsel, Stephen Patton, as well as its Director of Procurement Services, Jamie Rhee, and further ruled that the *in camera* review was mooted by her dismissal of the case. *Id.*, *see also* Pet. App. 134a-35a.

Antonacci moved to substitute Brewer for cause, which was heard before Judge Hogan on March 21, 2014. Pet. App. 137a-38a. A few weeks before the hearing, Antonacci delivered to Brewer a draft affidavit whereby she could corroborate her false statement of December 6, 2013, claiming she was not acquainted with respondent Ponder. Pet. App. 58a, 277a. Brewer refused to execute that affidavit. *Id.* She did not appear at the hearing to substitute her and no testimony was given. Pet. App. 137a-38a.

Brewer read a prepared opinion into the record during a hearing of March 23, 2014, but refused to issue an appealable order in the hope that Antonacci's case would get put into Cook County Circuit Court's "Black Line Pool," where cases that have been on the docket for extended periods of time are called for trial with little notice and subject to dismissal for want of prosecution. Pet. App. 277a-78a. Antonacci's case was put in the Black Line Pool, but he had it affirmatively removed and placed back on Brewer's docket. *Id.*

On April 23, 2014, a hearing was held on Antonacci's motion to reconsider Brewer's order

quashing the subpoenas he had served on Toomey. Pet. App. 81a-136a. The transcript of that hearing is reproduced in the appendix because it demonstrates Brewer's nonsensical and untoward harassment of Antonacci, and her deliberate, concerted effort to conceal Toomey's falsification of the December 5, 2013 hearing transcript. *Id*. The transcript also demonstrates the charade of legal process practiced by this criminal enterprise: Sandy Toomey and Peggy Anderson were present at the hearing, with prepared statements, but they were never actually sworn to give testimony, so they could simply lie without fear of repercussion, which they did. *Id*. And when Antonacci pointed out that he was never given any of the documents that the City of Chicago allegedly produced, Brewer ran off the bench and the hearing concluded. Pet. App. 134a-35a.

## REASONS FOR GRANTING THE PETITION

This Petition should be granted because the Seventh Circuit has decided an important federal question in a way that conflicts with relevant decisions of this Court. In addition, the Seventh Circuit has so far departed from the accepted and usual course of judicial proceedings, and further sanctioned such a departure by the district court, as to call for an exercise of this Court's supervisory power.

## A. THE DISTRICT COURT HAS JURISDICTION UNDER 28 U.S.C. § 1331

From a purely legal perspective, this is an easy case. 28 U.S.C. § 1331 gives the district courts original jurisdiction over "all civil actions arising

under the Constitution, laws, or treaties of the United States." Antonacci asserts two (2) causes of action under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq*. "RICO"), and thus the district court had subject matter jurisdiction over this case so this Petition should be granted and the Seventh Circuit reversed.

The Seventh Circuit erroneously ruled that this Court's decision in *Bell v. Hood* mandates dismissal of Petitioner Antonacci's complaint for lack of subject-matter jurisdiction, despite the fact that Antonacci plainly alleged the respondents are part of a criminal enterprise, which unlawfully engaged in a pattern of racketeering activity prohibited by RICO, and further presents a clear threat of racketeering activity. The Seventh Circuit erred in this regard because "[j]urisdiction ... is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell*, 327 U.S. at 682, 66 S. Ct. 773. "Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Id*. at 682. The Seventh Circuit relied on *Bell* for the opposite conclusion of law.

Indeed, this Court has "long distinguished between failing to raise a substantial federal question for jurisdictional purposes—which is what [*Goosby v. Osser*, 409 U.S. 512, 93 S. Ct. 854, 35 L. Ed. 2d 36 (2015)] addressed—and failing to state a claim for relief on the merits; only "wholly insubstantial and frivolous claims implicate the

former." *Shapiro v. McManus*, 136 S. Ct. 450, 455, 193 L. Ed. 2d 279 (2015) (citing *Bell*). "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010, 140 L. Ed. 2d 210 (1998).

This case arises, *inter alia*, under 18 U.S.C. §§ 1961 *et seq*. And, as set further demonstrated in Section B, *infra*, Antonacci's RICO claims are neither insubstantial nor frivolous. The district court had subject-matter jurisdiction so the Seventh Circuit should be reversed. But this case is about much more than that.

Antonacci asks this Honorable Court to reverse the Seventh Circuit's decision, affirming the Northern District of Illinois's ruling, that the Chicago Machine may utilize the judicial and attorney-admission processes to commit fraud and extortion with impunity. Antonacci has plainly alleged the respondents are part of a criminal enterprise that engaged in dozens of acts of extortion, mail fraud, and wire fraud, over a two-year period. More importantly, the respondents and their co-conspirators exert undue influence over the state courts and attorney admission process in Illinois, and thus this enterprise presents a grave threat of continued racketeering activity.

Both the district court and the Seventh Circuit essentially ruled that the notion of corrupt lawyers and judges in Chicago is facially absurd, and

18

thus Antonacci cannot invoke federal-question subject-matter jurisdiction under RICO. According to both those courts, lawyers, judges, and court reporters in Chicago are simply incapable of engaging in such a pattern of fraud and extortion. Of course, Chicago has been a symbol of political corruption the world over for generations, and while many had believed that current Mayor Rahm Emanuel would seek aggressive reform of Chicago's systemic corruption, that reform has not materialized.[7] So the conduct Antonacci has alleged is not only believable, but is indeed expected by anyone who knows anything about the way law and politics works in Chicago. Or rather, the way law and politics does not work, and that is precisely the point.

---

[7] Jack Mirkinson, *Rahm Emanuel is a National Disgrace: Why He Represents Every Worst Instinct of the Democratic Party*, SALON (Jan. 7, 2016, 1:24 PM), http://www.salon.com/2016/01/07/rahm_emanuel_is_a_national _disgrace_why_he_represents_every_worst_instinct_of_the_de mocratic_party/; Jason Meisner, *Emanuel Averts Witness Stand as City Settles Suit by Whistleblower Cops*, CHICAGO TRIBUNE (May 31, 2016, 7:44 PM), http://www.chicagotribune.com/news/local/breaking/ct-whistleblower-cops-code-of-silence-trial-met-20160530-story.html; Fortune Editors, *The World's 19 Most Disappointing Leaders*, FORTUNE (March 30, 2016, 9:00 AM), http://fortune.com/2016/03/30/most-disappointing-leaders/; Jason Meisner, Stacy St. Clair, *Senior City Lawyer Quits after Judge Rules He Hid Evidence in Fatal Police Shooting*, CHICAGO TRIBUNE (Jan. 5, 2016, 6:51 AM), http://www.chicagotribune.com/ct-chicago-cop-killing-retrial-ordered-met-20160104-story.html; *The Fish Rots from the Head in Chicago*, NATIONAL JOURNAL (circa. Dec. 7, 2015), https://www.nationaljournal.com/s/125098/fish-rots-from-head-chicago?oref=email ("A Chicago cop killed a teenager and the Emanuel administration fucked with the evidence. Pick up the rhetorical knife, Democrats, and aim it at Rahmbo: dead man.")

19

The northern district and the Seventh Circuit are protecting a failed system of corruption. Maybe they are doing so because that is the only system they know. But, back in 1970, the United States Congress – at a time when it worked better than it does today – wisely passed the Racketeer Influenced and Corrupt Organizations Act, as part of the Organized Crime Control Act, because of the deleterious effect organized crime has on human life and interstate commerce. And the criminal enterprise Antonacci details in his complaint represents the most dangerous and insidious criminal gang possible, because its undue influence over legal processes allows the enterprise to perpetrate criminal acts with absolute impunity. As a result, Cook County Circuit Court – the largest unified court system in America – is a national disgrace[8], the state of Illinois is effectively

---

[8] Nicole Gonzalez Van Cleve, *Chicago's criminal court system is as flawed as its police*, Crain's Chicago Business (June 14, 2016) ("As I studied how attorneys and judges practiced the law, I observed an entire legal culture that often acted in criminal ways, blurring the boundaries between those enforcing the law and those breaking it."), http://www.chicagobusiness.com/article/20160614/OPINION/160619972#utm_medium=email&utm_source=ccb-morning10&utm_campaign=ccb-morning10-20160614; NICOLE GONZALEZ VAN CLEVE, CROOK COUNTY: RACISM AND INJUSTICE IN AMERICA'S LARGEST CRIMINAL COURT 161 (Stanford University Press) (2016) ("[W]e saw how due process was reduced to a ceremonial charade for the undeserving. We also examined the logics and narratives that allowed such curtailing of due process to seem justifiable. Procedural justice was reduced to a performance without substance."); Taylor Humphrey, David Krane, Alex Chew, John Simmons, *2015 Lawsuit Climate Survey: Ranking the States*, U.S. Chamber Institute for Legal Reform 8 (September 10, 2015) (ranking Illinois third from last in perceived fairness and reasonableness of courts in U.S.).

bankrupt[9], and the City of Chicago is awash in the blood of those trapped in a cycle of poverty perpetuated by this Enterprise.[10]

Notably, the Seventh Circuit did not rely on the district court's erroneous ruling that it could dismiss the complaint for lack of subject matter jurisdiction under *Twombly-Iqbal.* That would have required remand. Rather, it relied on *Bell v. Hood* to reason that "Antonacci has flung wild accusations at

---

[9] Amanda Robert, *In Illinois, Some Push Bankruptcy as Solution to Troubled Public Budgets*, FORBES (April 19, 2016, 9:46 AM), http://www.forbes.com/sites/legalnewsline/2016/ 04/19/in-illinois-some-push-bankruptcy-as-solution-to-troubled-public-budgets/#6dfb4590122e; NPR Staff, *The View from Illinois: Voters Frustrated that Government is Broken*, NPR (April 15, 2016, 9:13 AM), http://www.npr.org/2016/04/15/474250134/the-view-from-illinois-voters-frustrated-that-government-is-broken

[10] Ben Austen, *Chicago after Laquan McDonald*, THE NEW YORK TIMES MAGAZINE (April 20, 2016) ("The footage was gruesome. But the routine way in which the October 2014 killing was covered up for more than a year exposed a deeper culture of secrecy and impunity in Chicago that implicated the entire police force and much of the city's government."), http://www.nytimes.com/2016/04/24/magazine/ chicago-after-laquan-mcdonald.html?emc=eta1&_r=0; Gregor Aisch, Eric Buth, Matthew Bloch, Amanda Cox and Kevin Quealy, *The Best and Worse Places to Grow Up: How Your Area Compares*, The New York Times | The Upshot (May 4, 2015) ("Cook County is extremely bad for income mobility for children in poor families. It is among the worst counties in the U.S."), http://www.nytimes.com/interactive/2015/05/ 03/upshot/the-best-and-worst-places-to-grow-up-how-your-area-compares.html?_r=0; *see also* Raj Chetty, Nathaniel Hendren, Patrick Kline, and Emmanuel Saez, *Where is the Land of Opportunity? The Geography of Intergenerational Mobility in the United States*, QUARTERLY JOURNAL OF ECONOMICS 129(4): 1553-1623 (2014).

a large number of people, but the state courts of Illinois found no merit in them, and we can see no reason to permit him to resuscitate them in the form of this RICO suit." This reasoning is specious for two important reasons.

First, as briefly discussed above, *Bell v. Hood* stands for the proposition that a case may not be dismissed for lack of subject-matter jurisdiction if the plaintiff asserts a claim, for which it has standing, under federal law. Antonacci has quite plainly done so here. The Seventh Circuit relied on *Bell* for a proposition that is diametrically opposed to its holding.

Second, the Seventh Circuit's reasoning suggests that the Illinois courts litigated some or all of the issues alleged in Antonacci's complaint. But they did not, and again, this is the point: during 21-months in Cook County Circuit Court, Seyfarth and Ponder were never required to answer Antonacci's verified allegations or submit any evidence whatsoever. Brewer quashed every subpoena that Antonacci served upon the City of Chicago and Toomey Reporting. No testimony was ever given. Not a single fact was discovered or adjudicated. The respondents falsified an official hearing transcript and Brewer helped them cover it up. Pet. App. 81a-136a.

Brewer even refused to execute an affidavit corroborating her in-court statement of December 6, 2013, from the bench, that she was not acquainted with Ponder. Demonstrating the pervasiveness of this criminal enterprise, the Illinois Appellate Court falsely claimed – in a published opinion – that, at the

22

hearing to substitute Brewer, which took place on March 19, 2014, Brewer testified, under oath, she was not affiliated with Ponder. Pet. App. 34a, 46a. Brewer was not even there. The relevant circuit court orders are reproduced in the appendix, so there can be no dispute about this judicially sanctioned fraud. *Contra.* Pet. App. 34a and 46a, with 55a and 137a-40a.

The enterprise's ongoing fraud has ostensibly perverted Illinois jurisprudence as well. The Illinois Appellate Court falsely claimed that respondent Ponder drafted the email memorializing some of the prejudicial, verifiably untrue statements that she made to numerous lawyers at Seyfarth concerning Antonacci. Pet. App. 37a-41a. But she did not. And it is now the "law" of the state of Illinois that those lies are capable of an innocent construction because the audience was limited to human resources personnel, even though they indisputably were not. *See, e.g., Gaynor v. American Association of Nurse Anesthetists*, 2015 IL App (1st) 150557-U ¶ 57 ("The *Antonacci* court found that the alleged statements were capable of an innocent construction when read in context of the email as a whole and given the purpose of the correspondence… and the audience for the email was limited to several human resources personnel.") Antonacci's petition for leave to appeal to the Illinois Supreme Court details the calculated, false averments made by the Illinois Appellate Court in support of this criminal enterprise. Pet. App. 279a-81a.

Antonacci has reproduced the report of the Inquiry Panel that declined to certify his admission to the Illinois Bar. Pet. App. 143a-48. That report

was issued one day after Antonacci requested all communications with respondents Gehringer, Ponder, and Seyfarth regarding the Inquiry Panel's decision to make his bar application contingent on the outcome of the Circuit Court Case. This is the essence of criminal extortion: Any request for the truth regarding the intent and nature of this criminal enterprise is met with immediate retaliation.

It bears repeating that Antonacci was, and is, licensed to practice law in three (3) jurisdictions without ever having any sort of disciplinary issue. He has worked as an honors attorney for numerous federal agencies and received professional recognition. He has published scholarly works.

Indeed, the Inquiry Panel's alleged concern that Antonacci did not respect client confidentiality *by allowing his lawyer* to file the state court complaint is belied by the fact that Cook County Circuit Court Judge, William Maddux, later denied Seyfarth and Ponder's motion to seal that complaint.[11] And the Inquiry Panel inexplicably

---

[11] Judge Brewer recused herself from deciding the defendants' motion to seal Antonacci's verified complaint (but nonetheless remained on Antonacci's case-in-chief), because the Chicago Tribune had recently published an article investigating cases that Judge Brewer had improperly sealed, where she was a defendant. Cynthia Dizikes, Todd Lightly, *Legal Battles Hidden from Public View*, CHICAGO TRIBUNE (February 24, 2013), http://articles.chicagotribune.com/2013-02-24/news/ct-met-cook-county-hidden-cases-20130224_1_former-judges-law-division-tribune. Shortly after that article was published, Mike Dolesh, City of Chicago lawyer acting on behalf of the enterprise, joined the Tribune's editorial board as a "community member," because "[Dolesh] always wondered how the editorial board

24

disregards the fact that he was represented by counsel when the complaint was filed.

The Inquiry Panel further suggested Antonacci, before moving back to Chicago, had engaged in the unauthorized practice of law by maintaining a federal practice in jurisdictions other than where he was licensed, despite the Panel having no jurisdiction to adjudicate allegations concerning the unauthorized practice of law anywhere. Not to mention that such practice is quite common, and Antonacci submitted literally a dozen affidavits from attorneys in government and previous law firms supporting his application, in accordance with Illinois Supreme Court requirements. And it bears repeating that Antonacci has never been subject to any disciplinary action.

Fortunately, however, the Inquiry Panel's retaliatory extortion betrays its bad faith efforts. The Inquiry Panel suggested that Antonacci might have engaged in the unauthorized practice of law by attending client meetings, with Ponder and at her direction, before he was admitted to practice in Illinois. Similarly, Ponder had the audacity to falsely accuse Antonacci of the unauthorized practice of law, for attending those meetings at her request, to senior attorneys at Seyfarth, which was one of the many bases of Antonacci's defamation claim. Of

determines what story or issue it is going to focus on at any given time and how it decides what position to take on the subject." Editorial Board, *We Are Listening: Profile on Michael Dolesh*, CHICAGO TRIBUNE (February 28, 2013), http://articles.chicagotribune.com/2013-02-28/opinion/ct-oped-0228-dolesh-20130228_1_editorial-board-piano-lessons-print-media.

25

course, both the circuit and appellate courts later ruled Ponder's false accusation – that Antonacci had engaged in the unauthorized practice of law – was subject to an innocent construction. Why? Because he was working under the supervision of an Illinois-licensed attorney – Ponder – and thus could not have engaged in the unauthorized practice of law, pursuant to the safe harbor provision of Illinois Code of Professional Responsibility 5.5(c).

So, to rehash, the "law" in Illinois, according to this criminal enterprise, is such that Ponder may falsely accuse Antonacci of engaging in the unauthorized practice of law, without fear of repercussion, when Antonacci could not have done so, as a matter of law, but the conduct giving rise to that false accusation may nonetheless subject Antonacci to professional criticism by the Inquiry Panel. For what? Engaging in the unauthorized practice of law. The respondents and their criminal co-conspirators disgrace the legal profession with their hypocrisy.[12]

---

[12] The Inquiry Panel's final alleged concern was "Lack of Judgment," where it cited Antonacci's explanation of being forced to resign from a Washington, DC law firm after successfully prosecuting a civil RICO action, in the Eastern District of Virginia, where the defendants' attorney allegedly was an integral part of the alleged criminal enterprise, much like this case. (Civil Case No. 1:09-cv-00927-LMB-TRJ, filed August 18, 2009.) In the state court proceedings leading up the federal action, Fairfax County Circuit Court imposed sanctions on opposing counsel for his dilatory and meritless motions practice. Antonacci correctly indicated to the Inquiry Panel that it was certainly ridiculous senior attorneys at his law firm would suggest Antonacci's behavior in that case reflected any lack of judgment on his part. Indeed, opposing counsel in that case was subsequently disbarred. *Attorney Grievance*

26

Integrity is the backbone of professional ethics. Without it, the legal profession cannot function effectively. And integrity requires the courage to do the right thing when it is unpopular or otherwise difficult. Having the requisite character and fitness to practice law does not mean that one should cave into political pressure when unjustifiably threatened. If it did, then the entire legal profession would be administered by crooks and cowards, as it is in the state of Illinois and the City of Chicago. The defendants and their criminal co-conspirators have eviscerated the integrity of the legal profession in their jurisdiction, and it has ceased to function effectively as a result.

This criminal Enterprise is a growing threat to the rule of law. *See generally*, Francis Fukuyama, *America in Decay: The Sources of Political Dysfunction*, 93 Foreign Affairs 5, 5 (2014). The Seventh Circuit should be reversed and this Petition granted.

---

*Commission of Maryland v. Gerald Isadore Katz*, Miscellaneous Docket AG No. 6, September Term, 2014, available at http://www.mdcourts.gov/opinions/coa/2015/6a14ag.pdf.    But, like the criminal enterprise that is the subject of this case, senior attorneys at Antonacci's previous firm had resisted the notion that opposing counsel could be culpable for any of the misconduct alleged. Indeed, the Inquiry Panel decidedly ignored the significant fact that Antonacci's supervising partner had been preoccupied embezzling money from the firm during Antonacci's tenure there. According to this criminal enterprise, the only mistake lawyers can make is questioning authority, regardless of how disgraceful that authority's conduct may be.

## B. ANTONACCI HAS STATED PLAUSIBLE RICO CLAIMS FOR CONDUCT AND CONSPIRACY

A RICO plaintiff must prove four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2133, 170 L. Ed. 2d 1012 (2008). As it pertains to this case, "racketeering activity" means "any act or threat involving ... extortion ... which is chargeable under State law and punishable by imprisonment for more than one year; or any act which is indictable under ... section 1341 (relating to mail fraud)… section 1343 (relating to wire fraud)… section 1951 (relating to interference with commerce, robbery, or extortion)… section 1952 (relating to racketeering)." 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). "Establishing a pattern also requires a showing that 'the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'" *Kaye v. D'Amato*, 357 F. App'x 706, 711 (7th Cir. 2009) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)).

Antonacci alleges that the respondents' association-in-fact, together with certain members of the Illinois Supreme Court's Committee on Character and Fitness and at least one Cook County Circuit Court Judge, are part of an ongoing criminal enterprise: "Specifically, the enterprise is an association-in-fact among individuals, business entities, and a municipal corporation, designed to

divert Chicago taxpayer money to members of the enterprise; protect the members of the enterprise from civil liability in Illinois by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct." (Complaint ¶¶ 248-249, 264-65.)

The respondents used the enterprise unlawfully to engage in a pattern of racketeering activity, as alleged throughout the complaint. The respondents participated in, and conducted the affairs of this criminal enterprise by committing numerous acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. The respondents also conspired to commit several other predicate acts of "racketeering activity," as specifically enumerated in Section 1961(1) of RICO, including 18 U.S.C. § 1951 (Hobbs Act Extortion); 18 U.S.C. § 1952 (Interstate or Foreign Travel or Transportation in Aid of Racketeering Activity); and 720 ILCS 5/12-6 (Illinois Intimidation, "extortion" under Illinois law and punishable by imprisonment for more than one year).

Because the enterprise casually manipulates the Cook County justice systems, it has necessarily engaged in long-term, habitual criminal activity, and presents a clear threat of continued racketeering activity. Antonacci was injured by the respondents'

violations of federal criminal law, vis-à-vis the enterprise, in an amount that exceeds $75,000, exclusive of interest and costs.

The lower courts erred in ruling that Antonacci has not stated a plausible RICO claim. A cause of action is "plausible" if the complainant alleges factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept all the well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Id.* Moreover, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) [internal citations omitted]; *see also*, *Riley v. Vilsack*, 665 F. Supp. 2d 994, 1004 (N.D.Ill. 2011) ("[a] complaint is implausible under *Iqbal* and *Twombly* not because the allegations are 'fanciful,' *Iqbal*, 129 S. Ct. at 1951, but because they are too conclusory or because they fail to include facts about the elements of a claim.").

The issue of plausibility can be boiled down to one simple question: if the respondents admitted all of the factual allegations in the complaint, or even most, would Antonacci be entitled to the relief requested? *Twombly*, 550 U.S. at 557. The answer is yes, because Antonacci has properly alleged 1) conduct (complaint ¶¶ 24-29, 41-42, 67, 69-71, 73-75, 80-82, 84-94, 96-118, 127-36, 140-48, 150-97, 252-59, 266-85); 2) of an enterprise (complaint ¶¶ 248-49, 264-65); 3) through a pattern (complaint ¶¶ 24-29, 41-42, 67, 69-71, 73-75, 80-82, 84-94, 96-118, 127-36,

140-48, 150-97, 252-59, 266-85); 4) of racketeering activity. (complaint ¶¶ 24-29, 41-42, 67, 69-71, 73-75, 80-82, 84-94, 96-118, 127-36, 140-48, 150-97, 252-59, 266-85.) Antonacci has properly stated substantive RICO claims for conduct and conspiracy.

Most importantly, Antonacci has fulfilled this Court's relationship-plus-continuity test to allege a "pattern" of racketeering under RICO:    1) the predicate acts are obviously related, and 2) because this enterprise was able to manipulate legal processes and resort to extortion whenever it did not get its way, it undoubtedly poses a threat of continued criminal activity. *See Northwestern Bell*, 492 U.S. at 239. Contrary to the Seventh Circuit's reasoning that "[n]othing but sheer speculation would support the hypothesis of open-ended continuity," that court previously ruled a scheme forcing minority shareholders to contribute capital to a company, and another scheme forcing the sale of that company, were separate but related schemes that constituted a "pattern" under RICO, despite the fact that all the alleged racketeering activity took place within eight months and had a clear ending point: the sale of the company. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1296 (7th Cir. 1992). The court reasoned that the allegations showed, like here, wherever the plaintiff hampered the enterprise, the enterprise resorted to extortion, so even though the company had been sold, the enterprise presented "a continuing threat of racketeering activity." *Id.*; *see also ChampionsWorld LLC v. U.S. Soccer Federation, Inc.*, 726 F. Supp. 2d 961, 971 (N.D.Ill. 2010) (plaintiff's allegations of scheme involving two dozen instances of mail and wire fraud, extortion,

and wrongful use of fear through economic threats and the color of official right, sufficiently alleged pattern of racketeering activity).

Moreover, "the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for the purposes of civil RICO." *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1304 (7th Cir. 1987). Antonacci has plainly alleged such repeated, continuing infliction of economic injury upon him.

To be sure, RICO does not concern all instances of wrongdoing, but rather focuses on eradicating racketeering predicates that "either constitute or threaten long-term criminal activity." *Northwestern Bell*, 492 U.S. at 230. Antonacci has alleged the existence of a criminal enterprise that has infiltrated Cook County Circuit Court and certain bodies of the Illinois Supreme Court. Because the enterprise has undue influence over the local courts and attorney admission process, it may exercise corruption with impunity. There is much more than just a "threat" of continued racketeering activity – this racketeering activity has metastasized into systemic corruption.

Perhaps these institutions have been rife with such rank corruption for so long that this seems acceptable to some, but Antonacci submits that the criminal activity by which the enterprise crushes dissent poses a systemic threat to the continued viability of the City of Chicago, Cook County, and the state of Illinois. Indeed, many scholars believe that this "vetocracy," by which the respondents and their co-conspirators stifle justice and rob taxpayers,

32

poses a threat to the American style of democracy. *See generally*, Francis Fukuyama, *America in Decay: The Sources of Political Dysfunction*, 93 Foreign Affairs 5, 5 (2014). This enterprise must be stopped.

## C.    IF    NECESSARY,    THE    CASE SHOULD BE REMANDED TO DETERMINE IF DIVERSITY JURISDICTION EXISTS

"*[S]ua sponte* dismissals without prior notice or opportunity to be heard are hazardous." *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) [internal quotation omitted]. "Thus, even when the dismissal is on jurisdictional grounds, unless the defect is clearly incurable a district court should grant the plaintiff leave to amend, allow the parties to argue the jurisdictional issue, or provide the plaintiff with the opportunity to discover the facts necessary to establish jurisdiction." *Id.* at 1073.

Six days after Antonacci filed the complaint, the district court dismissed it *sua sponte*, entered judgment, and closed the case in the district court. The district court based its ruling that it does not have diversity jurisdiction on two facial defects in the complaint: 1) Antonacci used the word "resident" instead of "citizen" in describing the parties, and 2) Antonacci described three defendant limited liability companies/partnerships with regard to their states of organization and principal places of business, rather than the citizenship of their members. The district court further speculated that Seyfarth and Perkins Coie might have members who are also citizens of the District of Columbia, and thus "Antonacci's access to this federal court" would be "destroyed."

Importantly, both the district court and the Seventh Circuit decidedly ignored paragraph 16 of the complaint, which alleges "[t]his Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of *citizenship* between Mr. Antonacci and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs." Pet. App. 198a (emphasis added).

As a general rule, the citizenship of a partnership for diversity purposes is the citizenship of every general partner and limited partner. *Carden v. Arkoma Associates*, 494 U.S. 185, 187 (1990); *see also, Signicast, LLC v. Fireman's Fund Ins.* Co., 920 F. Supp. 2d 967, 967 (E.D. Wis. 2013) (finding that, without exception, a limited partnership is a citizen of every state of which any partner, general or limited, is a citizen). However, "there are cases in which a partnership may describe a person as one of its 'partners' even though that person is not actually a partner of the partnership under state law." *See, Signicast*, 920 F. Supp. 2d at 970, *citing Morson v. Kreindler & Kreindler, LLP*, 616 F. Supp. 2d 171, 171 (D. Mass. 2009). In such cases, the citizenship of the supposed "partner" must be disregarded. *Id.* And with respect to the question of whether a person's status as a partner is entitled to consideration, Illinois courts look to the "substance of the relationship not the form." *Davis v. Loftus*, 334 Ill. App. 3d 761, 767 (1st Dist. 2002) ("income partner" did not share in profits or losses, did not participate in management, and was paid a salary plus bonus, so not liable for debts of partnership under Illinois law); *see also, Passavant Mem'l Area Hosp. Ass'n v. Lancaster Pollard & Co.*, 2012 U.S.

34

Dist. LEXIS 46590 at *7 (C.D. Ill. 2012) ("contract partners" are not "partners" for diversity purposes, pursuant to Illinois partnership law).

Illinois law controls this analysis because Seyfarth was formed under the laws of Illinois. Under District of Columbia law, the law of the jurisdiction of a foreign entity's formation governs both the "internal affairs of the entity," and the "[l]iability that a person has as an interest holder or governor for a debt, obligation, or other liability of the entity." DC ST § 29-105.01(a). Moreover, "[A] partnership agreement shall not: (9) [v]ary the law applicable to a limited liability partnership under § 29-105.01(a)." DC ST § 29-601.04(b). The law of Illinois must therefore determine who is deemed a partner of Seyfarth for the purposes of diversity jurisdiction.

Under Illinois law, general partners are managers and agents of the partnership, and they owe their partners fiduciary duties. *See* 805 ILCS 206/401(f). But both general and limited partners must share in the ownership of the partnership and in its profits and losses. *Kramer v. McDonald's System, Inc.*, 77 Ill. 2d 323, 332 (Ill. 1979). As such, in order for Seyfarth's supposed partner to destroy diversity jurisdiction, at the very least he or she must have been, at the time the complaint was filed, an owner of Seyfarth who shared in its profits and losses. *Id.* The citizenship of an income or contract partner, who does not share in profits or losses, or participate in management, is simply irrelevant to whether the district court has diversity jurisdiction over this matter. *Passavant*, 2012 U.S. Dist. LEXIS

35

46590 at \*7; *see also*, *Morson*, 616 F. Supp. 2d at 173; *see also*, *Davis*, 778 N.E.2d at 1150.

It is not possible for Antonacci to determine who is an equity partner of Seyfarth or any of the respondent law firms. And, because domicile is defined by the party's intent, he would not be able to determine their state of domicile, based on a public records search, even if he could. It is not clear why the Seventh Circuit seems to suggest that this is possible, as Chief Judge Diane Wood argued during the oral argument of January 26, 2016. The Seventh Circuit should be reversed and this case remanded so that jurisdictional discovery may proceed, if necessary.

**D.    IF    NECESSARY,    SEYFARTH SHOULD BE DISMISSED AS A DEFENDANT**

With their brief of appellee, Seyfarth submitted the affidavit of a Joseph Damato, which claims he is an equity partner at Seyfarth and a citizen of the District of Columbia. If this Court rules that this untested affidavit does, in fact, destroy diversity jurisdiction, then Antonacci requests that this Court dismiss Seyfarth as a defendant. *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989) (a court of appeals may grant a motion to dismiss a dispensable party whose presence spoils diversity jurisdiction). Seyfarth is not indispensable to this suit because each of the respondents are jointly and severally liable for Count III – Common Law Civil Conspiracy, which would be the remaining cause of action, except as against respondents Major and her law firm, The Law Offices of Ruth I. Major, P.C.

36

## CONCLUSION

The Seventh Circuit's decision conflicts with this Court's decision in *Bell v. Hood*. In addition, the district court's failure to allow Antonacci to amend his complaint, and its improvident *sua sponte* entry of judgment, together with the Seventh Circuit imposing impossible requirements upon Antonacci, and further allowing the respondents to escape these proceedings with nothing more than the entry of one, untested affidavit, reflect such a departure from the usual course of judicial proceedings as to call for an exercise of this Court's supervisory power. For all of the foregoing reasons, Antonacci respectfully requests that this Honorable Court grant this Petition so it may reverse and vacate both the Seventh Circuit and the Northern District of Illinois.

Respectfully submitted,

Louis B. Antonacci
*Petitioner and Counsel of Record*
ANTONACCI LAW PLLC
1875 Connecticut Avenue NW, 10th Floor
Washington, DC  20009
(202) 545-7590
lou@antonaccilaw.com

*Petitioner and Counsel of Record*

# No. _____

## In The
## Supreme Court of the United States

————————♦————————

# LOUIS B. ANTONACCI,

*Petitioner*,

## v.

# CITY OF CHICAGO, *et al.*,

*Respondents.*

————————♦————————

## ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

————————♦————————

## APPENDIX TO PETITION FOR WRIT OF CERTIORARI

————————♦————————

**Louis B. Antonacci**
*Petitioner and Counsel of Record*
ANTONACCI LAW PLLC
**1875 Connecticut Avenue NW, 10th Floor**
**Washington, DC  20009**
**(202) 545-7590**
**lou@antonaccilaw.com**

*Petitioner and Counsel of Record*

ia

# APPENDIX TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order of
The United States Court of Appeals for
The Seventh Circuit
       entered March 18, 2016 .................................. 1a

Order of
The United States Court of Appeals for
The Seventh Circuit
Re:  Striking Appellant's Brief
       entered July 27, 2015.................................. 10a

Order of
The United States Court of Appeals for
The Seventh Circuit
Re:  Denying Motion to Amend Pleadings
       entered July 8, 2015................................... 13a

Memorandum Opinion and Order of
The United States District Court for
The Northern District of Illinois –
Eastern Division
       entered May 5, 2015 ................................... 15a

Judgment in a Civil Case of
The United States District Court for
The Northern District of Illinois
       filed May 5, 2015......................................... 20a

iia

Order of
The Supreme Court of Illinois
Re:  Denying Petition for Leave to Appeal
      entered November 25, 2015 ......................... 22a

Order of
The Appellate Court of Illinois –
First Division
      entered August 17, 2015 .............................. 23a

Order of
The Circuit Court of Cook County, Illinois
Re:  Granting Defendants' Motion to Reconsider
and Denying Plaintiff's Motion to Reconsider
      entered July 23, 2014 ................................... 51a

Transcript of Hearing Proceedings before
The Honorable Eileen Mary Brewer
The Circuit Court of Cook County, Illinois
      on April 23, 2014 ......................................... 81a

Order of
The Circuit Court of Cook County, Illinois
Re:  Denying Plaintiffs' Second Petition for
Substitution of Judge for Cause
      entered March 19, 2014 ............................ 137a

Order of
The Circuit Court of Cook County, Illinois
Re:  Denying in Part and Granting in Part
Defendant's Motion to Dismiss
      entered December 6, 2013 ......................... 139a

iiia

Order of
The Circuit Court of Cook County, Illinois
Re:  Denying Seyfarth Shaw and Anita Ponder's
Motion to Seal Complaint
     entered August 1, 2013 ............................. 141a

Inquiry Panel Report
     dated April 24, 2013 ................................... 143a

28 U.S.C. § 1332 .................................................. 149a

28 U.S.C. § 1341 .................................................. 160a

28 U.S.C. §1343 ................................................... 162a

28 U.S.C. § 1951 .................................................. 164a

28 U.S.C. § 1952 .................................................. 166a

28 U.S.C. § 1961 .................................................. 170a

28 U.S.C. § 1962 .................................................. 177a

D.C. Code § 29-105.01 .......................................... 179a

D.C. Code § 29-601.04 .......................................... 181a

Ill. Com. Stat. 5/12-6 ........................................... 186a

Ill. Com. Stat. 2016/401 ....................................... 189a

Petitioner's Complaint
in The United States District Court for The
Northern District of Illinois – Eastern Division
     filed April 29, 2015 ................................... 192a

iva

Petitioner's Petition for Leave to Appeal
in The Supreme Court of Illinois
　　　　filed September 21, 2015 ........................... 264a

Letter to
United States Court of Appeals for
The Seventh Circuit
Re:  Brief of Appellant
　　　　dated July 10, 2015 ................................... 291a

Order of
The State of Illinois Supreme Court
Re:  Recording Devices
　　　　entered March 15, 2005 ........................... 295a

1a

[ENTERED MARCH 18, 2016]

**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

United States Court of Appeals
For the Seventh Circuit
Chicago, Illinois 60604

Argued January 26, 2016
Decided March 18, 2016

Before

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

No. 15-2194

| | |
|---|---|
| LOUIS B. ANTONACCI,<br>　　*Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| v. | No. 15 C 3750 |
| CITY OF CHICAGO, *et al.*,<br>　　*Defendants-Appellees.* | Milton I. Shadur,<br>*Judge.* |

# O R D E R

For a little less than a year, Louis Antonacci worked on an at-will basis as a staff attorney at the firm of Seyfarth Shaw LLP. In May 2012, Seyfarth terminated his employment. To borrow Dylan Thomas's phrase, Antonacci did not go gentle into that good night. Instead, he first hired attorney Ruth Major to sue Seyfarth on his behalf. Years of litigation in the state courts ensued, during which Antonacci tried to portray Seyfarth partner Anita Ponder in an extremely unflattering light. One allegation involved an assertion that the City of Chicago had retained Ponder in a scheme to divert taxpayer money to her for private purposes. Seyfarth retained attorney Matthew Gehringer and the firm of Perkins Coie LLP to represent it; the case was assigned to Judge Eileen Brewer of the Circuit Court of Cook County. The details of those proceedings need not detain us, apart from mentioning that Antonacci believed that court reporter Margaret Kruse and her company, Kruse & Associates, had somehow conspired with Gehringer to tamper with the transcript of a hearing before Judge Brewer. Eventually his state-court suit was dismissed, and the Illinois Appellate Court affirmed that decision. *Antonacci v. Seyfarth Shaw, LLP*, 39 N.E.3d 225 (Ill. App. Ct. 2015).

Antonacci then turned to the federal court for redress, filing this suit under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. He asserted that the many defendants he named had engaged in fraudulent acts designed to sabotage his state-court suit (which was

3a

generally for defamation) against Seyfarth and Ponder, and to thwart his application to be admitted to practice in the State of Illinois. He also raised a number of state-law claims, allegedly supplemental to these federal claims.

The district court reviewed the complaint and decided on its own initiative to dismiss the case for want of federal jurisdiction. It concluded that Antonacci's federal claims were so insubstantial that they did not suffice to engage federal jurisdiction, see *Bell v. Hood*, 327 U.S. 678 (1946), and that the requirements for diversity jurisdiction were also lacking. See 28 U.S.C. §§ 1331, 1332. Without a basis for federal jurisdiction, the supplemental claims also had to go. 28 U.S.C. § 1367. We agree with the district court that this is not a simple case of a failure to state a claim on which relief can be granted, see Federal Rule of Civil Procedure 12(b)(6). If we thought that Antonacci's case were plausible enough to engage jurisdiction, we would need to remand, because with no cross-appeal we are not entitled to broaden the relief granted from a dismissal for lack of jurisdiction to a dismissal on the merits. See, e.g., *Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015) ("an appellee who does not cross-appeal may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary") (internal quotation marks omitted); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 697 (7th Cir. 2015). But this case is governed by *Bell* and so no remand is necessary.

4a

Antonacci's prolix complaint alleges a wide-ranging conspiracy among the City of Chicago, several law firms, individual lawyers, at least two court reporters, and Judge Brewer, for the purpose of sabotaging his state-court suit against Seyfarth and Ponder and to foil his bar admission. He breaks this down into six claims: Claims 4 and 5, which are against all defendants, assert violations of RICO; Claim 3 alleges a common-law conspiracy among all defendants; and Claims 1, 2, and 6 are a hodge-podge of fraud, breach of fiduciary duty, and legal malpractice allegations against Major and her law firm.

According to Antonacci's account, the saga begins in August 2011, when Antonacci moved from Washington, D.C., to Chicago to work for Seyfarth. His first assignment was to work for Ponder on a project advising the City of Chicago on its Minority and Women-Owned Business Enterprise Program ("the Program"). Ponder, Antonacci alleges, is an ally of Chicago Mayor Rahm Emanuel and previously worked for and lobbied the City. He also contends that she is notoriously difficult to work with and has been fired from other firms for harassing subordinates. Antonacci believes that the City retained Ponder on the Program at the Mayor's request, with the idea that this work would provide her with funds she could use to pay off alleged sizeable federal tax liens on property she owned in Cook County. Whatever the truth of those assertions may be, it seems that Antonacci and Ponder did not get along. In May 2012, as we noted, Seyfarth ended Antonacci's employment.

Shortly thereafter, Antonacci hired Major to represent him in his lawsuit against Seyfarth and Ponder. Major was not diligent in pursuing this, Antonacci alleges. Instead, she dragged her feet in filing his complaint. They had shown the complaint to the City's Law Department and had ensured that it did not reveal any confidential information related to Antonacci's earlier work on the Program. A week after the complaint was filed, Attorney Joel Kaplan of Seyfarth called Major and offered to settle the case for $100,000. Antonacci asked Major to counteroffer, but she did not. Instead, Antonacci asserts, she told Kaplan that she would work with Ponder, Seyfarth, and Matthew Gehringer (of Perkins Coie, the firm representing Seyfarth) to sabotage his case. Her motivation? She supposedly believed that she could earn more money from referrals from large law firms than she could from Antonacci.

Antonacci set out a long list of ways in which Major and Gehringer, along with various other people, torpedoed his lawsuit. They delayed things unnecessarily, undermined his efforts to obtain discovery from the City, and ran up his fees. Worse, they conspired with Judge Brewer and the court reporters. On one occasion, he said, they warned Judge Brewer that Antonacci was going to be in her courtroom observing her preside over a *different* case. Because of that warning, she "deliberately appear[ed] calm and reasonable," and thus thwarted Antonacci's effort to have a different judge assigned to his case. Court reporter Sandy Toomey supposedly falsely certified the accuracy of her transcript of a hearing at which Judge Brewer allegedly screamed,

and court reporter Kruse supposedly lied to Antonacci when she said that she filed a transcript from a different hearing. Other allegations included one of a conspiracy between Gehringer and the City's attorneys to cover up evidence of Ponder's misconduct and another of an attorney blacklist on which Judge Brewer allegedly put Antonacci's name. Finally, Gehringer allegedly coordinated an attack on Antonacci's Illinois bar application, by harassing and intimidating members of the character and fitness committee and unduly influencing the inquiry panel. We could go on, but this is enough to illustrate the tenor of the complaint.

The district court, in an order that itself pulled no punches, dismissed the complaint and case before the defendants were served. It rejected Antonacci's RICO claims with the comment that these allegations—that Antonacci had "assertedly been the victim of a massive global conspiracy on the part of what seems to be the entire world with which he comes into contact plainly appear[] to fail—flat out—the 'plausibility' requirement established by the *Twombly-Iqbal* canon." The court also commented on the inadequacy of the diversity allegations. Antonacci had moved back to Washington, D.C., by the time he filed his complaint, but he alleged only his residence, not his citizenship. More importantly, instead of alleging the citizenship of the members or partners of the three defendant law firms (Seyfarth, Perkins Coie, and Neal & Leroy LLC), Antonacci had alleged each firm's state of organization and principal place of business. This is an elementary error, see, *e.g.*, *Americold Realty Trust v. ConAgra Foods, Inc.*, No. 14-1382, 2016 WL

854159 at *3 (U.S. March 7, 2016). It is the citizenship of each member of an LLC or an LLP that must be assessed. *Id*. Importantly, the district court gave Antonacci one last chance to cure the jurisdictional defects it had identified: it gave him 28 days to file an amended complaint, which it promised to consider. Antonacci decided to forgo that opportunity and instead filed his notice of appeal (after which he purported to serve process on the defendants).

Antonacci has asked this court to permit him to fix the jurisdictional deficiencies by permitting a belated amendment to the complaint pursuant to 28 U.S.C. § 1653. He thinks that if he drops Seyfarth as a defendant (a move that would be essential in light of an affidavit from a Seyfarth partner swearing that he is a citizen of the District of Columbia), all his problems would be solved. He complains that he has no way of researching the citizenship of every partner of each defendant firm, and so at a minimum his case should be remanded for the purpose of jurisdictional discovery. We are not inclined, however, to take this step, because Antonacci's complaint fails to raise anything that is worth salvaging. We explain this conclusion briefly.

First, even though his RICO allegations describe specific actions undertaken by specific defendants on certain dates, it takes more than that to allege a plausible conspiracy. The allegations fall far short of meeting the stringent pleading requirements of a civil RICO claim, which requires among other things an allegation of a pattern of racketeering activity that shows either closed-ended

8a

or open-ended continuity. *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472-73 (7th Cir. 2007). Antonacci's complaint comes nowhere close to meeting this standard. He seems to be thinking of a closed-ended pattern, because by now the alleged racketeers have succeeded in both sabotaging his state-court lawsuit and his bar application. But the entire scheme lasted only 21 months, giving Antonacci the benefit of the doubt, and we have repeatedly found that the combination of such a short period with only a single victim of a single scheme is insufficient as a matter of law. *Gamboa v. Velez*, 457 F.3d 703, 709-10 (7th Cir. 2006) (collecting cases). Nothing but sheer speculation would support the hypothesis of open-ended continuity, either.

The difficult question is whether Antonacci's RICO claims are legally frivolous, or if they simply fail to state a claim. In our view, the former is the proper description. While he premises his RICO claims on multiple allegations of fraud, each individual allegation is so unsupported by any plausible detail as to be preposterous. We realize that his complaint does not sink to the level of the one we evaluated in *Lee v. Clinton*, 209 F.3d 1025 (7th Cir. 2000), where the plaintiff thought that the United States and China were reading people's minds and torturing them with a bio-tech device called MATRET. But we did not mean to suggest in *Lee* that only such a level of delusional thinking would meet the *Bell v. Hood* standard. Antonacci has flung wild accusations at a large number of people, but the state courts of Illinois found no merit in them, and we can see no reason to permit him to resuscitate them in the form of this RICO suit.

9a

Finally, as we have noted, diversity jurisdiction is not available to salvage this case. The defendants have shown that the complete diversity required by § 1332 is lacking. That said, defendants are not blame-free on this point. They criticize Antonacci's failure to allege their citizenship properly, but at the same time they have also neglected to do so, and have thus violated Circuit Rule 28(b). That rule requires an appellee to submit a "complete jurisdictional summary" if it believes that the appellant's jurisdictional statement is not complete and correct. Appellees' failure to follow this rule left Antonacci some room to argue that he deserves a second chance. We have not given him that chance largely because of the affidavit filed by the Seyfarth defendant and his own failure to take advantage of the last-chance opportunity extended by the district court.

Because Antonacci's federal claims are legally frivolous, and because the record shows that diversity of citizenship is lacking, the district court correctly dismissed this case for lack of subject-matter jurisdiction. Its judgment is AFFIRMED.

10a

[ENTERED JULY 27, 2015]

**United States Court of Appeals
For the Seventh Circuit
Chicago, Illinois 60604**

July 27, 2015

**By the Court:**

| | |
|---|---|
| LOUIS B. ANTONACCI,<br>    Plaintiff-Appellant, | ] Appeal from the United<br>] States District Court for<br>] the Northern District of |
| No. 15-2194        v. | ] Illinois, Eastern Division.<br>] |
| CITY OF CHICAGO,<br>et al.,<br>    Defendants-Appellees. | ] No. 1:15-cv-03750<br>]<br>]Milton I. Shadur, Judge. |

O R D E R

The jurisdictional statement in appellant's brief does not comply with Circuit Rule 28(a)(1), which provides in part: "If jurisdiction depends on diversity of citizenship, the statement shall identify the jurisdictional amount and the citizenship of each party to the litigation. If any party is a corporation, the statement shall identify both the state of incorporation and the state in which the corporation has its principal place of business. If any party is an unincorporated association or partnership the statement shall identify the citizenship of all members."

11a

Notwithstanding this requirement, appellant's statement (which asserts subject matter jurisdiction, in part, on diversity) fails to identify <u>by name</u> each of the members of Neal & Leroy LLC and Perkins Coie LLC, the two defendant limited liability companies, and the state of "citizenship" of each member. Appellants must provide this information. *See Hicklin Engineering, L.C. v. R.J. Bartell*, 439 F.3d 346-48 (7th Cir. 2006). And, appellant is also reminded that it is "citizenship" that matters, not "residency", as to the individual parties. *See, Meyerson v. Harrah's East Chicago Casino*, 299 F.3d 616, 617 (7th Cir. 2002).

Also, appellants must identify <u>by name</u> each of the partners of Seyfarth Shaw LLP, a partnership, and the state of "citizenship" of each partner. *See Hart v. Terminex International*, 336 F.3d 541 (7th Cir. 2003) (citizenship of a partnership is that of its partners).

Further, Circuit Rule 28(a)(2) requires an appellant to provide the court with the filing dates of certain papers that relate to appellate jurisdiction. Appellant must provide this information and a citation to the basis of this court's jurisdiction over appellant's appeal. Accordingly,

IT IS ORDERED that appellant's brief is STRICKEN. Appellant must file a new brief no later than July 31, 2015, which contains a jurisdictional statement that complies with all the requirements of Circuit Rule 28(a). Counsel is reminded that he may not change any other portion of the brief.

12a

This order will not extend the time for appellees to file their briefs.

NOTE: Counsel is reminded that he must file an entire corrected brief, including the required certifications, and appendix if an appendix was attached to the stricken brief.

13a

[ENTERED JULY 8, 2015]

## UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

### ORDER

July 8, 2015

Before

RICHARD D. CUDAHY, *Circuit Judge*

| | |
|---|---|
| | LOUIS B. ANTONACCI, Plaintiff – Appellant |
| No. 15-2194 | v. |
| | CITY OF CHICAGO, et al., Defendants - Appellees |
| Originating Case Information: | |
| District Court No: 1:15-cv-03750 Northern District of Illinois, Eastern Division District Judge Milton I. Shadur | |

The following is before the court:
**APPELLANT'S MOTION FOR ELECTRONIC FILING PRIVILEGES, LEAVE TO AMEND**

14a

**JURISDICTIONAL ALLEGATIONS OF COMPLAINT, AND, IF NECESSARY, DISMISSAL OF A DISPENSABLE PARTY**, filed on July 6, 2015, by the pro se appellant.

Louis Antonacci is an attorney, so he does not need to request permission to use this court's electronic filing system and his request is **DENIED** as unnecessary.

**IT IS FURTHER ORDERED** that Antonacci's request to amend his complaint is **DENIED**.

15a

[ENTERED MAY 5, 2015]

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| LOUIS B. ANTONACCI, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) 15 C 3750 |
| CITY OF CHICAGO, a municipal corporation, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Court has just received, via the computerized random assignment system in force in this District Court, the prolix[1] Complaint filed pro se by attorney Louis Antonacci ("Antonacci"). This Court has waded through Antonacci's extensive allegations, and this memorandum order is issued

---

[1] Prolix is used advisedly: Antonacci's Complaint comprises no fewer than 295 paragraphs that occupy 57 pages and that assert a half dozen theories of liability labeled as separate counts (a locution that, although in common usage, follows the cause of action notion that governs state court pleading rather than the federal concept of a claim for relief -- in that respect, see the excellent discussions in <u>NAACP v. Am. Family Mut. Ins. Co.</u>, 978 F. 2d 287, 292 (7th Cir. 1992) and <u>Bartholet v. Reishauer A.G. (Zurich)</u>, 953 F.2d 1073, 1078 (7th Cir. 1992)).

16a

sua sponte because of some patently problematic aspects of the pleading.

Four of Antonacci's legal theories are nonfederal in nature: Count I is labeled "Common Law Fraud," Count II is labeled "Breach of Fiduciary Duty," Count III is labeled "Full Conspiracy" and Count VI is labeled "Legal Malpractice." Only two of the counts are purportedly advanced in federal-question terms -- Counts IV and V seek to invoke civil RICO. But quite apart from the obvious difficulty in squaring Antonacci's Complaint with the Fed. R. Civ. P. ("Rule") 8(a)(2) requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief."[2] Antonacci's assertions that he has assertedly been the victim of a massive global conspiracy on the part of what seems to be the entire world with which he comes into contact plainly appears to fail -- flat-out -- the "plausibility" requirement established by the Twombly-Iqbal canon that has taken the place of the long-standing and overly generous Conley v. Gibson approach.

What this Court has therefore done is to view Antonacci's Complaint in terms of the diversity-of-citizenship branch of federal jurisprudence, which he purports to call into play in Complaint ¶ 16. And from that perspective, as the ensuing analysis demonstrates, Antonacci's pleading gets a failing grade in every respect.

---

[2] This Court of course recognizes that what has just been said in the text poses no substantive problem when the nature of a complaint demands more.

17a

At the outset of that analysis, it is worth a moment's look to understand why it should take place at all. On that score it has been nearly three decades since <u>Wis. Knife Works v. Nat'l Metal Crafters</u>, 781 F.2d 1280, 1282 (7th Cir. 1986) set out a fundamental proposition that remains as true today as when it was written:

> The first thing a federal judge should do when a complaint is filed is check to see that federal jurisdiction is properly alleged.

And such cases as <u>Wernsing v. Thompson</u>, 423 F.3d 732, 743 (7th Cir. 2005) have since made clear that the sua sponte jurisdictional inquiry that follows is mandatory on any court such as this one:

> Jurisdiction is the power to declare law, and without it the federal courts cannot proceed. Accordingly, not only may the federal courts police subject matter jurisdiction sua sponte, they must.

Now to the substantive analysis itself. Here every individual party -- Antonacci himself and all of the individuals named as defendants -- are spoken of in terms of their <u>residences</u> rather than their respective states of <u>citizenship</u>. In that regard such cases as <u>Adams v. Catrambone</u>, 359 F.3d 858, 861 (7th Cir. 2004) continue to repeat the command that "when the parties allege residence but not citizenship, the district court must dismiss the suit."

18a

That, however, is only the start. Three of Antonacci's targeted defendants are law firms that the Complaint describes as limited liability companies: Seyfarth Shaw LLP ("Seyfarth Shaw") (Complaint ¶ 3), Perkins Coie LLC ("Perkins Coie") (Complaint ¶ 7) and Neal & Leroy LLC (Complaint ¶ 14). And as to each of those defendants Antonacci has alleged only irrelevancies -- their respective states of organization and their respective principal places of business. But in that respect such cases as Wise v. Wachovia Sec. LLC, 50 F.3d 265, 267 (7th Cir. 2006) (citing a passel of earlier cases) have regularly reconfirmed (in this instance nearly a decade ago) what facts to look to in determining whether diversity of citizenship exists:

> The citizenship for diversity purposes of a limited liability company, however, despite the resemblance of such a company to a corporation (the hallmark of both being limited liability), is the citizenship of each of its members.

That last deficiency on Antonacci's part is particularly troublesome, for Seyfarth Shaw and Perkins Coie are national law firms with multiple offices around the country. If either has even a single member that (like Antonacci) is a citizen of the District of Columbia[3] the complete diversity that has been required for more than two centuries (see Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806))

---

[3] What is said in the text assumes, as is most often the case, that Antonacci's District of Columbia's residence coincides with his citizenship there.

19a

would be destroyed, and with it Antonacci's access to this federal district court.

In summary, this Court holds that Antonacci cannot use civil RICO as the springboard for federal-question jurisdiction in the subjective and objective good faith required by Rule 11(b), so that Antonacci's multiple failures in terms of diversity of citizenship mandate dismissal (again see <u>Adams v. Catrambone</u>). But because this Court's view has always been that the "must dismiss the suit" language of the latter decision may be viewed as Draconian in nature, its consistent practice has been to comply with that case's mandate but, if a plaintiff were to cure that deficiency within the 28-day time frame made available by Rule 59(e), to entertain a motion that would avoid the plaintiff's having to file a new lawsuit -- on condition, however, that a payment equivalent to another filing fee must be tendered by the plaintiff to avoid his, her or its having to redraft a bulky complaint. This Court accordingly orders that both the Complaint and this action be dismissed because of Antonacci's failure to establish the existence of federal subject matter jurisdiction.

/s/ _____
Milton I. Shadur
Senior United States District Judge

Date: May 5, 2015

20a

[ENTERED MAY 5, 2015]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Louis B. Antonacci )
     Plaintiff(s) ) Case No.
    ) 15 C 3750
v. )
City Of Chicago, et al. )
    Defendant(s) )

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $

    Which  ☐  includes      pre–judgment
interest.
  ☐  does  not  include  pre–
judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

☐    in favor of defendant(s)
and against plaintiff(s)

21a

Defendant(s)    shall    recover    costs    from plaintiff(s).

        ☒    other Both the Complaint and this action are dismissed because of plaintiff"s failure to establish the existence of federal subject matter jurisdiction.

This action was *(check one)*:

☐    tried by a jury with Judge    presiding, and the jury has rendered a verdict.

☐    tried by Judge    without a jury and the above decision was reached.

☒    decided by Judge Milton I. Shadur.

Date: 5/5/2015        Thomas G. Bruton,
                    Clerk of Court

                    Carol Wing,, Deputy Clerk

22a

[ENTERED NOVEMBER 25, 2015]

SUPREME COURT OF ILLINOIS
SUPREME COURT BUILDING
200 East Capitol Avenue
SPRINGFIELD, ILLINOIS 62701-1721

November 25, 2015

Mr. Louis B. Antonacci
360 H Street NE, Unit 334
Washington, DC 20002

No. 119848 - Louis B. Antonacci, etc., petitioner, v.
Seyfarth Shaw, LLP, etc., et al.,
respondents.

Leave to appeal, Appellate Court, First
District.

The Supreme Court today DENIED the petition for
leave to appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate
Court on December 30, 2015.

23a

[ENTERED AUGUST 17, 2015]

2015 IL App (1st) 142372

FIRST DIVISION
August 17, 2015

No. 1-14-2372

LOUIS B. ANTONACCI, an individual,

    Plaintiff-Appellant,

v.

SEYFARTH SHAW, LLP, a Partnership, and
ANITA J. PONDER, an individual,

    Defendants-Appellees.

           Appeal from the
           Circuit Court of
           Cook County

           No. 12 L 013240

           Honorable
           Eileen M. Brewer and
           Thomas Hogan,
           Judges Presiding.

24a

JUSTICE HARRIS delivered the judgment of the court with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Louis B. Antonacci, appeals the order of the circuit court granting defendants Seyfarth Shaw, LLP (Seyfarth) and Anita J. Ponder's motion to dismiss his amended complaint alleging defamation *per se*, tortious interference, fraudulent misrepresentation, and promissory estoppel. Mr. Antonacci also seeks review of the court's denial of his second petition to substitute judge for cause, and its orders quashing subpoenas served upon the City of Chicago (City) and other third parties. On appeal, he contends the trial court erred (1) in dismissing his claim for defamation *per se* where Ms. Ponder suggested that Mr. Antonacci gave legal advice in violation of ethics rules and that Mr. Antonacci was to blame for a project being completed past the due date; (2) in dismissing his claim for tortious interference with prospective economic advantage where Ms. Ponder told lies about him and his work resulting in the termination of his employment with Seyfarth; (3) in dismissing his claim for fraudulent misrepresentation where Seyfarth attorneys affirmatively represented to Mr. Antonacci that Ms. Ponder was a good attorney to work for, and he relied on that misrepresentation in accepting an offer employment with Seyfarth; (4) in denying his second petition for substitution of judge for cause where the trial judge displayed "favoritism and

25a

antagonism" making a "fair judgment impossible"; and (5) in quashing subpoenas he served upon the City of Chicago and other third parties.[1] For the following reasons, we affirm.

¶ 2                    JURISDICTION

¶ 3 The trial court granted defendants' motion to dismiss upon reconsideration on July 23, 2014. Plaintiff filed his notice of appeal on July 29, 2014. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 4                    BACKGROUND

¶ 5      The following facts are relevant to the issues on appeal. In August 2011, Seyfarth hired Mr. Antonacci, who was licensed to practice law in Washington, D.C., as an attorney to support Ms. Ponder, a partner in its government contracts practice group in Chicago. According to Seyfarth's offer, Mr. Antonacci's employment was "at-will" meaning "either [Mr. Antonacci] or [Seyfarth] can terminate [his] employment with or without cause or notice." Ms. Ponder assigned him to a project for the city that involved conducting interviews, research, and fact-finding.

---

[1] Mr. Antonacci's brief does not address the dismissal of his claim of promissory estoppel; therefore he has waived review of that issue pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) ("[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 6    The working relationship between Ms. Ponder and Mr. Antonacci became strained and on October 12, 2011, Seyfarth's professional development consultant Kelly Grofon sent an email to several members of Seyfarth's human resources staff after speaking with Ms. Ponder. The email, which addressed Ms. Ponder's "feedback" on Mr. Antonacci, stated:

> "Trying to make the most of it, but it is not working out. Lou was hired primarily to work with her in Government Contract PG in Chicago, they even expedited hiring process. During hiring process, she explained the project without mentioning name of client to confirm his interest in work that he would be initially doing and confirm his capability in performing it. He assured them in process that he had significant interest in that project and developing firm's local Gov't Contract practice. He was hired knowing his experience was not state and local, but was federal. But, his asset was he had worked for another major law firm for a few years and would integrate well into our firm.
>
> Shortly after he was hired, they had meetings with client that Anita thought he did not act appropriately in the sense that he was asking the wrong questions, providing advice to them, which he should not have been doing. A. he's not licensed in IL B. he wasn't knowledgeable about local procurement C. he wasn't knowledgeable of City of Chicago's process. Anita brought to his attention

privately after meetings and Lou was very defensive. According to her, he handled criticism very inappropriately. He made comments undermining Anita's expertise in gov't procurement. The relationship continued to go downhill. He then had separate meetings with clients that Anita was aware of, but knew he had limited time to complete project. He missed deadlines that were initially set and have now been extended by the client and Anita. Recently, he told Anita he was able to meet the deadline and do the project. Then told her he couldn't, even with assistance with a second attorney. He had assured them in the interview he could do project on his own with limited supervision, but now can't.

Anita reported this to leadership (Kevin Connelly, Dave Rowland, Kate Perrelli). Kevin spoke with Lou and the Lou didn't show up to work one day after him/Anita had agreed to meet to discuss how to move forward. Lou gave Anita a revised schedule of what he could do by the deadline date and most of it was after the deadline date. So, Anita took on much more responsibility of the project and gave much of it to a Houston attorney. She told Lou he will not be responsible anymore for the project – but, Anita did give him another assignment, in which he was trying to reach out more to her and discuss with her and show interest. The attorney in Houston had to leave town for personal issue, so Lou agreed to do some work on her behalf yesterday. Anita found out Lou had reached

out to pro bono director, which she assumed was to do more work without her. Now that license issue is coming up, his attitude has changed and he appears to act more interested the last few days. Anita feels his actions have been unsettling and inconsistent with what he portrayed in the interview.

She thinks her relationship with working with him in future is highly speculative. So, she does not feel we should be going out of our way to make exceptions for him and wants to leave door open for future options.

Let me know how you think we should proceed."

¶ 7    In his amended complaint, Mr. Antonacci alleged that Ms. Ponder gave him the assignment "with an impending deadline, on which Ms. Ponder had done little or no work already." Their working relationship was fine until September when "a discussion between Ms. Ponder and a client revealed that Ms. Ponder was wholly unaware of critical case law on the very issue on which she had been hired to provide legal guidance." Embarrassed "that her ignorance had been exposed," Ms. Ponder criticized Mr. Antonacci and yelled at him. She told him to review the relevant case law and prepare a memorandum summarizing the decisions.

¶ 8    On October 4, 2011, "Ms. Ponder set an arbitrary deadline of October 17, 2011, for Mr. Antonacci to present her with a substantially

completed draft of the project" despite the fact the project was not due until three weeks after the deadline. She thus gave Mr. Antonacci two weeks to complete all of the work and reserved for herself three weeks for review. Mr. Antonacci alleged that this arbitrary deadline "was set by Ms. Ponder in a malicious attempt to criticize Mr. Antonacci and damage his career."

¶ 9    Mr. Antonacci met with Seyfarth partners Jason Stiehl and Dave Rowland for guidance. Stiehl indicated that the firm was aware of complaints against Ms. Ponder's unreasonable and unprofessional behavior, and that Ms. Ponder was "on an island" because people refused to work with her. Rowland told him that others have found Ms. Ponder difficult to work with. On the advice of Stiehl and Rowland, Mr. Antonacci proposed an alternative schedule to Ms. Ponder for completion of the project. Mr. Antonacci alleged that Ms. Ponder called him into her office and proceeded "to scream at [him] in an unprofessional manner for approximately 90 minutes." She made several accusations about his conduct and performance and although "he attempted to excuse himself from her office after 45 minutes, [she] insisted that he stay so that she could continue yelling at him for an additional 45 minutes."

¶ 10   On the advice of Rowland, Mr. Antonacci spoke with partner Mary Kay Klimesh who suggested that he prepare a comprehensive schedule for completing the project on time. Mr. Antonacci alleged that "[u]nder the proposed schedule, [he] would be working every day and every weekend

through the completion of the project, which would be well ahead of the client's deadline." He sent the proposed schedule to Ms. Ponder who did not respond until four days later when she informed him in an email that he was no longer responsible for working on the project. After several weeks, however, "with Ms. Ponder unable to get any other attorneys to assist her with the project, Ms. Ponder again assigned Mr. Antonacci to complete the project."

¶ 11    Mr. Antonacci alleged that Ms. Ponder made the statements in the email "to criticize Mr. Antonacci's professional judgment, diligence, and character in order to discredit him and threaten his employment, while at the same time protecting [her] reputation and employment." He further alleged that "[u]pon information and belief, Ms. Ponder maliciously made numerous false statements concerning Mr. Antonacci to Ms. Pirelli, Ms. Gofron, Mr. Rowland, Mr. Connelly, and others." He alleged "[u]pon information and belief," Ms. Ponder made false statements to the client Mr. Antonacci worked with, blaming Mr. Antonacci for her failure to complete the project on time.

¶ 12    Mr. Antonacci also alleged that he spoke with other partners about his concerns regarding Ms. Ponder and his continued employment with Seyfarth. He was assured that he would continue to be employed in the firm's commercial litigation group in Chicago. Mr. Antonacci applied to take the Illinois bar examination in July 2012 and Seyfarth reimbursed him for the filing fee he paid to take the exam. He actively sought work with other attorneys

at Seyfarth and his performance evaluations from those partners were "uniformly positive." Mr. Antonacci also declined an offer from a recruiter to apply as a candidate for an associate position with a law firm in Washington, D.C. Despite these assurances, on May 22, 2012, Mr. Antonacci's employment with Seyfarth was terminated and he was told to be out of the office by midnight. Mr. Antonacci alleged the reason given for his termination was that he had been hired to work for Ms. Ponder and "we all know how that worked out."

¶ 13   Mr. Antonacci filed a four-count complaint against Seyfarth and Ms. Ponder, alleging (1) defamation *per se* based on the Ponder email, (2) intentional interference with prospective economic advantage based on the defamatory statements, (3) fraudulent misrepresentation based on statements and omissions made when he interviewed with Seyfarth, and (4) promissory estoppel based on assurances made regarding his job security at Seyfarth. Defendants filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2010)), which the trial court granted. The trial court dismissed the defamation and intentional interference counts without prejudice, with leave to replead, and dismissed the fraudulent misrepresentation and promissory estoppel counts with prejudice.

¶ 14   Two weeks later, Mr. Antonacci filed a motion requesting that the trial judge, Judge Eileen Brewer, recuse herself from the proceedings because she was biased against him. Judge Brewer denied the

motion, and Mr. Antonacci filed a petition for substitution of judge for cause. In the petition, Mr. Antonacci alleged that Judge Brewer demonstrated "personal bias and prejudicial conduct, which prevents the parties from receiving a fair consideration of the matters at issue." After briefing and oral argument, Judge Lorna Propes denied the petition finding that Judge Brewer did not demonstrate actual prejudice or bias.

¶ 15   While the substitution of judge petition was pending, Mr. Antonacci filed his amended complaint, repleading counts I and II for defamation *per se* and tortious interference respectively, and repleading counts III and IV to preserve them for appeal. Defendants moved to dismiss the amended complaint pursuant to section 2-619.1, arguing that a qualified privilege exists as a matter of law for employment evaluations. Before the hearing on defendants' motion, Mr. Antonacci filed a motion for leave to file a surreply which he presented on December 5, 2013, one day before the scheduled hearing. The motion also requested sanctions against defendants' counsel for alleged misrepresentation of law and facts in their reply brief. The trial court did not grant Mr. Antonacci's motions and after oral argument, dismissed with prejudice his tortuous interference claim pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2010)). However, the trial court denied the motion to dismiss as to count I, defamation *per se*, finding Mr. Antonacci's claim that Ms. Ponder stated he should not have given advice sufficiently alleged that "Plaintiff had engaged in the unauthorized practice

of law." Both parties filed motions for reconsideration.

¶ 16    Meanwhile, Mr. Antonacci served subpoenas on the city seeking depositions of employees Stephen Patton and Jamie Rhee, and documents that may show Ms. Ponder made defamatory statements about him to the city. He also served a subpoena on the company, Toomey Reporting, Inc., and its court reporter whom he hired to transcribe the December 5, 2013, hearing on his motion for leave to file a surreply. Mr. Antonacci sought to discover whether Seyfarth's counsel requested that the court reporter alter the transcript so that the trial court did not appear biased against him. Additionally, he sought forensic examination of the court reporter's audio recording device and laptop.

¶ 17    The city, Toomey, and the court reporter filed motions to quash. The trial court granted the city's motion but ordered an *in camera* review of certain documents referring to Seyfarth's request for an extension of the deadline on the project worked on by Mr. Antonacci. Mr. Antonacci alleged that he never saw the documents ordered for *in camera* review. After hearing cross motions regarding the subpoena request on the court reporter, the trial court allowed an audio recording of the December 5, 2013, hearing to be played and the recording matched the transcript. Mr. Antonacci alleged that "[t]he transcript did not reflect [his] recollection of the proceedings." Specifically, it "did not reflect Judge Brewer's express refusal to consider the Affidavits submitted by Mr. Antonacci pursuant to Section 2-619(c)" nor did it reflect "Judge Brewer's erratic,

periodic screaming at Mr. Antonacci throughout the proceeding 'I'M NOT LOOKING AT IT!'" The trial court found Mr. Antonacci's statements and allegations "outrageous" and denied his request for forensic examination of the equipment. The trial court granted the motions to quash.

¶ 18    Four days later, Mr. Antonacci filed his second petition for substitution of judge for cause. He again alleged that Judge Brewer was biased against him as evidenced by her recent rulings against him, and added that her bias resulted from "her political affiliations and professional relationships" which were "inextricably intertwined with" Ms. Ponder and the city. Specifically, Mr. Antonacci alleged that Judge Brewer was an attorney for the city's law department from 1988 to 1994, while Ms. Ponder worked for the city's Department of Procurement Services from 1984 to 1989, and was director of contract compliance from 1986 to 1989. He also alleged they had connections through Cook County board presidents John Stroger and Bobbie Steele. The petition was heard before Judge Thomas Hogan on December 6, 2013. At the hearing, Judge Brewer unequivocally stated, "I do not know Anita Ponder." Mr. Antonacci alleged, however, that when he delivered to Judge Brewer a draft affidavit asking her to attest to the fact that she did not know Ms. Ponder, Judge Brewer refused to do so. Judge Hogan subsequently denied the petition for substitution of judge for cause.

¶ 19    With the motions for reconsideration before it, the trial court denied Mr. Antonacci's motion and granted defendants' motion. It found Ms. Ponder's

statement that Mr. Antonacci should not have been giving advice could be construed innocently, and allowed Mr. Antonacci leave to replead his defamation *per se* count. He waived amendment and stood on his pleading. The trial court then issued its written ruling and dismissed the amended complaint with prejudice. Mr. Antonacci filed this timely appeal.

¶ 20                    ANALYSIS

¶ 21 Defendants filed their motion to dismiss pursuant to section 2-619.1 of the Code, which combines a section 2-615 motion to dismiss based upon insufficient pleadings with a section 2-619 motion to dismiss based upon certain defects or defenses. 735 ILCS 5/2-619.1 (West 2010). In a motion to dismiss under either section, the court must accept all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 164 (2003). Also, exhibits attached to the complaint are a part of the complaint and if a conflict exists between facts contained in the exhibits and those alleged in the complaint, factual matters in the exhibits control. *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 287 (1986). Furthermore, this court reviews the determination of the trial court, not its reasoning, and therefore we may affirm on any basis in the record whether or not the trial court relied on that basis or its reasoning was correct. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995). We review the trial court's determination on motions to dismiss

36a

pursuant to sections 2-615 and 2-619 *de novo*. *Edelman*, 338 Ill. App. 3d at 164.

¶ 22   Mr. Antonacci first alleges that the trial court erred in dismissing his claim for defamation *per se*. To state a claim for defamation, the plaintiff must allege "facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). A defamatory statement damages the plaintiff's reputation in that it lowers the person in the eyes of the community or deters the community from associating with him. *Id.*

¶ 23   "A statement is defamatory *per se* if its harm is obvious and apparent on its face." *Id.* Five categories of statements are considered defamatory *per se*: (1) words imputing that a person has committed a crime; (2) words imputing that a person is infected with a loathsome communicable disease; (3) words imputing a person cannot perform or lacks integrity in performing employment duties; (4) words imputing a person lacks ability or otherwise prejudices him in his profession; and (5) words imputing a person has engaged in adultery or fornication. *Id.* at 491-92. A claim for defamation *per se* must plead the substance of the statement with sufficient particularity and precision so as to permit judicial review of the defamatory content. See *Mittelman v. Witous*, 135 Ill. 2d 220, 229-30 (1989), *abrogated on other grounds by Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16 (1993).

37a

¶ 24 Even if an alleged statement falls into a defamation *per se* category, it is not *per se* actionable if it is reasonably capable of an innocent construction. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 90 (1996). Pursuant to the innocent construction rule, the court considers the statement in context and gives the words of the statement, and any implications arising therefrom, their natural and obvious meaning. *Id*. Furthermore, "a statement 'reasonably' capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted. There is no balancing of reasonable constructions \*\*\*." *Mittelman*, 135 Ill. 2d at 232. However, when the defendant clearly intended or unmistakenly conveyed a defamatory meaning, "a court should not strain to see an inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500. The preliminary construction of an allegedly defamatory statement is a question of law we review *de novo. Tuite v. Corbitt*, 224 Ill. 2d 490, 511 (2006).

¶ 25 On appeal, Mr. Antonacci contends that defendants made the following defamatory statements against him based on Ms. Ponder's email to Ms. Grofon: (1) he engaged in the unauthorized practice of law by giving legal advice when he was not licensed to practice in Illinois; (2) he was incapable of performing his job as evidenced by the missed deadlines, his lack of enthusiasm for projects Ms. Ponder assigned to him, and his lack of time management skills; (3) he misrepresented that "he could waive into the bar of the State of Illinois prior to" being hired; (4) he failed to show up for work on a day he was supposed to meet with Ms. Ponder about

the city project; and (5) he concealed the fact that he had spoken to Seyfarth's pro bono director. Mr. Antonacci also alleges that, "[u]pon information and belief, Ms. Ponder maliciously made numerous false statements concerning [him] to Ms. Pirelli, Ms. Gofron, Mr. Rowland, Mr. Connelly and others subsequent to" the email, and "[u]pon information and belief," she also made such statements to the client, city of Chicago. He alleges that the statements Ms. Ponder made "blamed Mr. Antonacci for her failure to complete her project in a timely and effective manner."

¶ 26   As shown by Ms. Ponder's email reproduced above, Ms. Ponder stated that she "thought [Mr. Antonacci] did not act appropriately in the sense that he was asking the wrong questions, providing advice to them, which he should not have been doing" since he was not licensed in Illinois, nor was he "knowledgeable about local procurement" or "City of Chicago's process." If the statement that Mr. Antonacci improperly provided advice while not licensed in Illinois implies he engaged in the unauthorized practice of law, it may be actionable as defamation *per se* since it questions his integrity in the performance of his profession. Defendants argue, however, that the mere act of providing legal advice while not currently state-licensed is not necessarily an unauthorized practice of law.

¶ 27 Rule 5.5(c)(1) of the Illinois Rules of Professional Conduct (Ill. R. Prof Conduct (2010) R. 5.5(c)(1) (eff. Jan. 1, 2010)) provides that "[a] lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any

jurisdiction, may provide legal services on a temporary basis in this jurisdiction that \*\*\* are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter." At the time Mr. Antonacci allegedly provided the advice, he was licensed in Washington D.C. and working on a project assigned to him by Ms. Ponder, who is presumably licensed in Illinois. Ms. Ponder actively participated in the project. As such, Mr. Antonacci engaged in no wrongdoing and the statement referring to his actions is therefore not defamatory. Additionally, the statement could be viewed as an expression of opinion protected from claims of defamation *per se*. See *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 581 (2006); *Pompa v. Swanson*, 2013 IL App (2d) 120911, ¶ 22. Ms. Ponder could be stating her opinion that in light of the fact that Mr. Antonacci had not yet taken the Illinois bar examination, and given his inexperience in local procurement and the city's process, he should not have rendered certain advice to the city. Dismissal of this claim was proper.

¶ 28  As for Mr. Antonacci's remaining allegations of defamation *per se* based on Ms. Ponder's email, those statements are capable of an innocent construction read in context of the email as a whole and given the purpose of the correspondence. *Tuite*, 224 Ill. 2d at 512 (the innocent construction rule requires that a writing be read "'as a whole'" (quoting *John v. Tribune Co.*, 24 Ill. 2d 437, 442 (1962)). Ms. Ponder's email, read as a whole, addressed Mr. Antonacci's working relationship with her and his fit as an employee of Seyfarth. In his

interview, Mr. Antonacci assured the firm that he was capable of, and interested in, performing work for Ms. Ponder. He was hired primarily to work with her in the government contract group of the firm. In considering him for the position, Seyfarth knew that Mr. Antonacci's experience was at the federal, rather than state or local, level. However, he assured Seyfarth that he could work on projects alone and, given his background with large firms, defendants believed he "would integrate well into the firm."

¶ 29 Ms. Ponder soon discovered that Mr. Antonacci's experience was not a good fit with the job at Seyfarth. Mr. Antonacci scheduled "separate meetings with clients" when he "knew he had limited time to complete project." He "missed deadlines" and Ms. Ponder had to ask for an extension. Mr. Antonacci gave her a "revised schedule of what he could do by the deadline date and most of it was after the deadline date." She had to assign the project to another attorney. Ms. Ponder gave Mr. Antonacci another assignment, and he reached out to her and showed interest. However, she also "found out" that Mr. Antonacci "had reached out to pro bono director, which she assumed was to do more work without her." With the licensing issue approaching, Mr. Antonacci's attitude "changed and he appears to act more interested." Ms. Ponder felt that "his actions have been unsettling and inconsistent with what he portrayed in the interview." She believed that the future of their working relationship "is highly speculative" and felt that Seyfarth should not "be going out of our way to make exceptions for him and wants to leave door open for future options."

41a

¶ 30 Each of these statements was specifically confined to the context of Mr. Antonacci's working relationship with Ms. Ponder and his fit with Seyfarth, and the audience for the email was limited to several human resources personnel. In this context, we cannot reasonably conclude that Ms. Ponder's statements accused Mr. Antonacci of actions and misconduct that imputes a general lack of integrity in the performance of his duties as a lawyer or prejudices him. Rather, the more reasonable conclusion is that Ms. Ponder stated her belief that Mr. Antonacci was not a good fit with Seyfarth and did not work well with her. The statements are reasonably capable of an innocent construction and therefore they are not defamatory *per se*. *Green*, 234 Ill. 2d at 502-03.

¶ 31 Mr. Antonacci disagrees, arguing that Ms. Ponder made those statements "to criticize [his] professional judgment, diligence, and character in order to discredit him and threaten his employment, while at the same time protecting [her] reputation and employment." He supports his argument with allegations that she was embarrassed that the client discovered her "ignorance" of critical case law, gave Mr. Antonacci arbitrary deadlines that were difficult to meet, and yelled at him "in an unprofessional manner for approximately 90 minutes." However, under the innocent construction rule, we consider the written statement in context and give the words of the statement, and any implications arising therefrom, their natural and obvious meaning. *Bryson*, 174 Ill. 2d at 90. Notwithstanding Mr. Antonacci's unsupported allegations that Ms. Ponder lied about the events described in the email, the

natural and obvious meaning of the statements are reasonably capable of innocent construction and should be so interpreted. *Mittelman*, 135 Ill. 2d at 232.

¶ 32 Mr. Antonacci also alleges that, "[u]pon information and belief, Ms. Ponder maliciously made numerous false statements concerning [him] to Ms. Pirelli, Ms. Gofron, Mr. Rowland, Mr. Connelly and others subsequent to" the email, and "[u]pon information and belief," she also made such statements to the client, City of Chicago. In *Green*, our supreme court determined that in a claim for defamation *per se*, where actual damages need not be alleged, the plaintiff must plead with "a heightened level of precision and particularity" to protect defendants from baseless claims of serious wrongdoing. *Green*, 234 Ill. 2d at 495. The supreme court did not favor the use of the phrase, "upon information and belief," but found that pleadings based "upon information and belief" could survive dismissal if the plaintiff sufficiently pleads the factual basis informing his belief. *Id*. Here, Mr. Antonacci does not specify what was said to these parties, how the statements were made or when they were made. As such, his "pleadings do not allege sufficient facts to state a cause of action for defamation *per se* and the trial court properly dismissed" the claim. *Grundhoefer v. Sorin*, 2014 IL App (1st) 131276, ¶ 23.

¶ 33 Since the trial court properly dismissed Mr. Antonacci's claim for defamation *per se*, it follows that he cannot maintain his claim for tortious interference. See *Jacobson v. CBS Broadcasting*,

43a

*Inc.*, 2014 IL App (1st) 132480, ¶ 54 ("In light of the fact that plaintiff's actions for defamation, false light, and invasion of privacy have been rejected, those actions can no longer serve as a basis for her claims of *** tortious interference with a business expectation."). Furthermore, the issue of whether the trial court erred in quashing subpoenas seeking depositions and documents that may show Ms. Ponder made defamatory statements about him to the city is now moot. A reviewing court will not decide moot questions, or consider issues not essential to the disposition of the causes before it. *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99 (1990).

¶ 34  Mr. Antonacci next contends that the trial court erred in dismissing his fraudulent misrepresentation claim against defendants. He alleges that when he interviewed for the position at Seyfarth, the firm's attorneys assured him that "Ms. Ponder was a good person for whom to work and that other Seyfarth attorneys actively sought to work with her." However, he soon discovered that Ms. Ponder was "unreasonable, vindictive, and unable to manage people or projects *** which led to his ultimate termination." To plead and prove a claim for fraudulent misrepresentation, a plaintiff must show: (1) a false statement of material fact; (2) the party making the false statement knew of its falsity; (3) an intent to induce the other party to act; (4) the other party reasonably relied on the truth of the statement; and (5) the other party suffered damages resulting from such reliance. *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 571 (1998).

44a

¶ 35   A statement of opinion, however, cannot form the basis of an action for fraudulent misrepresentation. *Id.* at 572. "'A representation is one of opinion rather than fact if it only expresses the speaker's belief, without certainty, as to the existence of a fact.'" *Id.* at 571 (quoting *Marino v. United Bank of Illinois, N.A.*, 137 Ill. App. 3d 523, 527 (1985)). A comment to section 538A of the Restatement (Second) of Torts states that "[o]ne common form of opinion is a statement of the maker's judgment as to quality, value, authenticity or similar matters as to which opinions may be expected to differ." Restatement (Second) of Torts § 538A cmt. b, at 83 (1977). A statement that a person is "[i]ntelligent, industrious and innovative" is an opinion that describes personal qualities, "and whether they exist in a given individual is a matter upon which individual judgment may be expected to differ." *Arbor*, 295 Ill. App. 3d at 572. Similarly, the statement that Ms. Ponder was a good person to work for and whom others actively sought to work with, is one of opinion. Therefore, it cannot form the basis of an action for fraudulent misrepresentation and the trial court properly dismissed this claim. *Id.*

¶ 36   Additionally, given the unambiguous terms of Mr. Antonacci's employment contract with Seyfarth, it was not reasonable for him to rely on representations regarding the security of his employment. When interpreting a contract, a court's primary objective is to ascertain the intent of the parties at the time they executed the contract. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344 (2000). Where the contract's language is clear and unambiguous, we must ascertain the

parties' intent exclusively through the contract's terms given their plain and ordinary meaning. *Id.* According to Mr. Antonacci's employment contract with Seyfarth, his employment was "at-will" meaning "either [Mr. Antonacci] or [Seyfarth] can terminate [his] employment with or without cause or notice." An employer may terminate an at-will employee "for any reason or for no reason" so long as the termination does not violate "clearly mandated public policy." *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 525 (1985).

¶ 37   Mr. Antonacci's final contention is that the trial court erred in denying his second petition for substitution of judge. He argues that during the proceedings, Judge Brewer "displayed a deep-seated favoritism and antagonism that would make fair judgment impossible." A trial judge is presumed to be impartial, and the challenging party bears the burden of overcoming this presumption. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Allegations of judicial bias or prejudice are viewed in context and evaluated in terms of the judge's specific reaction to the situation at hand. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). A determination to disqualify a judge due to bias or prejudice is not " 'a judgment to be lightly made.' [Citation.]" *Eychaner*, 202 Ill. 2d at 280.

¶ 38   Mr. Antonacci alleges that Judge Brewer was biased as evidenced by her recent rulings against him and that her bias resulted from "her political affiliations and professional relationships" which were "inextricably intertwined with" Ms. Ponder and the city. Mr. Antonacci alleged that Judge Brewer

was an attorney for the city's law department from 1988 to 1994, while Ms. Ponder worked for the city's Department of Procurement Services from 1984 to 1989, and was director of contract compliance from 1986 to 1989. He also alleged they had connections through Cook County board presidents John Stroger and Bobbie Steele. However, at the hearing on his petition, Judge Brewer unequivocally stated, "I do not know Anita Ponder." Even if she had known her, that fact alone is not enough to disqualify Judge Brewer from presiding over the case. "It is generally held that a judge need not disqualify [herself] just because a friend appears before [her] in court." *People v. Buck*, 361 Ill. App. 3d 923, 933 (2005) (trial judge not necessarily disqualified from presiding over a case where one of the attorneys supported his election campaign in the past, but did not donate money or actively participate in the campaign).

¶ 39   As for Judge Brewer's rulings against him, "[a] judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280. Mr. Antonacci also refers to Judge Brewer's antagonism toward him during the proceedings, particularly at the December 5, 2013, hearing where he asked to submit his surreply. Mr. Antonacci contends that Judge Brewer's expressly refused to consider the affidavits he submitted pursuant to section 2-619(c), and she would erratically and periodically scream at him throughout the proceeding, "I'M NOT LOOKING AT IT!" The transcript of the hearing, however, reflects only Judge Brewer's frustration with Mr. Antonacci's attempt to submit a surreply one day before the hearing and at no point does she scream, "I'M NOT

47a

LOOKING AT IT." A display of displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against a party or his counsel. *Jackson*, 205 Ill. 2d at 277. There is no evidence in the record that Judge Brewer acted in a hostile manner or was biased against Mr. Antonacci due to her alleged connection with Ms. Ponder, and the trial court properly dismissed this claim.

¶ 40 Mr. Antonacci contends, without citation to authority, that the trial court erred in quashing the subpoenas he served upon Toomey and court reporter Peggy Anderson. He argues that the discovery he requests will tend to prove that the transcript of the December 5, 2013, hearing "was fraudulently altered" to delete "Judge Brewer's hostile outbursts" toward him and will bolster his petition for substitution of judge for cause. A reviewing court will not overturn the trial court's discovery order absent an abuse of discretion. *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 457 (2006). A discovery request must meet the threshold requirement of relevance to the matters at issue in the case, and the trial court should deny discovery where insufficient evidence is shown that the discovery is relevant. *Dei v. Tumara Food Mart, Inc.*, 406 Ill. App. 3d 856, 866 (2010). Although the trial court here quashed Mr. Antonacci's subpoena requests, it did allow the parties to hear the audio recording of the December 5, 2013, hearing from the court reporter's computer. There is no dispute that the transcript of the hearing matched the audio recording. Mr. Antonacci's request for further discovery amounts to an improper "'fishing

expedition'" conducted "'with the hope of finding something relevant.' [Citation.]" *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 659 (2002). The trial court did not abuse its discretion in denying this discovery request. *Id*.

¶ 41   Mr. Antonacci also argues in his brief that the trial court erred in denying his motion for leave to file a surreply *instanter*. However, he provides very little analysis and no support from case law. He cites section 2-1007 of the Code for the proposition that the trial court may extend time to do any act, upon good cause shown, prior to entry of judgment, but the cases he cites in support of his argument, *Sullivan v. Power Construction, Inc.*, 108 Ill. App. 3d 653 (1982) and *Grossman Clothing Co., v. Gordon*, 110 Ill. App. 3d 1063 (1982), are not section 2-1007 cases. Therefore, pursuant to Rule 341(h)(7), he has forfeited the issue for review.

¶ 42   For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 43   Affirmed.

49a

---

## REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

---

LOUIS B. ANTONACCI, an individual,

        Plaintiff-Appellant,

v.

SEYFARTH SHAW, LLP, a partnership, and ANITA J. PONDER, an individual,

        Defendants-Appellees.

---

No. 1-14-2372

Appellate Court of Illinois
First District, First Division

August 17, 2015

---

JUSTICE HARRIS delivered the judgment of the court with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

---

50a

Appeal from the Circuit Court of Cook County.

The Honorable Eileen M. Brewer and Thomas Hogan, Judges Presiding.

---

Law Offices of Louis B. Antonacci, 360 H Street NE, Unit 334, Washington, DC 20002, (Louis B. Antonacci, of counsel), for APPELLANT.

Perkins Coie LLP, 131 South Dearborn Street, Suite 1700, Chicago, IL 60603, (Matthew J. Gehringer and Bates McIntyre Larson, of counsel), for APPELLEES.

Stephen R. Patton, Corporation Counsel of the City of Chicago, 30 North LaSalle Street, Suite 800, Chicago, IL 60602, (Benna Ruth Solomon, Myriam Zreczny Kasper and Suzanne M. Loose, of counsel), for NON-PARTY APPELLEE *City of Chicago*.

51a

[ENTERED JULY 23, 2014]

IN THE CIRCUIT COURT OF COOK COUNTY,
ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| LOUIS B. ANTONACCI, an individual | ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 12 L 13240 |
| v. | ) | |
| | ) | Eileen M. Brewer, |
| SEYFARTH SHAW LLP, a Partnership, ANITA J. PONDER, an individual | ) ) ) | Judge Presiding |
| | ) ) | |
| Defendants. | ) | |

## **ORDER**

       This matter coming to be heard on Plaintiff Louis B. Antonacci's Motion to Reconsider and Defendants Seyfarth Shaw LLP (hereinafter "Seyfarth") and Anita Ponder's Motion to Reconsider this Court's December 6, 2013 order, granting in part and denying in part Defendants' 735 ILCS 5/2-615 Motion to Dismiss. The parties having appeared, the Court having jurisdiction over the subject matter and the Court being fully advised, IT IS HEREBY ORDERED THAT Defendants' Motion to Reconsider is granted and Plaintiff's Motion to Reconsider is denied, for reasons discussed below.

52a

## I. BACKGROUND

## A. PROCEDURAL HISTORY

On November 21, 2012, Plaintiff filed a Verified Complaint against Defendants seeking damages for injuries he suffered to his career and reputation, ensuing from his employment with Seyfarth, who hired Plaintiff to support Ms. Ponder, a partner in Seyfarth's Government Contracts Practice Group. The Verified Complaint against Defendants sounds in defamation per se, intentional interference with an economic advantage, fraudulent inducement and promissory estoppel.

On April 2, 2013, this Court granted Defendants' § 2-615 Motion to Dismiss because Plaintiff's Verified Complaint, consisting of 351 enumerated paragraphs with 320 identical paragraphs incorporated into four different theories, was redundant, excessively lengthy, and disjointed, violating 735 ILCS 5/2-603(a)'s requirement of submitting a "plain and concise statement of the pleader's cause of action." This Court dismissed with prejudice Plaintiff's counts for promissory estoppel and fraudulent inducement and permitted Plaintiff to replead defamation per se and interference with economic advantage. Plaintiff was ordered to submit an amended complaint within 28 days.

On April 17, 2013, Plaintiff filed a motion requesting this Court to recuse itself pursuant to Ill. Sup. Ct. R. 62, or alternatively requested the Court to reconsider its April 2, 2013 order dismissing with prejudice Plaintiff's Count III (fraudulent

misrepresentation to induce employment) and Count IV (promissory estoppel) of Plaintiff's Verified Complaint. Plaintiff filed this Motion for Recusal after making no objection to this Court's March 4, 2013 order, transferring Defendant's Motion to Seal Plaintiff's Verified Complaint to Judge Maddux. When Judge Maddux set a hearing date on Defendants' Motion to Seal Plaintiff's Verified Complaint–which argued Plaintiff's Verified Complaint included attorney-client information– Plaintiff did not object to this administrative transfer. However, after this Court's April 2, 2013 order, Plaintiff filed his first Motion for Recusal based on the erroneous claim that this Court's transfer of the Defendants' Motion to Seal required the Court to recuse itself from the case. This Court denied the Plaintiff's motion. Plaintiff then filed a First Amended Verified Complaint on April 30, 2013.[1]

Plaintiff filed his first Petition to Substitute Judge Brewer for Cause on May 28, 2013. Plaintiff's petition alleged that Judge Brewer had an apparent bias in overseeing Plaintiff's defamation per se action because she is a defendant in a defamation case brought by Lanre Amu, a suspended plaintiff's attorney. Judge Lorna Popes heard and denied Plaintiff's first Petition to Substitute Judge on June 17, 2013. Plaintiff then requested this Court to transfer his case to the Commercial Calendar, which was denied on August 19, 2013.

---

[1] Plaintiff's Amended Verified Complaint replead fraudulent misrepresentation, and promissory estoppel counts, both dismissed with prejudice pursuant to this Court's April 2, 2013, in order to preserve the counts for appeal.

54a

On December 5, 2013, the day before the scheduled hearing date for Defendants' § 2-619.1 Motion to Dismiss, Plaintiff appeared before this Court requesting to file his affidavits under seal in response to Defendants' § 2-619 Motion to Dismiss and requested the Court to consider his previously filed Sur-reply. This Court refused to consider Plaintiff's Sur-reply because Plaintiff filed his Sur-reply before requesting leave of this Court in violation of this Court's standing order, which requires a party to seek leave to file a Sur-reply. The Court also noted that the Plaintiff's motions were untimely, with the hearing the next day, and due to judicial economy notified the parties that the December 6, 2014 hearing would proceed, limited to the motions filed pursuant to Defendants' § 2-619.1 Motion to Dismiss.

Nor did this Court consider Plaintiff's exhibits filed in opposition of Defendants' § 2-619 Motion to Dismiss, under Ill. Sup. Ct. R. 191(b), because Plaintiff intended to file them under seal without supplying the Court a legal basis to seal otherwise public court records. Plaintiff specifically admitted that he filed "Exhibit C [ ... ] last minute in camera with the response, [and he wanted] to file that under seal." Here, while Plaintiff claimed the exhibit was privileged, he provided the court with no meaningful basis to determine, through an in camera review, whether to seal the documents. Further this Court informed Plaintiff that issues arising in the § 2-619.1 briefs, which were submitted as courtesy copies, would be addressed at the December 6, 2013 hearing. Further, Plaintiff's affidavits submitted in opposition of the motion were unnecessary because

Plaintiff's amended verified complaint contained sufficient allegations of malice to permit review of an otherwise qualified privileged communication, attached as an exhibit to Plaintiff's Amended Verified Complaint.

On December 6, 2013, this Court granted in part and denied in part Defendants' § 2.619.1 Motion to Dismiss. This Court denied Defendants' 2-619 Motion to Dismiss and granted in part and denied in part Defendants' 2-615. A brief summary of this hearing's substantive rulings are discussed below in Part I, Section C.

During the December 6, 2013 hearing, Plaintiff asked Judge Brewer whether she knew Defendant Anita Ponder. Judge Brewer said she did not and Plaintiff, in an increasingly aggressive and offensive manner, attempted to cross examine Judge Brewer regarding her prior work for the late Cook Count Board President John H. Stroger Jr. Plaintiff's questions were unfounded, unrelated to the instant motion, and insinuated that this Court lied about knowing Defendant Anita Ponder. Plaintiff implied that Judge Brewer must know Defendant Ponder because of her relationship with President John H. Stroger Jr.

On December 20, 2013, Defendants filed a Motion to Reconsider the Court's December 6, 2013 order, arguing this Court misapplied the innocent construction rule by incorrectly finding the Plaintiff's allegations and the Ponder statement set forth a valid defamation per se action. On December 27, 2013, Plaintiff filed a Motion to Reconsider the

56a

Court's December 6, 2013 order arguing this Court (1) erred in dismissing with prejudice Plaintiff's Count II, tortious interference with a prospective employment relationship; (2) erred in determining the Ponder statement was the sole well-pled defamation per se allegation; and (3) erred in not considering his Sur-reply or his exhibits submitted pursuant to § 2-619.

On January 14, 2014, Plaintiff presented a Motion to Compel discovery from two court reporters, Ms. Toomey and Ms. Anderson of Toomey Reporting, the reporter service Plaintiff hired for the December 5, 2013 proceedings. In this motion, Plaintiff accused Ms. Anderson, his own court reporter, of altering the transcript to make Judge Brewer appear less "biased against the Plaintiff in this matter," based on his suspicion that the defendants' counsel, Matthew Gehringer, may have requested the transcripts be altered. Plaintiff seemingly believed, without any verifiable proof, that Mr. Gehringer was engaged in a plot to alter court transcripts–implicitly accusing Mr. Gehringer of lying and suborning perjury. On February 3, 2014, Judge Brewer heard the Plaintiff's Motion to Compel discovery from the court reporter and Toomey Reporting's Motion to Quash Plaintiff's subpoenas. This Court granted Toomey's Motion to Quash finding Plaintiff's accusations offensive and unfounded. However, this Court still requested Toomey Reporting to play the recording for the Plaintiff, so he could hear that the audio recording matched the three page transcript.

57a

On March 19, 2014, Plaintiff's second Motion to Substitute Judge Brewer for cause was heard and denied by Judge Hogan. In an attempt to secure a new judge, Plaintiff continued to advance arguments connecting Judge Brewer to Defendant Anita Ponder through the late Cook County Board President John H. Stroger Jr., even though Judge Brewer stated she did not know Anita Ponder. Judge Hogan further rejected Plaintiff's arguments that Judge Brewer was biased against Plaintiff because of other political or personal connections Judge Brewer and Anita Ponder allegedly shared, including links to Former Cook County Board President Bobbi Steele, and Cook County Board President Toni Preckwinkle.[2]

[2] As reflected in Plaintiff's Motion for a Supervisory Order, Plaintiff believes that this Court is engaged in a conspiracy with Defendant Ponder, the City of Chicago and Mayor Rahm Emanuel "to conceal evidence that the City of Chicago wasted taxpayer money on the legal services of Ms. Ponder while she was being pursued by the U.S. Internal Revenue Service for hundreds of thousands of dollars of unpaid federal taxes when the City retained her. Indeed, Mayor Rahm Emanuel spoke at Seyfarth Shaw's Government Contractors Business Forum, which is chaired by Ms. Ponder, just days before the March 31, 2014 hearing at the Circuit Court. The Circuit Court must not be allowed to help conceal the corruption pervading the City's department of law." Plaintiff's Motion for a Supervisory Order at 14. Plaintiff states: "Mr. Antonacci believes that Judge Brewer does know Anita Ponder and is trying to protect her from liability for her fraudulent misconduct." *Id.* at 13 Plaintiff further states as follows: "It will not surprise many that the City of Chicago's Department of Law seeks to protect the cronyism and corruption that has driven honest business and talent out of Chicago for decades. But Judge Brewer is ending a message that says due process can be bought and sold in Chicago and thus Cook County Circuit Court exists only for the benefit of the well connected." *Id* at 18-19. The allegations in Plaintiff's defamation case, pale in comparison to Plaintiff's unfounded and sanctionable accusations about this Court's

Plaintiff further insulted the integrity of the Illinois judiciary by delivering an affidavit to the Court's chambers demanding that this Court attest to the fact that this Court is not acquainted with Defendant Ponder.

On March 31, 2014, a hearing was held regarding the parties' Cross Motions for Reconsideration of this Court's December 06, 2013 order. This Court ruled and granted the Defendants' Motion to Reconsider and granted Defendants' § 2-615 Motion to Dismiss without prejudice, and denied Plaintiff's Motion to Reconsider. During this hearing, Plaintiff repeatedly interrupted the Court, showing a lack of respect and disregard for this Court. The Court admonished the Plaintiff for raising his voice. When the Court recommended the Plaintiff amend his Complaint, he refused and stood on his pleading.

Even after Plaintiff's second motion to substitute Judge Brewer for cause was denied on March 19, 2014, Plaintiff advanced his Motion to Reconsider this courts' decision to grant Toomey Report Services' Motion to Quash Plaintiff's subpoena of the court reporter, Ms. Toomey and the reporter's equipment. Toomey's counsel even notified Plaintiff that his Subpoenas Duces Tecum and the Motion to Compel violated Illinois Supreme Court M.R. 20112, which proscribes discovery requests for court reporter audio recordings. On April 23, 2014,

---

integrity, as well as the integrity of defense counsel Matthew Gehringer and the Toomey court reporters. Plaintiff's baseless and scurrilous accusations are an attempt to undermine the Court's authority and dignity and bring the administration of justice into disrepute.

59a

this Court denied Plaintiff's Motion to Reconsider as Plaintiff is proscribed from directly asking for the audio recordings. Any discrepancy with the transcript requires the party contesting the accuracy to request court review, in order to preserve the integrity of the court record, as the transcripts are official court records subject to Ill. Sup. Ct. R. 46.[3]

---

[3] This Court has encouraged the Plaintiff to amend his Complaint to comply with Illinois pleading standards. However, instead of amending, Plaintiff has filed several motions, which were unfounded by the facts or the law. Further, Plaintiff has claimed that the Court and the Defendants prevented him from timely advancing his case, while also claiming his former counsel, Ruth Major, hindered his case. Plaintiff was represented by Ms. Major until September 5, 2013, when Plaintiff sent a letter firing her and accusing her of "not genuinely advocating on his behalf," that she engaged in fraudulent billing practices, and that counsel "prejudic[ed] his ability to prosecute his case." Here, Plaintiff believes that his former counsel hindered his case up until September 5, 2013, attributing a delay in prosecuting his case to his own choice in hiring representation. Since firing Ms. Major, Plaintiff has proceeded pro se. *See* Plaintiff's Motion for Reconsideration this Court's December, 6, 2013, order, ex. B. While Plaintiff is free to proceed pro se, his protests regarding the timely advancement of his case are inextricably linked to his own misunderstanding of Illinois law and procedure, advancing arguments and motions that are unsupported by Illinois law, unnecessarily divesting this court's time and resources in reviewing Plaintiff's frivolous arguments and conclusory pleadings (e.g., Plaintiff filed a motion to Reconsider the Court's February 3, 2014 order that granted Toomey's motion to quash Plaintiff's subpoenas. Plaintiff's Motion to Reconsider requested the court to permit the Plaintiff to compel discovery for audio recordings that are specifically proscribed by M.R. 20112).

60a

## B. FACTS

The parties' Cross Motions for Reconsideration request this Court to review its December 6, 2013 order pursuant to § 2-615, granting in part and dismissing in part, Plaintiff's Amended Verified Complaint. For the purposes of reviewing a § 2-615 Motion to Dismiss, this Court must accept the facts in Plaintiff's Amended Verified Complaint as true, construed in the light most favorable to the Plaintiff. Loman v. Freeman, 229 Ill. 2d 104, 109 (2008). Further, the well-pled facts in Plaintiff's Amended Verified Complaint operate as judicial admissions, withdrawing the well-pled facts from dispute and dispensing the need to prove the facts. Robins v. Lasky, 123 Ill. App. 3d 194, 198 (1st Dist. 1984). After a review of the parties' pleadings and briefs, the Court determined the factual allegations in this key fact section as significant in deciding the parties' Cross Motions to Reconsider this Court's December 6, 2013 order. Facts not listed in this summary were considered during the review of the parties' briefs.

Plaintiff is an attorney, who practiced law in Washington D.C. before accepting a job at Seyfarth. Defendant Anita Ponder is an attorney and partner at Seyfarth. In August 2011, Seyfarth interviewed Plaintiff for a staff attorney position. During these interviews, Plaintiff alleges that five Seyfarth attorneys (i.e., Michael D. Wexler, a partner; Mark L. Johnson, a partner; Amir Ovcina, an associate; Jerome F. Buch, a partner; and Anita J. Ponder) falsely and intentionally represented that attorneys in the Commercial Litigation Department actively

sought work with Ms. Ponder. On August 15, 2011, Plaintiff accepted Seyfarth's offer of employment. Plaintiff asserts he would not have accepted the position if Seyfarth's employees accurately portrayed Ms. Ponder's lack of professionalism and mistreatment of subordinate employees. Plaintiff relocated from Washington D.C. to Chicago and started at Seyfarth on August 29, 2011.

On September 12, 2012, Plaintiff attended a fact-finding interview with Defendant Ponder. During an interview, Plaintiff claims that Defendant Ponder was unaware of case law that was material to the representation. According to Plaintiff, Defendant Ponder confronted Plaintiff the next day and falsely criticized him, yelling "I have 25 years of experience and you have only been here for two weeks! You need to recognize that or we are going to have a problem!" Following this incident, Defendant Ponder assigned Plaintiff the task of drafting a memorandum on relevant case law pertaining to the legal issue material to the client's matter.

On October 4, 2011, Defendant Ponder notified Plaintiff that the internal deadline for the project was October 17, 2011, three weeks before the client deadline. Plaintiff claims this internal deadline was arbitrary and part of Ms. Ponder's attempt to damage his career. Instead of addressing his concerns about the deadline with Defendant Ponder, Plaintiff allegedly asked Jason Stiehl, a partner in Seyfarth's commercial litigation group, about how to proceed with the project. According to Plaintiff, Mr. Stiehl indicated that Seyfarth received previous complaints that Defendant Ponder was

unreasonable and unprofessional. Plaintiff also met with Dave Rowland, Managing Partner for Seyfarth's Chicago office, who acknowledged receiving reports from employees, who had difficulties working with Ms. Ponder. Mr. Rowland provided advice to Plaintiff about how to deal with Defendant Ponder, and stated, "We just don't want you to leave."

After meeting with Mr. Rowland and Mr. Stiehl, Plaintiff followed their advice and suggested an alternative internal project schedule to Defendant Ponder, who proceeded to berate Plaintiff for 90 minutes. Afterwards, Plaintiff claims he reported Ms. Ponder's conduct to Mr. Rowland, who referred Plaintiff to Mary Kay Klimesh, a Seyfarth partner. Ms. Klimesh allegedly suggested that Plaintiff prepare a comprehensive proposed project schedule to Ms. Ponder. On October 6, 2011, Plaintiff completed this schedule and sent it to Ms. Ponder. Defendant Ponder responded to Plaintiff on October 10, 2011, notifying him that he would no longer work on the project.

Ms. Ponder addressed her problems with the Plaintiff's performance and attitude with Seyfarth leadership. She discussed her concerns with Kelly Gofron, Professional Development Consultant at Seyfarth, and also to Seyfarth leadership: Mr. Rowland, Mr. Connelly, and Kate Perrelli. Ms. Gofron memorialized Ponder's criticism of the Plaintiff in an email to several Seyfarth employees, with the Subject line: "Ponder Feedback." Plaintiff's allegations supporting his defamation claim focused

63a

on interpreting the following segment from this email:

> "Shortly after [Plaintiff] was hired, they had meetings with client that Anita thought he did not act appropriately in the sense that he was asking the wrong questions, providing advice to them, which he should not have been doing: A. he's not licensed in IL B. he wasn't knowledgeable about locale procurement C. he wasn't knowledgeable of City of Chicago's process [ ... ]. According to her, he handled criticism very inappropriately. He made comments undermining Anita's expertise in gov't procurement. The relationship continued to go downhill. "Amend. Verified Compl. Ex. A.

Plaintiff alleges that several of Defendant Ponder's statements about Plaintiff were false, made in retaliation for her own failures on the project and made to discredit Plaintiff's complaints about her. According to Plaintiff, several weeks later, Ms. Ponder allegedly reassigned Plaintiff to this project because she was unable to elicit assistance from other attorneys.

Following this project, Plaintiff obtained work from other Seyfarth Partners, receiving positive performance reviews and helping bring in a new client. Plaintiff, motivated by Defendant Ponder's mistreatment of him, asked Seyfarth leadership, about his job status and potential for opportunities; in December 2011, Plaintiff addressed these concerns to Mr. Wexler; on December 29, 2011,

64a

Plaintiff addressed these same concerns with Mr. Connelly, who permitted Plaintiff to work in the Commercial Litigation Group rather than solely with Ms. Ponder; in January 2012, Plaintiff met with Mr. Wexler, who reiterated Plaintiff still had a position in Seyfarth's Commercial Litigation Group in Chicago; in March and April of 2012, Plaintiff sought reassurances about job security when he applied to sit for the July 2012 Illinois Bar Examination; in March or April 2012, Plaintiff declined an offer by a recruiter at North Berman & Beebe because he believed Seyfarth's assurances that his job was secure.

On May 22, 2012, Plaintiff was fired during a meeting with Mr. Wexler and Deborah Johnson, Human Resources Manager. Mr. Wexler stated that Plaintiff was hired to work for Defendant Ponder and "we all know how that worked out." Plaintiff requested his performance evaluation, which was overwhelmingly positive, containing no reference to the Ponder Feedback email. On July 2, 2012, Plaintiff requested his personnel file and discovered the Ponder Feedback email.

### C. December 6, 2013 Hearing

During the December 6, 2013 hearing, this Court granted in part and denied in part Defendants' 2-615 Motion to Dismiss, finding statements made in the Ponder Email, supplemented by allegations in Plaintiff's Complaint, were defamatory per se, and dismissing Count II (tortious interference with a prospective economic advantage), with prejudice because Illinois

law does not recognize a tortuous inference with a prospective economic advantage when the alleged tortious act interferes with an at-will employment. Harris v. Eckersall, 331 Ill. App. 3d 930 (1st Dist. 2002).

In reaching this decision, this Court first considered and denied Defendants' § 2-619 Motion to Dismiss, rejecting Defendants' arguments that the Ponder Feedback email was protected by a qualified privilege, as a protected statement made during an employee performance review. Mittelman v. Witous, 135 Ill. 2d 220 (Ill. 1989). This Court found the Plaintiff sufficiently alleged facts that established Defendant Ponder's statements, summarized in the Ponder Feedback Email, were motivated by malice, overcoming Defendants' qualified privilege. Thus, this Court considered the Ponder Feedback email exhibit to Plaintiff's Amended Verified Complaint, when considering Defendants' § 2-615 Motion to Dismiss.

This Court's December 6, 2013 order hinged on the legal finding that certain comments in the Ponder Feedback Email were defamatory per se. This Court found the following statement accused Plaintiff of the unauthorized practice of law: "[Plaintiff was] providing advice to [the City], which he should not have been doing: A. he's not licensed in IL" (hereinafter "Ponder statement"). This Court rejected the Defendants' argument to dismiss Plaintiff's defamation per se action because the innocent construction rule required the Court to apply a non-defamatory meaning to the Ponder statement. See Green v. Rogers, 234 Ill. 2d 478 (Ill.

66a

2009). Thus this Court denied Defendants' § 2-615 Motion to Dismiss Count I (defamation per se) of Plaintiff's Amended Verified Complaint.

## II. DEFENDANT'S MOTION TO RECONSIDER

### A. LEGAL BASIS FOR MOTION TO RECONSIDER

The purpose of a motion for reconsideration is to alert the Court to newly discovered evidence, a change in the law, or the Court's previous errors in applying the law. <u>Martinez v. River Park Place,</u> LLC, 2012 IL App (1st) 111478, ¶ 23, *appealed* denied, 985 N.E. 2d 307 (Ill. 2013). After careful review of the law, the parties' pleadings, and Plaintiff's Amended Verified Complaint, this Court finds it misapplied the law on defamation. This Court finds, pursuant to <u>Green</u>, 234 Ill. 2d at 502, that the Ponder statement reasonably can and therefore must be innocently construed.

### B. The Ponder statement can be reasonably construed in a non-defamatory matter.

1. Plaintiff's defamation per se claim must set forth well-pled allegations with specificity.

Plaintiff's allegations and interpretations of the Ponder statement fail to sufficiently set forth a defamation per se action. Plaintiff's defamation per se must be supported by well-pled facts and exhibits, and cannot rely on discovery to substantiate Plaintiff's suspicion of Defendants' potential tortious action. <u>Allen v. Peoria Park Dist.</u>, 2012 IL App (3d)

110197, P14 (finding a trial court committed reversible err by permitting a Plaintiff to conduct discovery, when the Plaintiff's Complaint did not contain well-pled allegations stating forth claims under IL law).

A well-pled defamation per se claim sets forth facts with greater specificity that establishes the defendant published a false and unprivileged statement to a third party, and this publication damaged the plaintiff. *See* Green, 234 Ill. 2d at 495. A communication is defamatory if the statement would tend "to cause such harm to the reputation of [the plaintiff] that it lowers that person in the eyes of the community or deters third persons from associating with her." Clarage v. Kuzma, 342 Ill. App. 3d 573, 580 (3d Dist. 2003), citing Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 87 (1996). In Illinois, there are five categories of defamatory statement giving rise to a defamation per se action: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease which, if true, would tend to exclude one from society; (3) those imputing inability to perform or want of integrity in the discharge of duties of office or employment; (4) those prejudicing a particular party in his or her profession or trade; and (5) those stating false accusations of fornication or adultery. Dunlap v. Alcuin Montessori Sch., 298 Ill. App.3d 329, 338 (1st Dist. 1998).

Plaintiff's allegations fail to establish the necessary specificity required to plead defamation per se. Plaintiff's defamation per se action is not alleged "in haec verba," but relies on Ms. Gofron's

summary of Ms. Ponder's feedback on Plaintiff–how Plaintiff was "providing advice to them, which he should not have been doing," immediately preceded "A. He's not licensed in IL"–and Plaintiff's interpretation of Ponder Feedback email. *See* <u>Green</u> at 492. ("Although a complaint for defamation *per se* need not set forth the allegedly defamatory words *in haec verba,* the substance of the statement must be pled with sufficient precision and particularity so as to permit initial judicial review of its defamatory content."). Plaintiff's reliance on "advice" lacks the specificity needed to establish whether Ms. Ponder intended a defamatory meaning, as there is insufficient context to determine whether the "advice" was in fact legal advice.

The Ponder email does not provide sufficient facts to determine whether Defendant Ponder intended a defamatory meaning. Here, "which he should not have been doing," can have several reasonable non-defamatory meaning, as the advice is undefined. What was that advice? Sometimes by asking a question a suggested course of action is conveyed to the recipient. Plaintiff assisted Ms. Ponder with client interviews, and by "asking the wrong questions," he could have reasonably conveyed advice to the client. The Court finds that the Ponder email provides insufficient basis to interpret whether Ponder's statement was defamatory, and Plaintiff's own interpretation of this email, without additional factual allegations, fall short of the heighted pleading standards for defamation per se.

2. This Court misapplied the innocent construction rule by finding the Ponder Email communication was defamatory on its face

Even if Defendant Ponder's statement is detrimental to the Plaintiff's profession, as a practicing attorney, the statements are not defamatory per se because the Ponder statement is subject to another reasonable, non-defamatory meaning. Green, 234 Ill. 2d at 499. The innocent construction rule considers whether an alleged defamatory communication, in the context of well-pled facts, is reasonably susceptible to an innocent and non-defamatory meaning. Green at 502. After reviewing Illinois defamation law, this Court finds it misapplied the innocent construction rule when the Court found the Ponder statement accused Plaintiff of the unauthorized practice of law: "[Plaintiff was] providing advice to [the City], which he should not have been doing: A. he's not licensed in IL" (hereinafter "Ponder statement"). The Ponder statement can be innocently construed, and therefore it must be innocently construed. Green at 499.

In Green, the Illinois Supreme Court determined whether the innocent construction rule applied to the Plaintiff's allegations, which summarized the defendants' defamatory statements as accusing the plaintiff of "misconduct with children" and "abus[ing] players, coaches, and umpires in CHLL." The Green court rejected the Plaintiff's arguments that the statements only reasonably inferred the Plaintiff committed a crime

by sexually or physically abusing players, coaches and umpires. These statements were capable of innocent construction of a non-criminal form of abuse because such criminal abuse was unlikely, in light of Green's allegations that the defendant's president still permitted and encouraged Green to participate with Green's son's team, albeit not as a coach. Green at 502.

Similar to Green, if Ms. Ponder believed that Plaintiff was engaged in the unauthorized practice of law, it is unlikely that Ms. Ponder would have sent him to further client meetings. In Defendant's Motion for Reconsideration and in Plaintiff's Response to Defendant's Motion for Reconsideration, the parties agree that given Plaintiff's allegations, he could not have committed the unauthorized practice of law, as the safe harbor provision, in Ill. S. Ct. Code of Prof. Res. 5.5(c), permits out-of-state attorneys to temporarily practice law in Illinois, as long as the services are "undertaken in association" with an Illinois attorney. Plaintiff's allegations fall squarely within the safe harbor provision because Plaintiff, an attorney licensed in a foreign jurisdiction, provided legal services in Illinois on a temporary basis, which was "undertaken in association" with Defendant Ponder, an Illinois licensed attorney.

This Court rejects Plaintiff's argument that the safe harbor provision is immaterial to the well-pled facts establishing that Ms. Ponder's statement accused him of the unauthorized practice of law. Pursuant to Green, this Court finds that the context of the Ponder email, coupled with Plaintiff's own

allegations that Ms. Ponder continued to allow him to provide legal services, establishes a sufficient reasonable basis to interpret Ms. Ponder's communication in a non-defamatory matter because she continued to supervise Plaintiff's legal work under the "safe harbor provision." It is reasonable that Ms. Ponder would not continue to supervise Plaintiff if he actually committed the unauthorized practice of law; thus, the innocent construction rule must be applied.

Additionally, Ms. Ponder's statements in the email can be reasonably innocently construed to be in furtherance of supervisory duties over the Plaintiff where she "brought to his attention after meetings" that she thought he was not "act[ing] appropriately in the sense that he was asking the wrong questions, providing advice to them, which he should not have been doing: A. he's not licensed in IL B. he wasn't knowledgeable about local procurement C. he wasn't knowledgeable of City of Chicago's process." *See* Flip Side, Inc. v Chicago Tribune Co., 206 Ill. App. 3d at 650, 651 (1st Dist. 1990) (construing alleged defamatory language in context of the entire statement). As Plaintiff's supervisor, Defendant Ponder would reasonably be concerned with Plaintiff's statements that could be construed as advice because he lacked experience and knowledge about Illinois law, and demonstrated concern that Plaintiff's actions could impact her own license because she supervised his work.

Accordingly, for the reasons discussed above, this Court finds Plaintiff's reliance on the Ponder Feedback email, similar to Plaintiff's other

allegations in support of his defamation per se action, are conclusory or lack the specificity needed to set forth a defamation per se action. Further, this Court finds the Ponder statement can be innocently construed and therefore must be dismissed. Because Plaintiff has stood on his Amended Verified Complaint, refusing to amend, this Court grants the Defendant's Motion for Reconsideration and dismisses the Plaintiff's Complaint with prejudice.

## III. PLAINTIFF'S MOTION TO RECONSIDER

1. Plaintiff's tortious interference with a prospective employment relationship for an at-will employee has no basis under Illinois law.

This Court did not err in dismissing Count II because Plaintiff was an at-will employee. Plaintiff had no employment contract and no property interest of continued employment at Seyfarth which distinguished him from the attorney in <u>Mittelman</u>, 135 Ill. 2d 220, who had an employment contract. Plaintiff had no reasonable expectation of continued employment. *See* <u>Mittelman</u>, 135 Ill. 2d 220; <u>Harris v. Eckersall</u>, 331 Ill. App. 3d 930, 934 (1st Dist. 2002). In <u>Mittelman</u>, the Plaintiff attorney's contract with his firm provided a property basis for Mittelman's tortious interference with a contractual expectancy action. <u>Id.</u> at 249-251.

73a

2. Plaintiff's allegations of Defendant Ponder's defamatory statements are conclusory in nature.

Plaintiff challenges this Court's December 6, 2013 order that the Ponder statement was the sole defamatory communication pled in Plaintiff's First Amended Complaint. In a most quixotic fashion, Plaintiff argues this Court incorrectly found that many of Plaintiff's allegations in his Amended Verified Complaint were not actionable through defamation per se. However, Plaintiff's own conclusory characterizations of the Ponder email, unsupported by the plain meaning of the alleged defamatory text, cannot be the basis of a defamation per se claim. *See* Flip Side, Inc., 206 Ill. App. 3d at 650-51 (rejecting the Plaintiff's attempt to argue construction of the communication contrary to the complaint and attached exhibit).

In short, Plaintiff's Amended Verified Complaint lacks well-pled allegations that establish Defendant Ponder made a defamatory communication about Plaintiff. This Court would ignore the heighted pleading standards required for defamation per se, if the Court accepted the Plaintiff's conclusory allegations that either (1) are contradicted by pleadings or the Ponder Email, or (2) ignore the plain language of the Ponder Feedback Email. Green, 234 Ill. 2d at 495. The Court has reviewed the Plaintiff's pleadings and will summarize and address how Plaintiff's allegations fall short of defamation per se:

74a

(1) Plaintiff attaches a defamatory meaning to the following segment of the Ponder Feedback email: "[Plaintiff] missed deadlines that were initially set and have now been extended by the client and Anita." Plaintiff asserts this segment is defamatory, how Defendant Ponder misrepresented that Plaintiff missed deadlines; however, Plaintiff's allegations admit that Ms. Ponder was unreasonable with her deadlines, and that Plaintiff sought advice about proposing new deadlines with Seyfarth leadership. Further, the Court finds that the email's reference to missing the deadline date can be innocently construed as not meeting Defendant Ponder's internal deadline and not the project deadline date.

(2) Plaintiff claims that Ms. Ponder defamed him by stating that Plaintiff shirked his responsibilities by "not showing up to work on a day Ms. Ponder and Mr. Antonacci had allegedly agreed to meet to discuss the project," and that Plaintiff "was not interested or enthusiastic about his work and that he had done a significant amount of work for others besides Ms. Ponder." First, Plaintiff concedes that he did not show up and report to Ms. Ponder at that time, claiming the statement was not entirely true, leaving the matter up for interpretation and is a matter of opinion. Second, opinions about Plaintiff's performance are not defamatory.

(3) Plaintiff mistakenly claims the Ponder Feedback email establishes Defendant Ponder defamed Plaintiff. when "Ms. Ponder misrepresented to [Seyfarth leadership] that Mr. Antonacci had misrepresented that he could waive into the bar of the State of Illinois prior to his being hired." This email, though, mentions nothing about waiving into the IL bar, making such allegations speculative and lacking specificity to substantiate this alleged defamatory statement.

(4) Plaintiff argues that the Ponder Feedback email establishes that "Ms. Ponder misrepresented to [Seyfarth leadership] that 'she found out' Mr. Antonacci had spoken with the Pro Bono director, [somehow] meaning that Mr. Antonacci [...] conceal[ed] that fact from her." This email does not contain any statement accusing Plaintiff of concealing or lying to Ms. Ponder about pursuing pro bono work. The email's statements referencing Pro Bono work are not defamatory and control over Plaintiff's contrary allegations.

Additionally, Plaintiff still alleges without any factual basis that Defendant Ponder made false statements about Plaintiff to City of Chicago employees. While there may be a factual basis for Defendant Ponder accusing Plaintiff of missing the deadlines, Plaintiff does not allege facts establishing that Ms. Ponder ever made this communication to

City of Chicago employees. Further, blaming Plaintiff for missing the City of Chicago's deadlines would be an opinion and not actionable per se unless based on verifiable facts tied to these alleged remarks.

While this Court does not expect Plaintiff to prove his case in his complaint, defamation per se entails presumptive damages and requires the Plaintiff to allege well-pled facts that rise beyond mere suspicion or belief. Plaintiff's numerous conc1usory factual and legal allegations about Ms. Ponder's purported lies about Plaintiff cannot support a defamation claim against Ms. Ponder. This Court agrees with the Plaintiff's characterization of Ms. Ponder's statements as nothing more than "an unambiguous indictment of Plaintiff's Character and conduct as an attorney." Here, this "indictment" only demonstrates Ms. Ponder's "strong disapproval" of the Plaintiff's conduct, rendering the email a matter of opinion, which cannot support a defamation per se action. *See* "indictment" definition *in* Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/indictment (last visited March 26, 2014) ("[A]n expression of strong disapproval <an *indictment* of government policy on immigrants>.") Plaintiff's allegations never establish a defamatory communication that meets the heighted pleading requirements for defamation per se.

3. This Court did not err in refusing to consider Plaintiff's Sur-reply exhibits and affidavit submitted in opposition to the Defendants' § 2-619 Motion to Dismiss.

77a

Plaintiff Motion to Reconsider also argues this Court erred in not (1) granting Plaintiff leave to file a Sur-reply to the Defendants' § 2-619.1 Motion to Dismiss, (2) refusing to accept Plaintiff's exhibits and affidavit submitted in opposition of the Defendants' § 2-619 Motion to Dismiss, and (3) encouraging the Defendants to file a motion to strike conc1usory allegations in the Plaintiff's First Amended Verified Complaint. Plaintiff's motion reflects Plaintiff's unfamiliarity with Illinois civil procedure.

First, Plaintiff's allegation that this Court erred in refusing to consider Plaintiff's Sur-reply illustrates Plaintiff's disregard of this Court's rules. Plaintiff ignores Calendar Z's Standing Order that specifically states that "Sur-Reply briefs will not be accepted without leave of the court." This Court's standing order prevents a non-movant from filing a Sur-reply as a means to exceed the Court ordered page limit. It also enables the Court to thwart a litigant's attempt to alter an existing briefing schedule and hearing date. Granting Plaintiff's request to submit a Sur-reply on the day before the scheduled hearing would have meant a new briefing schedule and new hearing date. This Court extensively prepared for the hearing and in order to ensure judicial economy and maintain an orderly administration of this Court, this Court properly denied the Plaintiff's request to file a Sur-reply a day before the scheduled hearing. In re Marriage of Elliott, 265 Ill. App. 3d 912, 917 (1994) (noting our courts have the inherent power to manage their own dockets so as to achieve the orderly and expeditious disposition of cases). Thus, this Court did not

consider the Plaintiff's Sur-reply because of Plaintiff's noncompliance with this Court's standing order.

Second, this Court did not err in denying Plaintiff's request to file his Affidavit and exhibits under seal. When Plaintiff asked the Court to file the affidavit under seal, this Court specifically asked Plaintiff whether he had a privilege log pertaining to the affidavit. Pursuant to A.P. v. M.E.E., 354 Ill. App. 3d 989, 995 (1st Dist. 2004), this Court, "as the primary representative of the public interest, should not blanket stamp requests to seal documents," but should follow a process that requires the submission of the documents for in camera review and accompanied by specific findings regarding confidentiality. Plaintiff's request was not accompanied by a privilege log nor did the Plaintiff submit the documents to be sealed with an accompanying "affidavit to support the very general conclusory assertions that a seal was necessary to protect confidential" attorney-client information. Plaintiff also concedes that this issue is moot because the affidavits and exhibits were filed in opposition to Defendant's §2-619 Motion to Dismiss, which this Court denied based on Plaintiff's Amended Verified Complaint.

Third, Plaintiff argues this Court erred in encouraging the Defendants to move to strike conclusory allegations in the Plaintiff's Amended Verified Complaint. Plaintiff misconstrues Illinois civil procedure by arguing (1) Defendants cannot move to strike conclusory allegations in the Plaintiff's complaint, and (2) striking any allegation

is premature at this early pleading stage because Plaintiff will seek discovery to marshal evidence supporting his case. However, Plaintiff's improperly attempts to bootstrap his defamation per se claim based on discovery and ill pled allegations. Cooney v. Magnabosco, 407 Ill. App. 3d 264, 270 (1st Dist. 2011) (holding a plaintiff cannot utilize "[d]iscovery as a fishing expedition to build speculative claims"). Additionally, any argument regarding a separate motion to strike is advisory, outside the subject jurisdiction of this Court, and will not be considered. Klehr v. Illinois Farmers Insurance Co., 2013 IL App (1st) 121843 at ¶10.

## IV. Conclusion

For the reasons stated above, this Court grants Defendants' Motion to Reconsider and denies the Plaintiff's Motion to Reconsider. As the Plaintiff refuses to amend his First Amended Complaint, this court is granting the Plaintiff's request for 304(a) language, finding there is no just reason for delaying appeal of the issue of whether Plaintiff's First Amended Complaint sets forth a prima facie defamation per se claim and tortious interference with a contractual expectation claim.

80a

ENTER:

Judge Eileen Mary Brewer
JUL 23 2014
Circuit Court - 1841

Order of Court

Judge Eileen Brewer

81a

STATE OF ILLINOIS

SS:

COUNTY OF C O O K

IN THE CIRCUIT COURT OF COOK COUNTY,
ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

LOUIS B. ANTONACCI,

       Plaintiff,

vs.                      No. 12 L 13240

SEYFARTH SHAW, LLP,

       Defendant.

       TRANSCRIPT OF PROCEEDINGS at the hearing of the above-entitled cause before THE HONORABLE EILEEN MARY BREWER, Judge of said Court, in Room 2204 of the Richard J. Daley Center, Chicago, Illinois, on April 23, 2014, at the hour of 12:06 p.m.

REPORTED BY:   Margaret M. Kruse, CSR, RPR
LICENSE NO.:   084-003036
JOB NO.:  5028

82a

APPEARANCES:

    MR. LOUIS B. ANTONACCI
    360 H Street, N.E.
    Unit 334
    Washington, D.C. 20002
    (703) 300-4635
    lbacookcounty@gmail.com

        Pro se;

    PERKINS COIE, by
    MR. MATTHEW J. GEHRINGER
    131 South Dearborn Street
    Suite 1700
    Chicago, Illinois 60603
    (312) 346-8000
    mgehringer@perkinscoie.com

        Representing the Defendant;

    SOSIN & ARNOLD, LTD., by
    MR. GEORGE J. ARNOLD, II
    9501 West 144th Place
    Suite 205
    Orland Park, Illinois 60462
    (708) 448-8141
    garnold@sosinarnold.com

        Representing Toomey Reporting.

ALSO PRESENT:

    Ms. Sandy Toomey
    Ms. Peggy Anderson

83a

(Whereupon, the following proceedings were had in open court.)

THE COURT: Good afternoon.

MR. ARNOLD: Good afternoon, your Honor. George Arnold appearing on behalf of --

THE COURT: Just one second. I want to put my papers together.

MR. ARNOLD: Sorry.

MR. GEHRINGER: Matt Gehringer on behalf of Seyfarth Shaw. I think plaintiff just stepped out in the hallway.

THE COURT: You are?

MS. TOOMEY: Sandy Toomey from Toomey Reporting.

THE COURT: So this is your firm?

MS. TOOMEY: Yes.

THE COURT: And you are?

MS. ANDERSON: Peggy Anderson.

THE COURT: From Toomey Reporting, correct?

MS. ANDERSON: Correct.

84a

THE COURT: All right.

> (Whereupon, Mr. Antonacci entered the proceedings.)

MR. ANTONACCI: Good morning, your Honor. Louis Antonacci on behalf of myself.

THE COURT: Okay. So I have before me this morning Mr. Arnold's motion on behalf of the court reporters for sanctions under 137?

MR. ARNOLD: Correct.

THE COURT: Did you ask for contempt of court?

MR. ARNOLD: I did not.

THE COURT: It's provided actually.

MR. ARNOLD: The rule provides for that, your Honor.

THE COURT: Okay. And then I have your motion, Mr. Antonacci, for reconsideration --

MR. ANTONACCI: And a cross-motion for sanctions.

THE COURT: -- of the February 3rd order quashing the subpoenas?

MR. ANTONACCI: Yes, and a cross-motion for sanctions.

85a

THE COURT: I'm going to start off by asking you, Mr. Antonacci, --

MR. ANTONACCI: Yes.

THE COURT: -- if you read the Supreme Court Miscellaneous rule --

MR. ANTONACCI: I did.

THE COURT: 20112.

MR. ANTONACCI: I did.

THE COURT: And this rule states that "any recordings of court proceedings made pursuant to this order shall be for the personal use only and held in strictest of confidence by the court reporter," which is you --

MS. ANDERSON: Correct.

THE COURT: -- ma'am?

And by "ma'am," I just referred to Peggy Anderson, who's an official court reporter at the Toomey Court Reporting Company.

"Audio recordings of any court proceedings shall be deemed and remain under control of the Circuit Court and shall be surrendered to the Court upon request. Any request by a party or entity other than the Court to obtain or review the recordings shall not be permitted under any circumstances. Any violation of this order may

subject the violator to contempt of court proceedings."

Now, Mr. Antonacci, you requested of the Toomey Court Reporting Company, Miss Anderson in particular, the recordings and documents regarding a hearing; is that correct, sir?

MR. ANTONACCI: That's correct.

THE COURT: Okay. And you served a subpoena upon them?

MR. ANTONACCI: Well, after they told me that the audio recording had been deleted, I served a subpoena upon them, correct.

Then Mr. Arnold here --

THE COURT: So you served a subpoena on them, yes. Go ahead.

MR. ANTONACCI: I did.

And then Mr. Arnold here notified me of MR Miscellaneous Rule 20112 I think that you just referred to, which I --

THE COURT: Which I just read into the record.

MR. ANTONACCI: Right, and I was unaware of that rule. I think it's --

87a

THE COURT: Okay. So you were unaware of the rule at the time?

MR. ANTONACCI: Yeah. And so when Mr. Arnold notified me of that rule, I voluntarily limited my subpoenas saying, okay, I don't need the audio recording then, that's perfectly fine.

Obviously, that would just be pursuant to an order of the court could that audio recording be compelled, because as the Miscellaneous Rule states, the Circuit Court retains exclusive jurisdiction over --

THE COURT: So then you withdrew -- so you withdrew --

MR. ANTONACCI: My request for the audio recording, but I still wanted to review -- examine the stenographic notes and the documents that I had requested pursuant to the subpoena.

THE COURT: Now, the -- it was the stenographic notes?

MR. ANTONACCI: I'm sorry?

THE COURT: You want the stenographic notes.

Did you take stenographic notes, ma'am?
MS. ANDERSON: They're digital.

THE COURT: You took digital notes such as --

88a

MS. ANDERSON: On my machine.

THE COURT: -- this woman is taking here, this court reporter?

MS. ANDERSON: Correct.

THE COURT: We call them digital notes. So you asked for those digital notes?

MR. ANTONACCI: I asked for them voluntarily initially and they refused to give them to me.

THE COURT: Well, they couldn't give them to you, could they?

MR. ANTONACCI: Well, the stenographic notes they could, not the audio recording.

THE COURT: Do you want to respond to that, Mr. Arnold? Can they turn that over, the stenographic notes?

MR. ARNOLD: My position is no, that it's not proper, your Honor. My position is that if you have an argument or contest what was written in the transcript, you have to bring the matter before the Court. It's the Court's record ultimately. And the discovery rules do not allow for parties to just start conducting discovery, pursuant to Supreme Court rules, of the court reporters and analyzing their notes.

89a

I believe that the proper form is for the parties to come before the Court, the Court to hear the stenographer read her notes and the Court to rule on what the record is.

I would also point out, your Honor, that I believe in counsel's motion to compel he's still asking -- requesting that this Court order Miss Anderson and Miss Toomey to turn over the audio recording. I believe that's still part of his motion to compel.

THE COURT: Let's find this then.

You want to pull that for me --

MR. ANTONACCI: In the motion to compel, I do ask for the audio recording, your Honor, that is correct.

THE COURT: So my guess is that you will want to withdraw that request for the audio recording pursuant to the fact that you now know and I've reminded you of what MR 20112 states. So you probably want to withdraw that request. That would be the smart thing to do.

MR. ANTONACCI: I just want to point out, your Honor, that's not my understanding. My reading of the rule -- if the Court disagrees, this Court disagrees. But my reading of the rule is that this Court retains exclusive jurisdiction over those audio recordings.

90a

In fact, this Court did compel production of that audio recording during the hearing on February 3. You sent us back to the anteroom and --

THE COURT: Right. I asked if they had any problem with -- it wasn't an order, it was a request. And that request pertained to the audio recording, because you were accusing them of altering the transcript on behalf of Mr. Gehringer --

MR. ANTONACCI: I never said that, your Honor. I sought discovery pertaining to that, pertaining to any communication with Mr. Gehringer or anybody else. But my recollection of the proceedings was at odds with the transcript that was presented to me, so I requested any communications pertaining to the transcript.

THE COURT: No. You said that Mr. Gehringer had --

MR. ANTONACCI: I did not say that, your Honor.

THE COURT: I'm sorry. You --

MR. ANTONACCI: I asked if they had any communication with Mr. Gehringer.

THE COURT: No. You told me that Mr. Gehringer had lied.

MR. ANTONACCI: No, your Honor. At the February 3rd hearing, as I pointed out in my affidavit, which is uncontroverted --

91a

THE COURT: Well, your affidavit is merely a self-serving document that you put together about a hearing with no backup. There were various things in there that I didn't say and it was hard for me to understand when I tried to review it how you could have been so precise with this eight-page affidavit when you were representing yourself and how you could have taken down verbatim what all of us said.

Like here you have quoted –

MR. ANTONACCI: It wasn't verbatim.

THE COURT: Well, you have here -- you've quoted me particularly. "Those are -- well, you know, No. 29."

I find that very hard to believe since you weren't taking notes.

MR. ANTONACCI: Again --

THE COURT: You were not taking notes during the hearing, so it's hard for me to believe that you could have recorded things that were said accurately. You used quotation marks –

MR. ANTONACCI: That is what you said, your Honor.

THE COURT: -- in this affidavit.

MR. ANTONACCI: I remember -- I remember you saying this.

92a

THE COURT: Oh, you remember all – you remember eight pages of this?

MR. ANTONACCI: Well, that --

THE COURT: Let's stop for a second.

Mr. Gehringer, do you remember --

MR. ANTONACCI: I just want to point out --

THE REPORTER: I can't take you guys at the same time.

THE COURT: I know. Ma'am, I'm the one who speaks. I'm the Court here.

THE REPORTER: I know.

THE COURT: And I will speak. Thank you.

MR. ANTONACCI: You're accusing -- you're challenging my recollection.

THE COURT: I'm sorry. Excuse me.

Mr. Gehringer, I would like to go back to the hearing in which you were accused of lying.

MR. ANTONACCI: I did not accuse Mr. Gehringer of lying.

THE COURT: Mr. Gehringer, can you refresh me, please. Maybe lying is not the proper word.

93a

MR. GEHRINGER: What I said and what he said in these motions is he suggested that I had asked the court reporter to alter the transcript. Specifically, I believe, "whether counsel for the defendants, Mr. Matthew Gehringer, or any other person on behalf of the defendants asked Miss Anderson and/or Toomey Reporting to alter the transcript specifically so that this Honorable Court did not appear biased against the plaintiff for this matter."

MR. ANTONACCI: I asked for those communications. I didn't say that that happened. I said if those communications exist, then I would like them. That's my document request. There's nothing unreasonable about that.

I want to make this point very, very clear --

THE COURT: I'm sorry. There is nothing unreasonable to claim that Mr. Gehringer --

MR. ANTONACCI: I did not claim that.

THE COURT: -- had asked -- you asked Mr. Gehringer if he had altered a court transcript.

MR. ANTONACCI: I did not claim that. I asked for any documents suggesting that that occurred.

Now, again, like I sought to obtain this information voluntarily. I discussed the transcript

with Miss Anderson. I followed up and asked for the audio recording, which Miss Toomey --

THE COURT: But you weren't able to --

MR. ANTONACCI: -- Miss Toomey --

THE COURT: Excuse me, counsel.

MR. ANTONACCI: I want to point out --

THE COURT: I'm speaking now, sir.

MR. ANTONACCI: -- she lied and told me that –

THE COURT: Excuse me. Will you stop?

When I say stop, you stop. Okay? Because I'm going control this hearing.

MR. ANTONACCI: I can play it for you right now, the audio recording. Do you want me to play the voice mail that Miss Toomey left for me?

THE COURT: No, no, we are not dealing with this point right now.

Somehow or another, I think you're attempting to mix-up your role with me. I conduct the hearing and I ask the questions. When I ask a question, when I speak, you stop speaking. Do you understand this?

MR. ANTONACCI: Yes, your Honor.

95a

THE COURT: Those are the ground rules. Thank you, so much, sir.

I want to go to the subpoena itself. Let's look at the subpoena that is now at issue.

What page is this on? I'm looking at the motion for reconsideration, or should I be looking at another document?

MR. ARNOLD: Your Honor, in our motion for sanctions, it appears at --

THE COURT: We have Exhibit A.

MR. ARNOLD: Yes, your Honor. It appears at Exhibit B, I believe, your Honor.

THE COURT: Excuse me?

MR. ARNOLD: I believe it's Exhibit B.

THE COURT: B. So let me get to that.

MR. ARNOLD: Subpoena for deposition testimony.

THE COURT: Let's make sure we're all looking at the same document.

Sir, would you put your phone down. Sir, are you making any recording of today's proceedings?

MR. ANTONACCI: No, I'm not.

96a

THE COURT: Are you recording on your phone?

MR. ANTONACCI: No, I'm not. I was going to play the voice mail Miss Toomey left for me where she lied and said the audio recording had been deleted.

THE COURT: About the?

MS. TOOMEY: The cassette was deleted, not on the laptop and the Stenograph machine.

THE COURT: Okay. Fine. Thank you, ma'am.

MR. ANTONACCI: She said I could not -- I will not be able to retrieve it, that I would not be able to listen to it.

MR. ARNOLD: That's true. She could not retrieve the cassette, it was erased. There was also an audio recording on the computer --

THE COURT: On the computer itself --

MR. ARNOLD: Yes.

THE COURT: -- which is the one I asked for you to hear.

MR. ANTONACCI: That is ridiculous, your Honor. She's saying that I could not listen to the audio recording because it was deleted off the cassette tape, but it was not deleted off the laptop

97a

computer. That makes no sense whatsoever. In the same way --

THE COURT: I'm sorry. Excuse me.

You have a computer going now?

THE REPORTER: Yes.

THE COURT: And then that is recording my voice, your computer?

THE REPORTER: Yes.

THE COURT: And then you have --

MS. TOOMEY: And the Stenograph machine.

THE COURT: And then you have a cassette in a handheld --

MS. TOOMEY: Uh-huh.

THE COURT: -- recording device?

MS. TOOMEY: Right, and it's also recorded in the Stenograph machine.

So these two are still available. The cassette, once we do the transcript, we transcribe it, we tape over it.

THE COURT: And the cassette tape is very small (indicating) -- I'm putting up my fingers -- two, three inches? And you pop it into it --

MS. TOOMEY: Right, into a regular --

THE COURT: -- a regular --

MS. TOOMEY: -- recorder.

THE COURT: Recording device?

MS. ANDERSON: It's actually a regular size cassette.

THE COURT: So that cassette was deleted?

MS. TOOMEY: Yes.

THE COURT: But you still have the computer?

MS. TOOMEY: The laptop and the Stenograph machine.

THE COURT: Right.

MR. ANTONACCI: So why couldn't I listen to that on the laptop?

MS. ANDERSON: You did listen to it.

THE COURT: Stop. Don't pay any attention to this man.

MR. ANTONACCI: I just want to make sure that's clear for the record.

THE COURT: Clear for the record?

99a

MR. ANTONACCI: That argument makes no sense.

THE COURT: I'm really not paying attention to these comments, sir, because --

MR. ANTONACCI: That's fine.

THE COURT: -- they are just offensive and silly most of the time.

MR. ANTONACCI: Sure.

THE COURT: So let's go to this request, please.

What page? Page 7, is it?

MR. ARNOLD: I believe page 7, yes, your Honor.

THE COURT: In this, it says the scope of the examination refers or relates to the hearing transcript and the audio recording.

So this subpoena requests the audio recording; is that correct?

MR. ANTONACCI: Yes, and we already established that, your Honor.

MR. ARNOLD: He's saying yes.

MR. ANTONACCI: We already discussed that, but yes, it does.

100a

THE COURT: Now --

MR. ANTONACCI: I would reiterate that Mr. Arnold e-mailed me saying that this MR 20112 does not allow production of the audio recording outside of court proceedings. I agreed and said --

THE COURT: And so therefore --

MR. ANTONACCI: -- you don't need to give it to me.

THE COURT: And so therefore you --

MR. ANTONACCI: Here, I'll read exactly what it says.

THE COURT: I'm sorry. You said you altered --

MR. ANTONACCI: Let me read the e-mail to you.

"Thanks for reaching out to me regarding" --

THE COURT: No, I'm not -- I don't really care about the e-mail.

MR. ANTONACCI: "I was unaware of the miscellaneous order" --

THE COURT: Excuse me. Stop, please. Stop, ma'am. I told him to stop.

101a

Thank you. Let's start again.

Sir, your subpoena requests the audio recording; is that correct? Yes or no?

MR. ANTONACCI: Yes.

THE COURT: Okay. Did you send an amended subpoena to Mr. Arnold?

MR. ANTONACCI: No.

THE COURT: You didn't?

MR. ANTONACCI: I said "I was unaware of the miscellaneous order" --

THE COURT: I'm sorry. Is that what you said on the subpoena?

MR. ANTONACCI: I sent -- he sent me an e-mail. I sent him an e-mail back saying, "I was unaware of the miscellaneous order that you attached which seems to preclude your client's production of the audio recording device. Nonetheless, I'm certainly entitled to examine Miss Anderson's laptop in order to analyze her stenographic notes."

THE COURT: So the subpoena --

MR. ANTONACCI: So I agreed.

THE COURT: So the subpoena stands and you didn't amend your subpoena?

102a

MR. ANTONACCI: I agreed.

THE COURT: Okay. Sir, you want to speak?

MR. ANTONACCI: I agreed that I would not --

THE COURT: Sir. Excuse me, sir.

MR. ARNOLD: Correct, your Honor. His motion to compel asks to enforce the subpoena. That was filed after all this. So the motion to compel is asking for that relief.

I would also point out, your Honor, in counsel's own motion for sanctions and cross -- motions for sanctions and cross-motion for sanctions against me, on page 2, your Honor -- I'm sorry. On page 12, your Honor had asked --

THE COURT: Page 12?

MR. ARNOLD: Yes.

THE COURT: Of what? I'm looking at --

MR. ARNOLD: Of his --

THE COURT: -- motion for reconsideration?

MR. ARNOLD: No. It's motion in response to -- I'm sorry, response in opposition to Toomey Reporting Inc.'s motion for sanctions and cross-motion against myself.

103a

THE COURT: Could I see that?

MR. ARNOLD: Sure.

THE COURT: Oh, here it is. I've got two motions here. Never mind.

You said page 12, sir?

MR. ARNOLD: Yes.

On the top of the page --

THE COURT: It says the statement is false because Mr. Arnold is aware --

MR. ARNOLD: Yes.

THE COURT: -- of at least two factual bases on which the transcript had been falsified?

MR. ARNOLD: Yes.

THE COURT: Go ahead.

MR. ARNOLD: This goes to your discussion earlier, your Honor, and questions as to whether Mr. Antonacci was accusing Mr. Gehringer of doing something, falsifying records or something. I think he, you know, indicated he wasn't accusing, but there is evidence. But this is his writing; this is what he is saying.

He's telling me that I should be sanctioned because I'm aware that he has a factual

104a

basis for his belief that the transcript had been falsified. He is alleging that.

MR. ANTONACCI: What is wrong with that? I've continued to allege that. At this time I'm saying right now, that this transcript was falsified.

THE COURT: That Mr. Arnold falsified the transcribed?

MR. ANTONACCI: I'm not saying Mr. Arnold falsified it. I'm not saying Mr. Gehringer falsified it. I'm say that there are things that are omitted from this transcript. Why wouldn't they give me the stenographic notes? Why wouldn't they let me get any of this discovery? There's no explanation. Why did she lie to me that the audio recording had been deleted? I have received no explanation for any of this.

MR. ARNOLD: Your Honor, I think you've cleared it up.

Just for the record I would like to address that he keeps saying my client lied. My client's position in her voice mail is very consistent all along. What she said was the recording that she would ever consider parting with, which is cassette tape, had been deleted. That is true.

She never in her wildest dreams thought that somebody was asking for her $10,000 piece of equipment to take from her. She didn't even contemplate that.

105a

MR. ANTONACCI: It's a digital file. It's a digital file. It's a .wav file.

MR. ARNOLD: It's not a lie.

MR. ANTONACCI: It costs nothing to copy and send.

MR. ARNOLD: It's not a lie. It's not inconsistent with her position all the way down the line. It's the same position.

MR. ANTONACCI: He's lying right now.

MR. ARNOLD: For the record, I am not lying.

MR. ANTONACCI: Let me play the recording. I asked for the -- I asked for this audio recording which I later found out I couldn't get.

"This is Sandy Toomey of Toomey Reporting. I just found out from Peggy -- she is out on a job, on another job -- that your job was December 4th. And we take two, three jobs a day. Her memory is that it was erased and gone to many other cases. Usually once you transcribed it, it's erased. So you wouldn't be able to get the audio anyhow. I don't know what the discrepancy was. She -- you know, she's been reporting for over 20-some years and does excellent work. So we don't have the audio to go over to verify what you think there was a mistake with. So if there's any other, you know -- anything else I could help you. They usually go over with the audio word by word to make sure everything is perfect. We're only trained for 95

percent, but that's why they have that. But then they immediately use it. It would be too expensive if we kept all the audio. So have a happy holiday and we will see you January 10th. Thank you. Bye."

THE COURT: So go ahead.

MR. ANTONACCI: They said that they don't have the audio to go over.

THE COURT: But they lost the cassette.

MR. ANTONACCI: She just said the audio is on the laptop computer as well. How do you not have the audio to go over if it's on the laptop and you played it for me?

MS. TOOMEY: We're not going to hand over the laptop or the Stenograph machine.

THE COURT: Of court you're not going to.

MR. ANTONACCI: She could have just sent me the .wav file. They didn't have to --

THE COURT: The law doesn't allow you to turn it over. What you did was absolutely correct. You would have been violating Supreme Court rules if you turned over the audio recording.

MR. ANTONACCI: As soon as Mr. Arnold told me that, I said that's perfectly fine. I agreed.

THE COURT: Then why didn't you withdraw or amend your subpoena?

107a

MR. ANTONACCI: Because it was a motion to compel at that point. They refused to comply with the subpoena entirely. This Court has authority, and indeed it did order production of that audio --

THE COURT: No. What happened with this Court is that because you were so adamant and you seemed to have a number of conspiracy theories circulating through your consciousness, I politely asked them if they would mind just playing it and they were happy to play it for you in order to support the written transcript.

Is there something funny.

MR. ANTONACCI: Well, what you're saying is they violated the Supreme Court order by doing that.

THE COURT: No. It was with my permission.

MR. ANTONACCI: So you're saying that you do have authority to order it then.

THE COURT: Of course I have authority to order it.

MR. ANTONACCI: That's what my motion to compel is. That's what my motion to compel is.

THE COURT: I think you're putting the cart before the horse. You needed to come to me --

MR. ANTONACCI: That's what the motion to compel is.

108a

MR. ARNOLD: Your Honor, the relief he's asking for in the motion to compel was not that. It was to turn it over to him.

MR. ANTONACCI: We could do that here. I'd be happy to bring in my forensic expert to the Court. No problem. No problem whatsoever. It would take an hour.

THE COURT: No, sir, you didn't follow the rule.

MR. ANTONACCI: I did follow the rule.

THE COURT: The rule said that you were not allowed to receive these documents. And if you ask for such documents, you were or could be held in contempt.

Now, what I don't understand is what don't you understand about this rule.

MR. ANTONACCI: This Court has authority to compel production of the audio recording.

THE COURT: It says here, "audio recordings of court proceedings shall be deemed and remain under control of the Court and shall be surrendered to the Court upon request."

MR. ANTONACCI: So retain -- under control of the Court.

109a

THE COURT: "Any request by a party or entity other than the Court to obtain them shall not be permitted."

So you made a request as an entity or a party --

MR. ANTONACCI: Yes.

THE COURT: -- to these people for these recordings. It says here they shall not be permitted -- a request shall not be permitted.

MR. ANTONACCI: When Mr. Arnold pointed that out to me, I withdrew it.

THE COURT: Excuse me. You made that request.

MR. ANTONACCI: Yeah, and then I withdrew it.

THE COURT: And any violation of the order is subject to contempt.

MR. ANTONACCI: No. The court reporter is the violator. The party or any entity cannot be the potential violator. I don't have control over the recorder --

THE COURT: Any violation of this order.

MR. ANTONACCI: The court reporter has control of the audio recording. I cannot be a violator by requesting this document. The court reporter is

the violator by turning it over. Show me any authority.

MR. ARNOLD: Your Honor, the Supreme Court rule itself says, "any request by a party or entity other than the Court to obtain shall not be permitted." It exactly does prohibit --

MR. ANTONACCI: By the court reporter.

MR. ARNOLD: -- prohibit requests by anybody.

MR. ANTONACCI: The court reporter.

THE COURT: I think the language --

MR. ANTONACCI: You're saying including the Court? The Court is powerless. So nobody has any power to compel production of these audio recordings.

THE COURT: It says other than the Court.

MR. ANTONACCI: Yes, exactly, other than the Court.

THE COURT: I can make the request.

MR. ANTONACCI: That's what I've been saying this whole time.

THE COURT: No, you haven't.

MR. ANTONACCI: Yes, I have.

111a

THE COURT: You subpoenaed --

MR. ANTONACCI: And I said numerous times as soon as Mr. Arnold pointed out this very peculiar rule to me, I said, okay, that's fine. I do not need the audio recording from you. I'll depose these people, I'll get the documents. He refused to even do that. I said, okay, if I'm going to file the motion to compel, I'm going to go for the whole thing in the motion to compel. The Court has jurisdiction.

THE COURT: Why would you go for the whole thing when you're not allowed to ask for it? That's number one.

MR. ANTONACCI: Because I did not know about this, like I said numerous times.

THE COURT: They told you.

MR. ANTONACCI: As soon as he told me, I said I don't need it.

THE COURT: Where in the motion to compel do you say that? Why didn't you amend your motion to compel?

MR. ANTONACCI: What are you talking about? I didn't file the motion to compel until after he refused to comply with the subpoena. I said forget about the audio recording for the purposes of the subpoena. This was like two days before or the weekend before they were going to -- we were supposed to have the depositions and they were supposed to produce documents.

112a

THE COURT: You also threatened Miss Toomey, the court reporter.

MR. ANTONACCI: I never threatened anybody.

THE COURT: Oh, you sure did. You said to her -- let's --

MR. ANTONACCI: If we want to go through Mr. Arnold's lies right now --

THE COURT: Ma'am, will you stop. He's continuing to talk while I'm speaking.

MR. ANTONACCI: Let's do this, come on. Show me.

THE COURT: You said to Miss Toomey in a --

MR. ANTONACCI: Let's go through the e-mails. They're all right here.

THE COURT: I have an e-mail right here. Mr. Arnold, do you know the e-mail I'm referring to?

MR. ARNOLD: I do, your Honor.

THE COURT: Would you read that?

MR. ARNOLD: I will. Can I have one second, your Honor?

MR. ANTONACCI: Oh, the one where you're in a lot of trouble?

113a

MR. ARNOLD: It says, "Sandy" -- and this was after Miss Toomey indicated that -- if you want, your Honor, I'll read her e-mail so you can have some context as to his response, if you'd like some context.

THE COURT: Yes. Go ahead.

MR. ARNOLD: So her e-mail was:

"Lou, the audio is not part of the stenographic notes that we retain for seven years at Toomey Reporting. We cannot turn over our only work product to an attorney. However, with a court order in front of a judge, we can read the notes to you. Let us know if and when you wish to do this so I can have Peggy available."

And his response was:

"Sandy, you are incorrect and you are in a lot of trouble. I will be issuing subpoenas shortly."

THE COURT: Sir, what was the date of that?

MR. ARNOLD: That e-mail, I believe, is dated December 23, 2013.

THE COURT: When was he informed of the rule which wasn't your obligation to inform him, he has to make the reasonable investigation into the law.

MR. ARNOLD: That's actually the e-mail which I believe motivated my client to contact me because obviously no one wants to hear they're in a

lot of trouble from an attorney, which is why we don't allow threats.

THE COURT: And who is unfamiliar with the rules.

MR. ARNOLD: Correct.

MR. ANTONACCI: You yourself at the February 3rd hearing said you had never seen that rule before. You took the rule and read it and said you had never seen it before.

THE COURT: Well, I never filed a motion, sir, asking for a --

MR. ANTONACCI: I've never seen a rule like that in any jurisdiction and I've litigated in a lot of jurisdictions.

THE COURT: I have never asked for a recording of a transcript at court, so I didn't know the rule. If I had, I would have reviewed the pertinent law.

MR. ANTONACCI: I did a lot of research.

THE COURT: Are you going to withdraw your motion regarding compelling the audio recording?

MR. ANTONACCI: Yes.

THE COURT: So you've withdrawn that?

MR. ANTONACCI: Yeah, that's fine.

115a

What about the rest of it, the documents, communications, depositions?

THE COURT: What's left? You have now withdrawn your request for all audio recordings which you had incorrectly asked for in your subpoenas. You have recognized that you have made a mistake in failing to heed the requirements of MR 20112. So that's over.

Now, sir, what about the -- Mr. Arnold?

MR. ARNOLD: Yes, your Honor.

THE COURT: What about the written transcripts, the documents?

MR. ARNOLD: Well, just so I understand --

THE COURT: He's withdrawn this.

MR. ARNOLD: Right.

THE COURT: And he's admitted that he made a mistake in asking for those because he was ignorant of the rule.

MR. ARNOLD: So when you're asking about the written transcript, she's produced the written transcript. I think he was asking for stenographer notes and the machine still.

MR. ANTONACCI: I'd like to analyze the stenographic notes, yes.

116a

THE COURT: No, I'm not requiring that the machine be turned over.

MR. ANTONACCI: How about the notes, the file itself?

THE COURT: You've got this -- you handed over. Tell me what you gave him.

MR. ANTONACCI: Nothing.

THE COURT: I didn't ask you that question. I asked that of Miss Toomey.

Miss Toomey and Miss Anderson -- please again, I'm going to ask you, sir, not to speak until I address you. Do you understand, sir?

MR. ANTONACCI: Sure.

THE COURT: Thank you, so much.

Please, ma'am.

MS. ANDERSON: Your Honor, I prepared the transcript. I sent him I think it was a total of seven or eight pages, three minutes long. I prepared it according to my notes and the audio recording. And that is the only thing that I tendered to him, and that's the only thing I'm required as far as producing a transcript for the services he hired me for to do. And that's what I produced.

Your Honor, may I also say something? I have never even been before you. I have never met Mr. Gehringer prior to this hearing. I don't think I've

ever even met Mr. Antonacci. I don't know how he is coming up with this conspiracy theory that I have altered a transcript to make you look less biased, to help Mr. Gehringer out. It is absolutely absurd. It is a complete waste of everybody's time, money, especially the Court's valuable time. It is ridiculous.

I could have fallen asleep on the proceedings and it wouldn't have made a difference. It was regarding a hearing that was happening the next day. There were no rulings made. Nothing had even occurred.

You were going to be reviewing whatever he was requesting the next day. That's all that it was. I don't know why he thinks I have done this. I have never met him. I have never met anybody.

THE COURT: Ma'am, I read the transcript and it appears that Mr. Antonacci believes that I said I was not going to look at some documents.

I still don't understand the importance of this. It's an utterly and completely trivial matter.

You've already been denied your SOJ. I think it's been twice now?

MR. ANTONACCI: Yeah.

THE COURT: And this one -- you claim that I stated I was not looking at particular documents because you had not requested permission to file a surreply?

118a

MR. ANTONACCI: No, there were two things, your Honor. There were the affidavits I was submitting pursuant to Section 2-619(c). At the very beginning --

THE COURT: But they had not been submitted with the initial motions.

MR. ANTONACCI: They don't have to be.

THE COURT: Excuse me.

MR. ANTONACCI: That statute itself --

THE COURT: Well, the rule -- I'm speaking.

The rule for this courtroom, the standing order, says if there are surreplies or surreplies are requested --

MR. ANTONACCI: I'm talking about the affidavit. They're two different things.

THE COURT: I'm speaking. Will you stop recording, Miss Reporter.

The standing order of this Court is that if a surreply is going to be submitted, there must be a request made to the Court that allows the filing of the surreply so that I can read it before.

We had a hearing the next day. I was prepared for the hearing, and I was not going to consider obviously a surreply. There had been no permission for the surreply given.

119a

MR. ANTONACCI: I was requesting --

THE COURT: Excuse me. Would you stop recording, please.

Thank you, ma'am. I'll start again.

This is a tempest in a teapot for you, Mr. Antonacci, and I am really not clear what this is all supposed to prove.

MR. ANTONACCI: You asked me for an explanation. May I give you one?

THE COURT: I don't --

MR. ANTONACCI: You interrupted me. As soon as I started talking, you interrupted me, as you have done throughout this case.

There were two sets of documents that were going to be submitted. One was my affidavit pursuant to Section 2-619(c), which did not have to be submitted pursuant to Illinois law. There are no rules of this Court pertaining to this.

I could bring those two to the hearing, pursuant to the statue itself, to the hearing itself. I brought them a day earlier as a courtesy, as a courtesy to this Court, as a courtesy to the parties. That's what I did.

And you said you were not going to look at them, just forget about it, we're not going to look

120a

at it. That entire exchange is not in the transcript at all.

And then with regard to the motion to file a surreply instanter, that's what I was doing. I was moving this Court to allow me to file the surreply instanter. I was giving it to you a day in advance.

As you know, I live in Washington, D.C. I don't live in Chicago. So I received his reply. There were many egregious legal and factual interpretations made in that reply, so I moved a leave to file a surreply. I filed that within two weeks. I sent a copy to your chambers to be certified mail. Then I showed up the day before the hearing to ask, pursuant to your rule, as you pointed out, for leave to file that surreply instanter.

Typically, parties will move to file surreplies and other documents and motions like that instanter, meaning right there. So the Court will take a minute, take a step back, read the document. It's not rocket science. Okay?

Now, I gave it to you a day before just asking you if you would look at it and you said no. There you go, you said no.

THE COURT: Right, you were denied and I did not consider your surreply because you hadn't submitted it in time for me to fully read it.

Mr. Gehringer --

121a

MR. ANTONACCI: One more thing, your Honor.

THE COURT: Please stop recording.

MR. GEHRINGER: Could we have some semblance of order here?

MR. ANTONACCI: If I could finish talking, that would be great.

MR. GEHRINGER: You've had a lot of opportunities.

First of all, the notion that he did anything as a courtesy to this Court, the way he's behaved in this courtroom, is laughable, honestly.

The surreply that he's referring to, these affidavits, they go to the 2-619 portion of our motion which was not even the basis for the Court's ruling. This is an entirely irrelevant thing.

As to the transcript, just so the record is clear -- now I haven't walked around filing affidavits on this stuff because it honestly is so tangential and so inconsequential -- but the transcript is exactly accurate to my recollection of that proceeding, although I do not pretend to have a verbatim recollection of it.

THE COURT: The issue over the transcript went to whether or not I said I will not consider this. Is that I will not consider it; I will not read this, are those the four words that were missing? Is that what we're talking about?

122a

MR. ANTONACCI: As I pointed out, the entire initial exchange when you said you would not look at the affidavit I was submitting pursuant to Illinois law, that was completely gone from the transcript. And throughout the proceeding, the very brief proceeding, at least four or five times you screamed at me, "I'm not looking at it," like completely erratically.

THE COURT: Excuse me. I want to ask you something about that. You've been here many times. Can you define what screaming is? Is this screaming right now with this tone of voice?

MR. ANTONACCI: No.

THE COURT: Mr. Gehringer, have I ever screamed in this courtroom during these proceedings?

MR. GEHRINGER: No, your Honor. In these proceedings, absolutely not.

I don't understand where that was coming from. I have no recollection of you using those words, much less using them in a screaming tone, saying I will not -- he says you repeated several times, "I will not read it." To my recollection, that didn't happen. The court reporter didn't take it down.

MR. ANTONACCI: Let me just point out that there's no evidence controverting the evidence I put forth.

123a

THE COURT: What evidence?

MR. ANTONACCI: Affidavits.

THE COURT: All you did was -- sir, the fact that you submit seven- or eight-page affidavits claiming that things occurred in court when you were the attorney of record standing here --

MR. ANTONACCI: Not just as an attorney. This is my conversation with Miss Anderson, Miss Toomey, Mr. Arnold, everybody.

THE COURT: And then putting quote marks over what I said, and you consider this to be evidence? Sir --

MR. ANTONACCI: You can diminish it all you want.

MR. GEHRINGER: Judge, I would note in the previous motion her he submitted an affidavit of a friend he brought with him. In her affidavit, interestingly, that wording and that screaming was not in her affidavit.

MR. ANTONACCI: It was the proceeding of the following day.

THE COURT: Sir --

MR. ARNOLD: Your Honor, I would just --

124a

MR. ANTONACCI: For the record, let me make sure that's clear. That was the December 6th hearing the affidavit of Lydia --

THE COURT: Excuse me. You're not speaking now. Ma'am, stop.

I'm going to ask you to sit down right now, sir.

MR. ANTONACCI: For what?

THE COURT: Sir, I've told you to sit down.

THE SHERIFF: Have a seat.

MR. ANTONACCI: Sure.

THE COURT: If you continue to behave in this fashion --

MR. ANTONACCI: Then I'll --
THE COURT: -- I'll have you removed from the courtroom.

The Court has just asked the Sheriff to escort Mr. Antonacci to a seat. I have done so because he has continually raised his voice at me. He is now laughing. I just heard him laugh out loud.

He has laughed at me at least six times during today's hearing. And he has interrupted me on numerous occasions and has interrupted Mr. Arnold and Mr. Gehringer. He has shown utter and complete disrespect for the integrity of this Court,

and I have had to stop the hearing and ask the court reporter to stop recording when Mr. Antonacci attempted to go on a tangent regarding various matters.

Mr. Arnold, will you speak now.

MR. ARNOLD: Yes, your Honor.

I was just going to point out that although I wasn't here on the original hearing at issue, your Honor had been questioning plaintiff what he considered streaming, because he indicated that your Honor had screamed.

He did also, I believe, throughout his motions that are pending right now indicate that at the hearings I was present at that you were also hostile and screaming. I just want to point out for the record that that is not my recollection. I don't recall at any of the other hearings pertaining to this you screaming either. And he does, I believe, contend that in his motions.

THE COURT: Well, I'm sure given Mr. Antonacci's pattern of misrepresenting what this Court has said or the tone used by this Court, the next filing will have me screaming again, or worse.

Unfortunately, Mr. Antonacci doesn't like a judge to speak in a normal manner or in an assertive manner. And I do wonder if that is -- I do wonder what the reasons for such accusations are, that Mr. Antonacci has a problem with a female judge speaking in a forceful and direct manner.

126a

Mr. Gehringer, do you have anything else to say?

MR. GEHRINGER: I don't, your Honor.

THE COURT: What we have now is we've had a motion brought by you for sanctions. Since Mr. Antonacci has admitted that he wrongfully requested the written -- I'm sorry, the recorded statements -- Mr. Antonacci has just loudly yawned in the court. I'd just like to put that on the record, again to show his disrespect for this Court and this Court's proceedings.

Because Mr. Antonacci has informed the Court that he wrongfully included a subpoena for recorded statements or the records of the court reporter which are covered by the Supreme Court rule MR 20112, I am not sanctioning him under rule 137. He has admitted the error of his ways in that subpoena, so I am not going to sanction him.

I am, however, not going to order you to turn over your machines that are worth $12,000?

MS. ANDERSON: Correct.

THE COURT: Two machines?

MS. ANDERSON: It's a computer and a Stenograph machine. It's the software also that's so valuable.

127a

THE COURT: In addition, you voluntarily played the recording for Mr. Antonacci at the last hearing?

MS. ANDERSON: That's correct, your Honor.

THE COURT: You volunteered to do so?

MS. ANDERSON: That's correct.

THE COURT: I want to thank you for your courtesy to Mr. Antonacci, despite the fact that he threatened you in an e-mail.

MS. ANDERSON: Thank you, your Honor.

THE COURT: You were quite professional in your behavior. Thank you, ma'am. I don't know what else -- oh, I'm denying Mr. Antonacci's motion for reconsideration.

MR. ANTONACCI: What about my motion for sanctions, your Honor?

THE COURT: And I am denying your motion for sanctions.

I found that motion to be incorrect on numerous points and found that there was nothing that would warrant Mr. Arnold to be sanctioned by this Court, far from it. Mr. Arnold has done nothing but professional and commendable work. So the next thing -- Mr. Antonacci, would you step up again?

MR. ANTONACCI: Be glad to.

128a

THE COURT: Mr. Antonacci, I would ask you to respect this Court as I have attempted to respect you throughout these proceedings. Is there anything you would like to add to this?

MR. ANTONACCI: Well, I would like to file my affidavit under seal today since we're here. So I was hoping I could get that order from you today.

THE COURT: Could you tell me what you want to file, sir?

MR. ANTONACCI: The affidavit under seal. You said at the last hearing on March 31st that there would have to be one sealed and one redacted.

THE COURT: I would have to see it.

MR. ANTONACCI: I have it right here.

THE COURT: Let me see it.

MR. ANTONACCI: Sure. It's the same one that you said that you had performed redactions on yourself.

THE COURT: Do you all have this?

MR. GEHRINGER: We don't, Judge.

MR. ANTONACCI: Yes, you do. I served this on him before.

MR. GEHRINGER: The?

129a

MR. ANTONACCI: The affidavit, my affidavit.

THE COURT: The redacted one?

MR. GEHRINGER: I thought that's what she was asking.

MR. ANTONACCI: No, no. I didn't have it with me at the time.

THE COURT: Is this all of this to be redacted?

MR. ANTONACCI: I was just going to file it under seal, but you said that you wanted one under seal and one with redactions.

THE COURT: So where's the redacted version?

MR. ANTONACCI: I don't have the redacted version. You were going to instruct me as to what the redactions were to be. If you just want to make a copy and give it to me, I'd be happy to do it myself.

THE COURT: I can tell you. Do you have it in front of you?

MR. ANTONACCI: Yeah.

THE COURT: The first page doesn't need to be redacted.

MR. ANTONACCI: Are you looking at the affidavit now?

130a

THE COURT: The affidavit.

MR. ANTONACCI: The affidavit shouldn't be. I mean, I discussed that with Mike Dolesh. He said the affidavit itself is fine.

THE COURT: Who?

MR. ANTONACCI: Mike Dolesh, counsel for the City of Chicago. I already filed the affidavit actually as a placeholder without the exhibits. I told Mike that and he said that's fine, he just wanted the exhibits. He requested the exhibits be filed under seal.

THE COURT: These are your memos to yourself?

MR. ANTONACCI: Well, this one is a memo to myself and then there are some e-mail communications that have some privileged information in them.

THE COURT: How many pages does this go to? Your first one is 10 pages? 11 pages. The next one, again, is a memo to yourself, the follow-up memorandum.

MR. ANTONACCI: No, it's an e-mail.

THE COURT: And then what?

MR. ANTONACCI: Another e-mail, I believe.

131a

THE COURT: September 18 that from Miss Ponda to Phil Turango and you and Miss Shannon?

MR. ANTONACCI: That's right. December 18.

THE COURT: Then there's a record of proceedings?

MR. ANTONACCI: Yes.

THE COURT: Why does that have to be?

MR. ANTONACCI: Just because it showed where I initially presented these communications to the Court.

THE COURT: Mr. Gehringer, this is a transcript. So most of this can --

MR. ANTONACCI: The transcript should be fine.

THE COURT: Most of this probably -- is there anything that is not supposed to be --

MR. ANTONACCI: It's December 30th. We were in open court that day. I just pointed out that --

THE COURT: I know, but even if you were in open court, there might be competitors of Seyfarth Shaw, who knows.

MR. ANTONACCI: That's fair, but I don't believe so.

132a

MR. GEHRINGER: This is the hearing on the motion to dismiss itself.

MR. ANTONACCI: No, it's the September 30 hearing.

MR. GEHRINGER: Motion tendered. I thought you said December.

MR. ARNOLD: Your Honor, I believe this portion does not involve anything that has to do with us. I wanted to work on the order.

THE COURT: You may.

MR. ARNOLD: Thank you, your Honor.

THE COURT: Mr. Gehringer, can we keep this reporter because they're hired by him? He wants to stop it, but I would prefer that a record be made. So you could be responsible for this portion of it?

MR. GEHRINGER: If you want.

THE COURT: Is that okay?

MR. GEHRINGER: Absolutely no problem.

THE COURT: You're not -- are you from their firm?

THE COURT REPORTER: No.

THE COURT: Off the record.

133a

(Whereupon, a discussion was had off the record.)

MR. GEHRINGER: That transcript is not a problem.

THE COURT: Not a problem? So do you have a problem with filing these? I think these are memos that Mr. Antonacci wrote to himself. Any problems putting this under seal?

MR. GEHRINGER: We don't, Judge.

THE COURT: What you need to do is prepare an order, Mr. Antonacci, explaining why this was put under seal.

MR. ANTONACCI: It's the attorney-client privileged communication.

THE COURT: Just say it is materials that are whatever, are confidential. Are there trade secrets in it? Are their competitors involved or whatever?

MR. GEHRINGER: Yeah.

THE COURT: Maybe the two of you can work on that together.

MR. GEHRINGER: They're communications that are protected by the attorney-client privilege between Seyfarth and Chicago.

THE COURT: Put that in the order. I need that in order to justifying sealing the file. I'm only sealing whatever they are, 20 pages of documents?

134a

MR. ANTONACCI: That's it.

THE COURT: So the next thing that's going to happen is I will issue a written order in regard to the motion to dismiss.

MR. GEHRINGER: Right.

THE COURT: And for reconsideration.

MR. GEHRINGER: And for reconsideration.

MR. ANTONACCI: Motion for reconsideration and motion to dismiss. There was the City's -- my motion for reconsideration of the order quashing the subpoena served on the City and the in camera review of documents produced by the City of Chicago which I think you pointed out at last hearing was mooted. Is that correct?

THE COURT: Yes.

MR. ANTONACCI: So is that going to be part of the decision as well that those were mooted for the purposes of appeal?

THE COURT: I'll have to look at my notes. I don't know what I have in my notes.

MR. ANTONACCI: Well, I would like that to be part of this -- to me, it's highly relevant on appeal. The City produced documents that I never got to see at the circuit level, the trial level.

135a

THE COURT: Thank you.

MR. GEHRINGER: Thank you.

> (Whereupon, the proceedings concluded at 12:54 p.m.)

136a

STATE OF ILLINOIS

SS:

COUNTY OF C O O K

     Margaret M. Kruse, being first administered an oath, says that she is a court reporter doing business in the City of Chicago; and that she reported in shorthand the proceedings of said hearing, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said hearing.

/s/
Margaret M. Kruse, CSR, RPR
LIC. NO. 084-003036

137a

[ENTERED MARCH 19, 2014]

Order                                    (2/24/05) CCG 0002

IN THE CIRCUIT COURT OF COOK COUNTY,
ILLINOIS

Antonacci

v.                        } No. 2012 L 013240

Seyfarth Shaw

**ORDER**

The cause coming to be heard on Plaintiff's Second Petition for Substitution of Judge Brewer for Cause, due notice having been given, the Judge having read the Petition, Response and Reply, the parties having been given oral argument, and the Court being fully advised in the premises, IT IS HEREBY ORDERED:

Plaintiff's Second Petition for Substitution of Judge Brewer for Cause is denied. The case is returned to Judge Brewer to continue pursuant to the existing schedule before Judge Brewer for motions.

**Atty. No.:** 39225

**Name:** M. Gehringer

**Atty. for:** Defendants

138a

**Address:** <u>131 S. Dearborn</u>

**City/State/Zip:** <u>Chicago, IL 60603</u>

**Telephone:** <u>312-324-8400</u>

**ENTERED:**        **Judge Thomas L. Hogan**
                              **MAR 19 2014**
                        **Circuit Court - 1739**

**Dated:** _____


_____
Judge        Judge's No.


**DOROTHY BROWN, CLERK OF THE CIRCUIT
COURT OF COOK COUNTY, ILLINOIS**

139a

[ENTERED DECEMBER 6, 2013]

Order                                      (2/24/05) CCG 0002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ANTONACCI

v.                          No. 2012 L 013240

Seyfarth Shaw, et al

**ORDER**

This cause coming to be heard upon Defendants' section 2-619.1 Motion to Dismiss the Amended Complaint, due notice having been given and the court being fully advised in the premises, It is herby ordered:

Defendants' Motion to Dismiss Count I for defamation per se is denied based solely upon the statement alleged to be a statement that Plaintiff had engaged in the unauthorized practice of law. Defendants' Motion to Dismiss Count II is granted and Count II is dismissed with prejudice.

Based on the Court's ruling on the Motion to Dismiss Count I, Defendants' motion to strike certain allegations of the Amended Complaint is due by January 9, 2014. Plaintiff shall file his response by January 30, 2014. Defendants shall have until February 13, 2014 to reply only as necessary. Clerk's

140a

status on the motion to strike is set for February 18, 2014 at 9:00a.m. to be conducted by telephone.

**Atty. No.:** <u>39225</u>

**Name:** <u>M Gehringer</u>

**Atty. for:** <u>Defendants</u>

**Address:** <u>131 S. Dearborn</u>
<u>Suite 1200</u>

**City/State/Zip:** <u>Chicago, IL 60603</u>

**Telephone:** <u>312-324-8400</u>

**ENTERED:        Judge Eileen Mary Brewer**
**DEC 06 2013**
**Circuit Court - 1841**

**Dated:** _____

_____
Judge          Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT
COURT OF COOK COUNTY, ILLINOIS**

141a

[ENTERED AUGUST 1, 2013]

Order                                    (2/24/05) CCG 0002

IN THE CIRCUIT COURT OF COOK COUNTY,
ILLINOIS

Louis Antonacci

v.                    } No. 2012 L 013240

Seyfarth Shaw LLP et al.

**ORDER**

This matter coming before the Court on Defendants' Motion to seal complaint and Plaintiff's Motion for Abstention from Ruling on Defendants' Motion to Seal Complaint, the notice having been given, the court being fully advised in the premises, it is HEREBY ORDERED THAT:

1)    The Motion for Abstention is denied for the reasons stated on the record;

2)    The Court having considered the Motion to Seal it is denied for the reasons stated on the record;

3)    This case remains pending before Judge Brewer and the status date of August 19, 2013 at noon stands.

**Atty. No.:** 39225

142a

**Name:** <u>Perkins Coie LLP/Larson</u>

**Atty. for:** <u>Defendants</u>
**Address:** <u>131 S. Dearborn St. # 1700</u>

**City/State/Zip:** <u>Chicago, IL 60603</u>

**Telephone:** <u>312-324-8400</u>

**ENTERED:    Judge WILLIAM D. MADDUX 1559**
                          **AUG 01 2013**
                     **DOROTHY BROWN**
       **CLERK OF THE CIRCUIT COURT**
             **OF COOK COUNTY, IL**
       **DEPUTY CLERK** _____

**Dated:** _____

_____
Judge            Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT**
  **COURT OF COOK COUNTY, ILLINOIS**

143a

INQUIRY PANEL REPORT

To: Regina Kwan Peterson, Director of Administration, Illinois Board of Admissions to the Bar

From: Inquiry Panel Members: Ellen S. Mulaney (Chair); Matthew P. Walsh II and Jeanette Sublett

Re: Declination to Certify Louis Antonacci

Date: April 24, 2013

The applicant, who was admitted to the Wisconsin Bar in 2004, the Virginia Bar in 2008 and the DC Bar in 2010, has applied for admission on motion. The Inquiry Panel declines to certify based on the totality of issues raised by the applicant's file. Our concerns fall into three main categories: (1) a demonstrated lack of respect for client confidentiality; (2) indications of the unauthorized practice of law; and (3) several instances of an apparent lack of good judgment.

Client confidentiality. Mr. Antonacci was employed by the Seyfarth, Shaw law firm in Chicago beginning in August 2011 under an at-will contract that required him to take the Illinois Bar within one year. He was laid off from Seyfarth in May 2012. On November 21, 2012 Mr. Antonacci filed a 351-paragraph verified complaint in the Circuit Court of Cook County against Seyfarth and Anita Ponder, a Seyfarth partner, claiming defamation, interference with economic advantage, fraudulent inducement, and promissory estoppel. His claims all relate to his

professed difficulties working with Ms. Ponder. Some of his interactions with Ms. Ponder concerned her representation of the City of Chicago. Mr. Antonacci participated in client meetings and interviews with City of Chicago representatives, at Ms. Ponder's request. When preparing his complaint against Seyfarth, Mr. Antonacci's attorney (Ruth Major) contacted the City of Chicago notifying it that the complaint would contain references to the representation. In letters dated November 9, 2012 and November 19, 2012 the City's Law Department protested the details that were included the draft complaint as violations of client confidentiality. Ms. Major made some revisions to the complaint, which she sent to the City on November 20, but filed it on November 21 without hearing back from the City Law Department. On January 18, 2013 the City's Deputy Corporation Counsel wrote to Ms. Major that "the fact that the City did not respond in that short period of time should not be interpreted as a waiver or consent by the City that it has given up its claim to confidentiality afforded by the attorney-client privilege." The letter stated that the complaint "went further than we would have liked" and revealed information that did "not adhere" to the guidelines earlier proposed by the City. The letter concluded with the following: "We reiterate our request that any documents pertaining to the City's engagement of Seyfarth, Shaw be maintained in a confidential manner under seal."

Mr. Antonacci was well aware of the interactions with the City before he filed his verified complaint. In describing to the Panel how accommodating to the City he thought he and Ms.

Major had been, he used the collective "we". The City had made its claim to confidentiality clearly, and the complaint was filed without the City's consent to its contents. Moreover, when Seyfarth later filed a motion to seal the complaint because of the client information contained in it, Mr. Antonacci opposed the motion (which is still pending).

Unauthorized Practice of Law. Mr. Antonacci did legal work in several jurisdictions before beginning work at Seyfarth, Shaw. After being admitted in Wisconsin, he first worked for the US Army Corps of Engineers. He then began work as an associate for a McLean, Virginia firm in April 2006 and was admitted to the Virginia Bar in March 2008. After resigning from that firm he began work for Holland and Knight, a Washington DC firm, in June 2008 as an associate. He was admitted to the DC Bar in April 2010. He was also admitted to the United States District Court in 2009. in support of his Rule 705 motion he submitted statements from his previous firms indicating that his primary areas of practice were not in the local jurisdiction where he was not yet admitted but in the jurisdictions where he was already admitted. After being laid off at Seyfarth, Mr. Antonacci began work as Counsel for Gordon, Rappold, Miller LLC in Chicago. Although the firm website mentions that he is not admitted in Illinois and his most recent business cards contain the same caveat, the Panel noted that he has used firm letterhead with his name typed in at the top without any mention of his lack of admission. This inconsistency in itself is not enough to raise serious concerns with the Panel. However, Mr. Antonacci provided the Panel with a memo to the file which he

wrote while at Seyfarth to detail his interactions with Ms. Ponder. The memo contains the following description of Mr. Antonacci's interactions with a client, the City of Chicago:

> I believe that I demonstrated a more than adequate understanding of the law....[City official A] and I discussed numerous technical and policy issues related to their supplier diversity program and even their other compliance programs, which we were not even tasked to review, such as their monitoring of the McLaughlin Ordinance and the Chicago Residency Ordinance. When [City Official A] complained of lack of resources, I suggested that [sic] might use monies recovered via imposition of liquidated damages on contractors.... She told me that was a "great idea." When [City Official B] a junior attorney, told us he....had recently advised ....that no such hearing was allowed by applicable regulations, I showed him the section in the regulation where such a hearing would be contemplated. He apologized and said he would advise [City Official A] accordingly. [City Official C] and I had a discussion about the nuances of multiple-award contract vehicles ....

Even if some of Mr. Antonacci's advice pertained to federal law, at a minimum his discussion of local ordinances raises serious concerns with the Panel that he has engaged in the unauthorized practice of law in Illinois.

147a

Lack of judgment. Mr. Antonacci's work history and his interactions with the Panel have raised substantial questions about his professional judgment. Before law school he was asked to leave a marketing position at ServiceMaster because of insubordination. He was later asked to resign from the ███████████████ law firm in DC in 2010 for "lack of judgment." The firm cited one specific example: a Virginia Commissioner in Chancery had stated that he would recommend sanctions against Mr. Antonacci if he levied another personal attack on opposing counsel. When asked about this incident by the Panel, Mr. Antonacci stated that the Commissioner's position was ridiculous. ███████ ██████ also cited "six or eight" other examples of lack of judgment that it did not elaborate on. Mr. Antonacci's application contains a long description of his experiences at ████████████████, where he felt he was forced out for "rubbing people the wrong way". His account questions both the legal competence and integrity of senior lawyers at the firm. His memo to the file at Seyfarth, Written in the early weeks of his employment there, describes how he questioned Ms. Ponder about what he viewed as her misunderstanding of the law.

In his interactions with the Inquiry Panel Mr. Antonacci has taken an inappropriate tone that does not demonstrate any understanding that it is his burden to demonstrate his character and fitness by clear and convincing evidence. He claims in emails that there is "no reason" for the Panel's "delay." He complains that the process has taken several months when he has done "all the right things" by disclosing the Complaint, related filings and other documents.

148a

His aggrieved and impatient tone does not indicate any awareness that it is his duty to disclose relevant information and that the Panel has a responsibility to carefully consider all the information in his voluminous and continually growing file. He has not acknowledged even the possibility of any fault on his part regarding any of the issues that concern the Panel.

Conclusion. Because of the totality of issues described above, the Panel has serious concerns about Mr. Antonacci's character and fitness to practice law. The Panel finds that Mr. Antonacci has not met his burden to prove by clear and convincing evidence that he is presently fit to practice law in this state. Accordingly, the Panel votes unanimously to decline certification.

/s/ _____    4/24/13____
Ellen S. Mulaney (Chair)          Date

149a

28 U.S.C.A. § 1332

§ 1332. Diversity of citizenship; amount in
controversy; costs

Currentness

<Notes of Decisions for 28 USCA § 1332 are
displayed in two separate documents. Notes of
Decisions for subdivisions I to X are contained
in this document. For Notes of Decisions for
subdivisions XI to end, see second document
for 28 USCA § 1332.>

**(a)** The district courts shall have original
jurisdiction of all civil actions where the matter in
controversy exceeds the sum or value of $75,000,
exclusive of interest and costs, and is between--

**(1)** citizens of different States;

**(2)** citizens of a State and citizens or subjects
of a foreign state, except that the district
courts shall not have original jurisdiction
under this subsection of an action between
citizens of a State and citizens or subjects of a
foreign state who are lawfully admitted for
permanent residence in the United States and
are domiciled in the same State;

**(3)** citizens of different States and in which
citizens or subjects of a foreign state are
additional parties; and

150a

**(4)** a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

**(b)** Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

**(c)** For the purposes of this section and section 1441 of this title--

**(1)** a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of--

**(A)** every State and foreign state of which the insured is a citizen;

151a

**(B)** every State and foreign state by which the insurer has been incorporated; and

**(C)** the State or foreign state where the insurer has its principal place of business; and

**(2)** the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

**(d)(1)** In this subsection--

**(A)** the term "class" means all of the class members in a class action;

**(B)** the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

**(C)** the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

**(D)** the term "class members" means the persons (named or unnamed) who fall within

the definition of the proposed or certified class in a class action.

**(2)** The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--

**(A)** any member of a class of plaintiffs is a citizen of a State different from any defendant;

**(B)** any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

**(C)** any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

**(3)** A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

**(A)** whether the claims asserted involve matters of national or interstate interest;

153a

**(B)** whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

**(C)** whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

**(D)** whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

**(E)** whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

**(F)** whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

**(4)** A district court shall decline to exercise jurisdiction under paragraph (2)--

**(A)(i)** over a class action in which--

**(I)** greater than two-thirds of the members of all proposed plaintiff

classes in the aggregate are citizens of the State in which the action was originally filed;

**(II)** at least 1 defendant is a defendant--

**(aa)** from whom significant relief is sought by members of the plaintiff class;

**(bb)** whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

**(cc)** who is a citizen of the State in which the action was originally filed; and

**(III)** principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

**(ii)** during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

**(B)** two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of

155a

the State in which the action was originally filed.

**(5)** Paragraphs (2) through (4) shall not apply to any class action in which--

**(A)** the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

**(B)** the number of members of all proposed plaintiff classes in the aggregate is less than 100.

**(6)** In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

**(7)** Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

**(8)** This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

**(9)** Paragraph (2) shall not apply to any class action that solely involves a claim--

> **(A)** concerning a covered security as defined under 16(f)(3)[1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)[2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));
>
> **(B)** that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or
>
> **(C)** that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

**(10)** For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

**(11)(A)** For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

157a

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

**(ii)** As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

> **(I)** all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

> **(II)** the claims are joined upon motion of a defendant;

> **(III)** all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

> **(IV)** the claims have been consolidated or coordinated solely for pretrial proceedings.

**(C)(i)** Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be

transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

**(ii)** This subparagraph will not apply--

>**(I)** to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

>**(II)** if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

**(D)** The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

**(e)** The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

**CREDIT(S)**
(June 25, 1948, c. 646, 62 Stat. 930; July 26, 1956, c. 740, 70 Stat. 658; July 25, 1958, Pub.L. 85-554, § 2, 72 Stat. 415; Aug. 14, 1964, Pub.L. 88-439, § 1, 78 Stat. 445; Oct. 21, 1976, Pub.L. 94-583, § 3, 90 Stat. 2891; Nov. 19, 1988, Pub.L. 100-702, Title II, §§ 201(a), 202(a), 203(a), 102 Stat. 4646; Oct. 19, 1996, Pub.L. 104-317, Title II, § 205(a), 110 Stat. 3850; Feb. 18, 2005, Pub.L. 109-2, § 4(a), 119 Stat. 9; Pub.L. 112-63, Title I, §§ 101, 102, Dec. 7, 2011, 125 Stat. 758.)

159a

Notes of Decisions (4434)

Footnotes

1        So in original. Reference to "16(f)(3)" probably should be preceded by "section".

2        So in original. Probably should be "77p(f)(3)".

28 U.S.C.A. § 1332, 28 USCA § 1332
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

160a

18 U.S.C.A. § 1341

§ 1341. Frauds and swindles

Effective: January 7, 2008
Currentness

<Notes of Decisions for 18 USCA § 1341 are displayed in two separate documents.>

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported,

transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 763; May 24, 1949, c. 139, § 34, 63 Stat. 94; Pub.L. 91-375, § 6(j)(11), Aug. 12, 1970, 84 Stat. 778; Pub.L. 101-73, Title IX, § 961(i), Aug. 9, 1989, 103 Stat. 500; Pub.L. 101-647, Title XXV, § 2504(h), Nov. 29, 1990, 104 Stat. 4861; Pub.L. 103-322, Title XXV, § 250006, Title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 2087, 2147; Pub.L. 107-204, Title IX, § 903(a), July 30, 2002, 116 Stat. 805; Pub.L. 110-179, § 4, Jan. 7, 2008, 121 Stat. 2557.)

Notes of Decisions (2793)

18 U.S.C.A. § 1341, 18 USCA § 1341
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

162a

18 U.S.C.A. § 1343

§ 1343. Fraud by wire, radio, or television

Effective: January 7, 2008
Currentness

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**CREDIT(S)**

(Added July 16, 1952, c. 879, § 18(a), 66 Stat. 722; amended July 11, 1956, c. 561, 70 Stat. 523; Pub.L. 101-73, Title IX, § 961(j), Aug. 9, 1989, 103 Stat. 500; Pub.L. 101-647, Title XXV, § 2504(i), Nov. 29, 1990, 104 Stat. 4861; Pub.L. 103-322, Title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat.

163a

2147; Pub.L. 107-204, Title IX, § 903(b), July 30, 2002, 116 Stat. 805; Pub.L. 110-179, § 3, Jan. 7, 2008, 121 Stat. 2557.)

Notes of Decisions (1156)

18 U.S.C.A. § 1343, 18 USCA § 1343
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

164a

18 U.S.C.A. § 1951

§ 1951. Interference with commerce by threats or violence

Currentness

**(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

**(b)** As used in this section--

> **(1)** The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

> **(2)** The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

165a

**(3)** The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

**(c)** This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101-115, 151-166 of Title 29 or sections 151-188 of Title 45.

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 793; Pub.L. 103-322, Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

Notes of Decisions (1690)

18 U.S.C.A. § 1951, 18 USCA § 1951
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

166a

18 U.S.C.A. § 1952

§ 1952. Interstate and foreign travel or
transportation in aid of racketeering enterprises

Effective: December 18, 2014
Currentness

**(a)** Whoever travels in interstate or foreign
commerce or uses the mail or any facility in
interstate or foreign commerce, with intent to--

> **(1)** distribute the proceeds of any unlawful
> activity; or

> **(2)** commit any crime of violence to further
> any unlawful activity; or

> **(3)** otherwise promote, manage, establish,
> carry on, or facilitate the promotion,
> management, establishment, or carrying on,
> of any unlawful activity, and thereafter
> performs or attempts to perform--

>> **(A)** an act described in paragraph (1) or
>> (3) shall be fined under this title,
>> imprisoned not more than 5 years, or
>> both; or

>> **(B)** an act described in paragraph (2)
>> shall be fined under this title,
>> imprisoned for not more than 20 years,
>> or both, and if death results shall be
>> imprisoned for any term of years or for
>> life.

167a

**(b)** As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(c)** Investigations of violations under this section involving liquor shall be conducted under the supervision of the Attorney General.

**(d)** If the offense under this section involves an act described in paragraph (1) or (3) of subsection (a) and also involves a preretail medical product (as defined in section 670), the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under subsection (a) is greater.

**(e)(1)** This section shall not apply to a savings promotion raffle conducted by an insured depository institution or an insured credit union.

**(2)** In this subsection--

168a

**(A)** the term "insured credit union" shall have the meaning given the term in section 101 of the Federal Credit Union Act (12 U.S.C. 1752);

**(B)** the term "insured depository institution" shall have the meaning given the term in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813); and

**(C)** the term "savings promotion raffle" means a contest in which the sole consideration required for a chance of winning designated prizes is obtained by the deposit of a specified amount of money in a savings account or other savings program, where each ticket or entry has an equal chance of being drawn, such contest being subject to regulations that may from time to time be promulgated by the appropriate prudential regulator (as defined in section 1002 of the Consumer Financial Protection Act of 2010 (12 U.S.C. 5481)).

**CREDIT(S)**

(Added Pub.L. 87-228, § 1(a), Sept. 13, 1961, 75 Stat. 498; amended Pub.L. 89-68, July 7, 1965, 79 Stat. 212; Pub.L. 91-513, Title II, § 701(i) (2), Oct. 27, 1970, 84 Stat. 1282; Pub.L. 99-570, Title I, § 1365(a), Oct. 27, 1986, 100 Stat. 3207-35; Pub.L. 101-647, Title XII, § 1205(i), Title XVI, § 1604, Nov. 29, 1990, 104 Stat. 4831, 4843; Pub.L. 103-322, Title XIV, § 140007(a), Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2033, 2147; Pub.L. 107-296, Title XI, § 1112(h), Nov. 25, 2002, 116 Stat. 2277; Pub.L. 112-186, § 4(b)(1), Oct. 5, 2012, 126 Stat. 1429;

169a

Pub.L. 113-251, § 5(1), Dec. 18, 2014, 128 Stat. 2890.)

Notes of Decisions (991)

18 U.S.C.A. § 1952, 18 USCA § 1952
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

170a

18 U.S.C.A. § 1961

§ 1961. Definitions

Effective: May 11, 2016
Currentness

As used in this chapter--

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of

citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons).,[1] sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual

exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is

indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

**(2)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

**(3)** "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

**(5)** "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

**(6)** "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in

violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

**(7)** "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

**(8)** "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

**(9)** "documentary material" includes any book, paper, document, record, recording, or other material; and

**(10)** "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any

department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

**CREDIT(S)**

(Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 941; amended Pub.L. 95-575, § 3(c), Nov. 2, 1978, 92 Stat. 2465; Pub.L. 95-598, Title III, § 314(g), Nov. 6, 1978, 92 Stat. 2677; Pub.L. 98-473, Title II, §§ 901(g), 1020, Oct. 12, 1984, 98 Stat. 2136, 2143; Pub.L. 98-547, Title II, § 205, Oct. 25, 1984, 98 Stat. 2770; Pub.L. 99-570, Title I, § 1365(b), Oct. 27, 1986, 100 Stat. 3207-35; Pub.L. 99-646, § 50(a), Nov. 10, 1986, 100 Stat. 3605; Pub.L. 100-690, Title VII, §§ 7013, 7020(c), 7032, 7054, 7514, Nov. 18, 1988, 102 Stat. 4395, 4396, 4398, 4402, 4489; Pub.L. 101-73, Title IX, § 968, Aug. 9, 1989, 103 Stat. 506; Pub.L. 101-647, Title XXXV, § 3560, Nov. 29, 1990, 104 Stat. 4927; Pub.L. 103-322, Title IX, § 90104, Title XVI, § 160001(f), Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1987, 2037, 2150; Pub.L. 103-394, Title III, § 312(b), Oct. 22, 1994, 108 Stat. 4140; Pub.L. 104-132, Title IV, § 433, Apr. 24, 1996, 110 Stat. 1274; Pub.L. 104-153, § 3, July 2, 1996, 110 Stat. 1386; Pub.L. 104-208, Div. C, Title II, § 202, Sept. 30, 1996, 110 Stat. 3009-565; Pub.L. 104-294, Title VI, §§ 601(b) (3), (i)(3), 604(b)(6), Oct. 11, 1996, 110 Stat. 3499, 3501, 3506; Pub.L. 107-56, Title VIII, § 813, Oct. 26, 2001, 115 Stat. 382; Pub.L. 107-273, Div. B, Title IV,

176a

§ 4005(f)(1), Nov. 2, 2002, 116 Stat. 1813; Pub.L. 108-193, § 5(b), Dec. 19, 2003, 117 Stat. 2879; Pub.L. 108-458, Title VI, § 6802(e), Dec. 17, 2004, 118 Stat. 3767; Pub.L. 109-164, Title I, § 103(c), Jan. 10, 2006, 119 Stat. 3563; Pub.L. 109-177, Title IV, § 403(a), Mar. 9, 2006, 120 Stat. 243; Pub.L. 113-4, Title XII, § 1211(a), Mar. 7, 2013, 127 Stat. 142; Pub.L. 114-153, § 3(b), May 11, 2016, 130 Stat. 382.)

Notes of Decisions (1678)

Footnotes
1       So in original.
18 U.S.C.A. § 1961, 18 USCA § 1961
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

177a

18 U.S.C.A. § 1962

§ 1962. Prohibited activities

Currentness

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any

178a

enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**CREDIT(S)**

(Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 942; amended Pub.L. 100-690, Title VII, § 7033, Nov. 18, 1988, 102 Stat. 4398.)

Notes of Decisions (1271)

18 U.S.C.A. § 1962, 18 USCA § 1962
Current through P.L. 114-143. Also includes P.L. 114-145, 114-146, 114-148, and 114-151 to 114-154.

179a

DC ST § 29-105.01

§ 29-105.01. Governing law.

Effective: July 2, 2011
Currentness

(a) The law of the jurisdiction of formation of an entity shall govern the:

(1) Internal affairs of the entity;

(2) Liability that a person has as an interest holder or governor for a debt, obligation, or other liability of the entity;

(3) Liability of a series of a series limited liability company; and

(4) Liability of a series of a statutory trust.

(b) A foreign entity shall not be precluded from registering to do business in the District because of any difference between the laws of the entity's jurisdiction of formation and the laws of the District.

(c) Registration of a foreign entity to do business in the District shall not authorize it to engage in any activity or exercise any power that a domestic entity of the same type may not engage in or exercise in the District.

**Credits**
(July 2, 2011, D.C. Law 18-378, § 2, 58 DCR 1720.)

180a

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2016 Thomson Reuters
DC CODE § 29-105.01
Current through May 5, 2016

181a

DC ST § 29-601.04
Formerly cited as DC ST 1981 § 41-151.3Formerly
cited as DC ST 2001 § 33-101.03

§ 29-601.04. Effect of partnership agreement;
nonwaivable provisions.

Effective: March 5, 2013
Currentness

(a) Except as otherwise provided in subsection (b) of
this section, relations among the partners and
between the partners and the partnership shall be
governed by the partnership agreement. To the
extent the partnership agreement does not otherwise
provide, this chapter shall govern relations among
the partners and between the partners and the
partnership.

(b) A partnership agreement shall not:

(1) Vary the rights and duties under § 29-
601.05, except to eliminate the duty to provide
copies of statements to all of the
partners;

(2) Unreasonably restrict the right of access to
books and records under § 29-604.03(b);

(3) Eliminate the duty of loyalty under § 29-
604.04(b) or § 29-606.03(b)(3), but:

(A) The partnership agreement may
identify specific types or categories of
activities that do not violate the duty of

loyalty, if not manifestly unreasonable; or

(B) All of the partners or a number or percentage specified in the partnership agreement may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty;

(4) Unreasonably reduce the duty of care under § 29-604.04(c) or § 29-606.03(b)(3);

(5) Eliminate the obligation of good faith and fair dealing under § 29-604.04(d), but the partnership agreement may prescribe the standards by which the performance of the obligation is to be measured, if the standards are not manifestly unreasonable;

(6) Vary the power to dissociate as a partner under § 29-606.02(a), except to require the notice under § 29-606.01(1) to be in writing;

(7) Vary the right of a court to expel a partner in the events specified in § 29-606.01(5);

(8) Vary the requirement to wind up the partnership business in cases specified in § 29-608.01(4), (5), or (6);

(9) Vary the law applicable to a limited liability partnership under § 29-105.01(a);

183a

(10) Restrict rights of third parties under this chapter;

(11) Vary the provisions of § 29-601.10;

(12) Vary the provisions of § 29-603.07;

(13) Relieve or exonerate a person from liability for conduct involving bad faith, willful or intentional misconduct, or knowing violation of the law;

(14) Vary the right of a partner to approve a merger, interest exchange, conversion, or domestication; or

(15) Vary any requirement, procedure, or other provision of this title pertaining to:

(A) Registered agents; or

(B) The Mayor, including provisions pertaining to records authorized or required to be delivered to the Mayor for filing under this title.

(c) Subject to subsection (b) of this section, without limiting other terms that may be included in a partnership agreement, the following rules apply:

(1) The partnership agreement may specify the method by which a specific act or transaction that would otherwise violate the duty of loyalty may be authorized or ratified by one or more disinterested and independent

184a

persons after full disclosure of all material facts.

(2) If not manifestly unreasonable, the partnership agreement may:

> (A) Restrict or eliminate the aspects of the duty of loyalty stated in § 29-604.07(b);

> (B) Identify specific types or categories of activities and affairs that do not violate the duty of loyalty;

> (C) Alter the duty of care, but may not authorize willful or intentional misconduct or knowing violation of law; and

> (D) Alter or eliminate any other fiduciary duty.

(d) The court shall decide as a matter of law any claim under subsection (b)(5) or (c)(2) of this section that a term of a partnership agreement is manifestly unreasonable. The court:

> (1) Shall make its determination as of the time the challenged term became part of the partnership agreement and by considering only circumstances existing at that time; and

185a

(2) May invalidate the term only if, in light of the purposes, activities, and affairs of the limited partnership, it is readily apparent that:

(A) The objective of the term is unreasonable; or

(B) The term is an unreasonable means to achieve the provision's objective.

**Credits**
(July 2, 2011, D.C. Law 18-378, § 2, 58 DCR 1720; Mar. 5, 2013, D.C. Law 19-210, § 2(f)(2)(C), 59 DCR 13171.)

Notes of Decisions (1)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2016 Thomson Reuters
DC CODE § 29-601.04
Current through May 5, 2016

186a

720 ILCS 5/12-6
Formerly cited as IL ST CH 38 ¶12-6

5/12-6. Intimidation

Effective: July 1, 2011
Currentness

§ 12-6. Intimidation.

(a) A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority any of the following acts:

(1) Inflict physical harm on the person threatened or any other person or on property; or

(2) Subject any person to physical confinement or restraint; or

(3) Commit a felony or Class A misdemeanor; or

(4) Accuse any person of an offense; or

(5) Expose any person to hatred, contempt or ridicule; or

(6) Take action as a public official against anyone or anything, or withhold official action, or cause such action or withholding;

187a

or

(7) Bring about or continue a strike, boycott or other collective action.

(b) Sentence.

Intimidation is a Class 3 felony for which an offender may be sentenced to a term of imprisonment of not less than 2 years and not more than 10 years.

**Credits**
Laws 1961, p. 1983, § 12-6, eff. Jan. 1, 1962. Amended by Laws 1965, p. 387, § 1, eff. July 1, 1965; P.A. 77-2638, § 1, eff. Jan. 1, 1973; P.A. 85-1210, § 1, eff. Jan. 1, 1989; P.A. 88-680, Art, 15, § 15-5, eff. Jan. 1, 1995. Re-enacted by P.A. 91-696, Art. 15, § 15-5, eff. April 13, 2000; P.A. 96-1551, Art. 1, § 5, eff. July 1, 2011.

**Formerly** Ill.Rev.Stat.1991, ch. 38, ¶ 12-6.

## VALIDITY

<Provision of this Section making it an offense to threaten to commit any crime no matter how minor or insubstantial has been held unconstitutional by the U.S. District Court, Northern District, in the case of U.S. ex rel. Holder v. Circuit Court of the 17th Judicial Circuit, N.D. Ill.1985, 624 F.Supp. 68.>

<The Supreme Court of Illinois held that P.A. 88-680 violated the single-subject rule of the Illinois Constitution in the case of People v.

188a

Cervantes, 1999, 243 Ill.Dec. 233, 189 Ill.2d 80, 723 N.E.2d 265; P.A. 91-696 re-enacted this section as contained in P.A. 88-680, including any subsequent amendments in order "to remove any question as to the validity or content of those provisions.">

Notes of Decisions (227)

Copr.(c) 2016 Thomson Reuters
720 I.L.C.S. 5/12-6, IL ST CH 720 § 5/12-6
Current through P.A. 99-503 of the 2016 Reg. Sess.

189a

805 ILCS 206/401

206/401. Partner's rights and duties

Effective: January 1, 2003
Currentness

§ 401. Partner's rights and duties.

(a) Each partner is deemed to have an account that is:

> (1) credited with an amount equal to the money plus the value of any other property, net of the amount of any liabilities, the partner contributes to the partnership and the partner's share of the partnership profits; and

> (2) charged with an amount equal to the money plus the value of any other property, net of the amount of any liabilities, distributed by the partnership to the partner and the partner's share of the partnership losses.

(b) Each partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits.

(c) A partnership shall reimburse a partner for payments made and indemnify a partner for liabilities incurred by the partner in the ordinary course of the business of the partnership or for the preservation of its business or property.

190a

(d) A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.

(e) A payment or advance made by a partner which gives rise to a partnership obligation under subsection (c) or (d) of this Section constitutes a loan to the partnership which accrues interest from the date of the payment or advance.

(f) Each partner has equal rights in the management and conduct of the partnership business.

(g) A partner may use or possess partnership property only on behalf of the partnership.

(h) A partner is not entitled to remuneration for services performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership.

(i) A person may become a partner only with the consent of all of the partners.

(j) A difference arising as to a matter in the ordinary course of business of a partnership may be decided by a majority of the partners. An act outside the ordinary course of business of a partnership and an amendment to the partnership agreement may be undertaken only with the consent of all of the partners.

(k) This Section does not affect the obligations of a partnership to other persons under Section 301 of this Act.

191a

**Credits**
P.A. 92-740, Art. 4, § 401, eff. Jan. 1, 2003.

Notes of Decisions (58)

Copr.(c) 2016 Thomson Reuters
805 I.L.C.S. 206/401, IL ST CH 805 § 206/401
Current through P.A. 99-503 of the 2016 Reg. Sess.

192a

[ENTERED APRIL 29, 2015]

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN
DISTRICT OF ILLINOIS
EASTERN DIVISION**

**Case No. 1:15-cv-03750
Judge Milton I. Shadur
Magistrate Judge Sheila M. Finnegan**

**LOUIS B. ANTONACCI,
an individual,**

   **Plaintiff,**

**v.**

**CITY OF CHICAGO,
a municipal corporation,**

   Serve: Mr. Stephen R. Patton
   City of Chicago Department of Law
   121 N. LaSalle Street, Suite 600
   Chicago, IL 60602

and

**SEYFARTH SHAW LLP,
a limited liability partnership,**

   Serve: J. Stephen Poor
   131 S. Dearborn Street, Suite 2400
   Chicago, IL 60603

193a

and

**ANITA J. PONDER,**
**an individual,**

>   Serve: Anita J. Ponder
>   131 S. Dearborn Street, Suite 2400
>   Chicago, IL 60603

and

**THE LAW OFFICES OF**
**RUTH I. MAJOR, P.C.,**
**a professional corporation,**

>   Serve: Ruth I. Major
>   30 West Monroe, Suite 1650
>   Chicago, Illinois 60603

and

**RUTH I. MAJOR,**
**an individual,**

>   Serve: Ruth I. Major
>   30 West Monroe, Suite 1650
>   Chicago, Illinois 60603

and

**MATTHEW J. GEHRINGER,**
**an individual,**

194a

> Serve: Matthew J. Gehringer
> 131 S. Dearborn Street, Suite 1700
> Chicago, IL 60603

and

**PERKINS COIE LLC,**
a limited liability company,

> Serve: CT Corporation System
> 208 South LaSalle Street, Suite 814
> Chicago, Illinois 60604

and

**KRUSE & ASSOCIATES, LTD.,**
**a corporation,**

> Serve: Margaret Kruse
> 180 N LaSalle Street, Suite 3700
> Chicago, Illinois 60601

and

**MARGARET KRUSE,**
**an individual,**

> Serve: Margaret Kruse
> 180 N. LaSalle Street, Suite 3700
> Chicago, Illinois 60601

and

**TOOMEY REPORTING, INC.**
**a corporation,**

Serve: Ms. Sandy Toomey
205 W. Randolph Street, Suite 1230
Chicago, Illinois 60606

and

**SOSIN & ARNOLD, LTD.,**
**a corporation,**

Serve: David Sosin
9501 W. 144th Place, Suite 205
Orland Park, Illinois 60462

and

**GEORGE A. ARNOLD,**
**an individual,**

Serve: George A. Arnold
9501 W. 144th Place, Suite 205
Orland Park, Illinois 60462

and

**NEAL & LEROY LLC,**
**a limited liability company,**

Serve: Langdon Neal
203 N. LaSalle Street, Suite 2300
Chicago, IL 60601

**Defendants.**

196a

## COMPLAINT

Plaintiff Louis B. Antonacci ("Mr. Antonacci") hereby files this Complaint against the above-named Defendants, and states as follows:

## PARTIES

1.     Mr. Antonacci is an individual and a resident of the District of Columbia.

2.     The City of Chicago ("City", "Chicago", or "City of Chicago") is a municipal corporation organized under the laws of the State of Illinois.

3.     Seyfarth Shaw LLP ("Seyfarth") is a limited liability company organized under the law of the State of Illinois, with its principal place of business located in the State of Illinois.

4.     Anita I. Ponder ("Ponder") is an individual and a resident of Cook County, Illinois. All of Ponder's acts alleged herein were on behalf of herself and on behalf of Seyfarth.

5.     The Law Offices of Ruth I. Major, P.C. ("Major Law") is a professional corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

6.     Ruth I. Major ("Major") is an individual, an attorney licensed in the State of Illinois, and a resident of Cook County, Illinois. All of Major's acts

alleged herein were on behalf of herself and on behalf of Major Law.

7.     Perkins Coie LLC ("Perkins Coie") is a limited liability company organized under the laws of the State of Delaware, with a place of business in Cook County, Illinois.

8.     Matthew J. Gehringer ("Gehringer") is an individual, an attorney licensed in the State of Illinois, a partner at Perkins Coie, and a resident of Cook County, Illinois. All of Gehringer's acts alleged herein were on behalf of himself, Perkins Coie, Seyfarth, and Ponder.

9.     Kruse & Associates, LTD. ("Kruse International") is a corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

10.     Margaret Kruse ("Kruse") is an individual, a principal officer of Kruse International, and a resident of Cook County, Illinois. All of Kruse's acts alleged herein were on behalf of herself and on behalf of Kruse International.

11.     Toomey Reporting, Inc. ("Toomey") is a corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

12.     Sosin & Arnold, Ltd. ("Sosin & Arnold") is a corporation organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

13.     George A. Arnold ("Arnold") is an individual, an attorney licensed in the State of Illinois, a principal officer of Sosin & Arnold, and a resident of Cook County, Illinois. All of Arnold's acts alleged herein were on behalf of himself and on behalf of Sosin & Arnold.

14.     Neal & Leroy LLC ("Neal & Leroy") is a limited liability company organized under the laws of the State of Illinois, with its principal place of business located in the State of Illinois.

## **JURISDICTION**

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because some of the claims asserted herein arise under the laws of the United States.

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Mr. Antonacci and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over all the Defendants pursuant to 735 ILCS 5/2-209 because the Defendants are 1) corporations organized under the laws of this State; 2) persons who resided in this State when the causes of action arose, the action was commenced, or when process was served; 3) persons who transacted business within this State, from which these causes of action arise; and/or 4) persons who committed tortious acts,

or caused tortious injury, within this State, from which these causes of action arise.

18.    This    Court    also    has    personal jurisdiction over the Defendants pursuant to 18 U.S.C. 1965(d) because all the Defendants reside in this judicial district, have an agent here, and/or transact their affairs in this State.

19.    Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. 1965 because a substantial part of the events giving rise to the claims occurred here, and Defendants reside and transact their business in this State, either directly or through their agents.

## FACTS COMMON TO ALL COUNTS

20.    Mr. Antonacci is an attorney who has been licensed to practice law since 2004. Mr. Antonacci is licensed to practice in the State of Wisconsin, the Commonwealth of Virginia, and the District of Columbia. Mr. Antonacci has never been disciplined for his conduct as an attorney nor has a bar complaint ever been filed against him.

21.    While in law school, Mr. Antonacci served as an Honors Intern for both the Criminal Division of the U.S. Department of Justice and the General Counsel of the U.S. Air Force. Immediately upon graduating with honors from the University of Wisconsin Law School in 2004, Mr. Antonacci began work as a Civilian Honors Attorney for the U.S. Army Corps of Engineers in Huntsville, Alabama. In 2006, Mr. Antonacci, relocated to Washington, D.C.

to work in private practice for international law firms, where he represented clients in construction, federal government contracts, and fraud disputes in federal and state courts.

22.    In August of 2011, Mr. Antonacci relocated to his hometown of Chicago, Illinois to accept a job offer from Seyfarth to work as an attorney in its commercial litigation practice group.

23.    Also in August of 2011, the City of Chicago retained Ponder and Seyfarth to advise the City on certain aspects of its Minority and Women Owned Business Enterprise Program ("DPS Matter"). The City retained Seyfarth and Ponder for a fixed fee of $235,000.

24.    The City of Chicago retained Ponder at the direction of City of Chicago Mayor Rahm Emanuel, longtime friend and political ally of Ponder.

25.    Prior to being retained on the DPS Matter, Ponder had lobbied the City for over a decade.

26.    Prior to working for Seyfarth, Ponder had been fired from multiple law firms because she is impossible to work with and regularly harasses those assigned to work for her.

27.    At the time the City retained Ponder, Ponder had hundreds of thousands of dollars of federal tax liens outstanding with the Cook County Recorder of Deeds.

201a

28.    Upon information and belief, the City off Chicago retained Ponder in order to divert Chicago taxpayer money to Ponder so that she could satisfy her federal debts.

29.    Earlier in 2011, Seyfarth and Ponder had falsely certified to the City of Chicago that, in the five (5) years prior to the City's retention of Seyfarth on February 7, 2011, no one "engaged in the performance of [Seyfarth's work for the City] ... had been found liable in a civil proceeding, or in any criminal or civil action ... instituted by the City or by the federal government ...".

30.    Mr. Antonacci was initially tasked to work with Ponder on the DPS Matter.

31.    Mr. Antonacci applied for admission to the Illinois Bar in April 2012.

32.    Despite successfully working with numerous attorneys at Seyfarth, and being retained by a prestigious non-profit organization, Mr. Antonacci was summarily terminated on May 22, 2012, being told that his work with Ponder months earlier was the issue.

33.    Seyfarth indicated to Mr. Antonacci that the reason for his termination was a layoff.

34.    Seyfarth offered Mr. Antonacci eight weeks of severance pay in exchange for a release of claims against Seyfarth. Mr. Antonacci never signed any release of claims against Seyfarth.

202a

35.    Because Ponder frequently harassed and lied to Mr. Antonacci while he was working with her at Seyfarth, consistent with her reputation for incompetence and professional misconduct, Mr. Antonacci requested all evaluations of his performance while at Seyfarth.

36.    Seyfarth provided Mr. Antonacci his performance evaluations the following day, May 23, 2012, which provided overwhelmingly positive reviews of his performance at Seyfarth.

37.    In June 2012, Mr. Antonacci retained Major and Major Law as his attorney to advise him on legal matters pertaining to the separation of his employment with Seyfarth.

38.    Mr. Antonacci retained Major and Major Law at an hourly rate. Mr. Antonacci offered to make Major's fees entirely contingent on the result obtained, but Major refused.

39.    Ms. Major requested Mr. Antonacci's personnel file from Seyfarth. In June of 2012, Seyfarth produced Mr. Antonacci's personnel file to Ms. Major.

40.    Mr. Antonacci's personnel file revealed an email from Seyfarth Professional Development Consultant, Ms. Kelly Gofron, memorializing numerous lies perpetrated by Ms. Ponder concerning Mr. Antonacci and his work ("Ponder Slander Email").

203a

41.    Seyfarth did not include the Ponder Slander Email in its response to Mr. Antonacci's request for all evaluations of his performance while at Seyfarth.

42.    Utilizing interstate communications, Seyfarth knowingly withheld the Ponder Slander Email and falsely indicated to Mr. Antonacci, via electronic mail, that it did not exist.

43.    Major advised Mr. Antonacci that he had colorable causes of action for promissory estoppel and fraudulent inducement, and thus she should write a demand letter to Seyfarth setting forth those causes of action.

44.    Mr. Antonacci suggested that Major include a cause of action for intentional interference with prospective economic advantage.

45.    Mr. Antonacci asked Major whether she was comfortable suing a large firm in Chicago. Major stated to Mr. Antonacci that she sued law firms in Chicago frequently and had no problem doing so. Upon information and belief, this representation was false because Major had not sued large law firms previously.

46.    Mr. Antonacci indicated to Major that he would likely wish to draft much of the pleadings and briefs, and perform much of the discovery work, in order to save money on legal fees.

204a

47.     Major indicated that she would not object to Mr. Antonacci performing as much or as little of the legal work as he deemed appropriate.

48.     Major never suggested that Mr. Antonacci include a cause of action for defamation or defamation *per se.*

49.     Major's website indicates that Ms. Major has professional expertise in the law of defamation pertaining to professionals and executives.

50.     Major never intended to file a complaint on behalf of Mr. Antonacci. Major intended to bill Mr. Antonacci an unreasonable amount of money for a demand letter so that she could take as much of his severance package as possible.

51.     Major's associate drafted the demand letter to Seyfarth over approximately two months, billing Mr. Antonacci approximately $5,000 for that letter.

52.     After Seyfarth rejected the initial demand, Mr. Antonacci indicated to Ms. Major that he would draft a verified complaint.

53.     Mr. Antonacci drafted the Verified Complaint, including a cause of action for defamation *per se,* and sent it to me Major and her associate on September 28, 2012.

205a

54.    Major's associate left Major Law almost immediately after Mr. Antonacci transmitted the draft complaint.

55.    Major did not review the Verified Complaint for over a month. She regularly ignored Mr. Antonacci's emails seeking status updates during this time.

56.    After Mr. Antonacci appeared at Major's offices seeking to determine the status of the Verified Complaint, Major finally began reviewing the Verified Complaint.

57.    Ms. Major indicated that defamation *per se* was his strongest cause of action and she did not know how the defendants could not be found liable for defamation based on the facts alleged in the Verified Complaint.

58.    Ms. Major transmitted the Verified Complaint to Corporation Counsel for the City of Chicago, Mr. Stephen Patton, to ensure that the Verified Complaint did not disclose any confidential or attorney-client privileged information pertaining to the DPS Matter.

59.    Major and Mr. Antonacci edited the Verified Complaint multiple times to address the City's concerns regarding potential disclosure of confidential or attorney-client privileged information.

60.    The Verified Complaint contained over 300 concise allegations and contained several

probative exhibits substantiating many of those allegations.

61.    On November 5, 2012, Mr. Antonacci's Illinois Bar application was assigned to Ms. Ellen S. Mulaney ("Mulaney"), Illinois Bar Character and Fitness Committee, for review.

62.    On November 19, 2012, Mulaney scheduled an Illinois Supreme Court Rule 708 interview with Mr. Antonacci for November 27, 2012.

63.    Major filed the Verified Complaint in Cook County Circuit Court on November 21, 2012, captioned Antonacci v. Seyfarth Shaw LLP and Anita J. Ponder, Civil Case No. 2012 L 13240 ("Circuit Court Case").

64.    On November 25, 2012, Mulaney rescheduled her interview with Mr. Antonacci indefinitely.

65.    On November 29, 2012 Mr. Joel Kaplan ("Kaplan"), Seyfarth General Counsel, spoke with Ms. Major and made a settlement offer of $100,000 on behalf of the Defendants. Kaplan further indicated that it was a "final offer" and threatened that no further offer would be forthcoming if Mr. Antonacci rejected it.

66.    On November 29, 2012, Mr. Antonacci requested that Major to make a counteroffer to the defendants in the Circuit Court Case. Major never responded to Mr. Antonacci's request.

207a

67.    On December 3, 2012, Mulaney indicated to Mr. Antonacci, via electronic mail, that "[b]ecause of the complexity of your file, the Chairman of our committee has decided that the initial interview should be bypassed and we will go directly to a three person panel to conduct your interview."

68.    Because Major never responded to Mr. Antonacci's November 29, 2012, request, Mr. Antonacci followed up with Major on December 6, 2012. Major indicated, via electronic mail message, that Kaplan was "not very happy" and that settlement communications were over for the "near future."

69.    Upon information and belief, during their telephone conversation, utilizing interstate communications, Major agreed with Kaplan to work with Seyfarth, Ponder and their counsel, Mr. Matthew J. Gehringer of Perkins Coie, to sabotage Mr. Antonacci's case.

70.    From December 2012 through the present, Major has had many further telephone conversations and email communications with Gehringer, Seyfarth, Ponder, Kaplan, and others working on behalf of Gehringer, to sabotage Mr. Antonacci's case in the Circuit Court.

71.    Major conspired with Gehringer, Seyfarth, Kaplan, and Ponder to

a.    keep Mr. Antonacci's Verified Complaint under seal so that the allegations

exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b.      file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

c.      include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

d.      unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

e.      deliberately incur unnecessary legal fees such that financial pressure would force

209a

Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

f.      if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.      Gehringer agreed to coordinate with Judge Eileen M. Brewer Brewer ("Judge Brewer"), Judge Brewer's law clerk, Mr. Matthew Gran ("Gran"), and any other Cook County Circuit Court judges, as necessary, to pass instructions to Judge Brewer concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952;

h.      Major agreed to write a letter to City of Chicago Deputy Corporation Counsel, Mardell Nereim ("Nereim"), and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

i.      Gehringer agreed to conspire with others as needed moving forward.

72.      Mr. Antonacci's Inquiry Panel originally consisted of Mulaney, Mr. John Storino ("Storino"), and Mr. Matthew Walsh ("Walsh").

210a

73.    Gehringer conspired to have Storino removed from the Inquiry Panel.

74.    Via email dated December 18, 2013, Mulaney falsely indicated to Antonacci that Mr. Storino "asked to be excused from the Panel because his time constraints made it impracticable."

75.    Storino asked to be removed from the Inquiry Panel, at the direction of Gehringer or those working on his behalf, so that the First District Chairman of the Character and Fitness Committee, Mr. Philip Bronstein ("Bronstein"), could replace Storino with Ms. Jeanette Sublett ("Sublett"), Member of Neal & Leroy. All of Sublett's acts alleged herein were on behalf of Neal & Leroy and her personal interests.

76.    Neal & Lerory received approximately $801,070 in legal fees from the City of Chicago in 2011.

77.    Neal & Leroy received approximately $796,330 in legal fees from the City of Chicago in 2012.

78.    Mulaney scheduled Mr. Antonacci's Inquiry Panel meeting date for Friday, January 25, 2013 at the offices of Neal & Lerory.

79.    Judge Brewer was assigned to the Circuit Court Case. Brewer is a longtime friend and political ally of Defendant Ponder. Judge Brewer

was also an attorney for the City of Chicago earlier in her career.

80.    Major emailed Mr. Antonacci to ask his opinion of Judge Brewer. Mr. Antonacci indicated that he knew nothing of Judge Brewer so he would watch his friend's oral argument before her.

81.    Major disclosed to Gehringer when Mr. Antonacci would watch Brewer preside over his friend's oral argument. Major disclosed this information so that Gehringer would transmit the information to Judge Brewer, who would deliberately appear calm and reasonable during the hearing, and thus Mr. Antonacci would not ask Major to Petition to Substitute Brewer as of Right. Major disclosed this information utilizing interstate communications.

82.    Gehringer disclosed to Brewer when Mr. Antonacci would watch Brewer preside over his friend's oral argument. Gehringer disclosed this information so that Judge Brewer would deliberately appear calm and reasonable during the hearing, and thus Mr. Antonacci would not ask Major to Petition to Substitute Brewer as of Right. Gehringer disclosed this information utilizing interstate communications.

83.    Defendants thereafter moved to seal the Verified Complaint, on the basis that it disclosed confidential or attorney-client privileged information. On January 7, 2013, Judge Brewer sealed the Verified Complaint pending resolution of the Motion to Seal.

212a

84.    Immediately after the hearing of January 7, 2013, Major sent Mr. Antonacci, via electronic mail, a draft letter to Patton, whereby Major sought the City's express assurance that the City did not object to the allegations in the Verified Complaint.

85.    Mr. Antonacci advised Major that it was imprudent to send such a letter, but Major insisted and consequently sent the letter via U.S. and electronic mail.

86.    Nereim responded on behalf of the City of Chicago on January 18, 2013, where she stated that the City had not expressly waived the attorney-client privilege and that the Verified Complaint "went further then the City would have liked."

87.    The Inquiry Panel later declined Mr. Antonacci's certification to the Illinois Bar. The Inquiry Panel relied heavily upon Nereim's letter in its report declining Mr. Antonacci's certification to the Illinois Bar.

88.    Major sent the January 8, 2013 letter to Patton at the direction of Gehringer. Gehringer directed Nereim and/or Patton to allow Nereim to respond to Major's January 8, 2013 letter. Gehringer instructed Nereim and/or Patton as to the language to include in Nereim's January 18, 2013 response.

89.    Gehringer notified the Inquiry Panel that Nereim's letter would be forthcoming and further instructed them how to use the letter to intimidate Mr. Antonacci.

213a

90.    Upon information and belief, Gehringer transmitted the City's January 18, 2013 letter to the Inquiry Panel via electronic mail.

91.    Gehringer orchestrated the City's response in order to intimidate Mr. Antonacci so that he would withdraw and/or settle the Circuit Court Case on defendants' terms.

92.    Gehringer and Perkins Coie subsequently filed an appearance on behalf of the Defendants.

93.    Gehringer conspired with the Inquiry Panel and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

94.    Judge Brewer placed Mr. Antonacci on a list of attorneys disfavored by Cook County Circuit Court judges (the "Blacklist"). The Blacklist is circulated to certain attorneys, law firms, and City and County organizations via U.S. and electronic mail, utilizing interstate communications. Those who receive the Blacklist are instructed by the Enterprise to injure the attorneys on the Blacklist in any way possible. Cook County Circuit Court judges consistently rule against and harass attorneys who appear on the Blacklist.

95.    After the January 7, 2013 hearing, Mr. Antonacci indicated that he would draft his response in opposition to Seyfarth and Ponder's 2-619.1 motion to dismiss the Verified Complaint. In

addition, Mr. Antonacci had drafted the Verified Complaint.

96.    Major responded erratically, scheduling numerous phone calls and assigning research to her new associate related to her brief. Major tried to insist that she would write the brief and her associate would at least perform extensive research for Mr. Antonacci. Major's associate followed up with a research memorandum that Mr. Antonacci specifically asked that she not prepare.

97.    Mr. Antonacci had to insist repeatedly that he would write the response before Major and his associate would leave him alone, despite the fact that, when Mr. Antonacci retained Major, she had indicated that Mr. Antonacci could preform as much or as little of the legal work as he liked.

98.    Major's newfound enthusiasm for Mr. Antonacci's case was false. Major took six months to get Mr. Antonacci's Verified Complaint on file, despite the fact that Mr. Antonacci drafted the Verified Complaint.

99.    Major sought to perform work on the Circuit Court Case so that she could sabotage the case and fraudulently bill Mr. Antonacci, in furtherance of the agreed-upon scheme.

100.    Mr. Antonacci met with the Inquiry Panel at the offices of Neal & Leroy on January 25, 2013. The Inquiry Panel was openly hostile towards Mr. Antonacci throughout the proceedings, unjustifiably questioning his prior practice of law as

an Honors Attorney for the Government of the United States and law firms in Washington, D.C. and Northern Virginia. The Inquiry Panel unjustifiably questioned his intentions in filing the Circuit Court Case, and inexplicably determined that his application could not be resolved until defendants' motion to dismiss was ruled upon. The Inquiry Panel inexplicably reasoned that the Circuit Court had jurisdiction to determine whether Mr. Antonacci had violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

101.    The Inquiry Panel sought to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case.

102.    Mr. Antonacci refused to withdraw the Circuit Court Case, and merely indicated that he would forward the hearing transcript of the April 2, 2013 hearing on the defendants' motion to dismiss as soon as he received it.

103.    A few hours after Mr. Antonacci left the offices of Neal & Leroy, Mulaney emailed Mr. Antonacci and falsely indicated that she had forgotten to mention that morning that her son, Mr. Charles Mulaney, was an attorney at Perkins Coie. Mulaney further indicated that Gehringer had recently filed an appearance in the Circuit Court Case, and that while her son was not involved in the case, she would ask the Chairman about reconstituting the Inquiry Panel if Mr. Antonacci objected to her involvement.

216a

104.   Due to inclement weather, Walsh was over 90 minutes late to the Inquiry Panel meeting of January 25, 2013. Mr. Antonacci, Mulaney, and Sublett were all present at Neal & Leroy waiting for Walsh for 90 minutes before the meeting commenced.

105.   Mulaney had not forgotten that morning to ask Mr. Antonacci whether he objected to Mulaney's participation as a result of her son working for Perkins Coie. Mulaney sought to harass and intimidate Mr. Antonacci into withdrawing the Circuit Court Case. When Mr. Antonacci refused to do so, she sought to distance herself from the conspiracy because she knew that the ongoing pattern of defrauding, harassing, and intimidating Mr. Antonacci violated state and federal criminal law.

106.   On April 2, 2013, Judge Brewer dismissed the Verified Complaint and granted Mr. Antonacci leave to file an amended complaint. Judge Brewer baselessly criticized the Verified Complaint as "incoherent", yet failed to identify even one allegation that was unclear. Judge Brewer further ordered that Mr. Antonacci not include relevant facts in his Amended Complaint. Judge Brewer acknowledged that she could not find that Mr. Antonacci violated the Illinois Rules of Professional Conduct by filing the Verified Complaint.

107.   Mr. Antonacci immediately asked Major to request dismissal with prejudice so that he could stand on his Verified Complaint. Major insisted that she file an Amended Complaint.

217a

108. On April 11, 2013, Mr. Antonacci transmitted the transcript from the April 2, 2013 hearing to the Inquiry Panel, per its request. Because Judge Brewer acknowledged on the record that she could not find that Mr. Antonacci violated the Illinois Rules of Professional Conduct, Mr. Antonacci expected a favorable resolution of his application.

109. Mulaney responded on April 11, 2013, via electronic mail, by asking Mr. Antonacci to keep the Inquiry Panel apprised of developments in the Circuit Court Case.

110. On April 23, 2013, Mr. Antonacci requested that "each member of [the] Inquiry Panel, as well as [Illinois Board of Bar Examiners member] Ms. [Vanessa] Williams, disclose to [Mr. Antonacci] any personal relationships or professional affiliations that they have with Ms. Anita Ponder. [Mr. Antonacci] further request[s] that each member of the Inquiry Panel, as well as Ms. Williams, disclose any communications, oral or written, with Ms. Ponder or Seyfarth Shaw, or anyone on behalf of Anita Ponder or Seyfarth Shaw, concerning [Mr. Antonacci]."

111. On April 24, 2013, the Inquiry Panel issued its report declining to certify Mr. Antonacci's Illinois Bar application.

112. The Inquiry Panel never responded to Mr. Antonacci's request that it disclose inappropriate affiliations or communications with Seyfarth or Ponder, or anyone on their behalf. The

Inquiry Panel failed to disclose this information because it would have revealed that they were committing felonies under Illinois and U.S. law.

113. Major filed the Amended Verified Complaint on April 28, 2013. The Amended Verified Complaint was a far weaker version of the Verified Complaint.

114. Major also insisted that she file a series of motions that she knew would be denied.

115. Major filed these motions in a calculated effort to delay the circuit court proceedings.

116. Major filed these motions in a fraudulent effort to increase her legal bills.

117. For the months of April, May, June, July, and August 2013, Major Law billed Mr. Antonacci over $50,000 in legal fees in the Circuit Court Case. Major Law billed Mr. Antonacci over $50,000 in legal fees for filing motions during the pleading stage of a four-count complaint against two defendants.

118. Major sought to fraudulently increase her legal bills to put financial pressure on Mr. Antonacci so that he would be more likely to settle his case for the low amount offered by Seyfarth. Major also sought to fraudulently increase her legal bills so that she would retain more of the settlement for herself.

219a

119. Mr. Antonacci requested a Hearing Panel to review his application to the Illinois Bar.

120. On May 6, 2013, Mr. Antonacci indicated to Ms. Regina Kwan Peterson, Director of Administration for the Illinois Board of Admission to the Bar, that the conduct of the Inquiry Panel seemed dubious for the reasons discussed above. Peterson initially agreed, stating "[a]fter reading your email, I understand your concerns." Peterson further advised Mr. Antonacci "the hearing panel is not bound in any way by the Inquiry Panel Report and you may marshal facts or evidence to impeach the credibility of the report."

121. Mr. Antonacci's Hearing Panel was scheduled for August 14, 2013.

122. Bronstein acted as Chairman of the Hearing Panel.

123. Pursuant to Rule 9.3(c) of the Rules of the Illinois Committee on Character and Fitness, Mr. Antonacci requested that the Committee issue subpoenas ("Rule 9.3 Subpoenas"), for testimony and documents, to the following: Patton, Nereim, Sublett, Ponder, Mulaney, Seyfarth, Neal & Leroy, Drinker Biddle LLP, and Quarles & Brady LLP.

124. The Rule 9.3 Subpoenas sought documents and testimony demonstrating that Gehringer, Nereim, Chicago, Seyfarth, Ponder, Mulaney, Sublett, Walsh, Neal & Leroy, had conspired to harass and intimidate Mr. Antonacci, cause him financial duress by indefinitely

postponing his admission to the Illinois Bar, and coerce him into withdrawing the Circuit Court Case.

125. Except for Quarles & Brady, all recipients of the Rule 9.3 Subpoenas moved to quash those subpoenas.

126. Quarles & Brady complied with the subpoenas by producing Ponder's personnel file from her time as a contract partner there. Ponder's personnel file indicated that she had been fired from both Altheimer & Gray and Quarles & Brady. Ponder's personnel file revealed that she had billed less than 700 hours in the year leading up to her termination. Ponder's personnel file further indicated that no associate at Quarles & Brady would work for Ponder for even 50 hours in a billable year. Ponder's personnel file further revealed that Ponder was expressly deemed "difficult to work with."

127. After the Illinois Board of Admissions to the Bar served Mr. Antonacci's Rule 9.3 Subpoenas, Chairman Bronstein postponed the Hearing Panel indefinitely.

128. Bronstein nonetheless convened the Hearing Panel on August 14, 2013, and styled it as a "prehearing conference."

129. The Hearing Panel did not have jurisdiction to quash the Rule 9.3 Subpoenas.

130. Bronstein convened the prehearing conference so that the Hearing Panel could harass

and intimidate Mr. Antonacci in order to coerce him into withdrawing the Rule 9.3 Subpoenas.

131. Counsel for the Character & Fitness Committee, Mr. Stephen Fedo ("Fedo"), was present at the prehearing conference.

132. Gerhinger, on behalf of Ponder and Seyfarth, and Lenny D. Asaro ("Asaro"), on behalf of Neal & Leroy, were also present.

133. Fedo unlawfully disclosed Mr. Antonacci's private Character and Fitness files to Asaro and Gehringer, at the request of Gehringer, Asaro, and Sublett, prior to the prehearing conference.

134. The "prehearing conference" of August 14, 2013, lasted approximately three hours, during which time the members of the Hearing Panel attempted to harass and intimidate Mr. Antonacci such that he would withdraw the Rule 9.3 Subpoenas.

135. Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas.

136. Bronstein and the Hearing Panel unlawfully quashed Mr. Antonacci's Rule 9.3 Subpoenas.

137. Also in August 2013, Major Law's two associates – both of whom who had been working on Antonacci's case – quit working for Major and Major Law.

222a

138.    The unlawful conduct of Defendants and their co-conspirators had prevented Mr. Antonacci from obtaining professional opportunities in Illinois and had further damaged Mr. Antonacci's professional reputation. As a direct result of these injuries, in August 2013, Mr. Antonacci relocated to Washington, D.C., because he is still actively licensed in both the District of Columbia and the Commonwealth of Virginia, and thus he could earn a living there.

139.    On August 1, 2013, Judge William Maddux, former Chief of the Law Division at Cook County Circuit Court, denied Seyfarth's Motion to Seal the Verified Complaint.

140.    While Mr. Antonacci was in Washington, D.C., Major indicated to Mr. Antonacci, via electronic mail utilizing interstate communications, that she would not execute Judge Maddux's order and have the seal removed from the Verified Complaint.

141.    Via letter dated August 28, 2013, Mr. Antonacci insisted that Major remove the seal from the Verified Major Complaint, and further set forth numerous undisputed facts demonstrating that Major's position was unfounded and suggested that she was not genuinely advocating on Mr. Antonacci's behalf.

142.    Major responded, via email, that she could no longer represent Mr. Antonacci, and thus she would withdraw her representation after she filed Mr. Antonacci's Response in Opposition to

Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint and that Motion was ruled upon.

143. Realizing that Major was trying to sabotage his case, Mr. Antonacci terminated Major's representation immediately so that she could not damage his case further with a faulty Response in Opposition to Seyfarth/Ponder's Motion to Dismiss the Amended Verified Complaint. Mr. Antonacci proceeded *pro se* in the Circuit Court.

144. On September 6, 2013, Major sent Mr. Antonacci a letter, to his address in Washington, D.C., via U.S. first class and certified mail, as well as electronic mail, where she falsely claimed that Mr. Antonacci had accused her former associates of fraudulently billing Mr. Antonacci, which he had never done. Major also falsely claimed that Mr. Antonacci had not identified any actual charges that were incorrect, when Mr. Antonacci had specifically identified that Major Law's charges for "legal services" were unreasonable on their face in light of the work performed.

145. On September 20, 2013, Mr. Antonacci requested that Major produce of all of Major's and Major Law's communications with Gehringer and Seyfarth pertaining to his case. Major refused to provide those communications, stating, via electronic mail, "under Illinois law you are not entitled to these materials if you owe your attorney money, which you do."

146. Major refused to disclose her email communications with Gehringer and Seyfarth

because those communications demonstrate that she was assisting the Defendants by sabotaging Mr. Antonacci's case and fraudulently billing him.

147. From December 2013 through the present, Major sent Major Law's bills to Mr. Antonacci via U.S. Mail and electronic mail, utilizing interstate communications.

148. Major sent Mr. Antonacci her legal bills in order to coerce him into accepting Seyfarth's $100,000 settlement offer to pay her legal bills.

149. On December 5, 2013, Mr. Antonacci presented his Motion for Leave to File Surreply *Instanter* to Judge Brewer. Judge Brewer screamed at Mr. Antonacci erratically throughout the presentment of that motion.

150. Ms. Peggy Anderson ("Anderson"), on behalf of Toomey, acted as court reporter throughout the proceeding. Anderson took notes on a laptop computer and further made a digital audio recording of the proceeding.

151. Anderson, Gehringer, and Ms. Sandy Toomey ("Sandy Toomey"), president and principal of Toomey Reporting, agreed and conspired to unlawfully delete portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

225a

152. In furtherance of the conspiracy, Anderson agreed to provide a false certification that the December 5, 2013 hearing transcript was true and accurate.

153. In furtherance of the conspiracy, upon information and belief, Anderson, Gehringer, and Sandy Toomey agreed to utilize the U.S. Mail and interstate wires to transmit falsified documents across state lines, and to make material factual misrepresentations regarding the veracity of the transcript and their conspiracy to falsify the same.

154. At the direction of Gehringer, Anderson deleted portions of the hearing transcript when Judge Brewer screamed erratically and stated to Mr. Antonacci that she would not review certain affidavits that he filed and submitted pursuant to Illinois law.

155. Anderson further deleted those portions of the audio recording at the direction of Gehringer.

156. On December 6, 2013, Judge Brewer denied Seyfarth and Ponder's motion to dismiss the Amended Verified Complaint, ruling that the defamation *per se* claim may proceed based solely on Mr. Antonacci's allegation that Ponder had falsely accused him of engaging in the unauthorized practice of law. Judge Brewer further invited Seyfarth and Ponder to file a motion to strike every other allegation from the Amended Verified Complaint. Judge Brewer instructed Mr. Antonacci not to object to defendants' motion to strike allegations from the Amended Verified Complaint.

226a

157. Judge Brewer and Gehringer had conspired to weaken Mr. Antonacci's Amended Verified Complaint by allowing defendants to strike allegations from the Amended Verified Complaint, contrary to well settled Illinois law. Judge Brewer instructed Mr. Antonacci to not object to defendants' motion to strike allegations from the Amended Verified Complaint so that Mr. Antonacci would waive his right to appeal the striking of those allegations.

158. On or around December 16, 2013 Mr. Antonacci caused subpoenas *duces tecum,* for documents and deposition testimony, to be served upon the City of Chicago, Patton, and Ms. Jamie Rhee ("Rhee"), Chief of Procurement Services for the City of Chicago (the "Chicago Subpoenas"). The Chicago Subpoenas sought documents and testimony demonstrating the Ponder had defamed Mr. Antonacci to City personnel relating to the DPS Matter.

159. Realizing that Mr. Antonacci would not allow the defendants to weaken his Amended Complaint further, and that he would seek discovery from the City proving Ponder fraudulent misconduct, on December 20, 2013, Seyfarth and Ponder moved to reconsider Judge Brewer's December 6, 2013 ruling, and to stay execution of the Chicago Subpoenas. Gehringer noticed the motion to reconsider for January 6, 2014.

160. Gehringer conspired with Patton, Nereim, and City attorney Mr. Michael Dolesh ("Dolesh"), to delay execution of the Chicago

Subpoenas to ensure that evidence of Ponder's fraudulent misconduct would never be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

161. On December 31, 2013 the City of Chicago moved to stay the Chicago Subpoenas. The City also noticed the motion for January 6, 2014.

162. Judge Brewer was not present at Cook County Circuit Court on January 6, 2014. Concerned that the substitute judge would not stay the Chicago Subpoenas, Gehringer and Dolesh approached Mr. Antonacci and offered an agreed order whereby Mr. Antonacci would narrow the scope of the Chicago Subpoenas, and the City would produce documents voluntarily within approximately two weeks, at which time Mr. Antonacci would determine whether the depositions of Patton and Rhee needed to go forward. Seeking to deal with the City amicably, Mr. Antonacci entered into the agreed order.

163. Upon information and belief, from December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct.

164. During January and February 2013, Dolesh sent Mr. Antonacci numerous emails falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees.

165.    The City never produced documents to Mr. Antonacci or allowed deposition testimony. After Mr. Antonacci had filed amended Chicago Subpoenas, on February 3, 2014, Brewer quashed the Chicago Subpoenas for testimony of Rhee and Patton, and falsely ordered the City to produce documents responsive to the amended Chicago Subpoenas directly to her chambers.

166.    On February 6, 2013, Dolesh sent a letter to Judge Brewer's Chambers, via U.S. Mail, falsely claiming that Ponder had not defamed Mr. Antonacci, orally or in writing, to City employees. Dolesh's February 6, 2013 letter also falsely stated that the City was transmitting therewith documents for the court's *in camera* review.

167.    Dolesh transmitted the February 6, 2013 letter to Mr. Antonacci in Washington, D.C. via electronic mail utilizing interstate communications.

168.    The City never transmitted responsive documents to the court for review. Dolesh sent the February 6, 2013 letter solely in furtherance of the conspiracy to conceal evidence of Ponder's fraudulent misconduct.

169.    On or about December 19, 2013, Toomey transmitted the falsified transcript of the December 5, 2013 hearing to Mr. Antonacci, at his residence in the District of Columbia, via U.S. and electronic mail, utilizing interstate communications.

229a

170. That same day, Mr. Antonacci pointed out the discrepancies in the transcript to Sandy Toomey.

171. On December 19, 2013, Sandy Toomey falsely stated to Mr. Antonacci, via electronic mail utilizing interstate communications, that no changes had been made to the transcript.

172. On December 20, 2013, Anderson, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C. During this phone conversation, Anderson falsely stated that she did not alter the transcript at the behest of Gehringer and Toomey. Anderson falsely stated that the transcript matched her recollection of the December 5, 2013 proceeding.

173. When Mr. Antonacci asked Anderson if he could listen to the audio recording, Anderson stated that she would have to check with Toomey regarding their company policy.

174. On December 20, 2013, Sandy Toomey, while in Cook County, Illinois, called Mr. Antonacci on his mobile phone in Washington, D.C, and left him a voice message. In her voice message, Sandy Toomey falsely claimed, multiple times, that Anderson's audio recording of the December 5, 2013 hearing transcript had been deleted and could not be retrieved.

175. The audio recording had not been deleted and was still in the possession of Toomey and Anderson.

176. In December 2013, Mr. Antonacci served subpoenas ("Toomey Subpoenas") on Toomey and its court reporter seeking documents and testimony demonstrating that Toomey, at the direction of Gehringer, had falsified the December 5, 2013 hearing transcript.

177. Arnold represented Toomey in the Circuit Court Case.

178. Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

179. From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy.

180. Brewer quashed the Toomey Subpoenas on February 3, 2014. During the February 3, 2014 hearing, Brewer invited Arnold and Toomey to impose sanctions on Mr. Antonacci for moving to compel the Toomey Subpoenas. Brewer invited Toomey to impose sanctions on Mr. Antonacci in

order to intimidate Mr. Antonacci and coerce him into withdrawing the Circuit Court Case.

181. Mr. Antonacci moved for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas.

182. On February 28, 2014, Arnold moved for sanctions against Mr. Antonacci ("Toomey's Motion for Sanctions"). Toomey's Motion for Sanctions misrepresented numerous material facts. Arnold transmitted Toomey's Motion for Sanctions to Mr. Antonacci in Washington, D.C. via U.S. Mail. In furtherance of the conspiracy, and at the direction of Gehringer, Ms. Janet Greenfield transmitted Toomey's Motion for Sanctions to Mr. Antonacci, via electronic mail.

183. On March 31, 2014, Judge Brewer ruled during a hearing that she would dismiss the Amended Verified Complaint with prejudice.

184. On April 23, 2014 a hearing was held on Mr. Antonacci's motion for reconsideration of the February 3, 2014 order quashing the Toomey Subpoenas, as well as Toomey's Motion for Sanctions.

185. Kruse and Kruse International acted as court reporter for the April 23, 2014 hearing.

186. Judge Brewer blatantly harassed Mr. Antonacci throughout the April 23, 2014 proceeding, such that her actual prejudice was unmistakable. Judge Brewer also made numerous false statements

during the hearing in an attempt to conceal Toomey's falsification of the December 5, 2013 hearing transcript. The falsity of Judge Brewer's statements is clear in the Record on Appeal. Judge Brewer's bias is an issue on appeal because Mr. Antonacci had petitioned to substitute Judge Brewer for Cause as a result of her actual prejudice.

187.   On July 23, 2014, Judge Brewer issued her Final Order ("Final Order") in the Circuit Court Case.

188.   The Final Order misrepresented numerous material facts.

189.   Gran, on behalf of Judge Brewer, transmitted the Final Order to Mr. Antonacci, at his address in Washington, D.C., via U.S. Mail.

190.   Mr. Antonacci perfected an Appeal of the Circuit Court Case (the "Appeal").

191.   On July 29, 2014, Mr. Antonacci requested that Ms. Kruse provide a Rule 323(b) letter so that Mr. Antonacci could use the transcript of the April 23, 2014 hearing in the Appeal.

192.   On August 21, 2014, Kruse and Kruse International sent a letter, via U.S. and electronic mail, to Mr. Antonacci, Gehringer, and Arnold, which falsely stated that Kruse and Kruse International had filed the April 23, 2014 hearing transcript with the Circuit Court of Cook County on August 21, 2014.

193.    On September 2, 2014, the Cook County Civil Appeals Clerk preparing the record on appeal indicated to Mr. Antonacci that no one had filed a copy of the April 23, 2014 hearing transcript except for Mr. Antonacci.

194.    Neither Kruse nor Kruse International filed the April 23, 2014 hearing transcript with the Circuit Court.

195.    Kruse and Kruse International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal.

196.    After talking with the Civil Appeals Clerk, Mr. Antonacci asked Kruse, via electronic mail, whether she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court, as she had indicated in her letter of August 21, 2014.

197.    Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23, 2014 hearing transcript with Cook County Circuit Court.

234a

## COUNT I: COMMON LAW FRAUD
### (Major, Major Law)

198. All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

199. Major falsely represented to Mr. Antonacci that she frequently sued large law firms, and thus she had no problem suing Seyfarth.

200. Upon information and belief, Major has never sued a law firm.

201. Major had no intention of suing Seyfarth or Ponder.

202. Major falsely represented that she would pursue Seyfarth aggressively and advocate on his behalf.

203. Major made these representations in order to induce Mr. Antonacci into retaining her so that she could overcharge him for a demand letter that she knew would have no impact.

204. Mr. Antonacci relied on Major's false representations in choosing to retain her.

205. When Mr. Antonacci insisted that Major file the Verified Complaint, Major delayed review of the Verified Complaint for a month because she did not wish to file it.

206. After Mr. Antonacci refused to accept Seyfarth's initial settlement offer, Major agreed with

235a

Seyfarth, Kaplan, Gehringer, Ponder, and Perkins Coie to sabotage Mr. Antonacci's case.

207. Major agreed with Seyfarth, Kaplan, Gehringer, Ponder, and Perkins Coie to sabotage Mr. Antonacci's case because she believes that she can get more money from referrals from large law firms than she could from Mr. Antonacci's case.

208. Major agreed with Seyfarth, Kaplan, Gehringer, Ponder, and Perkins Coie to sabotage Mr. Antonacci's case because they devised a plan whereby they would seal the Verified Complaint, file an Amended Verified Complaint that was far weaker than Verified Complaint, and allow Major to needlessly charge Mr. Antonacci exorbitant legal fees and keep more of the settlement for herself.

209. Despite agreeing to sabotage Mr. Antonacci's case, Major falsely represented to Mr. Antonacci that she would continue advocating on his behalf.

210. Major also fraudulently failed to represent the fact that she had agreed to sabotage Mr. Antonacci's case.

211. Major falsely represented to Mr. Antonacci that he should not appeal dismissal of the Verified Complaint, but should instead file the Amended Verified Complaint.

212. Mr. Antonacci relied on these false representations and material omissions when he

retained Major and Major Law to represent him in the Circuit Court Case.

213.    Mr. Antonacci was injured by these false representations in the following ways, *inter alia:*

a.    Seyfarth and Ponder were aware that their defenses to the Verified Complaint were meritless, and thus their entire defense strategy was predicated on Major agreeing to sabotage Mr. Antonaci's case. As such, if Mr. Antonacci had been aware that Major preferred to defraud her client rather than genuinely fight a major law firm, then Mr. Antonacci would not have retained Major and Major Law and Seyfarth and Ponder would have been forced to address the Circuit Court Case on the merits;

b.    Mr. Antonacci paid Major and Major Law over $12,000 in legal fees for legal services designed to sabotage the Circuit Court Case;

c.    Major and Major Law billed Mr. Antonacci for over $50,000 in legal fees for legal services designed to sabotage the Circuit Court Case and increase his legal bills to force him to settle his case for $100,000;

d.    The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's interest in the Circuit Court Case was put at risk by Major's fraudulent misconduct;

237a

e.    The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's position in the Circuit Court Case was weakened by Major's fraudulent misconduct; and

f.    Mr. Antonacci's case was unnecessarily delayed for over year by Major's fraudulent misconduct because Mr. Antonacci could have perfected his Appeal in April of 2013, rather than July of 2014, and thus he lost interest for the amounts due and owing to him pursuant to the Circuit Court Case.

214.  Mr. Antonacci was injured by his reliance on Major and Major Law's false representations in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE,** for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

### COUNT II: BREACH OF FIDUCIARY DUTY
### (Major, Major Law)

215.  All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

238a

216.   Major and Major Law had a fiduciary relationship with Mr. Antonacci arising out of their attorney-client relationship.

217.   Major and Major Law breached that duty by conspiring with Gehringer, Seyfarth, and Ponder to sabotage Mr. Antonacci's case.

218.   Specifically, Major breached her fiduciary duty to Mr. Antonacci by:

a.   refusing to appeal Judge Brewer's April 2, 2013 ruling dismissing two counts of the Verified Complaint with prejudice, and two counts without prejudice;

b.   instead filing numerous motions in the Circuit Court, knowing those motions would be denied, solely in an effort to increase her legal bills;

c.   ordering her associates to perform duplicative and unnecessary work solely in an effort to increase her legal bills;

d.   filing an Amended Verified Complaint that was far weaker than the Verified Complaint;

e.   baselessly refusing to remove the temporary seal from the Verified Complaint after Judge Maddux ruled that it could not be sealed; and

f.   threatening to withdraw her representation.

239a

219. All of these actions benefitted Major and Major Law to the detriment to Mr. Antonacci.

220. Mr. Antonacci was injured by Major's and Major Law's breaches of fiduciary duty to Mr. Antonacci in the following ways:

a.    Seyfarth and Ponder were aware that their defenses to the Verified Complaint were meritless, and thus their entire defense strategy was predicated on Major agreeing to sabotage Mr. Antonaci's case. As such, if Mr. Antonacci had been aware that Major preferred to defraud her client rather than genuinely fight a major law firm, then Mr. Antonacci would not have retained Major and Major Law and Seyfarth and Ponder would have been forced to address the Circuit Court Case on the merits;

b.    Mr. Antonacci paid Major and Major Law over $12,000 in legal fees for legal services designed to sabotage the Circuit Court Case;

c.    Major and Major Law billed Mr. Antonacci for over $50,000 in legal fees for legal services designed to sabotage the Circuit Court Case and increase his legal bills to force him to settle his case for $100,000;

d.    The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's interest in the Circuit Court Case was put at risk by Major's fraudulent misconduct;

240a

e.      The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's position in the Circuit Court Case was weakened by Major's fraudulent misconduct; and

f.      Mr. Antonacci's case was unnecessarily delayed for over year by Major's fraudulent misconduct because Mr. Antonacci could have perfected his Appeal in April of 2013, rather than July of 2014, and thus he lost interest for the amounts due and owing to him pursuant to the Circuit Court Case.

221.    Mr. Antonacci was injured by Major's and Major Law's breaches of fiduciary duty to Mr. Antonacci in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE,** for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

## COUNT III: COMMON LAW CIVIL CONSPIRACY
### (All Defendants)

222.    All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

241a

223.    Defendants combined, agreed, mutually undertook, and concerted together to effect preconceived plan and unity of design and purpose.

224.    The purpose of this plan was unlawfully to

a.    prevent Mr. Antonacci from prosecuting the Circuit Court Case, which is a breach of Major and Major Law's fiduciary duty to Mr. Antonacci;

b.    coerce and intimidate Mr. Antonacci into withdrawing the Circuit Court Case or accepting Seyfarth's initial settlement offer, by delaying his Illinois Bar Application and putting him on the Blacklist of attorneys disfavored by Cook County Circuit Court judges such that Mr. Antonacci could not earn a living practicing law in Chicago, in violation of 720 ILCS 5112-6 and 18 USC § 1951; and

c.    coerce and intimidate Mr. Antonacci into withdrawing subpoenas lawfully served in Cook County, such that the Defendants would not have to quash those subpoenas without authority, in violation of 720 ILCS 5/12-6 and 18 USC § 1951.

225.    Gehringer was and is the architect of this conspiracy. Shortly after Mr. Antonacci rejected Seyfarth's initial settlement offer, Gerhinger, Seyfarth, Ponder, and Kaplan conspired with Major to

242a

a. keep Mr. Antonacci's Verified Complaint under seal so that the allegations exposing the corruption and incompetence pervading Seyfarth would not remain public, breaching Major's fiduciary duty to Mr. Antonacci;

b. file an Amended Complaint that would be far weaker than the Verified Complaint because it would contain less relevant, factual allegations, and omit the exhibits substantiating those allegations, breaching Major's fiduciary duty to Mr. Antonacci;

c. include the Ponder Slander Email as an exhibit to the Amended Verified Complaint, breaching Major's fiduciary duty to Mr. Antonacci, so that Seyfarth and Ponder could argue (incorrectly) that the Ponder Slander Email solely embodied Ponder's defamatory statements concerning Mr. Antonacci and therefore controlled over Mr. Antonacci's allegations;

d. unnecessarily delay the proceedings as long as possible, breaching Major's fiduciary duty to Mr. Antonacci, while Gehringer utilized U.S. mail and interstate communications to conspire with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which would damage his professional reputation and prevent him from earning a living, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

243a

e.    deliberately incur unnecessary legal fees such that financial pressure would force Mr. Antonacci to accept a low settlement, breaching Major's fiduciary duty to Mr. Antonacci;

f.    if Mr. Antonacci refused to settle his case, then Major would withdraw her representation of Mr. Antonacci, in order to further pressure Mr. Antonacci into dropping his case, breaching Major's fiduciary duty to Mr. Antonacci;

g.    Gehringer agreed to coordinate with Gran, Brewer, and any other Cook County Circuit Court judges, as necessary, to pass instructions concerning the Defendants' case strategy, how to rule on particular issues, and how to harass and intimidate Mr. Antonacci when he appeared in court, in violation of 720 ILCS 5112-6, and 18 USC §§ 1341, 1343, 1951, 1952;

h.    Major agreed to write a letter to Neriem, and Ponder and Gehringer agreed to conspire with Neriem to coordinate her response such that it could be used to harass and intimidate Mr. Antonacci, in violation of 720 ILCS 5112-6, and 18 USC §§ 1341, 1343, 1951, 1952; and

i.    Gehringer agreed to conspire with others as needed moving forward.

226.    Gehringer conspired with Bronstein and Mulaney to have Storino removed from the Inquiry Panel and substituted with Sublett.

227.    Gehringer   conspired   with   Mulaney, Sublett, and Walsh and instructed them on how to harass and intimidate Mr. Antonacci such that he would withdraw and/or settle the Circuit Court Case, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

228.    When, on April 23, 2013, Mr. Antonacci requested that the Inquiry Panel disclose any communications with Seyfarth or Ponder relating to Mr. Antonacci, Ponder, Seyfarth, and Gehringer conspired with Mulaney, Walsh, and Sublett and instructed them, utilizing interstate communications and U.S. Mail, to deny Mr. Antonacci's certification to the Illinois Bar on April 24, 2013, in violation of720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

229.    Gehringer   conspired   with   Bronstein, Fedo, and Asaro to unlawfully quash Mr. Antonacci's Rule 9.3 Subpoenas.

230.    Gehringer    conspired    with    Patton, Nereim,   and   Dolesh   to   delay   execution   of   the Chicago   Subpoenas   to   ensure   that   evidence   of Ponder's   fraudulent   misconduct   would   never   be discovered. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions   in   order   to   accomplish   this   goal,   in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

231.    From December 2013 through March 2014, Dolesh, Gehringer, and Brewer conspired, via

electronic mail and telephone, utilizing interstate communications, to knowingly conceal the City's evidence of Ponder's fraudulent misconduct, in violation of 720 ILCS 5/12-6, and 18 USC §§ 1341, 1343, 1951, 1952.

232.   Arnold conspired with Gehringer to conceal evidence that Toomey had falsified the December 5, 2013 hearing transcript to delete Brewer's erratic, hostile outbursts and her refusal to review affidavits that Mr. Antonacci submitted to the Court. These individuals further conspired to make material, factual misrepresentations, utilizing the U.S. Mails and interstate wires, on numerous occasions in order to accomplish this goal, in violation of 18 USC §§ 1341, 1343, 1952.

233.   From January 2014 through April 2014, Arnold sent numerous emails to Gehringer, Toomey, and Mr. Antonacci in furtherance of this conspiracy, and further sent Mr. Antonacci numerous documents, via U.S. Mail, to his address in Washington, D.C., also in furtherance of this conspiracy, in violation of 18 USC §§ 1341, 1343, 1952.

234. Kruse    and    Kruse    International conspired with Gehringer and Arnold to falsely indicate to Mr. Antonacci that Kruse had filed the April 23, 2014 hearing transcript with the Circuit Court so that Mr. Antonacci would not file that transcript, and thus the transcript would not be in the Record on Appeal. On September 2, 2014, Kruse falsely stated, via electronic mail utilizing interstate communications, that she had filed the April 23,

246a

2014 hearing transcript with Cook County Circuit Court, in violation of 18 USC §§ 1341, 1343, 1952.

235. Defendants, Kaplan, Mulaney, Sublett, Walsh, Nereim, Brewer, and Dolesh all made this agreement intentionally, purposefully, and without lawful justification.

236. Defendants, Kaplan, Mulaney, Sublett, Walsh, Nereim, Brewer, and Dolesh each undertook acts in furtherance of this conspiracy.

237. Major conspired on behalf of herself and on behalf of Major Law.

238. Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago.

239. Sublett and Asaro conspired on behalf of Neal & Leroy.

240. Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, and Ponder.

241. Kaplan conspired on behalf of himself, Seyfarth, and Ponder.

242. Ponder conspired on behalf of herself and on behalf of Seyfarth.

243. Arnold conspired on behalf of himself, Sosin & Arnold, and Toomey.

244. Kruse conspired on behalf of herself and on behalf of Kruse International.

247a

245. Sandy Toomey and Anderson conspired on behalf of Toomey.

246. Mr. Antonacci was injured by Defendants' conspiratorial acts in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE**, for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

## COUNT IV: Violation of Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962 et seq.) (All Defendants)

247. All of the preceding paragraphs as if fully set forth herein.

248. The association-in-fact of all Defendants named in this Complaint, together with Mulaney, Sublett, Walsh, Nereim, Bronstein, and Dolesh, as described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

249. Specifically, the enterprise is an association-in-fact among individuals, business entities, and a municipal corporation, designed to divert Chicago taxpayer money to members of the

enterprise; protect the members of the enterprise from civil liability in Illinois by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; punishing attorneys who sue members of the enterprise by preventing them from becoming admitted in Illinois; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

250. The enterprise has been engaged in activities which affect interstate and foreign commerce.

251. Each Defendant is distinct from the enterprise itself but each Defendant has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

252. Defendants engaged in "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

253. Violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1341 (Mail Fraud) are specifically enumerated as "racketeering activity" in Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

249a

**254. Defendants violated 18 U.S.C. § 1343 (Wire Fraud) as follows:**

a.      Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

b.      In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c.      In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d.      In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

e.      In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

250a

f.     As more particularly described above, Defendants transmitted, and caused others to transmit, wire communications in interstate commerce for the purpose of executing this scheme.

**255. Defendants violated 18 U.S.C. § 1341 (Mail Fraud) as follows:**

a.     Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud Mr. Antonacci.

b.     In furtherance of this scheme, as more particularly described above, Defendants sought to sabotage the Circuit Court Case so that Seyfarth and Ponder would avoid paying any potential judgment, or larger settlement, against them and in favor of Mr. Antonacci, thereby allowing the enterprise to keep the money.

c.     In furtherance of this scheme, as more particularly described above, Defendants unnecessarily delayed the Circuit Court Case as long as possible and deliberately imposed unnecessary legal fees on Mr. Antonacci.

d.     In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

251a

e.    In furtherance of this scheme, as more particularly described above, Defendants falsified official documents and took official action without legal authority.

f.    As more particularly described above, Defendants used, and caused others to use, the U.S. mail for the purpose of executing this scheme.

256.    Defendants' multiple violations of 18 USC § 1341 and 18 USC § 1343 constitute a "pattern" of racketeering activity.

257.    In light of the pattern of racketeering activity more particularly described above, Defendants' enterprise presents a clear threat of continued racketeering activity.

258.    Defendants maintained their interest in this enterprise by means of this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).

259.    Defendants have been directly participating in and conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

260.    The enterprise is separate and distinct from the pattern of racketeering activity.

261.    As a proximate result of these RICO violations, Mr. Antonacci has been injured in an

amount that exceeds $75,000, exclusive of interest and costs.

262. Mr. Antonacci is entitled to recover treble damages, and the costs of bringing this action and the Circuit Court Case.

**WHEREFORE,** for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the treble amount of liability owed to Mr. Antonacci by each Defendant, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs.

## COUNT V: Violation of Racketeer Influenced and Corrupt Organizations Act
## (18 U.S.C. §§ 1962 (d) - RICO Conspiracy)
## (All Defendants)

263. All of the preceding paragraphs are hereby incorporated as if fully set forth herein.

264. The association-in-fact of all Defendants named in this Complaint, together with Mulaney, Sublett, Walsh, Nereim, Bronstein, Brewer, and Dolesh, as described more particularly above, constitutes an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

265. Specifically, the enterprise is an association-in-fact among individuals, business entities, and a municipal corporation, designed to divert Chicago taxpayer money to members of the enterprise; protect the members of the enterprise

from civil liability in Illinois by unlawfully influencing the outcome of civil cases, thereby keeping more money in the enterprise; defrauding litigants from monies to which they are legally entitled by unlawfully delaying and sabotaging meritorious civil cases; punishing attorneys who sue members of the enterprise by preventing them from becoming admitted in Illinois; punishing attorneys who sue members of the enterprise by putting them on the Blacklist of disfavored attorneys; and protecting the enterprise by unlawfully preventing them from obtaining evidence of the enterprise's fraudulent misconduct.

266. The enterprise has been engaged in activities which affect interstate and foreign commerce.

267. Each Defendant is distinct from the enterprise itself but each Defendant, together with Kaplan, Mulaney, Sublett, Walsh, Nereim, Brewer, and Dolesh, has acted independently and in concert to commit a variety of illegal acts in furtherance of the same goal.

268. Violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1951 (Hobbs Act Extortion), 18 U.S.C. § 1951 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Activity), and 720 ILCS 5/12-6 (Illinois Intimidation, "extortion" under Illinois law and punishable by imprisonment for more than one year), are specifically enumerated as "racketeering activity" in Section 1961(1) of RICO.

254a

269. **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Hobbs Act Extortion) as follows:**

a. Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

b. Specifically, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to prevent Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c. In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel utilized wrongful means to achieve wrongful objectives.

d. In furtherance of this scheme, as more particularly described above, Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to resolve the Circuit Court Case.

e. In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to use wrongful means to achieve a wrongful objective, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful justification.

255a

f.      In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel harassed and intimidated Mr. Antonacci in an attempt to force him to withdraw the Rule 9.3 Subpoenas.

g.      When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful justification.

h.      Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

i.      Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

270.  **The agreed-upon scheme involves knowing and intentional violations of 720 ILCS 5/12-6 (Illinois Intimidation/Extortion) as follows:**

a.      Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr. Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

b.      Specifically, Mulaney, Walsh, and Sublett, threatened to prevent, without lawful

256a

authority, Mr. Antonacci from becoming licensed to practice law in Illinois until he resolved the Circuit Court Case.

c.     In furtherance of this scheme, as more particularly described above, when Mr. Antonacci asked for communications demonstrating that Mulaney, Walsh, and Sublett had conspired with Defendants to threaten delaying Mr. Antonacci's bar application until the Circuit Court Case was resolved, without lawful authority, Mulaney, Walsh, and Sublett declined to certify Mr. Antonacci for admission to the Illinois Bar without lawful authority.

d.     In furtherance of this scheme, as more particularly described above, Bronstein and the Hearing Panel threatened to deny his application to the Illinois Bar, without lawful authority, ifhe did not withdraw the Rule 9.3 Subpoenas.

e.     When Mr. Antonacci refused to withdraw the Rule 9.3 Subpoenas, Bronstein and the Hearing Panel quashed the Rule 9.3 Subpoenas without lawful authority.

f.     Mt. Antonacci subsequently withdrew his Illinois Bar Application before the Hearing Panel could deny it.

g.     Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel are public officials.

257a

h.    Mulaney,    Walsh,    Sublett, Bronstein, and the Hearing Panel wrongfully utilized their official power, as set forth above, for private personal gain.

271.  **The agreed-upon scheme involves knowing and intentional violations of 18 U.S.C. § 1951 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Activity) as follows:**

a.    Defendants knowingly, and with specific intent, participated in a scheme or artifice designed to defraud, extort, and intimidate Mr. Antonacci.

b.    In furtherance of this scheme, as more particularly described above, Defendants conspired with members of the Illinois Board of Bar Examiners, and the Illinois Committee on Character and Fitness, to prevent Mr. Antonacci from becoming licensed to practice law in the State of Illinois, which damaged his professional reputation and prevented him from earning a living.

c.    In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel to interfere with interstate commerce by extortion.

d.    In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, conspired with

258a

Mulaney, Walsh, Sublett, Bronstein, and the Hearing Panel, to communicate to Mr. Antonacci, threats to take action as public officials, or withhold official action, without lawful authority, with intent to cause Mr. Antonacci to resolve the Circuit Court Case.

   e. In furtherance of this scheme, as more particularly described above, Defendants knowingly, and with specific intent, used, or caused to be used, the mail and other facilities, including interstate wires, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the scheme to defraud, extort, and intimidate Mr. Antonacci.

272. The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1341 (mail fraud), as more particularly described above.

273. The agreed-upon scheme specifically involves knowing and intentional violations of 18 U.S.C. § 1343 (wire fraud), as more particularly described above.

274. Defendants thus conspired to engage in a "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

275. Defendants thus conspired to engage in a pattern of racketeering activity.

259a

276.   Defendants thus conspired to violate 18 U.S.C. §§ 1962(b) and (c) in violation of 18 U.S.C. § 1962 (d).

277.   Major conspired on behalf of herself and on behalf of Major Law.

278.   Dolesh, Nereim, and Patton conspired on behalf of the City of Chicago.

279.   Sublett and Asaro conspired on behalf of Neal & Leroy.

280.   Gehringer conspired on behalf of himself, Perkins Coie, Seyfarth, and Ponder.

281.   Kaplan conspired on behalf of himself, Seyfarth, and Ponder.

282.   Ponder conspired on behalf of herself and on behalf of Seyfarth.

283.   Arnold conspired on behalf of himself, Sosin & Arnold, and Toomey.

284.   Kruse conspired on behalf of herself and on behalf of Kruse International.

285.   Sandy Toomey and Anderson conspired on behalf of Toomey.

286.   As a proximate result of these RICO violations, Mr. Antonacci has been injured in an amount in excess of $75,000, exclusive of interest and costs.

260a

287.   Mr. Antonacci is entitled to recover treble damages, and the costs of bringing this action and the Circuit Court Case.

**WHEREFORE,** for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the treble amount of liability owed to Mr. Antonacci by each Defendant, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs.

## COUNT VI: LEGAL MALPRACTICE
### (Major, Major Law)

288.   All of the preceding paragraphs are hereby incorporated as iffully set forth herein.

289.   Mr. Antonacci had an attorney-client relationship with Major and Major Law. Major and Major Law represented Mr. Antonacci in the Circuit Court Case.

290.   The attorney-client relationship gave rise to a duty of care on the part of Major and Major Law.

291.   Major and Major Law breached that duty by, *inter alia,* the following negligent acts and omissions:

a.   refusing to appeal Judge Brewer's April 2, 2013 ruling dismissing two counts of the Verified Complaint with prejudice, and two counts without prejudice;

b.      instead filing numerous motions in the Circuit Court, knowing those motions would be denied, solely in an effort to increase her legal bills;

c.      ordering her associates to perform duplicative and unnecessary work solely in an effort to increase her legal bills;

d.      filing an Amended Verified Complaint that was far weaker than the Verified Complaint;

e.      baselessly refusing to remove the temporary seal from the Verified Complaint after Judge Maddux ruled that it could not be sealed; and

f.      threatening to withdraw her representation.

292.  But for these negligent acts and omissions, Mr. Antonacci would have prevailed in the Circuit Court Case.

293.  But for these negligent acts and omissions, Mr. Antonacci would have prevailed in the Circuit Court Case one year earlier.

294.  Mr. Antonacci was injured by Major's and Major Law's negligent acts and omissions in the following ways:

a.      Seyfarth and Ponder were aware that their defenses to the Verified Complaint were meritless, and thus their entire defense strategy was

predicated on Major agreeing to sabotage Mr. Antonaci' s case. As such, if Mr. Antonaci had been aware that Major preferred to defraud her client rather than genuinely fight a major law firm, then Mr. Antonaci would not have retained Major and Major Law and Seyfarth and Ponder would have been forced to address the Circuit Court Case on the merits;

b. Mr. Antonaci paid Major and Major Law over $12,000 in legal fees for legal services designed to sabotage the Circuit Court Case;

c. Major and Major Law billed Mr. Antonacci for over $50,000 in legal fees for legal services designed to sabotage the Circuit Court Case and increase his legal bills;

d. The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's interest in the Circuit Court Case was put at risk by Major's fraudulent misconduct;

e. The Amended Verified Complaint is a weakened version of the Verified Complaint, and thus Mr. Antonacci's position in the Circuit Court Case was weakened by Major's fraudulent misconduct; and

f. Mr. Antonacci's case was unnecessarily delayed for over year by Major's fraudulent misconduct because Mr. Antonacci could have perfected his Appeal in April of 2013, rather than July of 2014, and thus he lost interest for the

263a

amounts due and owing to him pursuant to the Circuit Court Case.

295.   Mr. Antonacci was injured by Major's and Major Law's negligent acts and omissions in an amount in excess of $75,000, exclusive of interest and costs.

**WHEREFORE,** for the reasons stated herein, Mr. Antonacci hereby prays that this Court enter judgment in favor of Mr. Antonacci, and against the above-named Defendants, in the amount of liability owed to Mr. Antonacci, the exact amount to be proven at trial, plus Mr. Antonacci's reasonable attorneys' fees and costs, the exact amount to be proven at trial.

<strong>A JURY TRIAL IS DEMANDED.</strong>

**Dated: April 29, 2015**

Respectfully submitted,

/s/
Louis B. Antonacci
360 H Street NE, Unit 334
Washington, DC 20002
lbacookcounty@gmail.com
T 703-300-4635

264a

[ENTERED SEPTEMBER 21, 2015]

No. 119848

## IN THE SUPREME COURT OF THE STATE OF ILLINOIS

| | |
|---|---|
| LOUIS B. ANTONACCI, an individual,<br><br>        Petitioner,<br><br>v.<br><br>SEYFARTH SHAW, LLP, a partnership, ANITA J. PONDER, an individual,<br><br>        Respondents. | From the Circuit Court of Cook County, First Municipal District<br><br>Circuit Court No. 2012 L 013240<br><br>Hon. Eileen M. Brewer and Thomas Hogan, Presiding<br><br>Appeal No. 142372 Appellate Court of Illinois First District, First Division |

### PETITION FOR LEAVE TO APPEAL

Louis B. Antonacci
360 H Street NE
Unit 334
Washington, DC 20002
Tel: (703) 300-4635
lbacookcounty@gmail.com
*Pro Se Petitioner*

265a

## PRAYER FOR LEAVE TO APPEAL

Pursuant to Illinois Supreme Court Rule 315, Plaintiff-Appellant Louis B. Antonacci respectfully requests that this Court grant him leave to appeal from the August 17, 2015 decision of the Illinois Appellate Court, First District, affirming the circuit court's order granting dismissal of Antonacci's amended verified complaint, denying his second petition to substitute circuit judge Eileen M. Brewer for cause, quashing numerous subpoenas lawfully served in Cook County, Illinois, and denying him leave to file a surreply *instanter*.

## STATEMENT OF JURISDICTION

Illinois Supreme Court Rule 315 confers jurisdiction on this Court. The Appellate Court issued its decision on August 17, 2011, and no petition for rehearing was filed because no oral argument was even allowed in the Appellate Court. (A50.)[1] The filing of this petition is therefore timely.

## POINTS RELIED UPON FOR REVERSAL

The Appellate Court's decision eviscerated defamation *per se* as a cause of action in the State of Illinois by ruling that employers may lie about their employee's conduct and character – with impunity – because Illinois law somehow requires the courts to accept the employer's lies as true. Make no

---

[1] No abstract was filed in this case, but citations to Appelate Court documents are denoted "A###" for where they appear in the Appendix.

mistake – the Appellate Court unequivocally ruled that a complainant's verified allegations that an employer's prejudicial statements are false have no bearing on whether the complaint may proceed in the circuit court. The court may only analyze the defamatory statements in the false "context" in which they were made, regardless of whether complainant alleges that the "context" was fabricated by the defendant. If the Appellate Court's ruling is allowed to stand, then defamation no longer exists in the employment context in Illinois. The Appellate Court's decision should be reversed for the following reasons.

*First*, there is no question that Antonacci alleged that Ponder lied about him and his work at Seyfarth. Ponder made these defamatory statements orally to at least four different people at Seyfarth. One of Seyfarth's professional development consultants memorialized some of those lies in an email (the "Ponder Slander Email"). Judge Brewer ordered Antonacci to attach that email to his amended verified complaint. The Appellate Court ruled that the lies memorialized in the Ponder Slander Email control over Antonacci's verified allegations that those lies are false. The Appellate Court's ruling is plainly absurd.

*Second*, the Appellate Court erroneously ruled that Antonacci cannot allege, upon information and belief, that Ponder lied about him to City of Chicago personnel – with whom they were working on a Minority and Women-Owned Business Enterprise reform project ("M/WBE Matter") – even though those lies were made outside of his presence and

Antonacci, unfortunately, is not clairvoyant. Again, if this ruling stands it essentially eviscerates the law of defamation because employers will simply conceal the lies perpetrated by its agents, like Seyfarth and the City of Chicago did here, and those defamed will have no recourse. Antonacci even subpoenaed the City to obtain proof of Ponder's lies, but Brewer immediately quashed the deposition subpoenas, and falsely claimed that an *in camera* review of some documents would occur, pursuant to the subpoenas *duces tecum*, but that never even happened. These proceedings have made a mockery of the Illinois justice system.

*Third*, if the Appellate Court's ruling were to stand, then Illinois law would allow judges to lie on the bench about their affiliations with the parties in cases before them, as Judge Brewer did here. Incredibly, the Appellate Court even falsely states that Brewer attended the hearing on Antonacci's Second Petition to Substitute her, which she did not. Indeed, Antonacci set forth dozens of bald lies perpetrated by Brewer throughout these proceedings, which the Appellate Court decidedly ignored. Brewer even denied Antonacci the right to submit affidavits in opposition to Defendants' 2-619.1 Motion to Dismiss, as expressly provided by Section 2-619(c). The Fifth and Fourteenth Amendments of the United States Constitution guarantee U.S. citizens the right to a fair and impartial judge in any judicial proceeding within our borders. Antonacci has been denied that right throughout these proceedings.

*Fourth*, the Appellate Court's opinion is rife with deliberate, factual inaccuracies, as will be further discussed below.[2] The impunity with which the Appellate Court acts – and allowed the Circuit Court to act – speaks volumes about the need for judicial reform in Illinois. There must be some level of accountability for judges in the State of Illinois – they cannot be allowed to abuse their role as jurists to rewrite history.

Indeed, this Court should note that the Appellate Court's flawed opinion does not adopt the plainly erroneous reasoning of Judge Brewer. The Appellate Court's opinion distorts facts and law to say one thing only: junior attorneys cannot sue senior attorneys in Illinois, because that is stepping out of line. Antonacci asks this Court to look around the failed state of Illinois–and the crumbling City of Chicago–and ask yourself how the status quo is working out for the overwhelming majority of Illinois citizens who do not have the requisite political connections to curry judicial favor. The Appellate

---

[2] Some of these falsehoods are just bizarre. For example, the Appellate Court reported Antonacci as being represented by The Law Offices of Louis B. Antonacci, for which he is allegedly "of counsel." (A71.) First, Antonacci is thankfully not licensed to practice in the state of Illinois. Second, Antonacci never waived into this case *pro hac vice*. After Anonacci terminated his previous counsel in this matter, Ruth Major, he proceeded – and continues to proceed – pro se in this matter. Third, Antonacci owns the law firm Antonacci Law PLLC, located at 1875 Connecticut Ave. NW, Washington, DC 20009, organized under the laws of the District of Columbia, and registered and licensed in the Commonwealth of Virgnia. Antonacci is licensed and in good standing with the bars of the State of Wisconsin, the Commonwealth of Virginia, and the District of Columbia.

269a

Court should be reversed and this Petition should be granted.

## STATEMENT OF FACTS

At the outset Antonacci must highlight the undisputed fact that not even one evidentiary hearing was held in the circuit court. This point bears repeating – Antonacci submitted all the evidence in the record.

And because the Appellate Court's Opinion is rife with so many glaring, factual inaccuracies, Antonacci sets forth below a timeline of events relevant to this Petition. All of the facts set forth below are either alleged in Antonacci's verified pleadings, supported by affidavits in the record on appeal, taken from transcripts properly certified and filed in accordance with Rule 323(b), or taken from the circuit court's orders. Moreover, all of the facts set forth below are uncontroverted by any evidence – only the hollow conjecture of the Defendants, the City of Chicago, and Toomey Reporting, Inc.

| No. | Date | Uncontroverted Fact or Verified Allegation that Must Be Accepted as True on Motion to Dismiss | Record Citation |
|-----|------|------|------|
| 1 | 8/2011 | Antonacci moves from Washington, D.C. to Chicago to accept job offer in Seyfarth's Commercial Litigation Group | (R. C0574.) |

| | | | |
|---|---|---|---|
| 2 | 9/12/2011 | Client meetings with City of Chicago. Ponder insists on incorrect legal position at client meeting where Antonacci is present; embarrasses herself. | (R. C0578.) |
| 3 | 9/13/2011 | Ponder falsely criticizes Antonacci to conceal her misconduct. | (R. C0579.) |
| 4 | 10/2011 | Ponder makes verifiably false statements about Antonacci to Dave Rowland, Kevin Connelly, Kate Pirelli, Kelly Gofron and City of Chicago personnel. | (R. C0580-85.) |
| 5 | 10/4-5/2011 | Ponder tries to falsely criticize Antonacci by setting arbitrary, internal deadline three (3) weeks ahead of client's schedule. Antonacci tries to discuss with Ponder reasonably, but Ponder just screams at Antonacci for 90 minutes. | (R. C0579–80.) |
| 6 | 10/6/2011 | Pursuant to Seyfarth management guidance, Antonacci proposes reasonable schedule to Ponder. Antonacci's proposed schedule has | (R. C0579, 1122-27.) |

|   |   | him working every day, including weekends, until project is complete. Ponder never discusses schedule with Antonacci. |   |
|---|---|---|---|
| 7 | 10/10/2011 | Ponder tells Antonacci he is no longer responsible for the Project. | (R. C0579, 1122-27.) |
| 8 | 10/12/2011 | Gofron sends Ponder Slander Email, memorializing Ponder's earlier false statements Kevin Connelly, Kate Pirelli, and Kelly Gofron. | (R. C0597.) |
| 9 | 11/ 2011 | Ponder unable to finish Project on time. Blames Antonacci for her failures to Seyfarth personnel and client representatives. | (R. C0584-85.) |
| 10 | October 2011 – May 2012 | Seyfarth assures Antonacci job is secure. Antonacci successfully works for numerous partners at Seyfarth and is retained by prestigious non-profit. | (R. C0579, 0585-88, 1113-21.) |
| 11 | 5/22/2012 | Seyfarth terminates Antonacci with 7 hours notices. | (R. C0588.) |
|   | 5/23/2012 | Antonacci requests all performance | (R. C0588- |

272a

| | | | |
|---|---|---|---|
| 12 | | evaluations. Seyfarth does not provide Ponder Slander Email. Seyfarth only produces Antonacci's official Seyfarth performance evaluations, which are overwhelmingly positive. | 89, 1113-21.) |
| 13 | June – July 2012 | Antonacci retains Ruth Major, attorney. Major requests Antonacci's personnel file. On July 2, 2012, Seyfarth produces Ponder Slander Email in Antonacci's personnel file. | (R. C0589.) |
| 14 | 11/21/ 2012 | Verified Complaint Filed. | (R. C0851-0974.) |
| 15 | 4/2/2013 | Brewer dismisses Verified Complaint. | (R. C3686.) |
| 16 | 4/30/2013 | Amended Verified Complaint Filed. | (R. C0978-79.) |
| 17 | 9/5/2013 | Antonacci terminates Major's representation as counsel. | (R. C0978-79, 1024.) |
| 18 | 4/16/2013 | Antonacci files Response in Opposition to Defendants' Section 2-619.1 Motion to Dismiss | (R. C0980-1052.) |
| 19 | 9/30/2013 | Antonacci proceeds *pro se*. | (R. 53-55.) |

273a

| 20 | 10/22/ 2013 | Hearing on Defendants' 2-619.1 Motion to Dismiss set for December 6, 2013. | (R. C1063.) |
|----|-------------|------------------------------------------------------------------------------|------------|
| 21 | 11/12/ 2013 | Antonacci files and serves Motion for Leave to File Surreply *Instanter*. | (R. C1069-84) |
| 22 | 11/19/ 2013 | Antonacci delivers courtesy copy of Surreply to chambers | (R. C1156, 1161-63.) |
| 23 | 12/3/2013 | Antonacci files four (4) Affidavits pursuant to Section 2-619(c). | (R. C1113-1142.) |
| 24 | 12/3/2013 | Defendants file response to Surreply. | (R. C1144-1154.) |
| 25 | 12/5/2013 | Brewer denies Surreply and prohibits Antonacci from presenting Affidavits pursuant to Section 2-619(c). Screams at Antonacci throughout hearing. | (R. C1155-67, C3198.) |
| | 12/6/2013 | Hearing on Defendants' 2-619.1 Motion to Dismiss. Brewer dismisses Tortious Interference with prejudice. Allows Defamation to proceed based solely on allegation of unauthorized practice of | (R. C1168, C3085-88, C3154-63, C3697.) |

274a

| 26 | | law. Invites Defendants to strike all other allegations from the Amended Verified Complaint. Admonishes Antonacci from objecting to Defendants' Motion to Strike. Further rules Antonacci cannot make allegations "upon information and belief" until discovery reveals defamatory statements to City of Chicago. Brewer expressly states: "I do not know Anita Ponder." | |
| 27 | 12/16/ 2013 | Antonacci serves City of Chicago with subpoenas for testimony and documents. | (R. C1188-1214.) |
| 28 | 12/20/ 2013 | Toomey refuses to send Antonacci its stenographic notes of the Dec. 5, 2013 hearing, and further states, via email, "with a court order in front of a judge we can read the notes to you." Toomey falsely states that the digital audio recording of the Dec. 5 hearing had been deleted. | (R. C3200-01, C3173.) |

| 29 | 12/20/2013 | Defendants file Motion for Reconsideration. | (R. C1216.) |
|---|---|---|---|
| 30 | 12/27/2013 | Antonacci files Motion for Reconsideration. | (R. C1258-1314.) |
| 31 | 12/31/2013 | City files Motion to Stay Chicago Subpoenas. | (R. C1340-44.) |
| 32 | 1/2/2014 | Antonacci serves Toomey with subpoenas for testimony, documents, and forensic examination of equipment. | (R. C1363-89, C3201.) |
| 33 | 1/9-10/2014 | George Arnold, Toomey lawyer, indicates that Toomey will not comply with subpoenas: "Why not make a motion before the Court and let the Court decide how to determine the accuracy of the transcript? My clients will be happy to appear in Court and answer any questions." | (R. C3201-02, C3174-79.) |
| 34 | 1/14/2014 | Antonacci files Motion to Compel Toomey Subpoenas. | (R. C3202, C3174-79.) |
| 35 | 1/27/2014 | City of Chicago files Motion to Quash Chicago Subpoenas. | (R. C1557-65.) |
|  | 2/3/2014 | Brewer quashes subpoenas for testimony | (R. C1743.) |

| | | | |
|---|---|---|---|
| 36 | | of City personnel. Orders City's documents produced directly to her chambers on Feb. 6, 2014 for *in camera* review. | |
| 37 | 2/3/2014 | Brewer quashes Toomey Subpoenas. Toomey plays digital audio recording of Dec. 5, 2013 hearing in court's anteroom, despite Toomey's representation that recording had been deleted. Brewer invites Defendants and Toomey to sanction Antonacci. Screams at Antonacci throughout proceeding. | (R. C3202-03.) |
| 38 | 2/6/2014 | City Attorney Mike Dolesh purports to transmit responsive documents to Chambers for *in camera* review. | (R. C3258-62.) |
| 39 | 2/10/2014 | Antonacci files Second Petition to Substitute Judge for Cause. | (R. C1925-2106.) |
| 40 | 2/18/2013 | Court sets hearing on Motions for Reconsideration for March 31, 2014. Court sets *in camera* review of City's documents to take place immediately after hearing on Motions for Reconsideration. | (R. C3690.) |

277a

| 41 | 3/11/2014 | Antonacci delivers affidavit to Brewer, whereby she could attest to the fact that she does not know Anita Ponder. | (R. C3154-63.) |
|---|---|---|---|
| 42 | 3/19/2014 | Antonacci and Heithaus go to Brewer's clerk's office to pick up affidavit. Brewer's clerk indicates that Brewer refuses to attest, pursuant to 735 ILCS 5/2-1001(a)(3)(iii), to in-court statement of Dec. 5, 2013. | (R. C3154-63.) |
| 43 | 3/19/2014 | Hearing on Second Petition to Substitute Brewer. Judge Hogan denies Antonacci's Second Petition. Brewer not present. | (R. C3691.) |
| 44 | 3/21/2014 | Mayor Rahm Emanuel speaks at Seyfarth on behalf of Ponder. | (R. C3426, C3343-45.) |
| 45 | 3/31/2014 | Hearing on Motions for Reconsideration. Brewer grants Defendants' Motion and denies Antonacci's Motion. Brewer purports to read her opinion into the record. Refuses to issue appealable order. | (R. 1-115.) |

| 46 | 3/31/2014 and 4/23/2014 | The *in camera* review never takes place. Antonacci was never allowed to see the documents that the City allegedly produced. Antonacci's Motion to Reconsider Feb. 3, 2014 Order Quashing City Subpoenas deemed moot. | (R.114-15, 180-81.) |
|---|---|---|---|
| 47 | 4/23/2014 | Hearing on Antonacci's Motion to Reconsider Feb. 3, 2014 Quashing Toomey Subpoenas, and Cross Motions for Sanctions. All motions denied. | (R. 124-181; C3449.) |
| 48 | 5/21/2014 | Case released into Black Line Pool. | (R. C3651-55.) |
| 49 | 6/10/2014 | Antonacci removes case from Black Line Pool to be placed back onto Brewer's docket. | (R. C3658.) |
| 50 | 7/29/2014 | Brewer issues Final Order. | (R. C3694-3714.) |

Above is an accurate listing of the events relevant to the instant Appeal and this Petition. Below is a listing of the factual misrepresentations set forth in the Appellate Court's Opinion:

1.    The Appellate Court twice falsely states that Brewer attended the hearing on Antonacci's Second Petition to Substitute Brewer for Cause, and further falsely states that it was there Brewer falsely stated, "I do not know Anita Ponder." (Op. ¶¶ 18, 38; A59, A69.) Brewer made her false statement from the bench at the hearing of December 6, 2013, as even she admits in her Final Order. (R. 3697.) The hearing on Antonacci's Second Petition took place on March 19, 2014. It bears repeating that absolutely no evidentiary hearings took place in the Circuit Court. No witness was ever sworn to give testimony.

2.    Throughout the Argument section of its Opinion, the Appellate Court falsely reasons that Antonacci's defamation claim is somehow based upon an email sent by Ponder. (Op. ¶¶ 25, 26, 28, 30; A62-65.) Rather, Kelly Gofron, Seyfarth professional development consultant, sent the Ponder Slander Email, which summarized some of the defamatory statements made by Ponder to her. (R. C0581-85, C0597.) Ponder indicated to Gofron that she made those and other defamatory statements to Rowland, Connelly, and Perelli, all senior Seyfarth attorneys. (R. C0597.) Incredibly, the Appellate Court expressly recognized this fact in the Background section of its Opinion. (Op. ¶¶ 6-7; A53-55.) There is absolutely no dispute that – four years later – neither Antonacci nor this Court can know what Ponder actually said to Rowland, Connelly, or Perelli, because the Defendants were never required to file an answer, and absolutely no discovery was allowed in this case.

3.    Similarly, the Appellate Court falsely states that the audience for Ponder's defamatory statements was limited to "several human resources personnel." (Op. ¶ 30; A64-65.) It is true that the audience for Gofron's email was several human resources personnel, but the audience for Ponder's defamatory statements – the precise content of which cannot be ascertained – was Rowland, Connelly, and Perelli, all senior attorneys at Seyfarth. (R. C0581-85, C0597.)

4.    The Appellate Court falsely states that there is "no evidence in the record that Judge Brewer acted in a hostile manner or was biased against Mr. Antonacci." (Op. ¶ 39; A69.) On the contrary, there are numerous uncontroverted affidavits in the record attesting to Brewer's blatant hostility toward, and bias against, Antonacci. (R. C3085-88, 3154-63, 3198, 3202-03.) Antonacci further points this court to Brewer's nonsensical and untoward harassment of Antonacci during the hearings of March 31, 2014 (R. 1-115), and April 23, 2014 (R. 124-181.) Moreover, the record is rife with Brewer's deliberate, factual misrepresentations. (Reply Br. Appellant pp. 1-6; A1357-62.)

5.    The Appellate Court falsely states that Antonacci did not cite any authority in support of his contention that Brewer erred in quashing the subpoenas he served upon Toomey. (Op. ¶ 40; 69-70.) That is wrong. (Br. Appellant pp. 32-33, 38-40; A1416-17, 1422-24.)

Antonacci has a record of professional excellence and his credibility and integrity as an

attorney had never been questioned prior to working for Seyfarth and Ponder. (R. C2938-39, C2971-3062.)

## ARGUMENT

## I.   Antonacci Has Been Denied Due Process of Law and Judge Hogan Erred in Denying Antonacci's Second Petition to Substitute Brewer for Cause

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). To that end, "due process requires a 'neutral and detached judge in the first instance.'" *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 617 (1993) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1993). "Even appeal and a trial *de novo* will not cure a failure to provide a neutral and detached adjudicator." *Id*. at 618. "'[J]ustice,' indeed, 'must satisfy the appearance of justice, and this stringent rule may sometimes bar trial [even] by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" *Id*. (quoting *Marshall v. Jerrico, Inc*., 446 U.S. 238, 243 (1980)).

As set forth above, and throughout Antonacci's Briefs in the Appellate Court and numerous motions and pleadings in the Circuit Court, Judge Brewer, inter alia, (1) deliberately harassed and screamed at Antonacci when he

282a

appeared in court; (2) knowingly lied about her association with Defendant Ponder; (3) unjustifiably quashed subpoenas he lawfully served in Cook County; (4) denied him the right to evidentiary hearings; (5) made numerous false statements in order to conceal the lies perpetrated by Toomey Reporting and their fraudulent alteration of the December 5, 2013 hearing transcript and the digital audio recording; (6) invited the Defendants to strike allegations from the Amended Verified Complaint and directed Antonacci not to object; (7) invited the Defendants and Toomey to sanction Antonacci; (8) ordered the City of Chicago to produce documents directly to her chambers in order to prevent additional evidence of Ponder's tortious misconduct from being discovered; (9) deliberately delayed issuance of her final order so that Antonacci's case would be put into the Black Line Pool; (10) and her dismissal of the Verified Complaint was so obviously an attempt to weaken Antonacci's allegations and direct his previous counsel, Ruth Major, to attach the Ponder Slander Email to Amended Verified Complaint, so that the Appellate Court could make the ridiculous arguments set forth in its Opinion.

Simply put, these proceedings were a complete sham. Antonacci was not heard in a meaningful manner and was therefore denied due process of law. *Matthews*, 424 U.S. at 333; *Concrete Pipe*, 508 U.S. at 617-18. Judge Brewer displayed such a deep-seated antagonism that would make fair judgment impossible, and Judge Hogan erred in denying Antonacci's Second Petition to Substitute Brewer for Cause. *In re Estate of Wilson*, 238 Ill.2d 519, 554, (2010); *Marshall*, 446 U.S. at 243.

283a

## II.     Antonacci     Stated     a     Claim     for Defamation *per se*

This Court's review of a Section 2-615 or 2-619 motion to dismiss is *de novo. R-Five, Inc. v. Shadeco, Inc.*, 305 Ill.App.3d 635, 639 (1999). "The standard of review on appeal from a motion to dismiss a complaint under section 2-615 is whether the complaint alleges sufficient facts which, if proved, would entitle the plaintiff to relief." *Charles v. Seigfried*, 165 Ill.2d 482, 485-86 (1995). The court "accept[s] as true the well-pleaded facts and reasonable inferences in the complaint and construe[s] the allegations in the light most favorable to the plaintiff." *Horwitz v. Sonnenschein Nath and Rosenthal LLP*, 399 Ill.App.3d 965, 973 (1st Dist. 2010).

Under Illinois law, a statement is defamatory if it tends to harm the reputation of another person such that it lowers that person in the eyes of the community or deters other from associating with him or her. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill.2d 558, 579 (2006). Statements that are defamatory per se "are thought to be so obviously and materially harmful to the plaintiff that injury to [his] reputation may be presumed." *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 87 (1996). There are five categories of defamation per se, two of which have been alleged here: 1) "statements imputing an inability to perform or want of integrity in performing employment duties"; and 2) "statements imputing a lack of ability or that otherwise prejudice

a person in his or her profession or business." *Tuitte v. Corbitt*, 224 Ill.2d 490, 501-02 (2006).

The test to determine whether a statement is non-defamatory because it expresses an opinion is restrictive: "only those statements that cannot reasonably be interpreted as stating actual facts are protected under the first amendment." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 14-15 (1992). "Statements of fact usually concern the defamation of plaintiff's character or conduct." *Barakat v. Matz*, 271 Ill.App.3d 662, 672 (1st Dist. 1995). "Statements of mixed opinion are actionable." *Baier v. Rohr-Mont Motors, Inc.*, 2013 WL 2384269 *8 (N.D.Ill.).

"A mixed expression of opinion and fact 'is an opinion in form or context that is apparently based upon facts which have not been stated by the defendant or assumed to exist by the parties to the communication.'" *Bakarat*, 271 Ill.pp.3d at 672 (quoting *Mittelman v. Witous*, 135 Ill.2d 220, 242 (1989)). "The focus is on verifiability." *Baier*, 2013 WL 2384269 *8; *see also Seitz-Partridge v. Loyola University of Chicago*, 409 Ill.App.3d 76, 90 (1st Dist. 2011). "Oral or written words which impute to [an attorney] a want of the requisite qualifications to practice law or which charge him with dishonest or improper practices in the performance of his duties as an attorney are actionable per se." *Colmar v. Greater Niles Tp. Pub. Corp.*, 13 Ill.App.2d 267, 270-71(1st Dist. 1957); see also *Mittelman*, 135 Ill.2d at 242.

On numerous occasions on and around October 12, 2011, Ms. Ponder deliberately lied about

Antonacci to Gofron, Rowland, Connelly, and Perrelli. (R. C0580-85.) Ponder told these lies in order to deflect blame from the inexcusable ignorance that she demonstrated during client meetings on September 6, 2011. (R. C0578-79.) Moreover, when her negligent mishandling of her client project prevented the project from being completed on time, she falsely blamed Antonacci for her failings. (R. C0584-85.) Each of these lies is verifiably untrue, was made outside the performance evaluation process, and was made with malice. The Respondents are therefore liable for defamation *per se*. *Mittelman*, 135 Ill.2d at 242, *Colmar*, 13 Ill.App.2d at 270-71.

The Appellate Court erroneously accepted Ponder's lies memorialized in Gofron's email as true. (Op. ¶¶ 26-31; A61-64.) It based this absurd analysis on the erroneous premise that any exhibit attached to a complaint controls over the factual allegations in the complaint. (Op. ¶ 21; A59) citing *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill 2d 278, 287 (1986)). But "[w]hen the exhibit is not an instrument upon which the claim or defense is founded but, rather, is merely evidence supporting the pleader's allegations, the rule that the exhibit controls over conflicting averments in the pleading is inapplicable." *Garrison v. Choh*, 241 Ill.Dec. 376, 379 (1st Dist. 1999). There can be no dispute that Gofron's email summarizing some of Ponder's false statements is not any sort of written instrument, but is simply evidence supporting Antonacci's claim that Ponder lied about him and his work. Antonacci's allegations therefore control. *Id.*

286a

Finally, the Appellate Court erroneously reasoned that Antonacci cannot allege Ponder made additional defamatory statements "upon information and belief" because Antonacci did not specify "what was said to these parties, how the statements were made, or when they were made." (Op. ¶ 32; A65-66.) That is absurd, because if Antonacci knew those facts, then he would not have pleaded those statements upon information and belief. Antonacci did quite plainly set forth his factual bases for believing those statements were made, however, so under Illinois law the Amended Verified Complaint should stand. *Green v. Rogers*, 234 Ill.2d 478, 495 (2009).

### III. Antonacci Stated a Claim for Tortious Interference[3]

Because Antonacci stated a claim for defamation, he has also stated a claim for tortious interference with prospective economic advantage with his employment at Seyfarth against Ponder. *Dowd and Dowd, Ltd. v. Gleason*, 352 Ill.App.3d 365, 381 (1st Dist. 2004); *Larry Karchmar, Ltd. v. Nevoral*, 302 Ill.App.3d 951, 958 (1999).

---

[3] It is notable that the Appellate Court did not adopt Brewer's reasoning in dismissing Antonacci's toritious interference count. (*Compare* C3708 with Op. ¶ 33; A66.) Brewer falsely stated that Antonacci could not state this claim because he did not have an employment contract with Seyfarth, despite the fact that the record is replete with evidence of Antonacci's employment contract. (R. 14, C0043, C0574, C0578, C905-07, C1006-08, C1056.) As discussed above, Antonacci was not heard in a meaningful manner and was therefore denied due process of law. *Matthews*, 424 U.S. at 333; *Concrete Pipe*, 508 U.S. at 617-18.

## IV. Antonacci Stated a Claim for Fraudulent Misrepresentation

The Appellate Court erroneously reasons that Seyfarth is not liable for fraudulent misrepresentation because Antonacci's Amended Verified Complaint alleges that Seyfarth only lied to Antonacci about matters of "pure opinion." (Op. ¶ 35; A67.) That is incorrect. Ponder has a known history of damaging the careers of her subordinates in order to conceal her incompetence – as was subsequently confirmed by numerous Seyfarth partners to whom Antonacci reported her fraudulent and unprofessional behavior. (R. C853-56; 863-65; 876-78; 893-94.) Seyfarth affirmatively misrepresented Ponder's character and competence to Antonacci, and further fraudulently omitted the fact that her last associate was so appalled by her unprofessional behavior that he left without notice and was never heard from again. (R. C853-56; 863-65; 876-78; 893-94.) Working for Anita Ponder is a professional death trap – that is a fact that Seyfarth had a duty to disclose. Seyfarth is liable for fraudulent misrepresentation. *W.W. Vincent and Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752, 814 (1st Dist. 2004). And the Appellate Court's discussion of Antonacci's at-will employment is simply irrelevant to his claim for fraudulent misrepresentation. (Op. ¶ 36; A67.)

288a

## V.     The Trial Court Erred in Quashing Antonacci's Subpoenas[4]

Illinois Supreme Court Rule 204 requires the Clerks of the Circuit Courts to issue subpoenas upon request, which "may command the person to whom it is directed to produce documents or tangible things which constitute or contain evidence relating to any of the matters within the scope of the examination permitted under these rules." Rule 204(a)(1). The scope of examination under the Supreme Court Rules is broad. Rule 201(a).

The deponent in a discovery deposition may be examined regarding any matter subject to discovery under these rules." Rule 206(c)(1). Evidence is relevant "if it proves a fact in controversy or renders a matter at issue more or less probable." *Petraski v. Thedos*, 2011 IL App (1st) 103218 ¶ 140. "A plaintiff's complaint frames the case's issues." *Id*.

Regarding the subpoenas served upon the City of Chicago, paragraph 34 of the Amended Verified Complaint alleges "Ms. Ponder made numerous false statements concerning Antonacci to the client for whom the interviews were conducted. Namely,

---

[4] The Appellate Court erroeneously reasoned Antonacci "waived" his argument that Brewer abused her discretion denying Antonacci's motion for leave to file surreply instanter. That is incorrect because Antonacci set forth the most relevant authority and a throrough analysis of the facts in support of this argument. (Brief of Appellant. 30-32; A1414-16.) The Appellate Court's mindless "analysis" of this issue does not merit discussion, as it does not even set forth any competing authority. (Op. ¶ 41; A70.) Its conclusion that Antonacci somehow "waived" this issue should be reversed.

289a

Ponder blamed Mr. Antonacci for her failure to complete her project in a timely and effective manner."[5] Antonacci's Subpoenas request documents and communications pertaining to Ponder's failure to complete the DPS Matter in a timely manner, as well as her false statements seeking to blame Antonacci for her failures. The discovery sought is therefore clearly relevant to the issues framed by the Amended Verified Complaint and Brewer abused her discretion quashing them. *Petraski*, 2011 IL App (1st) 103218 ¶ 140.

Antonacci subpoenaed documents and testimony from Toomey, pursuant to Rules 204 and 206, that tend to prove that Toomey fraudulently altered the December 5, 2013 hearing transcript to delete Judge Brewer's hostile outbursts toward Antonacci, as well as her refusal to consider the affidavits that Mr. Antonacci presented pursuant to Section 2-619(c), thus further demonstrating Judge Brewer's actual bias and bolstering his petition to substitute her. Antonacci's Subpoenas are therefore relevant to the instant case and Judge Brewer abused her discretion in quashing them. *Petraski*, 2011 IL App (1st) 103218 ¶ 140.

## CONCLUSION

These proceedings tragically represent the disintegration of the rule of law in Cook County. The shameless manner in which Brewer, the Defendants,

---

[5] Antonacci further maintains that the documents produced by the City could not be deemed privileged and thus the Circuit Court erred in ordering them produced directly to her chambers for *in camera* review.

290a

the City of Chicago, and Toomey Reporting repeatedly lied and fabricated court documents – with impunity – is a glaring and undeniable example of Chicago's harsh reality: there is no justice here. The courts are stacked with judges whose only qualification is loyalty to the political class and their donors. And while the Cook County judiciary has secured its place on the wrong side of history, most of those judges do not even appreciate the significance of their criminal legacy. And that is why you are just the tiny pawns of those who do.

Dated: September 18, 2015

Respectfully submitted,

/s/ Louis B. Antonacci
Louis B. Antonacci
360 H Street NE, Unit 334
Washington, DC 20002
Tel: (703) 300-4635
(e) lbacookcounty@gmail.com

291a

[ENTERED JULY 14, 2015]

LOUIS B. ANTONACCI

360 H Street NE, Unit 334 · Washington, DC 20002
703.300.4635 · louantonacci@gmail.com

July 10, 2015

U.S. Court of Appeals for the Seventh Circuit
Clerk
Room 2722
219 S. Dearborn Street
Chicago, IL 60604

RE:    Antonacci v. City of Chicago
       Appeal No. 15-2194

Dear Clerk,

Enclosed herewith please find the Brief of Appellant in the above-referenced appeal. You called me last Friday, July 10, 2015, and told me that the Brief of Appellant that I filed in paper form on Thursday, July 9, 2015 was nonconforming for two reasons: 1) I did not file the brief electronically, and 2) I did not file the Rule 26.1 corporate disclosure statement. I tried to discuss these matters with you, but you interrupted me, stated that you would be sending the Briefs of Appellant back to me, and promptly hung up the phone. I was at dinner in Turin with Ms. Livya Heithaus at the time, and she can attest to those facts.

As I tried to explain to you during our phone conversation, I do not have ECF filing privileges,

292a

despite your insistence to the contrary. I have enclosed herewith a screen shot of my Seventh Circuit CM/ECF screen. As you will see, while my profile screen indicates that I am an attorney and my filing status is "active," I simply do not have the required action tab that would allow me to file any documents.

This is particularly troubling because, as I am sure you recall, when I first encountered this problem, I called you for assistance. At that time, you indicated that I could not file electronically, despite the fact that I am an attorney, because I was proceeding *pro se* in this appeal. You informed me that I would need to file a motion requesting filing privileges, which I did. The court denied that motion on July 8, 2015. As such, I am filing the Brief of Appellant the only way possible for me at this time – in paper form.

I am still confused as to your continued insistence that I must file a Rule 26.1 disclosure form. I am neither a corporate entity nor am I proceeding in my capacity as an attorney. I am not licensed to practice in Illinois, nor am I admitted to practice before the Northern District or the Seventh Circuit. Nonetheless, I am submitting a disclosure that conforms to the requirements of FRAP and Circuit Rule 26.1.

I object to your rejection of my filing of the Brief of Appellant as a denial of due process of law. Please file this letter with the record of these proceedings.



294a

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

NO. 15-2194

| | |
|---|---|
| LOUIS B. ANTONACCI, an individual, | |
|    Plaintiff-Appellant, | Appeal From Civil Case No. |
|    vs. | 1:15-CV-3750 |
| CITY OF CHICAGO, a municipal corporation, *et al.,* | Hon. Milton I. Shadur |
|    Defendants-Appellees. | |

### RUE 26.1 STATEMENT

The undersigned appellant hereby certifies that he is not a corporate entity. The undersigned appellant hereby certifies that he is not representing anyone in this proceeding in his capacity as an attorney. The undersigned is proceeding *pro se* in this matter.

295a

[ENTERED MARCH 15, 2005]

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday, the 14th day of March, 2005.

Present: Mary Ann McMorrow, Chief Justice
Justice Charles E. Freeman
                           Justice Thomas R. Fitzgerald
Justice Robert R. Thomas
                           Justice Thomas L. Kilbride
Justice Rita B. Garman
                           Justice Lloyd A. Karmeier

M.R.20112

In re: Supplemental    Recording    Devices
       Utilized by Privately Employed Court
       Reporters

Order

Personal audio recording devices utilized by privately employed court reporters to supplement the stenographic record may be used during court proceedings to assist in the preparation of the record. Any recordings of court proceedings made pursuant to this · order shall be for personal use only and held in strictest of confidence by the court reporter. Audio recordings of any court proceeding shall be deemed and remain under the control of the

296a

circuit court and shall be surrendered to the court upon request. Any request by a party or entity, other than the court, to obtain or review the recordings shall not be permitted under any circumstances. Any violation of this order may subject the violator to contempt of court proceedings.

Order entered by the Court.

> IN WITNESS WHEREOF, I have hereunto
>     subscribed my name and affixed the
>     Seal of said Court this 15th day of
>     March, 2005.

/s/

Clerk,
Supreme Court of the State of Illinois

# EXHIBIT B

# PERKINSCOie

131 South Dearborn Street
Suite 1700
Chicago, IL 60603-5559

T +1.312.324.8400
F +1.312.324.9400
PerkinsCoie.com

Matthew J. Gehringer
MGehringer@perkinscoie.com
D  +1.312.324.8655
F  +1.312.324.9655

October 24, 2017

**VIA EMAIL**

William W. Taylor, III
Zuckerman Spaeder LLP
1800 M Street, NW
Suite 1000
Washington, DC  20036

### *RE:    FUSION GPS*

Dear Mr. Taylor:

I write on behalf of Perkins Coie LLP as its General Counsel.  We understand that your client, Fusion GPS, has received a number of requests for information regarding the identity of clients who engaged Fusion GPS to conduct research during the 2016 Presidential campaign. We further are aware that Fusion GPS is currently engaged in litigation in the United States District Court for the District of Columbia in an effort to prevent the compelled disclosure of its bank records which would reveal confidential client information.

We recognize the important principle of client confidentiality, and we appreciate your efforts to fulfill your obligation to maintain client confidentiality.   In the circumstances, however, we believe it is appropriate to release Fusion GPS from this obligation as it relates to the identity of Perkins Coie.  Further, given the interest in this issue, we believe it would be appropriate for all parties who hired Fusion GPS in connection with the 2016 presidential campaign to release Fusion GPS from this obligation as well.  Finally, now that the appropriate client representatives have been informed of the specifics of our engagement with Fusion GPS, and with their consent, Perkins Coie therefore authorizes you to disclose the following:

> -- Fusion GPS approached Perkins Coie in early March of 2016 and, aware that Perkins Coie represented the Democratic National Committee ("DNC") and HFACC, Inc. ("Hillary for America") with respect to the 2016 elections, expressed interest in an engagement with the Firm in connection with the 2016 presidential election to continue research regarding then-Presidential candidate Donald Trump, research that Fusion GPS had conducted for one or more other clients during the Republican primary contest.

Page 2

-- To assist in its representation of the DNC and Hillary for America, Perkins Coie engaged Fusion GPS in April of 2016, to perform a variety of research services during the 2016 election cycle.  By its terms, the engagement concluded prior to the November 2016 Presidential election.

Nothing in this consent to the disclosure above authorizes Fusion GPS to disclose or waive any privilege with respect to communications or other information otherwise protected by this Firm's or its clients' attorney-client privilege and work product protections, nor does this authorization constitute a waiver of any applicable privilege of this Firm or its clients.

Very truly yours,

Matthew J. Gehringer
General Counsel
Perkins Coie LLP

MJG:jmg

# EXHIBIT C


**DNA Diagnostics Center**

# DNA Test Report

Ref No. OT4781

DDC is accredited/certified by AABB, CAP, ISO/IEC 17025 by ANAB, CLIA & NYSDOH.

| Case 3784045 | CHILD | Alleged FATHER |
|---|---|---|
| Name | S████████ P ANTONACCI | LOUIS B ANTONACCI |
| Race | | Caucasian |
| Sample Type | Buccal | Buccal |
| Date Collected | 11/19/2022 | 11/19/2022 |
| Test No. | 3784045-21 | 3784045-30 |

| Locus | PI | Allele Sizes | | Allele Sizes | |
|---|---|---|---|---|---|
| D3S1358 | 2.27 | 16 | 17 | 16 | 17 |
| vWA | 2.39 | 16 | | 16 | 18 |
| D16S539 | 1.41 | 9 | 13 | 12 | 13 |
| CSF1PO | 1.89 | 10 | | 10 | 12 |
| TPOX | 1.94 | 9 | 11 | 11 | |
| D8S1179 | 1.55 | 12 | 13 | 13 | |
| D21S11 | 1.18 | 28 | 29 | 29 | 30 |
| D18S51 | 1.53 | 14 | 16 | 13 | 14 |
| D2S441 | 4.38 | 11.3 | 14 | 11.3 | 14 |
| D19S433 | 1.37 | 13 | 14 | 14 | |
| TH01 | 1.76 | 6 | 9 | 9 | 9.3 |
| FGA | 1.71 | 23 | 29 | 23 | 25 |
| D22S1045 | 5.59 | 14 | 16 | 11 | 14 |
| D5S818 | 1.35 | 11 | 13 | 11 | |
| D13S317 | 0.89 | 11 | 12 | 9 | 12 |
| D7S820 | 1.56 | 8 | 11 | 8 | 9 |
| SE33 | 5.00 | 6.3 | 20 | 16 | 20 |
| D10S1248 | 1.62 | 13 | 14 | 13 | 14 |
| D1S1656 | 1.70 | 13 | 16 | 15 | 16 |
| D2S1338 | 3.40 | 17 | 19 | 17 | 19 |
| D8S1115 | 1.85 | 16 | | 16 | |
| D6S474 | 1.19 | 15 | 17 | 14 | 15 |
| D9S1122 | 0.78 | 12 | 13 | 13 | 14 |
| D17S1301 | 2.72 | 11 | | 11 | |
| D9S2157 | 2.35 | 7 | 12 | 7 | 15 |
| D3S4529 | 2.26 | 15 | | 13 | 15 |
| D14S1434 | 1.51 | 10 | 12 | 10 | 13 |
| Amelogenin | | X | | X | Y |

RN: 10703615

**Interpretation:**

Combined Paternity Index:  **25,815,006**          Probability of Paternity:  **99.999996%**

The alleged father is not excluded as the biological father of the tested child. Based on testing results obtained from analyses of the DNA loci listed, the probability of paternity is 99.999996%. This probability of paternity is calculated by comparing to an untested, unrelated, random individual of the Caucasian population (assumes prior probability equals 0.50).

The foregoing instrument was acknowledged before me by the signed Laboratory Director on November 30, 2022

Allen Elswick
State of Ohio, County of Butler
My Commission Expires January 4, 2027

I, the undersigned Laboratory Director, verify that the interpretation of the results is correct as reported on 11/30/2022.

Deepti L. Kumar, Ph.D.

End of Report



# DNA Test Report

Ref No. OT4781

DDC is accredited/certified by AABB, CAP, ISO/IEC 17025 by ANAB, CLIA & NYSDOH.

| Case 3784045 | CHILD | Alleged FATHER |
|---|---|---|
| Name | A████ G ANTONACCI | LOUIS B ANTONACCI |
| Race | | Caucasian |
| Sample Type | Buccal | Buccal |
| Date Collected | 11/19/2022 | 11/19/2022 |
| Test No. | 3784045-20 | 3784045-30 |

| Locus | PI | Allele Sizes | | Allele Sizes | |
|---|---|---|---|---|---|
| D3S1358 | 2.27 | 16 | 17 | 16 | 17 |
| vWA | 2.44 | 16 | 18 | 16 | 18 |
| D16S539 | 0.85 | 9 | 12 | 12 | 13 |
| CSF1PO | 0.0031 | 11 | 13 | 10 | 12 |
| TPOX | 1.94 | 9 | 11 | 11 | |
| D8S1179 | 1.55 | 13 | 16 | 13 | |
| D21S11 | 1.01 | 28 | 30 | 29 | 30 |
| D18S51 | 1.53 | 14 | 16 | 13 | 14 |
| D2S441 | 0.97 | 11 | 14 | 11.3 | 14 |
| D19S433 | 1.37 | 12 | 14 | 14 | |
| TH01 | 1.76 | 6 | 9 | 9 | 9.3 |
| FGA | 1.71 | 22 | 23 | 23 | 25 |
| D22S1045 | 5.59 | 14 | 16 | 11 | 14 |
| D5S818 | 1.35 | 11 | 13 | 11 | |
| D13S317 | 0.89 | 11 | 12 | 9 | 12 |
| D7S820 | 1.59 | 9 | 10 | 8 | 9 |
| SE33 | 10.00 | 16 | 20 | 16 | 20 |
| D10S1248 | 1.66 | 14 | | 13 | 14 |
| D1S1656 | 1.70 | 14.3 | 16 | 15 | 16 |
| D2S1338 | 3.40 | 17 | 19 | 17 | 19 |
| D8S1115 | 0.92 | 9 | 16 | 16 | |
| D6S474 | 1.19 | 15 | 17 | 14 | 15 |
| D9S1122 | 0.78 | 12 | 13 | 13 | 14 |
| D17S1301 | 1.36 | 11 | 13 | 11 | |
| D9S2157 | 5.72 | 12 | 15 | 7 | 15 |
| D3S4529 | 1.13 | 15 | 16 | 13 | 15 |
| D14S1434 | 2.16 | 10 | 13 | 10 | 13 |
| Amelogenin | | X | | X | Y |

RN: 10703612

Interpretation:

Combined Paternity Index: **4,482**     Probability of Paternity: **99.97%**

The alleged father is not excluded as the biological father of the tested child. Based on testing results obtained from analyses of the DNA loci listed, the probability of paternity is 99.97%. This probability of paternity is calculated by comparing to an untested, unrelated, random individual of the Caucasian population (assumes prior probability equals 0.50). Note: One possible mutation was observed. The mutation frequency was included in the calculation of the probability of paternity. This paternity calculation does not take into consideration any biological relatives of the alleged father.

The foregoing instrument was acknowledged before me by the signed Laboratory Director on November 30, 2022

_____

Allen Elswick
State of Ohio, County of Butler
My Commission Expires January 4, 2027

I, the undersigned Laboratory Director, verify that the interpretation of the results is correct as reported on 11/30/2022.

_____

Deepti L. Kumar, Ph.D.

End of Report

# EXHIBIT D

# LOUIS B. ANTONACCI

3338 7th Street NE • Washington, DC 20017
(o) 202.291.2327• (m) 703.300.4635 • lou@antonaccilaw.com

September 12, 2019

U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
ATTN: Aprel Thompson/Oversight Vacancy

**RE:  Oversight Vacancy**

Dear Ms. Thompson,

My name is Lou Antonacci and I am applying for the Attorney-Advisor position in the Oversight Section of the Department's Office of Intelligence. I believe that my professional and personal experiences handling fraud and corruption claims, together with my significant litigation and investigative experience, domestically and abroad, would make me a valuable member of your team.

I matriculated at the University of Wisconsin Law School in 2001. I was a managing editor for the Wisconsin International Law Journal and a member of its Moot Court Board. I participated in the Jessup International Law Moot Court competition and won honors for top brief.  I was an honors intern for both the Criminal Division of the U.S. Department of Justice and the General Counsel of the U.S. Air Force. In the latter capacity, I spent much of the summer analyzing high-profile allegations of procurement fraud. I graduated with honors in May of 2004.

Immediately after graduation, I began work in the U.S. Army Corps of Engineers's Civilian Honors Program, where I served as the lead attorney for the Corps's Chemical Demilitarization Program. I advised the U.S. Army on legal issues related to the United States's obligations under the Chemical Weapons Convention and other international agreements. I was part of a U.S. delegation to Moscow to work with the Russian Ministry of Defense completing a demilitarization facility outside of Chelyabinsk. I also supported the Iraqi Reconstruction Program during a temporary assignment in Baghdad. While in Iraq, I worked with our Contracting Directorate to establish contracting policies throughout the Gulf Region Division.

I subsequently moved into private practice at law firms in the Washington area, practicing federal contracts and construction law. I was an extremely successful associate, but my supervising partner at Holland & Knight was terminated for embezzling money from the firm. He did this while I was building a large fraud and racketeering case against a property developer, and their Dutch lender, for defrauding our client out of monies owed pursuant to a consent judgment. The case settled favorably for our client, and another of the terminated partner's clients stayed with the firm as my client. The latter client was an Iraqi construction company, who I soon discovered had fabricated an email intended to defraud a federal agency. I raised the matter to firm leadership, the client was terminated, and I was asked to resign shortly after.

This was early 2010, so there were virtually no legal jobs available. I performed work as a contract attorney, doing document review, for about 16 months, when I received a job offer from Seyfarth Shaw as a staff attorney in Chicago. I received only positive performance evaluations from that firm, and I was retained by a prestigious non-profit for government contracting work. Nonetheless, in May of 2012, I was terminated with no explanation and eight hours of notice. I hired a lawyer and discovered that a Seyfarth partner, for whom I had done work early on at Seyfarth, had been defaming me to firm leadership. We filed suit, and the criminal enterprise that is the Chicago Machine sprang into action. They blocked my admission to the Illinois bar and made it impossible for me to work in Chicago.

Ms. Aprel Thompson
U.S. Department of Justice
National Security Division
September 12, 2019
Page 2 of 2

The panel reviewing my character and fitness to practice law in Illinois made it clear that I would not be licensed until I dropped my lawsuit against Seyfarth. In my view, that is textbook extortion. I refused to capitulate, but because I could not make a living in Chicago, I moved back to Washington, DC, where I was already licensed to practice. Notably, I was also licensed in Wisconsin and Virginia at that time, and subsequently have been licensed in Maryland as well.

I fought the Chicago Machine all the way up to the U.S. Supreme Court. The details of the case are set forth in my SCOTUS petition, which I have included as my writing sample. I would not let the case go because it represents an unacceptable abuse of public power. As set forth in the petition, after years in state and federal courts, the defendants were never required to answer any allegation against them or respond to any discovery. Fraudulent court documents were filed, and judicial opinions were issued that contained demonstrably false statements material to the proceedings at bar. The defendants and their co-conspirators perpetrated this fraud with absolute impunity.

This scheme was contrived and premediated. It has been done before and it will happen again. It represents the erosion of the rule of law not only in Chicago, but throughout this country, as people lose faith in the institutions that allow our society to flourish. I want to help restore that faith in America's institutions.

I started a successful law practice here in Washington. I represent government contractors and private property owners in litigation and transactional matters. In 2016, my client won an appeal, before the Supreme Court of Virginia, reinstating a jury verdict that we had won in Arlington. I have a young daughter and another on the way. My wife is an SVP in the legal group at JBG Smith. We were associates together at Holland & Knight.

It would be my honor to assist the Department in ensuring that foreign intelligence information is collected, retained and disseminated in accordance with U.S. law and Department policy. America's intelligence apparatus is the most powerful and pervasive in the world. If Americans are to remain confident that their government is by and for them, then they must believe that our intelligence agencies are using their powers responsibly.

Enclosed please find my resume, SCOTUS petition, and my last federal performance evaluation for your consideration. Thank you for the opportunity to present this application.

Sincerely,

*Louis B. Antonacci*
Louis B. Antonacci

Enclosures

## SENIOR SYSTEM CIVILIAN EVALUATION REPORT
For use of this form, see AR 690-400; the proponent agency is ASA(M&RA)

### PART I - ADMINISTRATIVE DATA

| a. NAME *(Last, First, Middle Initial)* | b. | c. POSITION TITLE, PAY PLAN, SERIES AND GRADE |
|---|---|---|
| Antonacci, Louis B. | | General Attorney, GS-0905-12 |

d. ORGANIZATION/INSTALLATION
CEHNC-OC

e. REASON FOR SUBMISSION
[X] ANNUAL  [ ] SPECIAL  [ ] INTERN

f. PERIOD COVERED *(YYYYMMDD)*
FROM 2004/06/01   THRU 2005/10/31

g. RATED MOS.
17

h. RATEE COPY *(Check one and date)*
[X] GIVEN TO RATEE  [ ] FORWARDED TO RATEE

### PART II - AUTHENTICATION

a. NAME OF RATER *(Last, First, Middle Initial)*
Simmons, Margaret P.

SIGNATURE *Margaret P Simmons*   DATE 18 Jan 06

GRADE/RANK, ORGANIZATION, DUTY ASSIGNMENT
GS15, US Army Engineering & Support Center, Huntsville, Counsel

b. NAME OF INTERMEDIATE RATER *(Optional)(Last, First, MI)*
Diehl, LTC David

SIGNATURE   DATE 19 Jan 06

GRADE/RANK, ORGANIZATION, DUTY ASSIGNMENT
LTC, US Army Engineering & Support Center, Huntsville, Deputy Commander

c. NAME OF SENIOR RATER *(Last, First, Middle Initial)(If used)*
Allen, Ronald & Pike, Lloyd

SIGNATURE   DATE

GRADE/RANK, ORGANIZATION, DUTY ASSIGNMENT
GS15 & SES, USACE, Acting Deputy Chief Counsel & Deputy Chief Counsel

d. RATEE: I understand my signature does not constitute agreement or disagreement with the evaluations of the Rater and Senior Rater, and merely verifies Part I and Part IV data.

SIGNATURE OF RATEE   DATE

### PART III - PERFORMANCE AWARD/QUALITY STEP INCREASE

| a. SES - AWARD, BONUS/ SALARY INCREASE | RECOMMENDATIONS | | | | b. ST, SL, GM, GS, WS - PERFORMANCE AWARD/QSI | |
|---|---|---|---|---|---|---|
| | RATING (1) | SALARY (2) | | PERFORMANCE AWARD BONUS (3) | | PERCENT OF SALARY (EXCLUDES Locality Pay)   % *(OR)* |
| | | | | | | AMOUNT   $   *(OR)* |
| RECOMMENDING OFFICIALS | | YES | NO | YES | NO | QSI *(GS with Successful Level 1 Rating Only - minimum of 52 weeks must have elapsed since last QSI)*   TO (Grade/Step): |
| RATER | | | | | | AWARD APPROVED BY |
| INTERMEDIATE RATER | | | | | | |
| PERFORMANCE REVIEW BOARD | | | | | | DATE *(YYYYMMDD)*   FUND CITE |
| SENIOR RATER | | ES | | $ | | |

### PART IV - DUTY DESCRIPTION *(Rater)*

DAILY DUTIES AND SCOPE *(To include as appropriate: people, equipment, facilities, and dollars).* Position Description *(DA Form 374)* is correct:   [X] YES  [ ] NO

Serves as General Attorney in Office of Counsel. Under general supervision and review of the Counsel to whom assigned, provides legal advice, interpretations and determinations on matters involved in Corps of Engineers programs and missions. Performs legal research in final form on a variety of the most complex and difficult legal problems in all areas of responsibility of the Office of Counsel. These areas include, but are not limited to, procurement law, environmental law, litigation and legislation, including agency authorities, and administrative law. Responds to inquiries concerning the work of the office and prepares in final form and for signature of proper official, replies to inquiries and correspondence from Congress, the Army and other groups pertaining to legal matters within the area of responsibility of the Counsel to whom assigned, including the Comptroller General and from various elements within the Army Corps of Engineers. Serves as primary Counsel for the Chemical Demilitarization Program which includes the work in Russia. Works international issues with customer, Defense Threat Reduction Agency (DTRA) and Chemical Munitions Agency (CMA).

### PART V - VALUES *(Rater)*

| VALUES | BULLET COMMENTS |
|---|---|
| Loyalty | |
| Duty | Provides excellent advice and timely legal opinions on all program matters. |
| Respect | |
| Selfless service | Makes decisions with confidence and courage. |
| Honor | |
| Integrity | Willingly takes on new assignments and assists on any program. |
| Personal courage | Strives for excellence in all duties. |

DA FORM 7222, AUG 1998   PREVIOUS EDITION IS OBSOLETE.   USAPA V1.01

| PERIOD COVERED *(YYYYMMDD)*<br>2004/06/01 - 2005/10/31 | RATEE'S NAME<br>Antonacci, Louis B. | SSN<br>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 |
|---|---|---|

## PART VI - PERFORMANCE EVALUATION *(Rater)*

### a. PERFORMANCE DURING THIS RATING PERIOD

Comparison of individual objectives against accomplishments and OA-established performance standards resulted in the following objectives ratings:

[X] Excellence<br>75% or More Obj    [ ] Excellence<br>25-74% Obj    [ ] Success All or Excellence<br>1-24% Obj    [ ] Needs Improvement<br>1 or More Obj    [ ] Fails 1 or More Obj

Includes Excellence in Org Mgt/Ldshp OR EEO/AA<br>
Obj for supv/mgr   [ ] Yes   [X] No

### b. BULLET EXAMPLES

Concur with 360 rating for Objectives A, B, C & D. On a scale of 1-10, Louis received a 9.07 on A-Communication Skills / Customer Service; a 9.23 on B-Team Behavior; a 9.66 on C-Values; and a 9.26 on D-Continuous Improvements. He exceeded all four of those objectives.

Completed all legal reviews in a timely and thorough manner.

Provided outstanding legal support to the Chemical Demilitarization Directorate on several complex issues involving treaties and other international law matters, resulting in successful mission objectives within legal boundaries.

Traveled to Russia with team to participate in contract negotiations and assisted in analyzing cost issues for completion of the destruction facility currently under construction.

Presented a paper on international government contracting at the Chemical Weapons Destruction Conference in Edinburgh, Scotland.

Kept all CEALS-MTS data current and accurate.

Participated in an ADR with an ASBCA Judge, resulting in a favorable settlement of a contractor claim.

Wrote legal alerts, white papers and procurement/fiscal bulletins in support of OC preventive law practice.

Had comment published in the Santa Clara Journal of International Law.

## PART VII - INTERMEDIATE RATER *(Optional)*

BULLET COMMENTS

A competitive lawyer who will tackle any mission.

An integral part of the legal team, beacuse of his efforts the team is extremely successful.

Outstanding support to the Center's Chemical Demilitarization program.

Unlimited potential in service to the Nation.

| PART VIII - SENIOR RATER *(if used)* or<br>RATER *(no senior rater used)* | PART IX - SENIOR RATER *(if used)* |
|---|---|
| OVERALL PERFORMANCE RATING<br><br>[X]<br>2 } SUCCESSFUL<br>3<br>4   FAIR<br>5   UNSUCCESSFUL<br>(MUST Have Senior<br>Rater Review) | BULLET COMMENTS *(Performance/Potential)*<br>Tenacious in defense of government interests.<br><br>Willing to accept more responsibility and challenges.<br><br>Provides quality, well documented legal opinions.<br><br>Self motivated. Can handle extensive workload.<br><br>A completed OA Form 7222-1 was received with this report and considered in my evaluation and review:<br>[X] YES   [ ] NO *(Explain)* |

REVERSE, DA FORM 7222, AUG 1998              USAPA V1.01

## SENIOR SYSTEM CIVILIAN EVALUATION REPORT SUPPORT FORM
For use of this form, see AR 690-400; the proponent agency is ASA(M&RA)

### PART I - RATEE IDENTIFICATION

| a. NAME OF RATEE *(Last, First, Middle Initial)* | b. PAY PLAN, SERIES/GRADE | c. ORGANIZATION/INSTALLATION |
|---|---|---|
| ANTONACCI, LOUIS B. | GS-0904-11 | US Army Corps of Engineers, Office of Counsel |

### PART II - RATING CHAIN - YOUR RATING CHAIN FOR THE EVALUATION PERIOD IS:

| | NAME | POSITION |
|---|---|---|
| RATER | MARGARET P. SIMMONS | Counsel, Huntsville Center |
| INTERMEDIATE RATER *(Optional)* | DAVID A. DIEHL | LTC, Deputy Commander, Huntsville Center |
| SENIOR RATER | CRAIG R. SCHMAUDER | Acting Chief Counsel |

### PART III - VERIFICATION OF FACE-TO-FACE DISCUSSION

The following face-to-face discussions of duties, responsibilities, performance objectives, standards, and accomplishments for the rating period

01 Jun 04 _____ to _____ 31 Oct 04 _____ took place:

| | DATES | RATEE INITIALS | RATER INITIALS | INTERMEDIATE RATER INITIALS | SENIOR RATER INITIALS   DATE *(If used)* |
|---|---|---|---|---|---|
| INITIAL | 13 Aug 04 | *[initials]* | *[initials]* | | |
| MIDPOINT | | | | | |

### PART IV - RATEE *(Complete a, b, c below for this rating period)*

a. STATE YOUR SIGNIFICANT DUTIES AND RESPONSIBILITIES. DUTY TITLE IS:          General Attorney

Serves as General Attorney in the Office of Counsel. Under general supervision and review of the Counsel to whom assigned, provides legal advice, interpretations and determinations on matters involved in Corps of Engineers programs and missions. Performs legal research in final form, on a variety of the most complex and difficult legal problems in all areas of responsibility of the Office of Counsel. These areas include, but are not limited to, procurement law, environmental law, litigation, and legislation, including agency authorities, and administrative law. Responds to inquiries concerning the work of the office and prepares in final form and for signature of proper official, replies to inquiries and correspondence from Congress, the Army and other groups pertaining to legal matters within the area of responsibility of the Counsel to whom assigned including the Comptroller General, and from various elements within the Army Corps of Engrs.

b. INDICATE YOUR MAJOR PERFORMANCE OBJECTIVES/INDIVIDUAL PERFORMANCE STANDARDS

### A. COMMUNICATION SKILLS/CUSTOMER SERVICE
o  Listens actively to internal and external customers.
o  Keeps others informed.
o  Presents ideas simply, clearly, and effectively.
o  Identifies, understands, and responds to the needs of the customer.
o  Solicits and provides constructive and honest feedback.

### B. TEAM BEHAVIOR
o  Is a team contributor.
o  Treats you as an important member of the team.
o  Puts interest of team ahead of self.
o  Is considerate and cooperative.
o  Builds consensus and shares relevant information.

### C. VALUES
o  Is ethical and committed to doing what is right.
o  Accepts personal responsibility for assigned activities.
o  Supports organizations efforts to establish a work environment free of discrimination.     (Cont'd)

DA FORM 7222-1, AUG 1998          PREVIOUS EDITION IS OBSOLETE.                    USAPA V1.00

## SENIOR SYSTEM CIVILIAN EVALUATION REPORT SUPPORT FORM
For use of this form, see AR 690-400; the proponent agency is ASA(M&RA)

### PART I - RATEE IDENTIFICATION

| a. NAME OF RATEE *(Last, First, Middle Initial)* | b. PAY PLAN, SERIES/GRADE | c. ORGANIZATION/INSTALLATION |
|---|---|---|
| ANTONACCI, LOUIS B. | GS-0905-11 | CEHNC-OC |

### PART II - RATING CHAIN - YOUR RATING CHAIN FOR THE EVALUATION PERIOD IS:

| | NAME | POSITION |
|---|---|---|
| RATER | MARGARET P. SIMMONS | Counsel |
| INTERMEDIATE RATER *(Optional)* | NAME Diehl, LTC David | POSITION |
| SENIOR RATER | NAME Allen, Ronald & Pike, Lloyd | POSITION |

### PART III - VERIFICATION OF FACE-TO-FACE DISCUSSION

The following face-to-face discussions of duties, responsibilities, performance objectives, standards, and accomplishments for the rating period
01 Oct 04 to 30 Sep 05 took place:

| | DATES | RATEE INITIALS | RATER INITIALS | INTERMEDIATE RATER INITIALS | SENIOR RATER INITIALS   DATE *(If used)* |
|---|---|---|---|---|---|
| INITIAL | | | | | |
| MIDPOINT | 22 Jul 2005 | *U* | *TWS* | | |

### PART IV - RATEE *(Complete a, b, c below for this rating period)*

a. STATE YOUR SIGNIFICANT DUTIES AND RESPONSIBILITIES. DUTY TITLE IS:    General Attorney

Assistant Counsel responsible for providing procurement counsel to senior leadership and various contracting officers. Reviews formation and administrative contract actions for legal sufficiency. Prepares government position in bid protests to the Agency, and recommends Agency position in protests before the GAO. Also serves as Freedom of Information Act Officer and Ethics Counselor, as assigned. Recommends government position in contract disputes, drafts final contracting officer's decisions IAW the Contract Dispute Act, and represents the government position before the ASBCA.

b. INDICATE YOUR MAJOR PERFORMANCE OBJECTIVES/INDIVIDUAL PERFORMANCE STANDARDS

## A.  COMMUNICATIONS SKILLS/CUSTOMER SERVICE

1. Listens actively to internal and external customers.
2. Keeps others informed.
3. Presents ideas simply, clearly, and effectively.
4. Identifies, understands, and responds to the needs of the customer.
5. Solicits and provides constructive and honest feedback.

## B.  TEAM BEHAVIOR

1. Is a team contributor.
2. Treats you as an important member of the team.
3. Puts interest of team ahead of self.
4. Is considerate and cooperative.
5. Builds consensus and shares relevant information.

**DA Form 7222-1 Continuation**
**b. Major Performance Objectives/Individual Performance Standards**
**Louis B. Antonacci**

## C. VALUES

1. Is ethical and committed to doing what is right.
2. Accepts personal responsibility for assigned activities.
3. Supports organization's efforts to establish a work environment free of discrimination.
4. Can be counted on to do what he or she says will be done.
5. Is trustworthy, open and honest.

## D. CONTINUOUS IMPRIOVEMENTS

1. Delivers excellence in customer service.
2. Improves existing processes and/or introduces new methods.
3. Is creative and innovative.
4. Anticipates and prepares for change.
5. Actively increases personal skill, knowledge, and technology base.

## E. TECHNICAL OBJECTIVES

1. Conduct thorough and expeditious legal review of ~~utility service contracts~~ assigned contracts.
2. Provide comprehensive legal support to ~~Deputy Army Power Procurement Officer.~~ assigned programs.
3. Provide timely and accurate legal counsel to the HNC ~~Installation Support Directorate.~~ Chemical Demilitarization.
4. Manage workload using CEALS-MTS. Keep all CEALS-MTS data accurate and current.
5. Participate in preventive law practice by publishing at least two (2) CEHNC-OC bulletins on fiscal/contract issues.
6. Exercise independent judgment. Maintain responsiveness to client.
7. Engage in knowledge sharing.
8. Support PMBP – develop an understanding of the USACE Project Management Business Process (PMBP) and educate team members about PMBP concepts. Use client-focused teamwork in accomplishing day-to-day work.

**c. LIST YOUR SIGNIFICANT CONTRIBUTIONS**

As Lead Attorney for Chemical Demilitarization Directorate, provided timely and thorough legal review for all contract actions. Settled claim at CAMDS through Alternative Dispute Resolution (ADR) at ASBCA in Falls Church, VA. Settlement was favorable to the government. Handled all aspects of the claim.

Traveled with Chemical Demilitarization team to Moscow, Russia, to assist with analyzing cost estimate to complete the Russian Chemical Weapons Destruction Facility currently under construction in Schuch'ye, Russia.

Presented paper on international government contracting at the Chemical Weapons Destruction Conference held in Edinburgh, Scotland.  Had comment published in Santa Clara Journal of International Law.

Assisted setting up a Qualified Recycling Program (QRP) at the Deseret Chemical Depot in Tooele, UT.

Analyzed the legal sufficiency of all Cooperative Agreements funded under the DOD Legacy Program that is managed at CEHNC. Updated the Cooperative Agreements to comply with new DOD template.

Participated with IM to provide briefing to Commander on changes under AR 25-2, Information Assurance, regarding roles and responsibilities, and assisted with subsequent training for system administrators.

Prepared articles on procurement and fiscal law in support of OC's preventive law practice.

_____
SIGNATURE AND DATE          18 Jan 2006

## PART V - PERFORMANCE STANDARDS - SENIOR SYSTEM CIVILIAN POSITIONS

To derive Objectives ratings, apply the applicable performance standards below; the standards are written at the SUCCESS level, e.g., Ratee, in most cases:

**TECHNICAL COMPETENCE.** Exhibits technical knowledge, skills, and abilities to get desired results within established time frames and with the appropriate level of supervision. Sets and meets realistic milestones. Establishes priorities that reflect mission and organizational needs. Plans so that adequate resources are available. Makes prompt and sound decisions.

**INNOVATION/INITIATIVE.** Develops and implements or suggests better ways of doing business--methods, equipment, processes, resources. Seeks/accepts developmental opportunities. Serves on professional/technical committees, writes technical papers, joins professional societies to enhance personal knowledge and advance state-of-the-art of profession.

**RESPONSIBILITY/ACCOUNTABILITY.** Uses resources prudently and for intended purposes. Complies with DA emphasis programs, e.g., EEO/AA, safety/security, internal control, inventory management, quality assurance, personnel management, contract awards to small business concerns. Supports and encourages Total Army Quality (TAQ) approaches, e.g., team effort, continuous process/product improvement and customer satisfaction. Takes responsibility for personal errors, takes or proposes timely/adequate corrective measures. Establishes personal performance objectives that are challenging and reflect mission needs.

**WORKING RELATIONSHIPS.** Is an effective team player. Works well with group and others to get the job done. Exhibits a customer care attitude; e.g., shows respect to others; is courteous and seeks acceptable compromise in areas of difference.

**COMMUNICATION.** Provides or exchanges accurate/complete oral and written ideas and information in a timely manner. Listens effectively so that resultant actions show understanding of what was said. Coordinates so that all relevant individuals and functions are included in/informed of decisions and actions.

**FOR SUPERVISORY POSITIONS ONLY:**

**ORGANIZATIONAL MANAGEMENT AND LEADERSHIP.** Provides vision and communicates mission and organizational goals to all subordinates. Sets standard/leads by example. Implements/complies with appropriate DA emphasis programs. Secures/allocates/manages resources for effectiveness and efficiency. Takes timely and appropriate personnel actions. Develops subordinates through mentoring, counseling, providing challenging training and work assignments and timely performance evaluations. Recruits and retains high quality people by creating a positive environment that offers challenge and growth.

**EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION (EEO/AA).** Applies EEO principles to all aspects of personnel management (e.g., hiring, training, work assignments/schedules, discipline, counseling and awards). As appropriate, takes immediate corrective action if sexual harassment or other discriminatory/unfair treatment is observed, reported or suspected. Provides leadership and emphasis to the execution of the Affirmative Employment Plan. Participates in EEO/AA activities and encourages subordinates to do so.

Louis Antonacci

# 360 REPORT FOR 2005 BY SECTION

| Sections | Data Filter | Count | Mean | Mean | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| A. COMMUNICATION SKILLS / CUSTOMER SERVICE | Self | 0.0 | - | | | | | | | | | | | |
| | All but Self | 9.0 | 9.07 | | | | | | | | | | | |
| B. TEAM BEHAVIOR | Self | 0.0 | - | | | | | | | | | | | |
| | All but Self | 9.0 | 9.23 | | | | | | | | | | | |
| C. VALUES | Self | 0.0 | - | | | | | | | | | | | |
| | All but Self | 9.0 | 9.66 | | | | | | | | | | | |
| D. CONTINUOUS IMPROVEMENTS | Self | 0.0 | - | | | | | | | | | | | |
| | All but Self | 9.0 | 9.26 | | | | | | | | | | | |
| Overall Averages | Self | 0.0 | 0.00 | | | | | | | | | | | |
| | Team | 9.0 | 9.31 | | | | | | | | | | | |

Louis Antonacci

# 360 REPORT FOR 2005

| Questions | Data Filter | Count | Mean | Mean (0–10) |
|---|---|---|---|---|
| 1. Listens actively to internal and external customers. | Self | - | - | |
| | All but Self | 9 | 9.11 | |
| 2. Keeps others informed. | Self | - | - | |
| | All but Self | 9 | 9.13 | |
| 3. Presents ideas simply, clearly, and effectively. | Self | - | - | |
| | All but Self | 9 | 9.00 | |
| 4. Identifies, understands, and responds to the needs of the customer. | Self | - | - | |
| | All but Self | 9 | 9.00 | |
| 5. Solicits and provides constructive and honest feedback. | Self | - | - | |
| | All but Self | 9 | 9.11 | |
| 1. Is a team contributor. | Self | - | - | |
| | All but Self | 9 | 9.25 | |
| 2. Treats you as an important member of the team. | Self | - | - | |
| | All but Self | 9 | 9.44 | |
| 3. Puts interest of team ahead of self. | Self | - | - | |
| | All but Self | 9 | 9.13 | |
| 4. Is considerate and cooperative. | Self | - | - | |
| | All but Self | 9 | 9.22 | |
| 5. Builds consensus and shares relevant information. | Self | - | - | |
| | All but Self | 9 | 9.13 | |
| 1. Is ethical and committed to doing what is right. | Self | - | - | |
| | All but Self | 9 | 10.00 | |
| 2. Accepts personal responsibility for assigned activities. | Self | - | - | |
| | All but Self | 9 | 9.67 | |
| 3. Supports organizations efforts to establish a work environment free of discrimination. | Self | - | - | |
| | All but Self | 9 | 9.88 | |
| 4. Can be counted on to do what he or she says will be done. | Self | - | - | |
| | All but Self | 9 | 9.11 | |
| 5. Is trustworthy, open, and honest. | Self | - | - | |
| | All but Self | 9 | 9.67 | |
| 1. Delivers excellence in customer service. | Self | - | - | |
| | All but Self | 9 | 9.50 | |
| 2. Improves existing processes and/or introduces new methods. | Self | - | - | |
| | All but Self | 9 | 9.25 | |
| 3. Is creative and innovative. | Self | - | - | |
| | All but Self | 9 | 9.22 | |
| 4. Anticipates and prepares for change. | Self | - | - | |
| | All but Self | 9 | 9.13 | |
| 5. Actively increases personal skills, knowledge, and technology base. | Self | - | - | |
| | All but Self | 9 | 9.22 | |
| Overall Averages | Self | 0.0 | 0.00 | |
| | Team | 9.0 | 9.31 | |

# EXHIBIT E



# ANTONACCI LAW PLLC

3338 7th Street NE
Washington, DC
202.291.2327
lou@antonaccilaw.com

February 10, 2021

**VIA PERSONAL DELIVERY**

Mr. John T. Frey
Clerk of the Court
Fairfax County Circuit Court
4110 Chain Bridge Road
Fairfax, VA 22030

RE:    AECOM Technical Services, Inc. v. The Lane Construction Corp.
       Case No. CL2020-18128
       Defendant's Memorandum in Support of Crave Oyer and Motion to Strike

Dear Mr. Frey,

On January 29, 2021, this firm attempted to file the subject document, together with supporting exhibits and four (4) binders and a thumb drive it seeks to enter into evidence in this case. The Binders and their contents are again listed below:

| Binder 1 | Subcontract (March 16, 2017) |
|---|---|
| | Exhibit A – List of Prime Contract Documents incorporated by reference |
| | Exhibit "B" – 395 Express Lanes Project Contract Documents Index |
| | Exhibit B – Proposal incorporated by reference |
| | Exhibit C – Scope of Services |
| | Exhibit C-1 – Detailed Scope of Services |
| | Exhibit D – Design Schedule |
| | Exhibit D-1 – Detailed Design Schedule |
| | Exhibit E – Payment |
| | Exhibit F – Design Risk Contingency |
| | Exhibit F-1 – Design Risk Assessment |
| **Binder 2** | Prime Contract |
| **Binder 3** | Lane Proposal |

Mr. John T. Frey
Circuit Court Clerk
February 10, 2021
Page 2 of 2

| Binder 4 | Lane Proposal continued |
|---|---|
| Thumbdrive "iNSERViO" | Preliminary Design Documents Issued By the Owner Pursuant to Part 2 of the Prime Contract (3,496 pages) |

This firm hired a private process server (Capitol Process) to complete this task, but the clerk's office refused to accept the filing and instead directed the process server to Judges Chambers, who accepted the memorandum, the binders, and the thumb drive. Please see the attached affidavit of George Illidge, private process server for Capitol Process.

The memorandum, binders, and thumb drive were served upon counsel for the Plaintiff, via personal service, later that day. Please see the attached affidavit of Darin Freeman, private process server for Capitol Process.

I spoke with chambers and the clerk's office on Monday, February 1, 2021, to ensure the subject memorandum, together with supporting exhibits, including the affidavits of Brian Basnight and Richard McDonough, which attest to the authenticity of the contract documents contained in the binders, was filed with this court. The clerk's office assured me it was being filed.

Please file the affidavits of George Illidge and Darin Freeman, together with this letter, with the court records in this matter.

Please do not hesitate to contact the undersigned with any questions or concerns.

Enclosures

Sincerely,

**ANTONACCI LAW PLLC**

*Louis B. Antonacci*

By: Louis B. Antonacci, Managing Principal

cc:    Mr. Allen T. Wiggins
       Mr. David Mancini

www.antonaccilaw.com



# ANTONACCI LAW PLLC

3338 7th Street NE
Washington, DC
202.291.2327
lou@antonaccilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that, on February 10, 2021, the undersigned caused the above letter and affidavits noted therein to be served via electronic mail on the following:

Dave Mancini (VSB No. 24017)
TROUTMAN PEPPER HAMILTON SANDERS, LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Phone:      (202) 274-2840
Facsimile: (202) 274-2995
E-mail:  David.Mancini@troutman.com
Counsel for Plaintiff, AECOM Technical Services, Inc.

*Louis B. Antonacci*

By:  Louis B. Antonacci

www.antonaccilaw.com

CIRCUIT COURT FOR FAIRFAX COUNTY, VIRGINIA

AECOM Technical Services, Inc.

    Plaintiff

    vs.

The Lane Construction Corporation

    Defendant

FILED
CIVIL PROCESSING

2021 FEB 10 A 10: 22

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

Civil Action No.: CL 2020-18128

## AFFIDAVIT

That I, George Illidge, a Private Process Server, being duly sworn, depose and say:

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on January 29, 2021, I arrived at the Clerk's office at Fairfax County Circuit Court, 4110 Chain Bridge Road, Fairfax, Virginia 22030 and presented the Clerk with three complete sets of the following documents: Letter dated January 29, 2021 directed to Mr. John T. Frey, Friday Motions Day - Praecipe/Notice, Defendant's Memorandum of Law in Support of its Crave Oyer and Motion to Strike with Exhibits, and Attachments including four binders and a thumb drive.

I asked the Clerk to file stamp the original set of pleadings and supporting binders, as well as two identical sets. The Clerk reviewed the cover letter and the documents and said that these were not supposed to be provided to the Clerk's office. He said these would instead need to go to Judge's Chambers and he then directed me to the Judicial Chambers office on the 5th Floor.

When I arrived at the Judicial Chambers office, the administrator reviewed the documents and confirmed that this office was the correct recipient. The administrator stated that they only needed to keep one complete set of the three I'd provided, but agreed to file stamp the remaining two sets as well.

The administrator file stamped all three document sets but informed me that they did not file-stamp the accompanying binders. The administrator kept one complete package and returned the remaining two file stamped packages to me. The packages which were returned to me were file stamped at 12:53 PM.

When I spoke to Louis Antonacci soon after on January 29, 2021 at 12:59 PM, I did not relay to him that the filing was redirected to the Judicial Chambers, nor did I relay to him that the Clerk did not handle the filing. I did not state or suggest to Louis Antonacci that the documents were not filed with the Clerk's office.

I declare under penalty of perjury that this information is true.

Sworn to before me on 02/05/2021

Angela H. Croson

Notary Public

My Commission Expires:

ANGELA H. CROSON
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 31, 2024

George Illidge

Client Ref Number: N/A

Job #: 1586037

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

## CIRCUIT COURT FOR FAIRFAX COUNTY, VIRGINIA

**AECOM Technical Services, Inc.**

                        Plaintiff

                                                    Civil Action No.: CL 2020-18128

                                        vs.                    FILED
                                                          CIVIL PROCESSING

**The Lane Construction Corporation**                      2021 FEB 10 A 10: 22

                                                          JOHN T. FREY
                                                     CLERK, CIRCUIT COURT
                                                          FAIRFAX, VA

                        Defendant

### AFFIDAVIT OF SERVICE

I, Darin Freeman, Jr., a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Letter dated January 29, 2021 directed to Mr. John T. Frey, Friday Motions Day - Praecipe/Notice, Defendant's Memorandum of Law in Support of its Crave Oyer and Motion to Strike with Exhibits, and Attachments in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 1/29/2021 at 3:40 PM, I served Dave Mancini, Esquire (VSB No. 24017) at Troutman Pepper Hamilton Sanders, LLP, 401 9th Street, NW, Suite 1000, Washington, DC 20004 with the Letter dated January 29, 2021 directed to Mr. John T. Frey, Friday Motions Day - Praecipe/Notice, Defendant's Memorandum of Law in Support of its Crave Oyer and Motion to Strike with Exhibits, and Attachments by serving K. Smith, Front Desk Administrator, authorized to accept service.

K. Smith is described herein as:

Gender: Female   Race/Skin: White   Age: 40   Weight: 135   Height: 5'5"   Hair: Black   Glasses: Yes

I declare under penalty of perjury that this information is true and correct.

Sworn to before me on 01/29/2021

_Angela H. Croson_
Angela H. Croson
Notary Public, District of Columbia
My Commission Expires: March 31, 2024

_Darin Freeman, Jr._
Darin Freeman, Jr.

Client Ref Number: N/A
Job #: 1586018

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

# EXHIBIT F

Case 1:26-cv-00211-LLA    Document 72-1    Filed 03/31/26    Page 480 of 546



**Louis Antonacci <lou@antonaccilaw.com>**

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Luzier, Dennis A.** <DALuzier@laneconstruct.com>        Tue, Jun 1, 2021 at 4:15 PM
To: "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>,
"lou@antonaccilaw.com" <lou@antonaccilaw.com>

All,


See notes below for all custodians that AECOM requested


1. Brian Basnight – active
2. Dennis Luzier – active, computer replaced in April 2021
3. William Potempa – Last date worked (LDW) 10/02/2020
4. Jason Tracy – LDW 12/31/2018
5. Jennifer Dreyer – LDW 06/12/2020
6. Jesse Edwards – LDW 7/31/2018
7. Wallace Alphin – consultant but had a Lane computer
8. Kia Najad – LDW 5/25/2018
9. Phil Sullivan – still active
10. James Huie – LDW 4/1/2021
11. Martin Hoover – Still active
12. Bill Hameza – LDW 12/31/2020


The ligation hold was 2/6/2020 per Allen's email below. Jason Tracy, Jesse Edwards, and Kia Nejad all left prior to 2/2/2020, therefore nothing needs to be completed.

Active employees Basnight, Luzier, Sullivan, Hoover.

Jim Huie's computer is available in Chantilly

Potempa, Hameza, Dreyer – computers have been wiped clean.

Need to check with Wallace on when he turned his computer in. Tim, do you know anything on this?


Conclusion – may need computers from Basnight, Luzier, Sullivan, Hoover, Huie and maybe Alphin. **Has it been ruled out that the information needed can't be obtained from One Drive?**


Denny

**From:** Wiggins, Allen T. <atwiggins@laneconstruct.com>
**Sent:** Thursday, May 27, 2021 5:56 PM
**To:** Luzier, Dennis A. <DALuzier@laneconstruct.com>
**Cc:** Basnight, Brian A. <BABasnight@laneconstruct.com>; Wren, Tim <TWren@laneconstruct.com>;
lou@antonaccilaw.com
**Subject:** FW: Project Lane: Forensic Collections for Laptop, Email and OneDrive

Denny,

I spoke to Lou about collecting the laptops and explained to him that we likely can only provide access to those machines from current employees. Based on what you and I discussed, this list includes you, Brian, Phil Sullivan, and Martin Hoover. For the current employees we also need to determine if each still has the same laptop they had while on 395 or if they have changed laptops during the relevant time period. For example, if Phil Sullivan who is in Florida on another project, no longer has the same laptop that he had on 395, there is no need to make a copy of his current laptop.

For the former employees, we need to determine the date each left Lane. If an employee left before the litigation hold (2/6/2020), we shouldn't need to do anything further other than documenting that fact. If they left after the litigation hold, we will need to address what happened to their laptop assuming we can no longer have it. For example, we should probably run down whether we still have Bill Potempa's laptop. If not, we should document that it was decommissioned pursuant to our normal practice.

I will follow up with you next week to set this in motion.

Allen



**Allen Wiggins** | Assistant General Counsel, Claims & Litigation
The Lane Construction Corporation

M 919-451-1308

---

**From:** Crouse, Andrew <acrouse@epiqglobal.com>
**Sent:** Thursday, May 27, 2021 2:17 PM
**To:** Wren, Tim <TWren@laneconstruct.com>; Griggs, Amy <amy.griggs@epiqglobal.com>; lou@antonaccilaw.com;
Ciancanelli, Christopher G. <CGCiancanelli@laneconstruct.com>
**Cc:** DL-ATL0001 <ATL0001@epiqglobal.com>; Marlowe, Lisette <Lisette.Marlowe@epiqglobal.com>; Tao, Terry
<terry.tao@epiqglobal.com>; Basnight, Brian A. <BABasnight@laneconstruct.com>; Tobi Athanas
<tobi@antonaccilaw.com>; Wiggins, Allen T. <atwiggins@laneconstruct.com>; Luzier, Dennis A.
<DALuzier@laneconstruct.com>; Frioni, David <DFrioni@laneconstruct.com>
**Subject:** RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 482 of 546

Thank you Tim!


Best,


AC


**Andrew N. Crouse**

Epiq | Director, Forensics

Phone: +1 202.471.2865

Mobile: +1 202.779.1857

Email: acrouse@epiqglobal.com

---

**From:** Wren, Tim <TWren@laneconstruct.com>
**Sent:** Thursday, May 27, 2021 2:13 PM
**To:** Crouse, Andrew <acrouse@epiqglobal.com>; Griggs, Amy <amy.griggs@epiqglobal.com>; lou@antonaccilaw.com; Ciancanelli, Christopher G. <CGCiancanelli@laneconstruct.com>
**Cc:** DL-ATL0001 <ATL0001@epiqglobal.com>; Marlowe, Lisette <Lisette.Marlowe@epiqglobal.com>; Tao, Terry <terry.tao@epiqglobal.com>; Basnight, Brian A. <BABasnight@laneconstruct.com>; Tobi Athanas <tobi@antonaccilaw.com>; Wiggins, Allen T. <atwiggins@laneconstruct.com>; Luzier, Dennis A. <DALuzier@laneconstruct.com>; Frioni, David <DFrioni@laneconstruct.com>
**Subject:** RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive


Andrew,


     No existing restrictions on the Dell's. We are trialing this on Lenovo's but not currently in production.


     Thanks,

     Tim




**Tim Wren** | Enterprise Solutions Architect
The Lane Construction Corporation

T 203-718-4226   M 503-793-1856

**From:** Crouse, Andrew <acrouse@epiqglobal.com>
**Sent:** Thursday, May 27, 2021 11:12 AM
**To:** Wren, Tim <TWren@laneconstruct.com>; Griggs, Amy <amy.griggs@epiqglobal.com>; lou@antonaccilaw.com; Ciancanelli, Christopher G. <CGCiancanelli@laneconstruct.com>
**Cc:** DL-ATL0001 <ATL0001@epiqglobal.com>; Marlowe, Lisette <Lisette.Marlowe@epiqglobal.com>; Tao, Terry <terry.tao@epiqglobal.com>; Basnight, Brian A. <BABasnight@laneconstruct.com>; Tobi Athanas <tobi@antonaccilaw.com>; Wiggins, Allen T. <atwiggins@laneconstruct.com>; Luzier, Dennis A. <DALuzier@laneconstruct.com>; Frioni, David <DFrioni@laneconstruct.com>
**Subject:** RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

Hi Tim,

Thank you for the laptop information.  One follow-up question:  if we imaged the laptops using a bootable USB Ubuntu Linux forensic tool, are there any BIOS/UEFI restrictions in place where this would not be possible (e.g. SecureBoot that cannot be disabled, BIOS password restrictions, internal security policies, etc.)?  This would be the quickest way to image, and would allow us to image many of them at once without having to remove hard drives.

Best,

AC

**Andrew N. Crouse**

Epiq | Director, Forensics

Phone:   +1 202.471.2865

Mobile:   +1 202.779.1857

Email: acrouse@epiqglobal.com

---

**From:** Wren, Tim <TWren@laneconstruct.com>
**Sent:** Thursday, May 27, 2021 12:34 PM
**To:** Griggs, Amy <amy.griggs@epiqglobal.com>; lou@antonaccilaw.com; Ciancanelli, Christopher G. <CGCiancanelli@laneconstruct.com>
**Cc:** DL-ATL0001 <ATL0001@epiqglobal.com>; Marlowe, Lisette <Lisette.Marlowe@epiqglobal.com>; Crouse, Andrew <acrouse@epiqglobal.com>; Tao, Terry <terry.tao@epiqglobal.com>; Basnight, Brian A. <BABasnight@laneconstruct.com>; Tobi Athanas <tobi@antonaccilaw.com>; Wiggins, Allen T. <atwiggins@laneconstruct.com>; Luzier, Dennis A. <DALuzier@laneconstruct.com>; Frioni, David <DFrioni@laneconstruct.com>
**Subject:** RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

> **CAUTION:** This email originated from outside of Epiq. Do not click links or open attachments unless you recognize the sender and know the content is safe. Report phishing by using the "Phish Alert Report" button above.

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 484 of 546

Amy,

> I've added my comments inline below.

> Thanks,

> Tim



**Tim Wren** | Enterprise Solutions Architect
The Lane Construction Corporation

T 203-718-4226   M 503-793-1856

---

**From:** Griggs, Amy <amy.griggs@epiqglobal.com>
**Sent:** Thursday, May 27, 2021 9:03 AM
**To:** lou@antonaccilaw.com; Ciancanelli, Christopher G. <CGCiancanelli@laneconstruct.com>; Wren, Tim <TWren@laneconstruct.com>
**Cc:** DL-ATL0001 <ATL0001@epiqglobal.com>; Marlowe, Lisette <Lisette.Marlowe@epiqglobal.com>; Crouse, Andrew <acrouse@epiqglobal.com>; Tao, Terry <terry.tao@epiqglobal.com>; Basnight, Brian A. <BABasnight@laneconstruct.com>; Tobi Athanas <tobi@antonaccilaw.com>; Wiggins, Allen T. <atwiggins@laneconstruct.com>; Luzier, Dennis A. <DALuzier@laneconstruct.com>
**Subject:** Project Lane: Forensic Collections for Laptop, Email and OneDrive

Lane Construction and Lou:

Thank you for joining the scoping call. Below are the action items and outstanding questions specific for the forensic collection:

**Lane Custodians Requested by AECOM:**

1. Brian Basnight
2. Dennis Luzier
3. William Potempa
4. Jason Tracy
5. Jennifer Dreyer
6. Jesse Edwards
7. Wallace Alphin
8. Kia Najad
9. Phil Sullivan
10. James Huie
11. Martin Hoover
12. Bill Hameza

Software Law, PLLC Mail - Privileged and Confidential - RE: Project Lane: Process Collection for Laptop, Email and OneDrive

**Mimecast and OneDrive Collections:**

- Terry Tao collected Mimecast and OneDrive data from Basnight, Luzier, Potempa, Tracy, Dreyer, Edwards, Alphin, Najad and Sullivan
- We received permission to proceed with the Mimecast and OneDrive data collection for Huie, Hoover and Hamza

**Laptop Collection:**

- This will occur onsite at the following address:  14500 Avion Parkway, Chantilly, VA 20151
- We will need to have all 12 custodians' laptops onsite for the collection.  Lane will need to coordinate and let Amy know what date all laptops will be there.  We will also need the contact information for the person onsite to meet our forensic consultant onsite.
- Epiq consultants will adhere to CDC guidelines on COVID-19 precautions.  This does include the proper use of a mask at all times while indoors as well as social distancing.  Should Lane Construction have any additional requirements, please let me know prior to the collection and Epiq will adhere to these.

@Wren, Tim: Epiq spoke with you last August regarding the Purple Line matter.  We would like to confirm the following as soon as you can:

**PC Endpoints (User Laptops and Desktops)**

1.1.  Lane Construction provisions Dell machines to its employees.  All systems run Windows 10. We are transitioning to Lenovo so we are now provisioning both manufacturers.

1.2.  Lane Construction does not use Full Disk Encryption (FDE) or file-level encryption.   That is correct for a client PC.

1.3.  Lane Construction does not lock down USB ports via AD group policy, and no third party software is used for USB data security.  USB lockdown is being phased into our environment via Intune police; USB data is monitored via Crowdstrike for security.

1.4.  If a machine has not been connected to the Lane network in 90 days, the accounts are deactivated from AD. The machine account is deactivated. We have this process for both traditional Active Directory Joined PCs and Azure Active Directory Joined PCs

**LANE ACTION ITEMS:**

- Let us know (provide minimum 48 business hours in advance) when all 12 laptops are at the Chantilly Office
- Provide the contact information for the Lane employee who will be onsite to meet our forensic consultant.
- @Wren, Tim to confirm the information above

Let me know if you have any questions Thank you!.

**Amy Griggs**

Epiq | Account Director

Washington, DC

Office: +1 (202) 843-2404

Mobile: +1 (952) 454-1707

Email: amy.griggs@epiqglobal.com

**People. Partnership. Performance.**

www.epiqglobal.com

*This electronic mail (including any attachments) may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). If you have received this message in error, please notify the sender immediately by reply email of the inadvertent transmission and then immediately delete the original message (including any attachments) in its entirety.*

Note: This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any miss-transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LANE INDUSTRIES and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Thank You.



Louis Antonacci <lou@antonaccilaw.com>

---

## Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Louis Antonacci** <lou@antonaccilaw.com>                    Wed, Jun 2, 2021 at 12:23 PM
To: "Wren, Tim" <TWren@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>

Tim/Denny,

I addressed the OneDrive syncing with opposing counsel. Because OneDrive does not sync all the local folders, they want the data on the physical PC. Under VA rules, they are entitled to it, so we need to provide it to the extent possible.

What happened to Potempa, Hameza, and Dreyer's laptops? Was the data copied before they were wiped? Is it Lane's standard practice to wipe the laptops after an employee's LDW? Do we have a written policy we could provide?

Can Lane coordinate with Epiq directly for their visit to Chantilly to copy the data?

Thanks,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

Case 1:26-cv-00311-CLA    Document 72-1    Filed 03/31/26    Page 488 of 546



**Louis Antonacci <lou@antonaccilaw.com>**

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Wren, Tim** <TWren@laneconstruct.com>                                    Wed, Jun 2, 2021 at 12:42 PM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Frioni, David" <DFrioni@laneconstruct.com>

Lou,

Allen will have more context but the hold / initial discovery was performed by Jennifer Dryer, outside of IT, and I assume it was comprehensive to all local folders. IT doesn't copy data prior to wiping as it is assumed that all files are stored in the synced locations. Our Document Control policy attached and excerpted below highlights that these are the approved locations but I'm not aware of any written policy regarding computer wiping procedure but I have added our IT Director as he may be aware of a better reference.

Thanks,

Tim

*SharePoint is the only platform that should be used for official project documents. The owner's project site may have many of the required documents however this does not meet the requirements for document storage and retention at Lane. Many Lane departments may need access to all of these documents and will not have access to the owner's site. One Drive should only contain accessory files that were used to develop the final documents that reside in SharePoint.*

[Quoted text hidden]

---

📄 **Chapter 28 Document Control.pdf**
739K



Louis Antonacci <lou@antonaccilaw.com>

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Louis Antonacci** <lou@antonaccilaw.com>             Wed, Jun 2, 2021 at 3:35 PM
To: "Frioni, David" <DFrioni@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>

Thanks, Tim.

Hi David: Can you please elaborate on Lane's computer wiping procedure? Thanks.

**Managing Principal**
**Antonacci Law PLLC**
(o) 202-291-2327
(m) 703-300-4635
(e) lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

Case 1:26-cv-00211-LLA    Document 72-1    Filed 03/31/26    Page 490 of 546



**Louis Antonacci <lou@antonaccilaw.com>**

---

## Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Frioni, David** <DFrioni@laneconstruct.com>                    Wed, Jun 2, 2021 at 4:00 PM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>

Hello Louis,

Lane's standard best practice when repurposing end-user computering is to reimage the drives. There is no additional formal policy that speaks to this directly.

Regards,



**David Frioni** | Director of Information Technology
The Lane Construction Corporation

T 203-439-2984   M 203-376-7049

[Quoted text hidden]

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 491 of 546



Louis Antonacci <lou@antonaccilaw.com>

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Louis Antonacci** <lou@antonaccilaw.com>              Wed, Jun 2, 2021 at 4:07 PM
To: "Frioni, David" <DFrioni@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>

Thanks. Is there any policy with litigation holds as it relates to IT?

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

Case 1:26-cv-00211-LLA    Document 72-1    Filed 03/31/26    Page 492 of 546



**Louis Antonacci <lou@antonaccilaw.com>**

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Frioni, David** <DFrioni@laneconstruct.com>                          Thu, Jun 3, 2021 at 2:05 PM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, "Firebaugh, Tiffany S." <TSFirebaugh@laneconstruct.com>

Louis-

There is no formal policy related directly to litigation holds as it relates to IT.

[Quoted text hidden]

Case 1:26-cv-00211-LLA    Document 72-1    Filed 03/31/26    Page 493 of 546



Louis Antonacci <lou@antonaccilaw.com>

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

**Louis Antonacci** <lou@antonaccilaw.com>                                      Thu, Jun 3, 2021 at 2:19 PM
To: "Frioni, David" <DFrioni@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, "Firebaugh, Tiffany S." <TSFirebaugh@laneconstruct.com>

David,

Thanks for your response.

Let me ask this another way: How does Lane's IT Dept. preserve data that Lane is legally obligated to preserve? And why did that not happen with respect to Dreyer's, Potempa's, and Hameza's laptops?

Thanks again.

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 494 of 546



Louis Antonacci <lou@antonaccilaw.com>

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Louis Antonacci** <lou@antonaccilaw.com>      Wed, Jun 16, 2021 at 9:50 AM
To: "Frioni, David" <DFrioni@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, "Firebaugh, Tiffany S." <TSFirebaugh@laneconstruct.com>

All,

Following up on this. If the answer is that no one knows how or why Jen Dreyer wiped these laptops, then someone needs to get a statement from her. We will need an explanation.

Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

Case 1:26-cv-00311-LLA    Document 72-1    Filed 03/31/26    Page 495 of 546



Louis Antonacci <lou@antonaccilaw.com>

---

## Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Firebaugh, Tiffany S.** <TSFirebaugh@laneconstruct.com>                    Wed, Jun 16, 2021 at 11:03 AM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>, "Frioni, David" <DFrioni@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, "Firmender, Seth T." <STFirmender@laneconstruct.com>

**Please allow me to intervene on behalf of my IT Team and offer the following explanation/timeline:**

First in response to last email, Jen Dreyer would not have the administrative rights to wipe data off of any Lane computer, this has to be done by IT.

**Timeline from IT perspective:**

  **October 5, 2020** Allen Wiggins sends an email and asks about legal holds (IT is on email)

    Lou Antonacci sends information about USB (2 Drives) with data from Jen Dreyer

    Jen Dreyer – assigned to collect data for dispute.

    At this point IT is provided no information on legal holds and no custodian list provided.

    Tim Wren (IT) calls Allen Wiggin and still has no list provided

  **March 15, 2021** Incident #53791 logged on IT Help desk -Another Data Request – and IT again explains to Legal that no hold information has been passed along to IT

  **March 23, 2021** Tim Wren (IT) calls Allen Wiggins and receives a verbal list of custodians and legal hold is setup by IT

    At a later data 3 additional names are added

  **April 12, 2021** Full access given to EPIQ to setup future holds – can now mine data for Mimecast (all Lane emails) and One Drive data (all office 365 data/documents)

**Standard Lane process** – employee terminates, wipe device, reimage and assign to new employee

**Standard Operating Procedure / Policy –** all users windows setup is to save all documents to OneDrive

All of the custodian list employees were terminated and an AD Term sent (standard process) via Lane email and help desk system prior to the March 23rd date.   Therefore a soft delete of users was done.

Despite this all instances of the employee data has been retrieved.  You simply do not have the devices.  If there was data on the computer outside of what can be retrieved via Mimecast and OneDrive, which is highly unlikely, it would have been

Case 1:26-cv-00211-LLA — Document 72-1 — Filed 03/31/26 — Page 496 of 546

picked up by Jennfier Dreyer and on the USB drives, which has been placed on EPIQ.



**Tiffany S. Firebaugh** | Chief Information Officer
The Lane Construction Corporation

T 203-439-2923   M 203-379-6889

## Be Green, Leave it on the Screen

[Quoted text hidden]



**Louis Antonacci <lou@antonaccilaw.com>**

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

---

**Firmender, Seth T.** <STFirmender@laneconstruct.com>                    Wed, Jun 16, 2021 at 12:04 PM
To: "Firebaugh, Tiffany S." <TSFirebaugh@laneconstruct.com>, "lou@antonaccilaw.com" <lou@antonaccilaw.com>, "Frioni, David" <DFrioni@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>

I just talked to Tiffany and I will talk to legal and we will revert to this group.  This case is about to be settled and this IT effort is about to end.  We will discuss best practices and lessons learned on a go forward and sharpen our game on our side – all good here – we are one team and we will figure this out!  Seth



**Seth T. Firmender** |  General Counsel
The Lane Construction Corporation

T 203-439-2182   M 203-232-7641

[Quoted text hidden]



Louis Antonacci <lou@antonaccilaw.com>

---

# Privileged and Confidential - RE: Project Lane: Forensic Collections for Laptop, Email and OneDrive

**Louis Antonacci** <lou@antonaccilaw.com>                                    Wed, Jun 16, 2021 at 2:05 PM
To: "Firmender, Seth T." <STFirmender@laneconstruct.com>, "Firebaugh, Tiffany S." <TSFirebaugh@laneconstruct.com>
Cc: "Frioni, David" <DFrioni@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, Tobi Athanas <tobi@antonaccilaw.com>

Seth/Tiffany:

Thanks for the explanation/follow-up. Assuming the case settles very soon then there is no need for me to better understand what exactly occurred here and why.

That said, I need to clarify two errors in Tiffany's timeline:

1. I did not send any information to Lane about data from Jen Dreyer. On October 6, 2020, I mailed, to Ed Arruda, two thumb drives that Bill Potempa gave me on my way to Culpeper the weekend prior. Bill had indicated to me that those thumb drives contained his electronic files related to the project. Please see the attached correspondence in this regard.

2. Per Denny's initial email in this chain, dated June 1, 2021, Jen Dreyer's last day with Lane was June 12, 2020. So she could not have been assigned to collect data for this dispute four months later.

I apologize for all the emails, but this inquiry is/was necessary. And I do not want to be incorrectly associated with Jen's data collection efforts.

Lou

**Managing Principal**
**Antonacci Law PLLC**
(o) 202-291-2327
(m) 703-300-4635
(e) lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**3 attachments**

📄 **Antonacci Law PLLC Mail - 395 Express Lanes - AECOM Document Preservation Notice.pdf**
211K

📄 **Antonacci Law PLLC Mail - LBA Address Info.pdf**
118K

📄 **AL PLLC Ltr. to E. Arruda trx W. Potempa thumb drives.pdf**
2249K

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 500 of 546



Louis Antonacci <lou@antonaccilaw.com>

## 395 Express Lanes - AECOM Document Preservation Notice

**Louis Antonacci** <lou@antonaccilaw.com>      Mon, Oct 5, 2020 at 3:53 PM
To: "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Wren, Tim" <TWren@laneconstruct.com>, "Arruda, Ed S." <ESArruda@laneconstruct.com>, "Basnight, Brian A."
<BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>

All,

Bill gave me two thumb drives when I stopped by the Chantilly office last week. I haven't looked at them, but they are supposed to contain his files related to this project.

It probably makes sense for me to send those thumb drives to your corporate office in CT so that your IT department can ensure everything on them also exists in his custodian file.

Should I send them to the attention of Tim Wren at the 90 Fieldstone Court address?

Thanks,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]



Louis Antonacci <lou@antonaccilaw.com>

## LBA Address Info

**Potempa, William M.** <WMPotempa@laneconstruct.com>                    Thu, Oct 1, 2020 at 9:21 AM
To: Louis Antonacci <lou@antonaccilaw.com>

Lou,

I'll ask our office manager to ship a flash drive to you with my files.

**OR** if you available to stop by Chantilly on way out to Culpepper I can hand it off to you.

Due to COVID, we are limiting visitors to office but I am able to have you stop by for quick visit in afternoon.

Either way works.

Bill

[Quoted text hidden]

Note: This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any miss-transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LANE INDUSTRIES and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Thank You.



# ANTONACCI LAW PLLC

3338 7th Street NE
Washington, DC 20017
202.291.2327 • lou@antonaccilaw.com

October 6, 2020

**VIA FEDERAL EXPRESS**

Mr. Ed Arruda
IT Manager
The Lane Construction Corporation
90 Fieldstone Court
Cheshire, CT 06410

RE:    395 Express Lanes – William Potempa's Thumb Drives

Dear Ed,

As I mentioned in my email correspondence of October 5, 2020, last Friday, October 2, 2020, Mr. William Potempa, former Lane Project Engineer, gave me two thumb drives that he indicated contain files associated with the subject project. We have not accessed either of those thumb drives or copied any of their contents. Those thumb drives are enclosed for your use.

Thank you for your assistance with this matter.

Sincerely,

*Louis B. Antonacci*

Louis B. Antonacci, Managing Principal

Enclosures

cc:    Mr. Allen T. Wiggins (via electronic mail)
       Mr. Dennis Luzier (via electronic mail)
       Mr. Brian Basnight (via electronic mail)
       Mr. Tim Wren (via electronic mail)

ORIGIN ID:BZSA   (703) 300-4635
LOUIS ANTONACCI

3338 7TH ST NE

WASHINGTON, DC 20017
UNITED STATES US

SHIP DATE: 06OCT20
ACTWGT: 0.40 LB
CAD: 6996925/SSF02121

BILL CREDIT CARD

TO  **ED ARRUDA IT MANAGER**
**THE LANE CONTRRUCTION CORP**
**90 FIELDSTONE CT**

**CHESHIRE CT 06410**
(203) 446-7025              REF:
INV:
PO:                                    DEPT:



FedEx
Express

E

REL#
3785346

WED – 07 OCT 4:30P
TRK#
0201  **3975 6466 2250**   STANDARD OVERNIGHT

# EB HVNA

06410
CT-US   **BDL**





Louis Antonacci <lou@antonaccilaw.com>

---

## 395 Express Lanes - AECOM Document Preservation Notice

**11 messages**

---

**Wiggins, Allen T.** <atwiggins@laneconstruct.com>                    Thu, Feb 6, 2020 at 11:28 AM
To: "Dreyer, Jennifer L." <JLDreyer@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Potempa, William M." <WMPotempa@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>
Cc: "Firmender, Seth T." <STFirmender@laneconstruct.com>, Louis Antonacci <lou@antonaccilaw.com>

All,


Please find attached a Document Preservation Notice for the AECOM dispute.


Jennifer, please forward this memo to anyone else on the project team that may have documents relevant to the AECOM matter.


Thanks,


Allen





**Allen Wiggins**
Assistant General Counsel, Claims & Litigation
M 919-451-1308
ATWiggins@laneconstruct.com

The Lane Construction Corporation
621 Hutton Street
Raleigh, NC 27606

www.laneconstruct.com


Note: This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any miss-transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LANE INDUSTRIES and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Thank You.

---



**Lane-AECOM - Document Preservation Notice.pdf**
128K

---

**Wiggins, Allen T.** <atwiggins@laneconstruct.com>                                    Mon, Oct 5, 2020 at 3:40 PM
To: "Wren, Tim" <TWren@laneconstruct.com>
Cc: "Arruda, Ed S." <ESArruda@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>, Louis Antonacci <lou@antonaccilaw.com>

Hi Tim,


Can you confirm that the project files (Sharepoint, OneDrives, etc.) related to 395 are still on litigation hold? With this job winding down and employees leaving for other opportunities I just want to make sure we are preserving all of our documents as an extended dispute with AECOM may be likely.  Two key employees that have left us recently are Bill Potempa and Jennifer Dreyer (see highlights below).


If you have any questions, please let me know.


Thanks,


Allen





**Allen Wiggins** | Assistant General Counsel, Claims & Litigation
The Lane Construction Corporation

M 919-451-1308

---

**From:** Potempa, William M.
**Sent:** Monday, September 28, 2020 5:22 PM
**To:** Wiggins, Allen T. <atwiggins@laneconstruct.com>
**Cc:** Basnight, Brian A. <BABasnight@laneconstruct.com>
**Subject:** RE: 395 Express Lanes - AECOM Document Preservation Notice


Allen,


Is there anything we need to coordinate on with IT in regards to Jennifer's old electronic files she had on OneDrive?

Or anything I need to specifically do to back up my files?

Case 1:26-cv-00211-LLA Document 72-1 Filed 03/31/26 Page 506 of 546

My thought is IT might need to disable any auto deletion of emails or OneDrive files after a period time when employee leaves.

Note I do have some hard files including Jesse Edwards from 2017 when he was the design manager in my office in Chantilly.

I will add labels so the banker boxes are clearly distinguishable.

Bill

[Quoted text hidden]
[Quoted text hidden]

 **Lane-AECOM - Document Preservation Notice.pdf**
128K

---

**Wiggins, Allen T.** <atwiggins@laneconstruct.com>                          Mon, Oct 5, 2020 at 3:46 PM
To: "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>
Cc: Louis Antonacci <lou@antonaccilaw.com>

Brian,

As this project wraps up we need to make sure we have a plan to secure all the hard copy files in one place, including those referenced by Bill below. I know you have your hands full trying to close this project out, but when you get a chance let me know if there is a plan for securing these documents or if we need to put something in place. Also, let me know if who has Bill's and Jennifer's laptops.

Thanks,

Allen



**Allen Wiggins** | Assistant General Counsel, Claims & Litigation
The Lane Construction Corporation

M 919-451-1308

**From:** Potempa, William M.
**Sent:** Monday, September 28, 2020 5:22 PM
**To:** Wiggins, Allen T. <atwiggins@laneconstruct.com>
**Cc:** Basnight, Brian A. <BABasnight@laneconstruct.com>
**Subject:** RE: 395 Express Lanes - AECOM Document Preservation Notice

Allen,

Is there anything we need to coordinate on with IT in regards to Jennifer's old electronic files she had on OneDrive?

Or anything I need to specifically do to back up my files?

My thought is IT might need to disable any auto deletion of emails or OneDrive files after a period time when employee leaves.

<mark>Note I do have some hard files including Jesse Edwards from 2017 when he was the design manager in my office in Chantilly.</mark>

<mark>I will add labels so the banker boxes are clearly distinguishable.</mark>

Bill

---

**From:** Wiggins, Allen T. <atwiggins@laneconstruct.com>
**Sent:** Thursday, February 6, 2020 11:28 AM
**To:** Dreyer, Jennifer L. <JLDreyer@laneconstruct.com>; Basnight, Brian A. <BABasnight@laneconstruct.com>; Potempa, William M. <WMPotempa@laneconstruct.com>; Luzier, Dennis A. <DALuzier@laneconstruct.com>
**Cc:** Firmender, Seth T. <STFirmender@laneconstruct.com>; Louis Antonacci <lou@antonaccilaw.com>
**Subject:** 395 Express Lanes - AECOM Document Preservation Notice

All,

[Quoted text hidden]
[Quoted text hidden]

---

 **Lane-AECOM - Document Preservation Notice.pdf**
128K

---

**Louis Antonacci** <lou@antonaccilaw.com>      Mon, Oct 5, 2020 at 3:53 PM
To: "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Wren, Tim" <TWren@laneconstruct.com>, "Arruda, Ed S." <ESArruda@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>

All,

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 508 of 546

Bill gave me two thumb drives when I stopped by the Chantilly office last week. I haven't looked at them, but they are supposed to contain his files related to this project.

It probably makes sense for me to send those thumb drives to your corporate office in CT so that your IT department can ensure everything on them also exists in his custodian file.

Should I send them to the attention of Tim Wren at the 90 Fieldstone Court address?

Thanks,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Arruda, Ed S.** <ESArruda@laneconstruct.com>                           Mon, Oct 5, 2020 at 3:56 PM
To: Louis Antonacci <lou@antonaccilaw.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>
Cc: "Wren, Tim" <TWren@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>

Hi Allen, please send them to me Ed Arruda, the address is correct.

Thanks,



**Ed Arruda**
IT Manager
T 203-439-2917 Ext. 12917

M 203-446-7025
ESArruda@laneconstruct.com

The Lane Construction Corporation
90 Fieldstone Court
Cheshire, CT 06410

www.laneconstruct.com

[Quoted text hidden]

**Louis Antonacci** <lou@antonaccilaw.com>                                    Mon, Oct 5, 2020 at 4:05 PM
To: "Arruda, Ed S." <ESArruda@laneconstruct.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, "Basnight, Brian A."
<BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>

Thanks, Ed. I will send those thumb drives to your attention.

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Basnight, Brian A.** <BABasnight@laneconstruct.com>                         Mon, Oct 5, 2020 at 4:17 PM
To: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>
Cc: Louis Antonacci <lou@antonaccilaw.com>

Allen,

   I have these documents (labeled 6 boxes) secured in my engineers office at this point.  If we win more work and my team and I relocate to a field office, I will get with Cheryl to find a secure accessible location here at the Chantilly office unless you want them sent to the CT office?

Thanks,

 Brian

[Quoted text hidden]
[Quoted text hidden]

---

**Wiggins, Allen T.** <atwiggins@laneconstruct.com>                           Mon, Oct 5, 2020 at 4:46 PM
To: "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>
Cc: Louis Antonacci <lou@antonaccilaw.com>

Thanks Brian.  Hold on to them for now and let me see if we have a process for securing hard copy files like this.

[Quoted text hidden]
[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>                                    Tue, Oct 6, 2020 at 5:38 PM
To: "Arruda, Ed S." <ESArruda@laneconstruct.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>, "Basnight, Brian A."
<BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>

Ed,

Please see the attached letter sent out today. You should be receiving Bill's thumb drives tomorrow afternoon. Tracking info included in the pdf.

Let me know if you have any questions or concerns.

Thanks,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o) 202-291-2327
(m) 703-300-4635
(e) lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

 **AL PLLC Ltr. to E. Arruda trx W. Potempa thumb drives.pdf**
2249K

---

**Wiggins, Allen T.** <atwiggins@laneconstruct.com>      Wed, Dec 9, 2020 at 11:57 AM
To: "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>
Cc: Louis Antonacci <lou@antonaccilaw.com>

Brian,

I don't think I ever responded to you on this, but please hold onto these documents for now.

[Quoted text hidden]
[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>      Mon, Apr 19, 2021 at 3:40 PM
To: "Arruda, Ed S." <ESArruda@laneconstruct.com>, "Wren, Tim" <TWren@laneconstruct.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Basnight, Brian A." <BABasnight@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Le, Thanh" <Thanh.Le@epiqglobal.com>, "Griggs, Amy" <amy.griggs@epiqglobal.com>

Ed/Tim,

Can you please provide the data on Bill's thumb drives to Than Le of Epiq (copied) at your earliest convenience? Thank you.

Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGE**
**ATTORNEY WORK PRODUCT**

**MEMORANDUM**

TO:          **Jennifer Dreyer**
                  **Brian Basnight**
                  **William Potempa**
                  **Dennis Luzier**

CC:          **Seth Firmender**
                  **Louis Antonacci**

FROM:        **Allen Wiggins**

DATE:         **February 6, 2020**

SUBJECT:    **Directive Regarding Preservation of Documents and Electronic Data – *The Lane Construction Corporation / AECOM Technical Services, Inc. Dispute***


The Lane Construction Corporation and AECOM Technical Services, Inc. have initiated the dispute resolution process required by the Contract Documents to resolve claims arising out of or relating to the Parties' obligations under the Subcontract for Design dated March 16, 2017, on the 395 Express Lanes Project in Northern Virginia. If the Parties are unable to resolve their claims through the initial stages of the dispute resolution process, litigation in a court of competent jurisdiction in Fairfax County, VA may be necessary ("Litigation").

Electronic data contained in our computer systems and hard copy documents may be an important source of discovery and evidence in the Litigation. As such, we are required to take steps to ensure that all electronic data potentially relevant to this Litigation is preserved. Similarly, we are required to preserve potentially relevant hard copy documents, including drafts of such documents.

The purpose of this memorandum is to inform you of our legal obligations and request your assistance in preserving our electronic data and hard-copy documents as described in the following directive.

**DIRECTIVE REGARDING PRESERVATION
OF DOCUMENTS AND ELECTRONIC DATA**

Effective immediately, everyone receiving this directive must preserve and retain (or continue to preserve and retain), i.e., do not alter, delete or otherwise modify, any documents and electronic data that may relate to the Litigation.

This directive supersedes and suspends any existing records retention program and guidelines with respect to the materials described below, and any other automatic deletions or overwrites of data pertaining to the systems with which you are involved.

Relevant documents and data include, but are not limited to, e-mails, memoranda, correspondence (including text messages or iMessages), minutes and notes of all meetings, communications, and agreements, whether such information is in handwritten, typewritten, or electronic form.

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGE**
**ATTORNEY WORK PRODUCT**

Any questions you may have as to the relevance of a particular document, file, e-mail, or other electronic data compilation should be resolved in favor of preservation and retention.

Please retain both hard copies <u>and</u> electronic copies of any document and information that may relate to the foregoing. You need <u>not</u> print any electronic documents at this time.

**<u>Hard Copy Materials</u>**

In identifying and preserving potentially responsive hard-copy materials, please keep in mind that this directive is not limited to the "final version" of hard-copy documents. Instead, this directive covers potentially responsive drafts and includes all types of documents (letters, typed or handwritten notes, memoranda, reports, studies, printed spreadsheets, post-its, etc.). This directive also covers hard-copy materials that are kept in departmental or central files or in off-site storage. Regularly scheduled destruction of potentially relevant materials kept in such places must be suspended until you receive further notice.

**<u>Electronic Discovery Materials</u>**

In identifying and preserving electronic data, please keep in mind that "electronic data" includes, but is not limited to, all text files (including word processing documents and presentations), spread sheets, electronic mail, databases, calendars, computer system activity logs, internet usage files, and network access information. Our computer systems include, but are not limited to, all workstations, laptops, network servers, removable media, handheld devices, and backup tapes. You should also preserve any potentially relevant documents or data saved in your iPhone, iPad, smart phone, BlackBerry or other similar device or on your home computer. Again, any questions as to the scope of this directive should be resolved in favor of preservation and retention. Please keep all potentially relevant electronic materials in their current electronic form.

At individual workstations, this directive requires you to preserve and retain all potentially relevant files stored on your hard drive and all potentially relevant e-mails contained in your e-mailbox and archive folders. Any e-mail "janitorial" functions, such as automatic deletion of e-mail after a certain number of days, must be disabled.

At the network and systems administration level, this directive requires you to preserve and retain all potentially relevant files stored on servers and to refrain from doing any administrative work that has any potential to destroy potentially relevant files. Any "janitorial" functions must be disabled. All back up tapes must be preserved and pulled from recycling rotation.

At the appropriate time, we will notify you regarding collection of your files. We greatly appreciate your efforts in helping us meet our legal obligations. If you have any questions, please contact me.

# EXHIBIT G

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 515 of 546



Louis Antonacci <lou@antonaccilaw.com>

---

# 395 Express - AECOM v LANE - Fairfax Circuit Court CL2020 - 18128 - KPMG Audit/Irregularities

---

**Louis Antonacci** <lou@antonaccilaw.com>             Tue, Jul 20, 2021 at 4:14 PM
To: "Firmender, Seth T." <STFirmender@laneconstruct.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Luzier, Dennis A." <DALuzier@laneconstruct.com>, "Schiller, Mark A." <MASchiller@laneconstruct.com>, Louis Antonacci <lou@antonaccilaw.com>, Accouting Department <accounting@antonaccilaw.com>

Seth,

As General Counsel of Lane, I presume that you are charged with legal compliance and governance at the Company. If that is not the case, then please forward this to the appropriate party/ies.

There are some irregularities with respect to the subject matter that I want to ensure are brought to your attention. The first is the purported data collection efforts of Jen Dreyer last year. This seems to have resulted in some missing data. And there are some factual inconsistencies being asserted by your IT Department. I emailed you about this under separate cover, so please respond at your convenience.

The second relates to Lane's settlement with the Owner of the subject Project, 95 Express Lane LLC, in the summer of 2019. As I have previously discussed with Allen and the Lane Project Team, the draft settlement agreement with the Owner specifically identifies the claims purported to be resolved by the settlement, while the final settlement agreement executed by the parties more generally applies to all commercial claims between the parties. I addressed this issue in my legal analysis of Lane's backcharge for the purposes of mediation last summer. I've attached that analysis for your reference, as well both versions of the confidential settlement with the Owner.

In preparing my analysis, I asked that Lane provide its understanding of the Owner's treatment of AECOM's claims passed through by Lane. Lane maintains, via its email attached to this firm's memorandum, that the settlement amount was mostly for weather delays impacting Lane, and that the Owner deemed AECOM's design performance unsatisfactory in general, and it considered AECOM's claims largely untimely and otherwise meritless. This firm prepared its analysis with that understanding.

I should note that, in January of last year, I asked Transurban's assistant general counsel, per the request of AECOM's counsel, if we could disclose the executed settlement to AECOM. She declined to waive the confidentiality provision. I also reached out to her in December of last year to notify her that AECOM had filed suit and to ask about the Owner's official position on the settlement. She indicated that her former superior (she did not exactly say but it seemed that she may no longer be with Transurban/95 Express) would get back to me. I never heard back.

As you know, we hired Epiq to assist with document review and production earlier this year. Last month, while doing quality control review of documents tagged as responsive by the review team, I came across some emails from 2018 with Lane's former project manager, Mr. Jason Tracy, and related documents, that required further explanation. We brought Mr. Tracy on as a consultant and I sent him the documents I wanted to discuss and set up a call for June 30, 2021. Just before that call, he sent the documents back to me with a written explanation, which is attached for your review. As you will see, Mr. Tracy indicates that the Owner had represented to him that the Owner did not intend to hold Lane or AECOM responsible for Design Exceptions/Waivers that arose from defects in the preliminary design. This is contrary to the position taken by Lane in its official responses to AECOM's change order requests. It is unclear to this firm whether the Owner changed that position, but it would also be inconsistent with Lane's position(s) as to the Owner Settlement.

We should discuss how these alleged facts relate to Lane's positions in this case, as well as Lane's ability to properly assert its purported backcharge as a counterclaim and/or offset.

Lou

**Managing Principal**
**Antonacci Law PLLC**
(o) 202-291-2327
(m) 703-300-4635
(e) lou@antonaccilaw.com

Case 1:26-cv-00211-LLA   Document 72-1   Filed 03/31/26   Page 516 of 546

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

**3 attachments**

 **Lane Backcharge Legal Analysis.pdf**
1111K

 **395 Express Lanes Settlement Agreement (FINAL 6-25-19).pdf**
228K

**2021.06.30 JAT Review of DE-DW emails.pdf**
861K

# EXHIBIT H

Case 1:26-cv-00211-LLA    Document 721    Filed 03/31/26    Page 518 of 546



**Louis Antonacci <lou@antonaccilaw.com>**

---

## KPMG auditors' letter - Webuild/Lane Construction - Financial statements as at and for the year ended 31st December 2021

---

**Louis Antonacci** <lou@antonaccilaw.com>                    Mon, Jan 31, 2022 at 8:29 AM
To: enita@kpmg.it
Cc: Abbo Barbara <b.abbo@webuildgroup.com>

Dear Miss Elena Luiza Nita,

Per the request of Avv. Vinicio Fasciani, please see the attached.

Regards,
Louis B. Antonacci

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

 **Response to KPMG Milan Jan. 31 2022.pdf**
208K



**Louis Antonacci <lou@antonaccilaw.com>**

---

# KPMG auditors' letters- Financial statements as at and for the year ended 31st December 2021

16 messages

---

**Abbo Barbara** <b.abbo@webuildgroup.com>                      Thu, Jan 20, 2022 at 10:02 AM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>

Dear All,

I hope this email finds you well.

I am contacting you because our auditors of KPMG would need your reply to the attached letter (which your firm should have received by post) if possible by the end of January 2022.

Apologies for the short notice of this follow up, and thank you very much in advance for your kind understanding.

Best regards,



**Barbara Abbo**

**Legal International**

T +39 06 41766381
b.abbo@webuildgroup.com

Webuild S.p.A.

Sede Legale

Centro Direzionale Milanofiori

Strada 6 Palazzo L – 20089 Rozzano (MI)

Via della Dataria, 22 - 00187 Roma

Via Giulio Vincenzo Bona 65 - 00156 Roma

www.webuildgroup.com

    

Società soggetta ad attività di direzione e coordinamento da parte di Salini Costruttori S.p.A.

---

Le informazioni contenute in questo messaggio e negli eventuali allegati possono essere di natura riservata e confidenziale e sono indirizzate unicamente al destinatario. Qualora non ne siate il destinatario, vi è fatto divieto di utilizzare, copiare, divulgare o intraprendere qualsiasi azione basata su questo messaggio, sui suoi allegati o sulle informazioni in essi contenute. Se avete ricevuto questo messaggio per errore, Vi preghiamo di comunicare immediatamente al mittente l'accaduto e di cancellare il messaggio e i suoi eventuali allegati. Le dichiarazioni contenute nel presente messaggio nonché nei suoi eventuali allegati devono essere attribuite esclusivamente al mittente e non possono essere considerate come trasmesse o autorizzate da Webuild S.p.A.; le medesime dichiarazioni non impegnano Webuild S.p.A. nei confronti del destinatario o di terzi. Webuild S.p.A. non si assume alcuna responsabilità per eventuali intercettazioni, modifiche o danneggiamenti del presente messaggio. In ogni caso, Webuild S.p.A. si dissocia da qualsiasi affermazione o opinione contenute nei messaggi inviati dalla propria rete che non siano strettamente inerenti all'attività della stessa.

This message may contain information that is confidential and is being sent exclusively to the Recipient. If you are not the designated Recipient, you are prohibited from utilizing, copying or divulging the information contained in this message and in its attachments, if any, or taking any action whatsoever on the basis of the information herein. If you have received this message by mistake, we ask you to kindly inform the Sender and to delete the message and any attachment. The declarations and attachments to this message are attributable exclusively to the Sender and cannot be considered either as authorized or transmitted by Webuild S.p.A.; such declarations or attachments do not bind Webuild S.p.A. to the addressee or to third parties. Webuild S.p.A. assumes no responsibility for any interception, modification or damage to this message. It is understood that, with regard to the messages sent by its network, Webuild S.p.A. is not responsible for any statements made or opinions expressed that are not strictly related to Webuild S.p.A.'s operations.

📄 **Antonacci_Law.pdf**
505K

---

**Louis Antonacci** <lou@antonaccilaw.com>                               Thu, Jan 20, 2022 at 11:35 AM
To: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Firmender, Seth T." <STFirmender@laneconstruct.com>

I'm happy to do this, but I will bill for it. Please confirm that is acceptable. Thanks.
[Quoted text hidden]

---

**13 attachments**

 **image001.png**
13K

 **image002.png**
3K

Case 1:26-cv-00311-PLA Document 72-1 Filed 03/31/26 Page 521 of 546



**image003.png**
2K



**image004.png**
2K



**image005.png**
3K



**image006.png**
8K



**image001.png**
13K

 **image002.png**
3K



**image005.png**
3K



**image006.png**
8K

 **image004.png**
2K

 **image003.png**
2K

 **Antonacci_Law.pdf**
505K

---

**Firmender, Seth T.** <STFirmender@laneconstruct.com>                    Fri, Jan 21, 2022 at 8:10 AM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>

Lou – please hold for now and we will revert ASAP – thanks.

Case 1:26-cv-00311-LLA Document 72-1 Filed 03/31/26 Page 522 of 546



**Seth T. Firmender** |  General Counsel
The Lane Construction Corporation

T 203-439-2182   M 203-232-7641

[Quoted text hidden]

Note: This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any miss-transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LANE INDUSTRIES and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Thank You.

---

**Louis Antonacci** <lou@antonaccilaw.com>                                      Fri, Jan 21, 2022 at 10:44 AM
To: "Firmender, Seth T." <STFirmender@laneconstruct.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, b.abbo@webuildgroup.com

Seth:

Your auditors requested this by the end of January. I will comply with their request. I just do not want any unnecessary drama over the bill.

Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Abbo Barbara** <b.abbo@webuildgroup.com>                                      Fri, Jan 21, 2022 at 10:48 AM
To: Louis Antonacci <lou@antonaccilaw.com>

Dear Mr. Antonacci,

Case 1:26-cv-00311-LLA    Document 72-1    Filed 03/31/26    Page 523 of 546

Thank you for your prompt reply and cooperation.

Kind regards,


Barbara Abbo

[Quoted text hidden]
[Quoted text hidden]

> [Quoted text hidden]
> [Quoted text hidden]
> [Quoted text hidden]

**Barbara Abbo**

**Legal International**




T +39 06 41766381
b.abbo@webuildgroup.com

Webuild S.p.A.

Sede Legale

Centro Direzionale Milanofiori

Strada 6 Palazzo L – 20089 Rozzano (MI)


Via della Dataria, 22 - 00187 Roma

Via Giulio Vincenzo Bona 65 - 00156 Roma



www.webuildgroup.com



Società soggetta ad attività di direzione e coordinamento da parte di Salini Costruttori S.p.A.

---

Le informazioni contenute in questo messaggio e negli eventuali allegati possono essere di natura riservata e confidenziale e sono indirizzate unicamente al destinatario. Qualora non ne siate il destinatario, vi è fatto divieto di utilizzare, copiare, divulgare o intraprendere qualsiasi azione basata su questo messaggio, sui suoi allegati o sulle informazioni in essi contenute. Se avete ricevuto questo messaggio per errore, Vi preghiamo di comunicare immediatamente al mittente l'accaduto e di cancellare il messaggio e i suoi eventuali allegati. Le dichiarazioni contenute nel presente messaggio nonché nei suoi eventuali allegati devono essere attribuite esclusivamente al mittente e non possono essere considerate come trasmesse o autorizzate da Webuild S.p.A.; le medesime dichiarazioni non impegnano Webuild S.p.A. nei confronti del destinatario o di terzi. Webuild S.p.A. non si assume alcuna responsabilità per eventuali intercettazioni, modifiche o danneggiamenti del presente messaggio. In ogni caso, Webuild S.p.A. si dissocia da qualsiasi affermazione o opinione contenute nei messaggi inviati dalla propria rete che non siano strettamente inerenti all'attività della stessa.

This message may contain information that is confidential and is being sent exclusively to the Recipient. If you are not the designated

Case 1:26-cv-00311-LLA Document 72-1 Filed 03/31/26 Page 524 of 546

Recipient, you are prohibited from utilizing, copying or divulging the information contained in this message and in its attachments, if any, or taking any action whatsoever on the basis of the information herein. If you have received this message by mistake, we ask you to kindly inform the Sender and to delete the message and any attachment. The declarations and attachments to this message are attributable exclusively to the Sender and cannot be considered either as authorized or transmitted by Webuild S.p.A.; such declarations or attachments do not bind Webuild S.p.A. to the addressee or to third parties. Webuild S.p.A. assumes no responsibility for any interception, modification or damage to this message. It is understood that, with regard to the messages sent by its network, Webuild S.p.A. is not responsible for any statements made or opinions expressed that are not strictly related to Webuild S.p.A.'s operations.

Note: This message is for the named person's use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any miss-transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies of it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient. LANE INDUSTRIES and any of its subsidiaries each reserve the right to monitor all e-mail communications through its networks. Any views expressed in this message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of any such entity. Thank You.

[Quoted text hidden]

---

**Firmender, Seth T.** <STFirmender@laneconstruct.com>                    Fri, Jan 21, 2022 at 12:18 PM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "b.abbo@webuildgroup.com" <b.abbo@webuildgroup.com>

Please do not respond Lou as we are working this out with Webuild and will be in touch Monday. Thank you very much.



**Seth T. Firmender** | General Counsel
The Lane Construction Corporation

T 203-439-2182    M 203-232-7641

---

**From:** Louis Antonacci <lou@antonaccilaw.com>
**Sent:** Friday, January 21, 2022 10:45 AM
**To:** Firmender, Seth T. <STFirmender@laneconstruct.com>
**Cc:** Wiggins, Allen T. <atwiggins@laneconstruct.com>; b.abbo@webuildgroup.com
**Subject:** Re: KPMG auditors' letters- Financial statements as at and for the year ended 31st December 2021

Seth:

Your auditors requested this by the end of January. I will comply with their request. I just do not want any unnecessary drama over the bill.

Lou

Case 1:26-cv-00311-HLA    Document 72-1    Filed 03/31/26    Page 525 of 546

**Managing Principal**

**Antonacci Law PLLC**

(o)  202-291-2327

(m) 703-300-4635

(e)  lou@antonaccilaw.com


**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

On Fri, Jan 21, 2022 at 8:10 AM Firmender, Seth T. <STFirmender@laneconstruct.com> wrote:

Lou – please hold for now and we will revert ASAP – thanks.



**Seth T. Firmender** |  General Counsel
The Lane Construction Corporation

T 203-439-2182   M 203-232-7641

**From:** Louis Antonacci <lou@antonaccilaw.com>
**Sent:** Thursday, January 20, 2022 11:35 AM
**To:** Wiggins, Allen T. <atwiggins@laneconstruct.com>; Firmender, Seth T. <STFirmender@laneconstruct.com>
**Subject:** Fwd: KPMG auditors' letters- Financial statements as at and for the year ended 31st December 2021

I'm happy to do this, but I will bill for it. Please confirm that is acceptable. Thanks.

---------- Forwarded message ---------
From: **Abbo Barbara** <b.abbo@webuildgroup.com>

Date: Thu, Jan 20, 2022, 10:02
Subject: KPMG auditors' letters- Financial statements as at and for the year ended 31st December 2021
To: lou@antonaccilaw.com <lou@antonaccilaw.com>

Dear All,

I hope this email finds you well.

I am contacting you because our auditors of KPMG would need your reply to the attached letter (which your firm should have received by post) if possible by the end of January 2022.

Apologies for the short notice of this follow up, and thank you very much in advance for your kind understanding.

Best regards,

**Error! Filename not specified.**

**Barbara Abbo**

**Legal International**

T +39 06 41766381
b.abbo@webuildgroup.com

Webuild S.p.A.

Sede Legale

Centro Direzionale Milanofiori

Strada 6 Palazzo L – 20089 Rozzano (MI)

Via della Dataria, 22 - 00187 Roma

Via Giulio Vincenzo Bona 65 - 00156 Roma

www.webuildgroup.com

**Error! Filename not specified.    Error! Filename not specified.    Error! Filename not specified.    Error! Filename not specified.    Error! Filename not specified.**

Case 1:26-cv-00311-LLA    Document 72-1    Filed 03/31/26    Page 527 of 546

Società soggetta ad attività di direzione e coordinamento da parte di Salini Costruttori S.p.A.

---

Le informazioni contenute in questo messaggio e negli eventuali allegati possono essere di natura riservata e confidenziale e sono indirizzate unicamente al destinatario. Qualora non ne siate il destinatario, vi è fatto divieto di utilizzare, copiare, divulgare o intraprendere qualsiasi azione basata su questo messaggio, sui suoi allegati o sulle informazioni in essi contenute. Se avete ricevuto questo messaggio per errore, Vi preghiamo di comunicare immediatamente al mittente l'accaduto e di cancellare il messaggio e i suoi eventuali allegati. Le dichiarazioni contenute nel presente messaggio nonché nei suoi eventuali allegati devono essere attribuite esclusivamente al mittente e non possono essere considerate come trasmesse o autorizzate da Webuild S.p.A.; le medesime dichiarazioni non impegnano Webuild S.p.A. nei confronti del destinatario o di terzi. Webuild S.p.A. non si assume alcuna responsabilità per eventuali intercettazioni, modifiche o danneggiamenti del presente messaggio. In ogni caso, Webuild S.p.A. si dissocia da qualsiasi affermazione o opinione contenute nei messaggi inviati dalla propria rete che non siano strettamente inerenti all'attività della stessa.

This message may contain information that is confidential and is being sent exclusively to the Recipient. If you are not the designated Recipient, you are prohibited from utilizing, copying or divulging the information contained in this message and in its attachments, if any, or taking any action whatsoever on the basis of the information herein. If you have received this message by mistake, we ask you to kindly inform the Sender and to delete the message and any attachment. The declarations and attachments to this message are attributable exclusively to the Sender and cannot be considered either as authorized or transmitted by Webuild S.p.A.; such declarations or attachments do not bind Webuild S.p.A. to the addressee or to third parties. Webuild S.p.A. assumes no responsibility for any interception, modification or damage to this message. It is understood that, with regard to the messages sent by its network, Webuild S.p.A. is not responsible for any statements made or opinions expressed that are not strictly related to Webuild S.p.A.'s operations.

[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>           Fri, Jan 21, 2022 at 1:42 PM
To: "Firmender, Seth T." <STFirmender@laneconstruct.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "b.abbo@webuildgroup.com" <b.abbo@webuildgroup.com>

I will wait to hear from you on Monday, Seth. For your reference, here is a copy of this firm's last audit response letter to KPMG.

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

📄 **AL PLLC Response to KPMG Audit July 2021 - Lane Construction FINAL.pdf**
205K

---

**Firmender, Seth T.** <STFirmender@laneconstruct.com>        Fri, Jan 21, 2022 at 2:50 PM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "b.abbo@webuildgroup.com" <b.abbo@webuildgroup.com>

10-4 – thanks Lou.



**Seth T. Firmender** | General Counsel
The Lane Construction Corporation

T 203-439-2182   M 203-232-7641

---

**From:** Louis Antonacci <lou@antonaccilaw.com>
**Sent:** Friday, January 21, 2022 1:42 PM
**To:** Firmender, Seth T. <STFirmender@laneconstruct.com>
**Cc:** Wiggins, Allen T. <atwiggins@laneconstruct.com>; b.abbo@webuildgroup.com
**Subject:** Re: KPMG auditors' letters- Financial statements as at and for the year ended 31st December 2021

I will wait to hear from you on Monday, Seth. For your reference, here is a copy of this firm's last audit response letter to KPMG.

**Managing Principal**

**Antonacci Law PLLC**

(o) 202-291-2327

(m) 703-300-4635

(e) lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

🖼️ Image removed by sender.

[Quoted text hidden]

[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>        Fri, Jan 28, 2022 at 11:55 AM

1/16/24, 1:27 AM · Antonacci Law-PLLA Mail - Documents' letters- Financial Statements, a... and for the year ended 31 of December 2021

Case 1:26-cv-00311-PLA Document 72-1 Filed 03/31/26 Page 529 of 546

To: "b.abbo@webuildgroup.com" <b.abbo@webuildgroup.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "Firmender, Seth T." <STFirmender@laneconstruct.com>

Ms. Abbo,

To clarify, this firm has represented Lane Construction, which is a subsidiary of Lane Industries, but we have not represented Lane Industries itself. We are putting together our response, but I want to ensure that KPMG wants responses for the subsidiaries of the companies listed in Annex A to Avvo. Fasciani's letter. It is not entirely clear. Please advise.

Grazie mille,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o) 202-291-2327
(m) 703-300-4635
(e) lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Firmender, Seth T.** <STFirmender@laneconstruct.com>                    Fri, Jan 28, 2022 at 11:57 AM
To: "lou@antonaccilaw.com" <lou@antonaccilaw.com>, "b.abbo@webuildgroup.com" <b.abbo@webuildgroup.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "bcalafiore@kpmg.com" <bcalafiore@kpmg.com>

I just spoke to Bri from KPMG who is copied here and Lane will not need a letter from Lou as the matters he worked on a settled.  Happy to discuss further



**Seth T. Firmender** |  General Counsel
The Lane Construction Corporation

T 203-439-2182   M 203-232-7641

---

**From:** Louis Antonacci <lou@antonaccilaw.com>
**Sent:** Friday, January 28, 2022 11:55 AM
**To:** b.abbo@webuildgroup.com

Case 1:26-cv-00211-MLA    Document 72-1    Filed 03/31/26    Page 530 of 546

**Cc:** Wiggins, Allen T. <atwiggins@laneconstruct.com>; Firmender, Seth T. <STFirmender@laneconstruct.com>
**Subject:** Re: KPMG auditors' letters- Financial statements as at and for the year ended 31st December 2021

Ms. Abbo,

To clarify, this firm has represented Lane Construction, which is a subsidiary of Lane Industries, but we have not represented Lane Industries itself. We are putting together our response, but I want to ensure that KPMG wants responses for the subsidiaries of the companies listed in Annex A to Avvo. Fasciani's letter. It is not entirely clear. Please advise.

Grazie mille,

Lou

**Managing Principal**

**Antonacci Law PLLC**

(o)  202-291-2327

(m) 703-300-4635

(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com

Image removed by sender.

[Quoted text hidden]

[Quoted text hidden]

---

**Abbo Barbara** <b.abbo@webuildgroup.com>         Fri, Jan 28, 2022 at 12:08 PM
To: "Firmender, Seth T." <stfirmender@laneconstruct.com>, "lou@antonaccilaw.com" <lou@antonaccilaw.com>
Cc: "Wiggins, Allen T." <atwiggins@laneconstruct.com>, "bcalafiore@kpmg.com" <bcalafiore@kpmg.com>

Thank you for the clarification. I forwarded your message to Maria Irene.

Best regards,

Barbara

[Quoted text hidden]
[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>         Fri, Jan 28, 2022 at 12:28 PM
To: Abbo Barbara <b.abbo@webuildgroup.com>
Cc: "Firmender, Seth T." <stfirmender@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>,
"bcalafiore@kpmg.com" <bcalafiore@kpmg.com>

Case 1:26-cv-00311-PLA   Document 72-1   Filed 03/31/26   Page 531 of 546

I believe that the information I was provided in connection with those engagements is nonetheless relevant to the auditor's request, but I will only respond if requested.

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>                                         Sat, Jan 29, 2022 at 10:46 AM
To: Abbo Barbara <b.abbo@webuildgroup.com>
Cc: "Firmender, Seth T." <stfirmender@laneconstruct.com>, "Wiggins, Allen T." <atwiggins@laneconstruct.com>,
"bcalafiore@kpmg.com" <bcalafiore@kpmg.com>

Ciao Barbara:

Is there any update here? I will respond to Avv. Fasciani's request on Monday unless I hear otherwise from your office.

Thanks,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Abbo Barbara** <b.abbo@webuildgroup.com>                                       Sat, Jan 29, 2022 at 11:01 AM
To: Louis Antonacci <lou@antonaccilaw.com>

Case 1:26-cv-00311-JLA Document 72-1 Filed 03/31/26 Page 532 of 546

Hi Louis,

I will discuss the matter with Maria Irene and we will try to answer your question by Monday.

Regards,


Barbara

[Quoted text hidden]
[Quoted text hidden]

---

**Louis Antonacci** <lou@antonaccilaw.com>        Fri, Feb 25, 2022 at 2:09 PM
To: Abbo Barbara <b.abbo@webuildgroup.com>

Barbara,

For your information, this week we received Webuild's December 12, 2021 letter by post.

Regards,
Lou

**Managing Principal**
**Antonacci Law PLLC**
(o)  202-291-2327
(m) 703-300-4635
(e)  lou@antonaccilaw.com

**Visit us on the web:** www.antonaccilaw.com



NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

---

**Abbo Barbara** <b.abbo@webuildgroup.com>        Mon, Feb 28, 2022 at 2:19 AM
To: Louis Antonacci <lou@antonaccilaw.com>

Hi Lou,


thank you for notifying me.

[Quoted text hidden]
[Quoted text hidden]

# EXHIBIT I

 Gmail

**Lou Antonacci <louantonacci@gmail.com>**

# A████ absent Monday 1/31

**Lou Antonacci** <louantonacci@gmail.com>                    Mon, Jan 31, 2022 at 5:20 AM
To: odaly@lambpcs.org
Cc: Livya Heithaus <livya.heithaus@gmail.com>

She's fine we had a late night at hospital with Livya, who passed a kidney stone but is also fine now. :)

# EXHIBIT J



# ANTONACCI LAW PLLC

Washington, DC
202.291.2327
www.antonaccilaw.com

January 31, 2022

**VIA ELECTRONIC MAIL**

KPMG S.p.A.
Via Vittor Pisani 25
20214 Milano
enita@kpmg.it

ATTN: Miss Elena Luiza Nita

RE:    The Lane Construction Corporation

Ladies and Gentlemen,

By letter dated December 20, 2021, Avv. Vinicio Fasciani, General Counsel of Webuild S.P.A. ("Webuild"), has asked this Firm to furnish you with certain information in connection with your examination of the combined and consolidated financial statements of Lane Industries Incorporated or any of its subsidiaries, such as the Lane Construction Corporation (the "Company" or "Lane"), at December 31, 2021 and for the year then ended and for the period from that date to the date of this letter.

We call your attention to the fact that, since our engagement by the Company on November 4, 2019, the Company is the only subsidiary of Lane Industries Incorporated that this Firm has represented, and our engagement has been limited to specific matters as to which we were consulted by the Company.

We have assumed that Webuild, in making the request set forth in its letter, did not intend to waive the attorney-client privilege with respect to any information which the Company had furnished to us. Moreover, our response to you should not be construed in any way to constitute a waiver of the protection of the attorney work product doctrine with respect to any of our files involving the Company.

Subject to the foregoing and to the last paragraph of this letter, we advise you that as of June 30, 2021, and up to the date hereof, we have not been engaged to give substantive attention to, or represent the Company in connection with, loss contingencies coming within the scope of clause (a) of Paragraph 5 of the ABA Statement of Policy Regarding Lawyers' Responses to

**www.antonaccilaw.com**

KPMG S.p.A.
January 31, 2022
Page 2 of 5

Auditors' Requests for Information (December 1975) (the "ABA Statement of Policy"), except as follows:

On November 4, 2019, this Firm was engaged to represent the Company with respect to two (2) contract disputes, with two (2) of its subcontractors, arising out of the Company's Prime Contract (the "Prime Contract") with 95 Express Lanes, LLC (the "Owner") for the I-395 Express Lane Design-Build Construction Project, which involved an 8-mile extension and widening of the I-395 express lanes from Fairfax County through Alexandria and Arlington, Virginia to the Washington, D.C. line (the "Project"). The Prime Contract allows the Owner to assess $17,500 for each day that Final Completion Date extends beyond the Scheduled Final Completion Date. Those disputes are addressed separately below:

1.    **395 Express Lanes Construction Project – Contract Dispute with Rampart Hydro Services, LP ("Rampart").**  On or about April 19, 2018, the Company issued a subcontract to Rampart to perform certain hydrodemolition work on the Project. On June 21, 2019, Rampart submitted a claim for additional costs related to its work on the Project. The Company subsequently sent a response to Rampart rejecting its claims. On January 14, 2020, Rampart filed its Demand for Arbitration, Case Number 02-20-0000-1313 (the "Arbitration") against the Company with the American Arbitration Association ("AAA"). Rampart ultimately demanded $905,000 in additional costs in the Arbitration. The Company denied liability to Rampart and submitted a counterclaim in the amount of $50,000. On June 10, 2020, the parties executed a settlement agreement whereby the Company agreed to pay Rampart $153,000 in exchange for a mutual release of claims. Per mutual agreement of the parties, the AAA closed the matter on July 17, 2020.

2.    **395 Express Lanes Construction Project – Contract Dispute with AECOM Technical Services, Inc. ("AECOM").** As indicated above, the Company agreed to a design-build prime contract with the Owner on the Project (the "Prime Contract"). On March 16, 2017, the Company awarded a lump-sum design subcontract (the "Subcontract") to AECOM for $19,139,427, with engineering services during construction carved out on a time-and materials basis with a budget of $2,204,907. The Company and AECOM disagree as to the scope of AECOM's responsibilities and the allocation of design risk under the Subcontract. AECOM has thus submitted numerous claims for time and money under the Subcontract. As of June 24, 2020, AECOM's final confidential claim amount was $19,323,861.38. Approximately $3.1MM of that claim amount is undisputed monies owed for completed work, which the Company has been withholding, pursuant to the Subcontract, for damages the Company has incurred as a result of AECOM's breaches of the Subcontract. To that end, the Company has asserted, through confidential settlement and mediation communications, a backcharge ("Lane's Backcharge") against AECOM, in the amount of $20,480,552, comprising delay, impact, acceleration and direct damages resulting from AECOM's failure to perform its design work in accordance with the terms of the Subcontract. The Company settled all of its commercial disputes with the Owner pursuant to the settlement agreement effective July 30, 2019 (the "Owner Settlement"). At the request of the Company, this Firm provided its legal analysis of Lane's Backcharge, and its relation to the Owner Settlement, to the Company in this Firm's memorandum dated June 3,

KPMG S.p.A.
January 31, 2022
Page 3 of 5

2020. As mandated by the Subcontract, the Company and AECOM engaged in confidential mediation in an attempt to resolve this Subcontract dispute on mutually agreeable terms. During May of 2020, the Company and AECOM exchanged confidential mediation statements and rebuttals thereto, and, on June 25 and 26, 2020, the parties engaged in mediation at the Washington, DC offices of Troutman Sanders LLP (now Troutman Pepper LLP), who is representing AECOM in this matter. The parties did not resolve the dispute during the mediation. Article 11 of the Subcontract establishes venue for resolution of contract disputes to a court of competent jurisdiction in Fairfax County, Virginia. Article 17.f of the Subcontract provides that the prevailing party in a dispute shall be entitled to recover its reasonable attorneys' fees and costs. On November 17, 2020, AECOM filed, in the Circuit Court of Fairfax County, Virginia, a four-count complaint (the "Complaint") seeking $19,936,705.35 in damages from Lane for breach of contract, plus pre and post-judgment interest, as well as its attorneys' fees and costs. This firm will not further characterize AECOM's allegations, which can be found in the Complaint itself: *AECOM Technical Services, Inc. v. The Lane Construction Corporation*, civil action no. 2020-18128. The Complaint was served on December 8, 2020. On December 29, 2020, this Firm filed four (4) pre-answer motions on behalf of Lane. On February 12, 2021, the first of those motions was to be heard by Chief Judge Bruce White, who instead removed the motion from the hearing docket and assigned the entire case to Judge Thomas Mann. Judge Mann has denied three of Lane's pre-answer motions. On April 20, 2021, AECOM made a claim on Lane's payment bonds (Payment Bond Nos.: 012026097 (Liberty Mutual); 47-SU-300016-01-0003 (Berkshire Hathaway); and 346-107 (National Union)) (collectively hereinafter the "Bonds" and the "Sureties," respectively).

On May 13, 2021, this Firm filed Lane's Answer to Counts II, III, and IV of the Complaint, where it denied liability and sought Lane's attorneys' fees and costs in defending the action. The Company further asserted several affirmative defenses in support of its Answer, including the defense of offset. This Firm and the Company retained Deloitte LLP to analyze and audit the Company's Backcharge, which would form the basis of its Counterclaim(s) and/or offset. Deloitte's audit, which did not include analysis of legal entitlement, concluded that approximately $12MM of Lane's alleged damages are reasonable, allowable, and properly allocable. The Company, on the Firm's recommendation, retained Epiq Legal Services to assist with the collection and review of its documents for discovery in this matter. Via emails dated June 2, 3, and 16, 2021, this Firm sought clarification as to the Company's data preservation and collection efforts in this matter. The Firm followed up on July 16, 2021, in advance of its response to another audit letter. The relevant facts were never clarified to this Firm's satisfaction.

On July 12, 2021, this Firm withdrew Lane's fourth pre-answer motion (plea in bar) as to Count I. On July 20, 2021, this Firm provided an update of facts relevant to Lane's Backcharge, the Owner Settlement, and this Firm's aforementioned memorandum dated June 3, 2020. This office confirms that all information brought to its attention indicating the occurrence of a possible non-compliance with laws and regulations, including illegal acts comitted by the Company, or any of its agents or employees, has been reported to those charged with governance at the Company.

KPMG S.p.A.
January 31, 2022
Page 4 of 5

At the request of this Firm, Lane sought new counsel in this matter. AECOM sought its costs in preparing for the plea in bar hearing as to Count I of the Complaint, from both the Company and this Firm, by motion ultimately scheduled to be heard on August 27, 2021. Lane settled that matter, with this Firm's consent, in advance of the hearing.

On August 2, 2021, AECOM filed an Amended Complaint, whereby it added its Bond claims against the Sureties. On August 3, 2021, Shapiro, Lifschitz & Schram, P.C. (the "SLS Firm") entered an appearance on behalf of the Company. On August 25, 2021, the SLS Firm filed Answers to AECOM's Amended Complaint, on behalf of the Company and the Sureties, and further filed a Counterclaim against AECOM, seeking damages in the amount of $12,000,000, plus attorneys' fees, interest, and costs.

This Firm withdrew as counsel of record for Lane via this Firm's motion heard October 1, 2022. Lane has represented that it settled the matter with AECOM around the same time.

The information set forth herein is as of the date of this letter, except as otherwise noted, and we disclaim any undertaking to advise you of changes which thereafter may be brought to our attention.

This response is limited by, and in accordance with, the ABA Statement of Policy. Without limiting the generality of the foregoing, the limitations set forth in the ABA Statement of Policy on the scope and use of this response (Paragraphs 2 and 7) are specifically incorporated herein by reference, and any description herein of any loss contingencies or contingent liabilities is qualified in its entirety by Paragraph 5 of the ABA Statement of Policy and the accompanying Commentary (which is an integral part of the ABA Statement of Policy). Consistent with the last sentence of Paragraph 6 of the ABA Statement of Policy and pursuant to Webuild's request, this will confirm as correct the Company's understanding as set forth in its audit inquiry letter to us that whenever, in the course of performing legal services for the Company with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, we have formed a professional conclusion that the Company must disclose or consider disclosure concerning such possible claim or assessment, we, as a matter of professional responsibility to the Company, will so advise the Company and will consult with the Company concerning such disclosure and the legal requirement that financial statement reporting should be in conformity with generally accepted accounting principles. Our failure to comment on any "contingent liabilities" described in Webuild's letter should not be interpreted as indicating that we either agree or disagree therewith. In our opinion, any request for information concerning unasserted claims, contingent liabilities, loss contingencies, or assessments which are not specifically identified by the Company is outside the scope of Paragraph 5 of the ABA Statement of Policy. Moreover, the Company has not been forthcoming with credible facts responsive to some of this Firm's inquiries relevant to the second matter set forth above. Similarly, personnel changes at all levels of the Company have made resolution of some facts material to the second matter described above either impracticable or impossible for this Firm.

Very truly yours,

KPMG S.p.A.
January 31, 2022
Page 5 of 5

# ANTONACCI LAW PLLC

cc:      Avv. Barbara Abbo (Webuild S.p.A.)

# EXHIBIT K



# ANTONACCI LAW PLLC

501 Holland Ln, Unit 501
Alexandria, VA 22314
703.300.4635 • lou@antonaccilaw.com

February 8, 2024

Ms. Bates McIntyre Larson
General Counsel
Perkins Coie LLP
131 S. Dearborn Street
Chicago, IL 60631

**RE:**   *Antonacci v. Emanuel et. al.* **– Litigation Hold Notice**

Dear Bates,

Perkins Coie LLP has been named by Louis B. Antonacci ("Plaintiff") as a defendant in the following litigation (the "Litigation") claiming damages incurred by Plaintiff arising from widespread fraud and racketeering related to Plaintiff, his case against Seyfarth Shaw and Anita Ponder in Cook County Circuit Court, filed in 2012, Plaintiff's subsequent federal action in the Northern District of Illinois, and subsequent acts by Perkins Coie against the Plaintiff, including, but not limited to, Perkins Coie's retention/use of BEAN LLC d/b/a Fusion GPS, FTI Consulting LLC, Rokk Solutions LLC, Storij, Inc., Derran Eaddy, and others:

- *Louis B. Antonacci v Rahm Israel Emanuel et. al.,* - E.D.Va. No 1:2024cv00172

Electronic data contained in your computer systems and hard copy documents are an important source of discovery and evidence in the Litigation. As such, you are required to take steps to ensure that all electronic data potentially relevant to this Litigation are preserved. Similarly, you are required to preserve potentially relevant hard copy documents, including drafts of such documents.

The purpose of this letter is to inform you of your legal obligations to preserve your electronic data and hard-copy documents as described in the following directive.

**In particular, Plaintiff is aware that, since he opened his case in the Eastern District of Virginia, your partner, and former General Counsel of Perkins Coie, Mr. Matthew J. Gehringer, has left Perkins Coie. As you are aware, Mr. Genhringer was lead counsel in Antonacci's case against Seyfarth and Ponder, and a defendant in Antonacci's**

**www.antonaccilaw.com**

Ms. Bates I. Larson
Perkins Coie LLP
February 8, 2024
Page 2 of 3

**federal action in the NDIL.** Please ensure that all of Geheringer's files related to Antonacci are preserved in accordance with the following directive.

## DIRECTIVE REGARDING PRESERVATION OF DOCUMENTS AND ELECTRONIC DATA

Effective immediately, you must preserve and retain (or continue to preserve and retain), i.e., do not alter, delete or otherwise modify, any documents and electronic data that may relate to the Litigation.

This directive supersedes and suspends any existing records retention program and guidelines with respect to the materials described below, and any other automatic deletions or overwrites of data pertaining to the systems with which you are involved.

Relevant documents and data include, but are not limited to, e-mails, memoranda, correspondence (including text messages or iMessages), minutes and notes of all meetings, communications, and agreements, whether such information is in handwritten, typewritten, or electronic form.

Any question you may have as to the relevance of a particular document, file, e-mail, or other electronic data compilation should be resolved in favor of preservation and retention.

Please retain both hard copies <u>and</u> electronic copies of any document and information that may relate to the foregoing. You need <u>not</u> print any electronic documents at this time.

### Hard Copy Materials

In identifying and preserving potentially responsive hard-copy materials, please keep in mind that this directive is not limited to the "final version" of hard-copy documents. Instead, this directive covers potentially responsive drafts and includes all types of documents (letters, typed or handwritten notes, memoranda, reports, studies, printed spreadsheets, post-its, etc.). This directive also covers hard-copy materials that are kept in departmental or central files or in off-site storage. Regularly scheduled destruction of potentially relevant materials kept in such places must be suspended until you receive further notice.

### Electronic Discovery Materials

In identifying and preserving electronic data, please keep in mind that "electronic data" includes, but is not limited to, all text files (including word processing documents and presentations), spread sheets, electronic mail, databases, calendars, computer system activity logs, internet usage files, and network access information. Your computer systems include, but are not limited to, all workstations, laptops, network servers, removable media, handheld devices, and backup tapes. You should also preserve any potentially relevant documents or data saved in your iPhone, iPad, smart phone, BlackBerry or other similar

Ms. Bates I. Larson
Perkins Coie LLP
February 8, 2024
Page 3 of 3

device or on your home computer. Again, any questions as to the scope of this directive should be resolved in favor of preservation and retention. Please keep all potentially relevant electronic materials in their current electronic form.

At individual workstations, this directive requires you to preserve and retain all potentially relevant files stored on your hard drive and all potentially relevant e-mails contained in your e-mailbox and archive folders. Any e-mail "janitorial" functions, such as automatic deletion of e-mail after a certain number of days, must be disabled.

At the network and systems administration level, this directive requires you to preserve and retain all potentially relevant files stored on servers and to refrain from doing any administrative work that has any potential to destroy potentially relevant files. Any "janitorial" functions must be disabled. All back up tapes must be preserved and pulled from recycling rotation.

Very truly yours,

**ANTONACCI PLLC**

*Louis B. Antonacci*

By: Louis B. Antonacci, Managing Principal



Louis Antonacci <lou@antonaccilaw.com>

---

## Litigation Hold Notice
2 messages

---

**Louis Antonacci** <lou@antonaccilaw.com>                    Thu, Feb 8, 2024 at 4:16 PM
To: blarson@perkinscoie.com

Bates,

Congratulations on your elevation to General Counsel. Attached please find a litigation hold notice.

Thanks,
Lou

**Managing Principal**
**Antonacci PLLC**
703-300-4635
lou@antonaccilaw.com



**Visit us on the web:** www.antonaccilaw.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

 **Antonacci v Emanuel et al - Litigation Hold Letter.pdf**
192K

---

**Louis Antonacci** <lou@antonaccilaw.com>                    Tue, Feb 13, 2024 at 10:56 AM
To: blarson@perkinscoie.com
Cc: llombardo@perkinscoie.com

Hi Bates,

Can you please confirm that you received the litigation hold notice I sent last Thursday, Feb. 8? I'm attaching it here again. Thank you.

Lou

**Managing Principal**
**Antonacci PLLC**
703-300-4635
lou@antonaccilaw.com



**Visit us on the web:** www.antonaccilaw.com

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

[Quoted text hidden]

**Antonacci v Emanuel et al - Litigation Hold Letter.pdf**
192K